**Case 25-17998 & 25-18000
EXHIBIT R-01**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

KPM ANALYTICS NORTH AMERICA
CORPORATION,

     Plaintiff,

     v.

BLUE SUN SCIENTIFIC, LLC, THE
INNOVATIVE TECHNOLOGIES GROUP &
CO., LTD., ARNOLD EILERT,
ROBERT GAJEWSKI,
RACHAEL GLENISTER, AND
IRVIN LUCAS,

     Defendants.

Civil Action No.
21-10572-MRG

**GUZMAN, D.J.**

<u>**MEMORANDUM & ORDER**</u>

I.   <u>**INTRODUCTION**</u>

     Following a nine-day jury trial, five post-trial motions are presently before the Court.

The Court will first address the Defendants' motions -- of which there are two. Blue Sun

Scientific, LLC, ("Blue Sun") and The Innovative Technologies Group & Co., LTD. ("ITG")

(collectively, the "Corporate Defendants") have filed a motion to alter or amend the judgment or,

alternatively, for remittitur. For their part, Arnold Eilert, Robert Gajewski, Rachael Glenister,

and Irvin Lucas (collectively, the "Individual Defendants") have filed a motion to alter judgment.

     The Court will then turn to Plaintiff KPM Analytics North America Corporation's

("Plaintiff" or "KPM") three pending motions. KPM has moved for: (1) a finding of willful and

malicious trade secret misappropriation and exemplary damages, (2) a judgment in its favor on

its Massachusetts General Law Ch. 93 § 11 ("93A") claims and for prejudgment interest on all counts, and (3) a permanent injunction.[1]

## II.   **RELEVANT BACKGROUND**

At this late stage of the case, both the Court and parties are well-acquainted with the facts. Prior sessions of this Court have provided detailed factual findings, including at the preliminary injunction stage, [ECF No. 94]; [ECF No. 119], and at the summary judgment stage [ECF No. 165]. However, the Court will nevertheless provide an abbreviated recitation of certain key facts as well an accounting of the outcome at trial before turning to the parties' post-trial motions.

### a.   **Abbreviated Factual Background**

Plaintiff KPM is a Massachusetts-based corporation. Its Unity Scientific division[2] manufactures and sells machines known as called Near Infrared ("NIR") analyzers. These devices "measure the diffraction of light to determine the chemical composition of common substances found in consumer products, such as the amount of moisture, oil or protein in flour, agricultural ingredients, chocolate, or processed foods." [ECF No. 119, p. 2] (citation omitted). These analyzers have a variety of research and industrial uses, and they offer users a relatively affordable and efficient way to perform on-demand, rapid quality control testing of various substances. An alternative to using these devices would be to perform wet chemistry on the testable substances, but that can be expensive in terms of time and money.

---

[1] The Court has already informed the parties that the Court will hear argument regarding KPM's motion for attorneys' fees and costs [ECF No. 259] at an upcoming motion hearing. For a list of those other issues about which the Court will hear oral argument during this upcoming hearing, please see Section VI of this Memorandum and Order.

[2] Throughout, any reference to Unity is a reference to KPM. This fact is undisputed.

In terms of its business model, KPM earns NIR analyzer-related revenue through both the sale of these devices and also through continuing service relationships with its customers. Evidence adduced at trial suggested that the lifecycle of these machines can be rather lengthy – somewhere between fifteen to twenty years. [ECF No. 240, p. 100:11-13]. The trial record also revealed that KPM's NIR analyzers, which it calls the "SpectraStars," sell for about $35,000 - $60,000 each and that KPM charges about $5,000 for each customer's annual service visit. KPM established at trial that it owned three species of trade secrets. Specifically, KPM proved that trade secret protection extended to its proprietary UCal software, its calibration datasets, and its customer information. [ECF No. 230, p. 1].

ITG is a Maryland-based corporation that has a long history with NIR analyzers. Its President and CEO, Robert Wilt ("Wilt") founded the company in 1996. ITG founded the Unity business which designed and manufactured the machines that are predecessors to the SpectraStars. In 2008, ITG sold its partial interest in Unity -- and along with its related patents -- to a company called Westco Scientific. In 2015, "[t]hrough several corporate transactions, Westco became KPM." [ECF No. 119]. After being away from the NIR analyzer market for several years, ITG decided to re-enter the NIR analyzer market around the same time, when it began selling a machine it called the "M5."

In 2018, a KPM sales employee named Irvin Lucas "Lucas" approached Wilt about possibly working together. This partnership culminated in ITG incorporating Blue Sun -- also a Maryland-based corporation -- on July 2, 2018. Lucas concealed from KPM the fact that he was working simultaneously for KPM and its new direct competitor, Blue Sun. Blue Sun rebranded ITG's M5 machines under the name "Phoenix" and it became ITG's sales arm.

Lucas left KPM's employ on May 17, 2019. However, before he had even left KPM, he began surreptitiously maneuvering to Blue Sun's benefit. By way of just one example, he began to recruit KPM-affiliated individuals and employees, such as Robert Gakewski ("Gajewski"), to join and/or materially assist Blue Sun. Gajewski later became a secret Blue Sun employee, too -- until KPM found out and terminated him in April of 2021. It was later discovered that Gajewski, who had a technical background, had been, among other things, diverting customers away from KPM and towards Blue Sun and had also been using certain of KPM's trade secrets while acting on behalf of Blue Sun. Notably, the secret Blue Sun network relied on a set of pseudonymic e-mail addresses designed to keep the owner of the email account's true name concealed.

Lucas recruited several other KPM employees to join Blue Sun, including among them Rachel Glenister ("Glenister") and Arnold Eilert ("Eilert"). Lucas had first approached Glenister, a KPM sales representative sometime in 2018-2019 timeframe, and Glenister was a secret Blue Sun employee prior to her departure from KPM in July 2020. Trial evidence revealed that before she left, Glenister had exploited a number of opportunities to strengthen her future full-time employer while weakening her current one. Eilert, for his part, was another technical KPM employee that Lucas had approached and recruited. Eilert accepted a position at Blue Sun in December of 2020. When he resigned from KPM, his stated reason was that he was going to work full-time on his family's farm. However, very soon after joining Blue Sun, Eilert began to reach out directly to KPM customers in an effort to lure their business to his new employer. He also used KPM's trade secrets in performing work on behalf of Blue Sun.

Notably, every KPM employee -- and each of the Individual Defendants -- had signed KPM non-disclosure agreements designed to ensure that they did misappropriate any of KPM's confidential information.

One final preliminary factual issue is worth noting.  In the lead-up to this litigation, Blue Sun changed e-mail providers and migrated its emails from GSuite (i.e., Gmail) to a service called Zoho.  As Judge Hillman found during the preliminary injunction stage, this e-mail migration resulted in "GSuite *delete[ing] emails* sent or received from Eilert (don@bluesunscientific.com), Gajewski (rob@bluesunscientific.com), and a third former KPM employee's accounts before March 5, 2021."  [ECF No. 93, p. 14].  At the preliminary stage, Judge Hillman imposed a "modest adverse inference" against Blue Sun for this spoliation of evidence.  Testimony regarding this spoliation of evidence was also adduced at trial.  See, e.g., [ECF No. 31:11-24].

**b.  Outcome at Trial**

On May 17, 2023, following a nine-day trial, the jury returned a verdict that was mostly in favor of KPM.  [ECF No. 230].  Specifically, the jury found that each of the Individual Defendants and Blue Sun had misappropriated at least some of KPM's trade secrets.  [ECF No. 230, p. 2].  The jury did not find that ITG had misappropriated any trade secrets, however.  [Id.]  Further, the jury found that each of the Individual Defendants violated their non-disclosure agreements with KPM and that they also violated the implied covenant of good faith and fair dealing.  [Id. at 4].  However, the jury did not find that any of the Individual Defendants owed or violated any duty of loyalty to KPM.  [Id. at 5].  The jury further found that both Blue Sun and ITG tortiously interfered with KPM's contractual relationships.  [Id. at 6].  And, as described in more detail below, the jury found that both Blue Sun and ITG engaged in unfair or deceptive practices -- and that both did so willfully or knowingly.  [Id. at 7].  The jury rejected Eilert and Gajewski's counterclaims, which were premised on the argument that KPM had breached its

5

contractual obligations by not paying them severance upon their departures from the company.
[Id. at 7-8].

The jury awarded compensatory damages against those Defendants that were found
liable. The exact amounts awards that the jury awarded are the subject of the following section
regarding the Court's interpretation of the verdict form.

**III.    INTERPRETATION OF THE VERDICT FORM**

Before turning to the parties' motions, the Court will first explain how it has interpreted
the jury's completed verdict form with respect to the money damages awarded. [ECF No. 230].
Given the complexity of the case and the claims-at-issue, the Court determined before trial that a
detailed verdict form asking the jury to engage in step-by-step fact-finding would be most
appropriate. See, e.g., Geffon v. Micrion Corp., 76 F. Supp. 2d 134, 143 (D. Mass. 1999)
(explaining, in the context of a "complex" class action securities fraud case that, "[u]sing a
Verdict Form requiring answers to a series of separable questions enables the court to break apart
the total array of instructions into more easily understood parts"). To that end, the Court crafted
a comprehensive nine-page verdict form. In accordance with the Court's instructions, the jury
fully completed the verdict form.

At least with respect to the post-trial motions presently before the Court, the parties have,
collectively, only raised one issue with respect to the verdict form. Specifically, they have
pointed out that one interpretation of the verdict form would indicate that the jury intended to
award compensatory damages against Blue Sun and each of the Individual Defendants twice -- in
identical amounts. However, as explained below, the Court finds that this would be an erroneous
interpretation of the verdict form. Although all parties seem to agree that the Court's
interpretation is correct, the Court has an obligation to explain its final determination regarding

the jury's compensatory damages awards here -- especially because this finding bears on the analysis of multiple of the parties' motions.

As a general rule, if a party "raises a potential inconsistency in the verdict after the jury has been discharged, the court has an obligation to attempt to harmonize that potential inconsistency if it is possible under a fair reading of the verdict form." Perez v. Cnty. Of Rensselaer, No. 1:14-CV-950, 2020 U.S. Dist. LEXIS 27849, at *6-7 (N.D.NY. Feb. 19, 2020) (citations and internal quotations omitted). This obligation to harmonize "*seemingly* inconsistent answers," if possible, arises under the Seventh Amendment to the U.S. Constitution. See, e.g., Pinasco v. California, No. CIV S-09-0777 KJM CKD, 2012 U.S. Dist. LEXIS 70767, at *4-5 (E.D. Cal. May 19, 2012) (emphasis added and internal quotations omitted).

Here, the only *seeming* inconsistency lies in the fact that the jury was asked the write how much each Defendant that was found liable under certain counts owed in compensatory damages in more than one place on the verdict form. See [ECF No. 230, pp. 3, 5-6]. Both the Corporate Defendants and the Individual Defendants initially interpreted this fact as suggesting that they might somehow be held liable for a combined total of the individual amounts listed next to their personal and/or corporate names throughout the verdict form -- as opposed to being liable for one total amount, which just happened to be written more than once. [ECF No. 250, p. 3 (Corporate Defendants arguing that "[t]he Court [s]hould [a]lter or [a]mend the [a]wards to [e]liminate [d]ouble [c]ounting [a]gainst Blue Sun . . .")]; [ECF No. 251, p. 1 (Individual Defendants moving to amend (their initial understanding of) the jury verdict against them because "the jury improperly awarded [KPM] damages twice for the same harm")].

Here, it is easy to harmonize the *seemingly* inconsistent answers contained within the jury's verdict form. Notwithstanding the fact that the jurors wrote the same damages number

twice, the Court finds that they jury intended for the Individual Defendants and the Corporate

Defendants to be liable -- *at least in terms of compensatory damages* -- as follows:

| *Defendant* | *Amount Liable (Compensatory Damages Only)* |
|---|---|
| Blue Sun | $1,500,000 |
| ITG | $1,800,000 |
| Robert Gajewski | $15,000 |
| Arnold Eilert | $2,500 |
| Rachael Glenister | $10,000 |
| Irvin Lucas | $20,000 |

Indeed, KPM has rightly pointed out that these are the amounts that they are owed in

terms of compensatory damages under a fair reading and have wisely not tried to pursue a double

recovery of compensatory damages under what would be an erroneous reading of the verdict

form.  [ECF No. 283, p. 92:2-5 (counsel for KPM stating at oral argument, "I can confirm that

[KPM] is not seeking to double count . . . the damages awarded by the jury against the

defendants")].

Accordingly, the Court concludes that the jury did not intend for there any "double-

counting" in terms of compensatory damages, and that, consequently, the jury intended for the

total compensatory damages owed by each Defendant to be in the amounts owed listed in the

table above.

## IV.    DEFENDANTS' MOTIONS

### a.    Corporate Defendants' Motion to Alter Judgment or, in the Alternative, For Remittitur [ECF No. 250]

In their motion to alter or amend the judgment or, alternatively, for remittitur, the

Corporate Defendants advance two, related arguments -- both under the banner of Federal Rule

of Civil Procedure 59(e) ("Rule 59(e)").  First, they argue that, as alluded to above, the jury

impermissibly "double-counted" in its compensatory damages findings and that, therefore, the

Court should amend the judgment accordingly.  [ECF No. 250, pp. 3-5].  Secondly and alternatively, they argue that in any case, the Court should exercise its discretion and remit the compensatory damages award *against ITG* down from $1,800,000 to $1,248,127 in compensatory damages -- essentially on the basis that no rational jury could have assigned $1,800,000 in compensatory damages against it.  [Id. at p. 6].

### i.  Legal Standard

A motion to alter or amend a judgment under Rule 59(e) "must be filed no later than 28 days after the entry of the judgment."  Fed. R. Civ. P. 59(e).  The Court may grant a Rule 59(e) motion "if the movant presents (1) new evidence not previously available; (2) an intervening change in controlling law; or (3) the need to correct a clear error of law or to prevent manifest injustice."  Storie v. Household Int'l, Inc., No. 03-40268-FDS, 2005 U.S. Dist. LEXIS 40292, at *11 (D. Mass. Sept. 22, 2005) (citing Hayes v. Douglas Dynamics, Inc., 8 F.3d 88, 90 n.3 (1st Cir. 1993)).  As the First Circuit has explained, the discretion to grant Rule 59(e) relief "must be exercised with considerable circumspection" since "revising a final judgment is an extraordinary remedy and should be employed sparingly."  Ira Green, Inc. v. Military Sales & Serv. Co., 775 F.3d 12, 28 (1st Cir. 2014) (citation omitted).

A party seeking remittitur under a Rule 59(e) motion "bears a heavy burden of showing that an award is grossly excessive, inordinate, shocking to the conscience of the court, or so high that it would be a denial of justice to permit it to stand."  Sánchez v. Foley, 972 F.3d 1, 17 (1st Cir. 2020) (citations omitted).  Indeed, before a district court in this Circuit can remit a jury's damages award, there must be a finding that the award exceeds "any rational appraisal or estimate of the damages that could be based upon the evidence before it."  Climent-García v. Autoridad de Transporte Marítimo y las Islas Municipio, 754 F.3d 17, 21 (1st Cir. 2014) (citation

omitted).  Remittitur is inappropriate "if the court merely perceives that the award is extremely generous or the damages are considerably less." <u>Arborjet, Inc. v. Rainbow Treecare Sci. Advancements, Inc.</u>, 187 F. Supp. 3d 217, 225-26 (D. Mass. 2016) (citation and internal quotations omitted).

When damages experts testify, juries are not mechanically bound by their estimates. <u>See, e.g.</u>, <u>Fredette v. Allied Van Lines</u>, 66 F.3d 369, 373, 373 n.2 (1st Cir. 1995) (explaining that "the jury can depart upward, as well as downward, from the opinion of the expert" and citing approvingly to a Wisconsin state appellate court's statement of the rule that "the jury is not bound by an expert's estimate of damages") (citation omitted); <u>Cal-Agrex, Inc. v. Van Tassell</u>, 258 F.R.D. 340, 349 (N.D. Cal. 2009) ("[t]he jury is not bound to accept the bottom line provided by any particular damages expert, but the jury is bound to follow the law") (citation omitted).  Rather than being bound by a damages expert's bottom-line figure, the jury is "free to select the highest figures for which there is adequate evidentiary support, as long as the figure remains in the universe of acceptable awards." <u>Am. Steel Erectors, Inc. v. Local Union No. 7, Int'l Ass'n of Bridge, Structural, Ornamental & Reinforcing Iron Workers</u>, 815 F.3d 43, 58 (1st Cir. 2016) (internal citations and quotations omitted).

### ii.  Application

As a threshold matter, the Corporate Defendants' motion is technically premature.  As the Corporate Defendants rightly pointed out, a final judgment had not yet entered when they filed their Rule 59(e) motion.  [ECF No. 250, p. 3 n. 2].  Plaintiff did not oppose the motion on the grounds that it was untimely.  Although the Court could decline to reach merits of the Corporate Defendants' Rule 59(e) motion, it concludes that judicial efficiency favors considering the merits of the motion today. <u>See, e.g.</u>, <u>Hilst v. Bowen</u>, 874 F.2d 725, 726 (10th Cir.

1989) ("[a]lthough Rule 59 motions are to be served not later than ten days after entry of judgment, courts and commentators generally agree that this ten-day limit sets only a maximum period and does not preclude a party from making a Rule 59 motion before a formal judgment has been entered"); Kersey v. Dennison Mfg. Co., 3 F.3d 482, 485 n.7 (1st Cir. 1993) (concluding that although "premature," a party's Rule 59(e) motion was not untimely even though a final judgment had not yet entered) (citing 11 Charles Wright & Arthur Miller, Federal Practice and Procedure § 2812, at 81-82, 81 n.44 (1973 & Supp. 1993)).

Turning to the merits, the Court concludes that to the extent that the motion seeks to prevent any "double-counting" of the compensatory damages that the jury awarded vis-à-vis the Corporate Defendants, the motion is **DENIED AS MOOT** in light of the Court's aforementioned determinations regarding its interpretation of the verdict form.

A simple reduction based on the now-mooted double-counting issue is not all that the Corporate Defendants seek with their motion, however.  Corporate Defendants also ask this Court to remit the jury's compensatory damages award relative to ITG (i.e., $1,800,000) principally on the basis that the Plaintiff's trial damages expert -- Mr. Neil Zoltowski -- had testified at trial that his calculations showed that, among many other things, ITG had "unjustly . . . received . . . additional profits" of $1,143,127.  [ECF No. 241, p. 8:6-12].  In the Corporate Defendant's view, KPM's damages expert's figure constituted a firm, upper ceiling above which the jury was not allowed to assign compensatory damages against ITG.  [ECF No. 250, p. 5] (Corporate Defendants arguing that "[since] Mr. Zoltowski's damage calculations derived from the entirety of ITG's machine sales to Blue Sun -- there was no additional 'unjust enrichment' from which the jury could derive nearly $700,000 in additional damages").

11

This argument is unavailing and the Court declines to remit the jury's compensatory damages award against ITG. As a threshold matter, the Corporate Defendants have not directed the Court to any new evidence not previously available, any intervening change in the controlling law, or the need to correct clear error or prevent manifest injustice. See Storie, 2005 U.S. Dist. LEXIS 40292 at *11. Instead, they contend that the jury's verdict constituted "manifest error[]" because its compensatory damages award against ITG exceeded the bottom line estimate proffered by KPM's damages expert. [ECF No. 250, p. 5]. This argument is unavailing.

First, the jury was not mechanically bound to stay within the range of Mr. Zoltowski's damages estimates. See, e.g., Fredette, 66 F.3d at 373 n.2. Indeed, the Corporate Defendants have cited no legal authority for this proposition. Accordingly, it is incorrect to say that simply because the compensatory damages award against ITG exceeded Mr. Zoltowski's damages estimate, it necessarily follows that the award must be remitted.

Instead, the proper question for this Court is whether the compensatory damages award against ITG exceeds "_any rational appraisal or estimate of the damages_ that could be based upon the evidence before it." See Climent-García, 754 F.3d at 21. It is the Court's considered opinion that there was ample evidence in the trial record from which the jury could have rationally concluded that ITG owed KPM $1,800,000 in compensatory damages. Just by way of example, the Court notes that the very damages expert whose testimony the Corporate Defendants have put at issue in their remittitur motion had opined that the "total amount of damages available against [the Corporate Defendants] for tortious interference" was "$3,426,792," which is actually _more_ than the grand total of all compensatory damages awarded against both ITG and Blue Sun (i.e., $3,300,000). [ECF No. 241, p. 19:8-10].

12

Notwithstanding the Corporate Defendants' argument that the compensatory damages award against ITG was "either irrational" or "impermissibly designed to punish ITG," the jury learned the undisputed fact at trial that Blue Sun is a wholly-owned subsidiary of ITG, and that ITG subsumes 65% of all Blue Sun's analyzer sales revenue. [ECF No. 240, p. 102:4-8] (ITG President and CEO Robert Wilt stating that ITG receives 65% "of the price that [Blue Sun] sell[s] the instrument[s] for"). Accordingly, it was not irrational for the jury to assign a higher total compensatory damages figure to ITG than to Blue Sun. In fact, in terms of sheer arithmetic, ITG's portion of the total compensatory damages awarded against the Corporate Defendants is only approximately 54.5%, more than 10% less than the jury could have assigned if it had chosen to be guided purely by the framework of the Corporate Defendants' distributor relationship. In sum, the Corporate Defendants have not met their "heavy burden" of demonstrating that the compensatory damages award against ITG is "grossly excessive, inordinate, shocking to the conscience of the court, or so high that it would be a denial of justice to permit it to stand." See Sánchez, 972 F.3d at 17. Accordingly, remittitur is unwarranted with respect to the Corporate Defendants and the Corporate Defendants' motion [ECF No. 250] is hereby **DENIED**.

> **b.  Individual Defendants' Motion to Alter or Amend the Judgment [ECF No. 251]**

The Individual Defendants have moved to amend or alter the judgment, as well. [ECF No. 251]. In their motion, they only ask the Court to amend the judgment to prevent the possibility of "double-counting." [Id. at p. 1]. Unlike the Corporate Defendants, they have not sought remittitur. [ECF No. 270, p. 1] (Individual Defendants writing that "[we] have not moved for remittitur…") Since the Individual Defendants only sought to have the compensatory damages amounts assessed against them set to the amounts that the Court has already determined flow from the correct reading of the verdict form, no further discussion of this motion is

necessary.  Accordingly, the Individual Defendants' motion [ECF No. 270] is **DENIED AS**

**MOOT**.

V.   **PLAINTIFF'S MOTIONS**

    a.   **KPM's Motion for a Finding of Willful and Malicious Trade Secret Misappropriation & Exemplary Damages [ECF No. 255]**

       With this motion, KPM asks the Court to find that Blue Sun and each of the Individual

Defendants committed trade secret misappropriation that was "willful[] and malicious[]" within

the meaning of the Defend Trade Secrets Act ("DTSA") and the Massachusetts Uniform Trade

Secrets Act ("MUTSA").  18 U.S.C. § 1836(b)(3)(C); Mass. Gen. Laws ch. 93, § 42B(b).  If the

Court makes any such predicate findings, it may then, in its discretion, assess against any such

defendant(s) exemplary (i.e., punitive) damages in an amount not to exceed twice the applicable

compensatory damages award, as well as reasonable attorney's fees and costs.  18 U.S.C. §

1836(b)(3)(D); Mass. Gen. Laws ch. 93, § 42B(b); Mass. Gen. Laws ch. 93, § 43C.  Blue Sun

and the Individual Defendants have opposed this motion -- first on the ground that their given

acts of trade secret misappropriation were not "willful and malicious," and, alternatively, that

even if their trade secret misappropriation was "willful and malicious," the Court should

nevertheless not assess any exemplary damages, reasonable attorney's fees or costs against any

of them.

          i.   **Preliminary Points**

       Three preliminary points are in order.  First, the Court will not depart from the jury's

verdict that Blue Sun and each of the Individual Defendants misappropriated certain of KPM's

trade secrets.  [ECF No. 230, p. 2].  Second, throughout its "willful and malicious" analysis, the

Court will, as the jury was asked to do, consider the conduct of Blue Sun and each of the

Individual Defendants separately.

Third, the Court rejects Blue Sun and the Individual Defendants' contention that the Court has already ruled on this issue. [ECF No. 263, pp. 4-5]. In their opposition to KPM's motion, they devote nearly two pages to arguing that the Court had previously determined that their trade secret misappropriation was not willful and malicious. [Id.]. This argument is incorrect for three different reasons.

First and most fundamentally, nowhere in the quoted language (or elsewhere) did the Court rule on this question. Secondly, the entire discussion-at-issue occurred *before* the end of the trial and before the jury had even determined that any trade secret misappropriation had occurred; a predicate for any factfinder -- the Court or otherwise -- being able to find that any such misappropriation was willful and malicious. Third, all of the quoted language arose in the context of a charge conference, where the issue was not whether Blue Sun and/or any of the Individual Defendants had willfully and maliciously misappropriated any trade secrets, *but whether KPM was entitled to a willful and malicious-related jury instruction*. The question of whether to give a certain jury instruction is entirely different from the question now before the Court. Accordingly, the Court finds that it has not ruled on the present issue and that it now stands ripe for decision.

### ii. Legal Standard – "Willful and Malicious"

Since Plaintiff's motion asks this Court to determine whether any of the trade secret misappropriation that occurred in this case was "willful[] and malicious[]" within the meaning of the federal and state trade secrets statutes, a discussion of the relevant legal standard must necessarily begin with some commentary about those statutes themselves. 18 U.S.C. § 1836(b)(3)(C); Mass. Gen. Laws ch. 93, § 42B(b).

First, both the DTSA and the MUTSA are relatively new -- with the former having become law in 2016 and the latter having become law in 2018.  Second, both statutes are based on the same model statute -- the Uniform Trade Secrets Act ("UTSA") -- which was written by the Uniform Law Commission.  See AirFacts, Inc. v. de Amezaga, No. DKC 15-1489, 2022 U.S. Dist. LEXIS 224367, at *39 n.14 (D. Md. Dec. 12, 2022) (explaining that the Uniform Law Commission drafted the UTSA); Calendar Research LLC v. StubHub, Inc., No. 2:17-cv-04062-SVW-SS, 2017 U.S. Dist. LEXIS 222745, at *6 (C.D. Cal. Aug. 16, 2017) ("[t]he DTSA was modeled on the Uniform Trade Secrets Act . . ."); Neural Magic, Inc. v. Meta Platforms, Inc., No. 20-cv-10444-DJC, 2020 U.S. Dist. LEXIS 266048, at *2 (D. Mass. Oct. 29, 2020) ("Massachusetts adopted the MUTSA, its version of the Uniform Trade Secrets Act . . .").

Indeed, as courts within this District have recognized, these two statutes set out "substantially similar" standards relative to the misappropriation of trade secrets.  Milliman, Inc. v. Gradient A.I. Corp., 651 F. Supp. 3d 438, 442 (D. Mass. 2023) ("[t]he standard for misappropriation under Massachusetts law is substantially similar to that under the DTSA") (citation omitted); Moog, Inc. v. ClearMotion, Inc., No. 1:19-cv-12066-IT, 2020 U.S. Dist. LEXIS 194913, at *20 (D. Mass. Oct. 21, 2020) (same).

A close reading of the specific, parallel provisions containing the phrase "willful[] and malicious[]" reveals that these provisions are substantially similar, as well.  Compare 18 U.S.C. § 1836(b)(3)(C) with Mass. Gen. Laws ch. 93, § 42B(b).  Given that the DTSA and the MUTSA share the common DNA of the Uniform Trade Secrets Act; have been found to be generally substantially similar; and because the specific provisions-at-issue are similar, as well, the Court need only and will only conduct one "willful[] and malicious[]" inquiry.

16

The DTSA does not define the phrase "willful[] and malicious[]," nor does it independently define the terms "willful" or "malice". As a general principle, "courts typically look to the state UTSA when interpreting the DTSA inasmuch as the two are substantively identical." Trent P. Fisher Enters., LLC v. SAS Automation, LLC, No. 3:20-cv-216, 2021 U.S. Dist. LEXIS 62914, at *16 (S.D. Ohio Mar. 31, 2021). Since it is well-established that the DTSA and the MUTSA are substantially similar, the Court could certainly apply the MUTSA's definition of "willful and malicious," but the state statute neither defines that phrase nor defines the terms "willful" or "malice." Accordingly, this Court must look elsewhere for guidance.

Permissible sources of that guidance can include, among other things, how the phrase "willful[] and malicious[]" is defined in other contexts under Massachusetts state laws, out-of-circuit case law, and legal treatises and legal dictionaries. See, e.g., Steves & Sons, Inc. v. Jeld-Wen, Inc., 988 F.3d 690, 726-27 (4th Cir. 2021) (considering the DTSA's lack of a definition of "malicious" and observing that, in similar circumstances, courts have looked to how the term "malice" was defined "in other contexts under the relevant state's laws"); Allstate Ins. Co. v. Fougere, No. 16-11652-JGD, 2021 U.S. Dist. LEXIS 253232, at *7 (D. Mass. Mar. 21, 2021) (considering the meaning of the phrase "willful and malicious" under DTSA and looking to out-of-state cases for guidance); Caudill Seed & Warehouse Co. v. Jarrow Formulas, Inc., 53 F.4th 368, 394 (6th Cir. 2022) (observing in a trade secrets case that "Kentucky's courts have looked to Black's Law Dictionary when defining 'willful and malicious injury'") (citation omitted).

As the Fourth Circuit observed in Steves & Sons, Inc., courts that have not had the benefit of a clear and controlling definition of willful and malicious have generally adopted one of two different approaches -- with the real difference of opinion relating to how to define the malice prong. 988 F.3d at 726-27. Some such courts have adopted what might be called the

"intent to cause injury or harm" standard, while others have adopted a standard that turns primarily on whether the trade secret misappropriating defendant showed a "conscious disregard for the rights of another." Id. (collecting cases). Compare Contour Design, Inc. v. Chance Mold Steel Co., No. 09-cv-451-JL, 2011 U.S. Dist. LEXIS 145321, at *36–41 (D.N.H. 2011), aff'd in part & rev'd in part, 693 F.3d 102 (1st Cir. 2012) (determining that the phrase "willful and malicious misappropriation" under New Hampshire's version of the UTSA "requires a finding that the defendant engaged in the acts of misappropriation with the intent to bring about their likely results and with ill will, hatred, hostility, *or* evil motive") (emphasis added and citations omitted)[3] with Macquarie Bank Ltd. v. Knickel, 793 F.3d 926, 940 (8th Cir. 2015) ("[w]e believe that the North Dakota Supreme Court would not define malice to require ill will, hatred, or intent to cause injury. . . . [A] conscious disregard of another's rights constitutes malice.").

Here, the Court has not identified any Massachusetts statutory or case law definition of "willful and malicious" that is sufficiently related to the trade secret misappropriation context to be instructive. Accordingly, the Court has reviewed a large set of out-of-jurisdiction cases and has determined that, as signaled by the Fourth Circuit in Steves & Sons, Inc., the apparent majority approach is to employ an "intent to injure"-type standard. See 988 F.3d at 726-27. Indeed, the leading trade secrets treatise adopts this approach in its plainly-worded and succinct definition of "willful and malicious" trade secret misappropriation:

> Under the UTSA, exemplary damages and attorneys' fees are available where the misappropriation was "willful," i.e., ***done with actual or constructive knowledge of its probable consequences***, and "malicious," i.e., ***done with intent to cause injury***. 1 MILGRIM ON TRADE SECRETS § 1.01[2][c][iv][C] (emphasis added and citations omitted).

---

[3] Incidentally, Blue Sun and the Individual Defendants repeatedly cite approvingly to the legal standard articulated in Contour throughout their opposition brief. [ECF No. 263]. For its part, KPM has argued that Contour supports findings of willful and malicious trade secret misappropriation in this case. [ECF No. 273, pp. 2-7].

This Court finds the above-cited treatise definition of "willful[] and malicious[]" in the context of trade secret misappropriation (the "Milgrim Definition") is the most appropriate definition available and therefore will adopt it as its own for use in its "willful[] and malicious[]" analysis.[4]

Relatedly, case law from courts that have embraced the "intent to injure standard" articulated in the Milgrim Definition at the post-trial stage constitutes helpful and persuasive authority here. See e.g., Contour, 2011 U.S. Dist. LEXIS 145321 at*36–41; Int'l Med. Devices, Inc. v. Cornell, No. 2:20-cv-03503-CBM, 2024 U.S. Dist. LEXIS 56663, at *20-22 (C.D. Cal. Mar. 28, 2024) (citing to California Supreme Court precedent for the proposition that "[m]alice may be proven either expressly by direct evidence probative of the existence *of ill-will*, or by implication from indirect evidence") (emphasis added and citations omitted); Hair Club for Men, LLC v. Ehson, No. 1:16-cv-236, 2017 U.S. Dist. LEXIS 51370, at *6 (E.D. Va. Apr. 3, 2017) (citing to Supreme Court of Virginia precedent for the proposition that "[w]illful and malicious misappropriation is

---

[4] In that connection, the Court notes that imputing definitions of "willful" and/or "malicious" from too far outside of the trade secrets realm would be ill-advised since both of the trade secrets statutes-at-issue provide for a distinction between damages for misappropriation and damages for "willful[] and malicious[]" misappropriation.

For that distinction to make a meaningful difference, it follows that the applicable legal standard should be higher than in other, less analogous contexts and should be closer to a subjective intent to injure. See, e.g., Caudill Seed & Warehouse Co., 53 F.4th at 394 (explaining that definitions of "[w]illful and [m]alicious injury" from Black's Law Dictionary and elsewhere were "an *awkward fit* for trade-secret law" since "to find liability in a KUTSA [Kentucky Uniform Trade Secrets Act] case, a plaintiff must already establish intentional misappropriation. A plaintiff could thus argue that the court may award exemplary damages *in every KUTSA case*: every businessperson presumably 'knows [it] to be his duty' that he should not steal a competitor's trade secrets.") (emphasis added and internal citations omitted).

acting consciously in disregard of another person's rights or acting with reckless indifference to the consequences, with the defendant aware, from his knowledge of existing circumstances and conditions, ***that his conduct probably would cause injury to another***") (emphasis added and citations omitted); <u>Nucar Consulting, Inc. v. Doyle</u>, No. 19756-NC, 2005 Del. Ch. LEXIS 43, at *49-50 (Del. Ch. Apr. 5, 2005) (considering the legal standard for willful and malicious trade secret misappropriation under the Delaware version of the UTSA and concluding that, "Delaware case law generally characterizes wil[l]fulness as an awareness, either actual or constructive, of one's conduct and a realization of its probable consequences, and malice ***as ill-will, hatred or intent to cause injury***") (emphasis added and citations omitted); <u>Highland Consulting Grp., Inc. v. Soule</u>, 19-CV-81636, 2024 U.S. Dist. LEXIS 22722, at *26 (S.D. Fla. Feb. 8, 2024) (finding that the defendant had willfully and maliciously misappropriated the plaintiff's trade secrets under "any of the possible civil legal standards").

Now that the Court has determined that it will apply the <u>Milgrim</u> Definition, it will turn to its defendant-by-defendant analysis. At each turn, KPM bears the burden of proving willful and malicious trade secret misappropriation. <u>See</u> 1 MILGRIM ON TRADE SECRETS § 1.01[2][c][iv][C].

### iii. Application – "Willful and Malicious" Trade Secret Misappropriation

As noted, the jury did not find ITG liable for trade secret misappropriation. [ECF No. 230, p.2]. Accordingly, this Court has no predicate basis to find that ITG committed any willful and malicious trade secret appropriation and will therefore not engage in any willful and malicious trade secret misappropriation analysis relative to ITG.

### 1. Blue Sun

The Court finds that the evidentiary record is replete with examples of Blue Sun willfully and maliciously misappropriating KPM's trade secrets. As previously noted, the jury found that Blue Sun had misappropriated all three species of KPM's trade secrets (*i.e.*, UCal software; calibration datasets, and customer information). [ECF No. 230, p.2].

In terms of willfulness, three illustrative examples point strongly towards the conclusion that Blue Sun's acts of trade secret misappropriation were "done with actual knowledge of their probable consequences." See 1 MILGRIM ON TRADE SECRETS § 1.01[2][c][iv][C].[5]

First, Blue Sun supplied pseudonymous e-mail accounts to various KPM-affiliated individuals as a means of helping them avoid detection and create confusion in the marketplace that Blue Sun could exploit. See, e.g., [ECF No. 238, pp. 133:20-134:9] (Gajewski explaining that Lucas had given him a Blue Sun e-mail address associated with the name "Rob Roberts" years before Gajewski was ultimately terminated from KPM); [ECF No. 239, p. 147:10-16] (Eilert explaining that, before he left KPM, he had been using a Blue Sun e-mail address associated with the name "Don Donaldson"). Blue Sun's attempts to conceal the real names of these KPM-affiliated individuals clearly signals that its trade secret misappropriation was willful. See Contour, 2011 U.S. Dist. LEXIS 145321, at *37-38 (collecting cases and explaining that, "[a] defendant's ***attempts to conceal*** its misappropriation support a finding that it was willful and malicious") (emphasis added and citations omitted).

Second, the trial record showed that Blue Sun recruited certain KPM-affiliated individuals and then promptly benefited from their acts of misappropriation despite having been

---

[5] As KPM notes, the trade secret misappropriating Defendants virtually conceded willfulness by dedicating almost all of their opposition brief [ECF No. 263] to arguments relating to the malice element. [ECF No. 273, p. 5, n. 2]. That said, the Court does not find that the trade secret misappropriating Defendants waived their arguments relative to willfulness.

well aware that they were under strict contractual obligations to protect KPM's intellectual property.  [ECF No. 236, pp. 149:22-150:4] (Blue Sun's President Lucas admitting that he recruited nearly all of the former KPM-affiliated individuals to Blue Sun despite knowing that they had employment contracts with KPM).  Blue Sun's intentional disregard for the valid legal restrictions that had been placed on the KPM-affiliated individuals further supports the conclusion that Blue Sun's misappropriation was willful.

A final example of Blue Sun's willfulness can be found in an e-mail from Gajewski to Lucas in February 2019.  At that time, both Gajewski and Lucas were simultaneously affiliated with both KPM and Blue Sun.  In one e-mail exchange, Gajewski is seen trying to leverage pricing information that he knew from his role at KPM to convert a KPM customer into a Blue Sun customer.  [ECF No. 239, pp. 17:8-18:25].  Gajewski tells Lucas that they "have to be a little careful that [a KPM employee] does not find out and *blow the whistle*.  Thanks."  [Id. at p. 18:8-12] (emphasis added).  This example is illustrative of Blue Sun's clear understanding and knowledge of the "probable consequences" of its trade secret misappropriation.  See 1 MILGRIM ON TRADE SECRETS § 1.01[2][c][iv][C].  More specifically, Blue Sun knew that if the whistle was blown, they faced severe legal consequences once KPM found out.  Each of these three representative examples lead this Court to easily conclude that Blue Sun's trade secret misappropriation was willful.[6]

---

[6] A final note on Blue Sun's willfulness.  The Court recognizes that the evidentiary record might have contained even more evidence tending to show Blue Sun's willfulness and/or its maliciousness but for the above-described spoilation of evidence that occurred right before this lawsuit commended.

This Court also finds that Blue Sun "maliciously" (*i.e.,* with the intent to cause injury) misappropriated KPM's trade secrets.  See id.  Three selected examples from the trial record strongly support this finding.

First, Blue Sun intentionally poisoned the NIR analyzer market with misrepresentations regarding the present and future state of KPM's business.  For example, Glenister admitted to coaching a member of the Blue Sun sales team to advertise to potential customers that KPM had "discontinued service" on its SpectraStar instruments and also that Blue Sun had hired "over 80 percent of [KPM's] original engineering service and sales staff of [KPM]."  [ECF No. 238, pp. 72:7-73:23].  However, Blue Sun knew that these sorts of attacks were either false or contrived. [ECF No. 237, pp. 60:9 – 61:3] (Lucas admitting that he personally did not agree with a Blue Sun statement that KPM had "discontinued service" on its Spectrastar machines); [ECF No. 238, p. 73:11-14] (Glenister admitting that the 80 percent figure "was just a figure I threw out…").[7] These and similar misrepresentations went beyond the bounds of commercial gamesmanship; they were an attempt to unfairly attack the relationship between KPM and its customers.  Such conduct is analogous to certain of the defendant's conduct in Contour.  See 2011 U.S. Dist. LEXIS 145321, at *36-37 (citations omitted).  There, the defendant had, among other things, "embarked on a conscious effort to exploit" the ending of a long-term business relationship with the plaintiff and had engaged in what the court termed "treacherous opportunism."  Id.  Here, Blue Sun employees were on the one hand surreptitiously leveraging close friendships with KPM

---

[7] In that connection, the Court notes that Blue Sun was apparently not just making misrepresentations about KPM; it was also apparently making misrepresentations about itself. For example, evidence adduced at trial revealed that Blue Sun -- which was founded on July 2, 2018 -- had created marketing materials falsely suggesting that it was founded in 1996.  Compare [ECF No. 236, p. 159:3-4] (Lucas stating that Blue Sun was founded on July 2, 2018) with [ECF No. 237, p. 27:8-11] (Lucas explaining that Blue Sun was not founded in 1996 -- despite the fact that a customer-facing PowerPoint falsely stated as much).

employees to lure some of them away while on the other hand strongly suggesting to KPM's customers that KPM's future was in doubt due in part to certain departures.  This is the very sort of "treacherous opportunism" that mandates the conclusion that KPM acted with the requisite level of malice.  See id.

A second example of Blue Sun's maliciousness can be found in the company's attempts to wrongly divert to Blue Sun certain KPM customers that had reached out intending to do business with KPM.  For example, in February 2021, a representative from a KPM customer reached out to Gajewski, who was then a KPM employee with a secret Blue Sun affiliation.  The representative told Gajewski about the customer's possible interest in buying a new KPM NIR analyzer machine.  [ECF No. 239, p. 42:8-14].  Acting on behalf of Blue Sun and seeing a diversion opportunity, Gajewski wrote back, in part, "I would send you a quote for *our* Phoenix system, which is a replacement." [Id. at p. 42:15-20] (emphasis added).  After the customer responded and asked, in part, "[is the] Phoenix system the newest *you guys* have?", Gajewski responded in part, "*Yes*, all the calibrations *we* currently use can be moved over." [Id. at p. 42:23-25] (emphasis added).  Gajewski, acting on behalf of Blue Sun, knew that the KPM customer was operating under the assumption that he was speaking for KPM.  However, he took wrongful advantage; deliberately confused the customer, and diverted the business to direct competitor Blue Sun.  This is textbook malicious trade secret misappropriation.  See, e.g., Contour, 2011 U.S. Dist. LEXIS 145321 at *37-38 (finding that the fact that the defendant had "engaged in a series of efforts to *obscure the source of the products it sold* to [a non-party customer]" supported a finding that the trade secret misappropriation at-issue was willful and malicious) (emphasis added).

24

Third and finally, trial evidence revealed that Blue Sun exploited KPM's misappropriated customer information in order to generate quotes to customers that were designed to undercut KPM. One example in the record showed how Gajewski and Lucas worked in concert to generate these undercutting bids. [ECF No. 238, pp. 148:7-9] (KPM's counsel asking Gajewski in relation to Tr. Ex. 115, "you were speaking with [Irvin Lucas] about setting a price for Blue Sun that was based upon Unity's [KPM's] pricing?" Gajewski: "Yes.") In so doing, Blue Sun was not just exploiting KPM's customer information in order to beat out its general pool of competitors, but to instead deliberately harm and undercut KPM, which further supports a finding of maliciousness. See Nucar Consulting, Inc., 2005 Del. Ch. LEXIS 43, at *50-52 (concluding post-trial that the defendant had maliciously misappropriated trade secrets where, among other things, he had "aggressively solicited . . . an identified 'active prospect' [of plaintiff] with whom [the defendant] recently had dealt . . . and others with the intent to cause injury to [plaintiff]") Accordingly, the Court concludes that Blue Sun willfully and maliciously misappropriated KPM's trade secrets.

### 2. Arnold Eilert

The jury found that Eilert misappropriated KPM's UCal software and calibration datasets. [ECF No. 230, p. 2]. Upon a review of the entire trial record, the Court concludes that Eilert's trade secret misappropriation was willful and malicious. In terms of willfulness, the Court finds that, in December 2020, Eilert concocted a pretextual reason designed not to arise suspicion as to why he was leaving KPM. Specifically, Eilert told his colleagues at KPM, "I need to involve myself in a family farming operation in which I have a considerable interest and investment. This recently-developing need is going to require my ***full and concentrated attention*** for some time going forward and it is a responsibility that I cannot shirk." [ECF No. 239, p. 144:18-22]

25

(emphasis added).  The truth was that Eilert had already begun working with Blue Sun, and that he had actually signed a Blue Sun offer letter about a month prior.  [Id. at p. 142:1-8].  This example highlights Eilert's willfulness.

The Court further finds that Eilert's misappropriation was malicious.  In one illustrative example from the trial record, Eilert, while acting on behalf of Blue Sun, capitalized on a customer relationship that he had built while at KPM.  [ECF No. 240, pp. 13:13-15:2].  In March 2021, Eilert went out into the field to perform maintenance on a KPM machine and used KPM's UCal software to do so, despite having been contractually obligated to return this and other trade secrets to KPM upon his December 2020 departure from KPM.  See id.  The Court finds that Eilert's trade secret misappropriation was willful and malicious.  See, e.g., Highland Consulting Grp., Inc., 2024 U.S. Dist. LEXIS 22722 at *25-26 (concluding that the defendant had committed willful and malicious trade secret misappropriation "[u]nder any of the possible civil legal standards" and citing as one example of such conduct the fact that there had been "evidence that [the defendant] immediately began working for one of [plaintiff's] business competitors, servicing a former [one of plaintiff's] client on the same project on which [the defendant] had been working for [the plaintiff]" where "[t]he trade secrets were directly relevant to this project.").

### 3.  Robert Gajewski

The jury found that Gajewski misappropriated all three species of KPM's trade secrets.  [ECF No. 230, p. 2].  This Court, after considering the entire trial record, finds that Gajewski committed willful and malicious trade secret misappropriation.  Since many of the Court's above-cited examples in the Blue Sun analysis involve Mr. Gajewski, the Court incorporates

each of those by reference here. However, two additional examples highlight the willfulness and the maliciousness of Gajewski's trade secret misappropriation.

 With respect to willfulness, Gajewski -- while acting surreptitiously on Blue Sun's behalf -- sent an e-mail to a KPM distributor about Blue Sun's business operations and cautioned them, "please, please, please be careful to where you are sending emails to me. You can't send Blue Sun emails to my Unity address. Please be extra careful." [ECF No. 239, p. 56:19-21]. Clearly, Gajewski actually knew about the probable consequences of his trade secret misappropriation and was trying to ensure that he evaded detection. See 1 MILGRIM ON TRADE SECRETS § 1.01[2][c][iv][C].

 With respect to malice, the Court finds that Gajewski acted maliciously when he acted in concert with Lucas to publish several "application notes" (which derived entirely from KPM's trade secrets in UCal software) onto Blue Sun's public website. Lucas testified that while Gajewski was still affiliated with KPM, he had prepared and sent Lucas several application notes for Blue Sun's publication in January 2020, despite the fact that all of the application notes were derived from KPM's proprietary information. [ECF No. 237, pp. 76:20-78:13]. Gajewski later acknowledged that he had created about twenty or so or these application notes. The scale of this misappropriation suggests that Gajewski's actions cannot be written off as a mere accident or one-off lapse in judgment. [ECF No. 238, p. 132:15-20]. Moreover, Gajewski later admitted to conducting calibration work for KPM customers but then billing the work to Blue Sun. [ECF No. 239, p. 36:3-14]. All of these examples point conclusively towards a finding that Gajewski's trade secret misappropriation was willful and malicious.

27

### 4. Rachel Glenister

The jury found that Glenister misappropriated KPM's customer information. [ECF No. 230, p.2]. The Court concludes that Glenister's trade secret misappropriation was willful and malicious. As to willfulness, when Glenister announced that she was leaving KPM in the Summer of 2020, KPM sent her a letter dated July 1, 2020, that stated, in part, "[y]ou are reminded that all trade secrets, business plans and procedures, client contact list and other confidential information of KPM Analytics North America are proprietary and may not be used by you in any way." [ECF No. 238: 34:9-24]. At trial, Glenister admitted to not only seeing this letter, but to signing it right before her departure from KPM. [Id. at 34:15-24]. Nevertheless, within less than one month after signing this letter, Glenister was working for Blue Sun and was continuing to misappropriate KPM's trade secrets to KPM's detriment. Accordingly, there is no question that Glenister understood that what she was doing flew in the face of her legal obligations to KPM. Accordingly, her trade secret misappropriation was willful. See, e.g., Int'l Med. Devices, 2024 U.S. Dist. LEXIS 56663, at *21-22 (concluding that the defendant-doctor had willfully and maliciously misappropriated plaintiff's trade secrets and citing as one example that "[w]ithin days" of signing an NDA with the plaintiff, defendant promptly began misappropriating certain of plaintiff's trade secrets).

In addition to the example featuring Glenister above regarding the marketing misrepresentations that is incorporated here by reference, a further example demonstrates that Glenister's trade secret misappropriation was malicious. Evidence adduced at trial showed that Glenister's efforts to abscond with KPM's customer information continued until the very final minutes of her employment at KPM. About twenty-two minutes before the close of business on Glenister's last day at KPM (July 10, 2020), Glenister was forwarding certain KPM customer

28

information to her personal e-mail account. [ECF No. 238, pp. 49:10-50:2]. This sort of "treacherous opportunism" points towards a finding of malicious trade secret misappropriation. See Contour, 2011 U.S. Dist. LEXIS 145321, at *36-37 (citations omitted). Accordingly, this Court finds that Glenister's trade secret misappropriation was willful and malicious.

### 5. Irvin Lucas

Like Gajewski, the jury found that Lucas misappropriated all three species of KPM's trade secrets. [ECF No. 230, p. 2]. Upon review of the entire trial record, the Court can easily conclude that Lucas' trade secret misappropriation was willful and malicious. In addition to the above-cited examples featuring Lucas -- each of which are incorporated here by reference -- several other examples weigh strongly in favor of such a finding. First and foremost, Lucas' long period of duplicitous behavior strongly indicates a desire to injure KPM. From around the time of the Blue Sun's founding (July 2, 2018) until his departure from KPM on May 17, 2019, Lucas was collecting regular paychecks from both KPM and, secretly, Blue Sun. [ECF No. 236, p. 155:6-12]. Indeed, despite apparently having some interesting ideas about the future of the NIR analyzer market, Lucas never shared these ideas with his employer KPM -- but instead secretly acted in concert with Wilt and others to build Blue Sun under the radar. Id. at pp. 153:22-154:10 (Lucas admitting that he did not inform anyone at KPM about his ideas for Blue Sun or his conversations with Wilt). Moreover and as noted above, his recruitment of KPM personnel was done despite his having been fully on notice of their -- and his -- contractual obligations. See [ECF No. 236, pp. 149:22-150:4]

The only logical conclusion that the Court can draw from Lucas' actions is that consciously chose to injure KPM; depleting it of everything from wages to employees to

customers, and, most relevant here, trade secrets. Lucas' actions, without question, constitute willful and malicious trade secret misappropriation.

### iv. Legal Standard – Exemplary Damages

Having found that Blue Sun and each of the Individual Defendants willfully and maliciously misappropriated KPM's trade secrets, the Court must now turn to the question of whether it will consequently award any additional exemplary damages against any of the trade secret misappropriating Defendants. Both the DTSA and the MUTSA provide that, where willful and malicious trade secret misappropriation has occurred, the Court may award additional exemplary damages in an amount not to exceed double the compensatory damages award. See 18 U.S.C. § 1836(b)(3)(C); Mass. Gen. Laws ch. 93, § 42B(b).

However, merely because the Court concludes that willful and malicious trade secret misappropriation has occurred does not mean that the Court must grant any amount of exemplary damages. See e.g., AgroFresh Inc. v. Essentiv LLC, No. 16-662, 2020 U.S. Dist. LEXIS 222898, at *73 (D. Del. Nov. 30, 2020) (explaining in this context that "[w]hether to award exemplary damages is committed to the Court's discretion"); 4 MILGRIM ON TRADE SECRETS § 15.02[3][i] (2022) ("[a]n award of exemplary damages is within the discretion of the court").

Rather than awarding exemplary damages automatically, courts consider a wide variety of factors to determine whether any such damages award are proper against a given defendant. This Court has determined that there is no one set of criteria that it must apply in this case. However, other courts have offered a number of useful factors -- some of which will bear on this Court's analysis. See e.g., AgroFresh Inc., 2020 U.S. Dist. LEXIS 222898 at *73 (explaining that, under the Pennsylvania version of the UTSA, "courts have considered the duration of misappropriative conduct, the defendant's consciousness of resulting injury and any efforts to

cover up malfeasance"); <u>Proofpoint, Inc. v. Vade Secure, Inc.</u>, No. 19-cv-04238-MMC, 2021

U.S. Dist. LEXIS 223204, at *10-11 (N.D. Cal. Nov. 18, 2021) (listing other, additional factors

including, "the degree of reprehensibility associated with the wrongdoer's actions, . . . the need to

deter similar misconduct in the future, . . . the amount of compensatory damages awarded, . . .

and the wealth of the particular defendant") (citations and internal quotation marks omitted).

### 1. Blue Sun

Here, there is no question that, if KPM's trade secrets misappropriation claim existed

against Blue Sun in pure isolation, exemplary damages would be warranted against Blue Sun.

Blue Sun's misappropriative conduct seems to have gone on at least from around the time of its

founding in June 2018 until at least until April 2021 when KPM filed its Complaint in this case.

[ECF No. 1].  Moreover, Blue Sun took various, above-described efforts to conceal its

malfeasance.  Additionally, there would seem to be a public interest in deterring similar

misappropriative conduct in the future.

However, given that this Court has determined (as described below) that Blue Sun is

liable to KPM for an additional $1,500,000 in punitive 93A damages, the Court, in its discretion,

will not award any additional, exemplary damages under the trade secrets statutes.  This decision

ensures that Blue Sun is not assigned any punitive damages that might be construed as unfairly

duplicative.  Indeed, this decision is in accord with the spirit of cases that counsel consideration

of the "amount of compensatory damages awarded" when determining whether to apply

exemplary damages.  Although the 93A damages award against Blue Sun in this case are of

course punitive in nature, this Court nevertheless recognizes that the total sum owed will be very

substantial and is sufficiently proportional to Blue Sun's wrongdoing.  <u>See e.g.</u>, <u>Bladeroom Grp.,</u>

<u>Ltd. v. Emerson Elec. Co.</u>, 11 F.4th 1010, 1024-1025 (9th Cir. 2021) (explaining in the trade

secrets context that consideration of the "amount of compensatory damages awarded" factor helps "balance a punitive damages award with actual harm that is caused") (citation omitted).

### 2.  Arnold Eilert and Rachel Glenister

This Court finds that exemplary damages are not warranted against Eilert and Glenister. As a starting point, the Court notes that the jury did not find either of these two Individual Defendants liable for misappropriating all of KPM's trade secrets, but instead just a subset of them.  [ECF No. 230, p. 2].  Secondly, the record at trial revealed that both Eilert and Glenister were involved with Blue Sun and its wrongful scheme for a shorter period than Lucas and Gajewski.  Moreover, while the type of conduct that they committed should of course be deterred, it is also the case that the compensatory damages awarded against them are both a sufficient deterrent against future, similar behavior and are appropriately indexed to the actual harm that Eilert and Glenister each caused.  Accordingly, this Court will not assess any exemplary damages against Eilert or Gajewski.

### 3.  Rob Gajewski and Irvin Lucas

With respect to Gajewski and Lucas, however, the Court finds that exemplary damages are very much an appropriate consequence for the willful and malicious trade secret misappropriation that these two perpetrated against KPM for a long period of time and to KPM's great detriment.  Unlike Eilert and Glenister, the jury found that both Lucas and Gajewski each misappropriated all three species of KPM's trade secrets.  [ECF No. 230, p. 2].  Accordingly, this Court, in its discretion, assesses an exemplary damages penalty in an amount equal to 50% of the compensatory damages that were awarded against each of them.  Therefore, Lucas shall owe $10,000 in exemplary damages and Gajewski shall owe $7,500 in exemplary damages.  The Court finds that these amounts reflect, among other things, the duration of their misappropriative

conduct, their consciousness of the injuries that they had caused, and their efforts to cover up

their malfeasance.  See AgroFresh Inc., 2020 U.S. Dist. LEXIS 222898 at *73.

### b.  KPM's Motion for Judgment in its Favor on its 93A Claims and for Prejudgment Interest on All Counts [ECF No. 255]

With this motion, KPM asks the Court to find that both Corporate Defendants not only

engaged in unfair or deceptive trade practices under 93A, but also that they both did so

knowingly and/or willingly.  Consequently, KPM asks that this Court treble the compensatory

damage figures awarded against each of the Corporate Defendants -- and also enter a finding that

they be held jointly and severally liable for the total amount awarded against them.  KPM further

requests reasonable attorneys' fees and costs -- certain of which would be mandatory if the Court

finds that the Corporate Defendants committed unfair or deceptive trade practices.  KPM also

asks the Court to award it additional damages against the Corporate Defendants based on

allegations that there have been violations of the Court's preliminary injunction [ECF No. 120]

that were not presented to the jury.  Lastly, KPM requests that the Court award it prejudgment

interest on all counts against each of the Defendants.

The Court will reach the merits of most of KPM's motion today, but, as it informed the

parties during a post-trial motions hearing, it will not address the merits of KPM's argument that

there have been violations of this Court's preliminary injunction order that were not presented to

the jury.  [ECF No. 283, p. 97:9-14].  If KPM wishes to seek redress for those alleged violations,

it must do so by means other than a post-trial motion related to the jury's verdict.  And, as the

Court has already informed the parties, the issue of any attorneys' fees and costs that might be

awarded in this case will be discussed in a global fashion during an upcoming motions hearing.

Relatedly, the Court reserves judgment on the issue of joint and several liability until after that

upcoming motion hearing.

33

**i. Legal Standard – Unfair or Deceptive Trade Practices Under 93A**

KPM alleged that the Corporate Defendants had violated 93A by, among other things, misappropriating its trade secrets and by tortiously interfering with its contractual relationships. [ECF No. 1, ¶¶ 131-136].  Under 93A, it is unlawful for those that are engaged in trade or commerce to use "unfair methods of competition and unfair or deceptive acts or practices in business transactions with others engaged in trade or commerce." Arthur D. Little, Inc. v. Dooyang Corp., 147 F.3d 47, 55 (1st Cir. 1998) (internal citation and quotations omitted).  As the Supreme Judicial Court has explained, 93A was designed to "to encourage more equitable behavior in the marketplace . . . [and impose] liability on persons seeking to profit from unfair practices." Linkage Corp. v. Trustees of Boston Univ., 679 N.E.2d 191, 208 (Mass. 1997) (citation omitted).  In order for 93A to possibly apply to a given dispute, there must be "a commercial transaction between a person engaged in trade or commerce and another person engaged in trade or commerce, such that they were acting in a 'business context.'" Milliken & Co. v. Duro Textiles, LLC, 887 N.E.2d 244, 259 (Mass. 2008).

Although the statute does not define "unfair" or "deceptive", Massachusetts courts have developed definitions of each term as used in the 93A context.  A practice or act is "unfair" under 93A, "if it is (1) within the penumbra of a common law, statutory, or other established concept of unfairness; (2) immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to competitors or other business people." Morrison v. Toys "R" Us, Inc., 806 N.E.2d 388, 392 (Mass. 2004) (citation omitted).  A practice or act is "deceptive" under 93A "if it possesses a tendency to deceive" (quotation and citation omitted). Aspinall v. Philip Morris Cos., 813 N.E.2d 476, 487 (Mass. 2004).  A finding of trade secret misappropriation can constitute an unfair or deceptive act under 93A. Mass Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.,

412 F.3d 215, 243 (1st Cir. 2005) ("[u]nder Massachusetts law, misappropriation of trade secrets alone can constitute a violation of Chapter 93A"). Relatedly, a finding of tortious interference can constitute an unfair or deceptive practice, as well. See People's Choice Mortg., Inc. v. Premium Cap. Funding, LLC, No. 06-3958-BLS2, 2010 Mass. Super. LEXIS 61, at *54 (Mass. Super. Ct. Mar. 31, 2010).

There is no constitutional or statutory right to a jury trial for 93A claims. Nei v. Burley, 446 N.E.2d 674 (Mass. 1983) ("there is no right to a trial by jury for actions cognizable under G.L. c. 93A"). However, in its discretion, a court may allow such claims to be tried to a jury. Serv. Publ'ns, Inc. v. Goverman, 487 N.E.2d 520, 527 (Mass. 1986). When a party brings a 93A claim along with other common law claims and the court is inclined to allow the 93A claims to be tried to a jury, the "preferred practice" is for them to be tried together. See Global Investors Agent Corp. v. Nat'l Fire Ins. Co., 927 N.E.2d 480, 490 (Mass. App. Ct. 2010). During such a jury trial, the Court has three options relative to the 93A claim(s): it may (1) allow the jury to decide the 93A question; (2) take from the jury a nonbinding advisory opinion of the 93A question, or (3) decide the 93A question independently. Id.

Just because a court allows a jury to render advisory findings on the 93A-related claims does not mean that the court is bound to accept those findings. See e.g., Columbia Chiropractic Grp. v. Tr. Ins. Co., 712 N.E.2d 93, 96 (Mass. 1999) ("[t]he judge was not bound by the jury's advisory special verdict that Columbia's G. L. c. 93A violation caused Trust no damages"). As an independent trier of fact, a court may, in its discretion, "come to its own conclusions as to the findings of fact and rulings of law." Reddish v. Statuta, No. 03-1775-G, 2006 Mass. Super. LEXIS 485, at *19 n. 9 (Aug. 28, 2006) (citation omitted). Cf. Perdoni Bros. v. Concrete Sys., 35 F.3d 1, 5 (1st Cir. 1994) ("in the Chapter 93A context, the court has

35

recognized that judge and jury, sitting as independent triers of fact, may reach conflicting conclusions") (citation omitted).  However, if a court determines that a jury's verdict appropriately resolved "all material, factual issues relating to the 93A claim" the court is "not required to make specific findings of fact."  See Makuc v. Am. Honda Motor Co., 835 F.2d 389, 394 (1st Cir. 1987); Biopoint, Inc. v. Dickhaut, No. 20-10118-RGS, 2023 U.S. Dist. LEXIS 71656, at *21 (D. Mass. Apr. 25, 2023) (concluding that "the jury's verdict amply supports a determination that Catapult violated Chapter 93A and that no further findings of fact on this issue are required").

Lastly, vicarious liability "applies in a Chapter 93A context when an agent's acts taken in service of or for the benefit of the corporation fall within the scope of his or her employment." Id. at *22.  These principles apply when multiple damages are at issue.  Id.

### i. Application – Unfair or Deceptive Trade Practices Under 93A

Here, the Court asked the jury to answer an advisory[8] question regarding whether either or both of the Corporate Defendants engaged in an unfair or deceptive trade practices. Specifically, the jury was asked:

> Did KPM prove, by a preponderance of the evidence, the either Blue Sun or ITG or both engaged in any competition, or any attempt at competition, using unfair or deceptive acts or unfair methods of competition in the conduct of trade or commerce?  [ECF No. 230, p. 7].

_____

[8] The Court treated both of the 93A-related questions submitted to the jury as advisory.  [ECF No. 242, p. 8:11-14] (the Court explaining to the parties that "if the jury makes a determination that the 93A elements have been met, then the Court . . . *will be reserving for itself what impact that would have on any ruling*") (emphasis added).  See Linkage Corp., 679 N.E.2d at 206 n.31 (explaining that "[t]he judge's decision to treat the jury verdict as advisory was within his prerogative").

The jury answered "Yes" as to both ITG and Blue Sun. Id. The Court finds that the evidentiary record amply supports the jury's determination that both Blue Sun and ITG violated 93A. Since the jury's finding resolved "all material, factual issues relating to the[se] 93A claim[s]," and because the Court has adopted that finding, it is not required to make any further specific findings of fact. See, e.g., Makuc, 835 F.2d at 394; Biopoint, Inc., 2023 U.S. Dist. LEXIS 71656 at *21. In that connection, the Court notes that neither of the Corporate Defendants has even substantively challenged the jury's determination that 93A violations occurred, but they have instead raised more technical and procedural challenges (which are addressed below). See [ECF No. 264, pp. 4-14].

### ii. Legal Standard – Willful or Knowing Violations of 93A & Multiple Damages

If a factfinder determines that a 93A violation has occurred, "the next area of inquiry" is whether that violation was "willful or knowing." Morani-Vegnani v. Travelers Ins. Co., No. 93-2028F, 1996 Mass. Super. LEXIS 705, at *10-11 (Mass. Super. Ct. Jan. 31, 1996). Establishing a "willful or knowing" violation requires a plaintiff to "prove that defendant had a 'subjectively culpable state of mind.'" BioPoint, Inc., 2023 U.S. Dist. LEXIS 71656 at *22-23 (citation omitted). In this context, willfulness "implies not only intent to do an act, but also intent that the act be unfair or deceptive" and knowing violations occur "where a defendant is aware that his act is unfair or deceptive or will cause such a result." BioPoint, Inc., 2023 U.S. Dist. LEXIS 71656 at *22 (internal citations and quotations omitted).

If the Plaintiff proves that a "willful or knowing" violation occurred, 93A requires multiple damages. Anderson v. Comcast, Corp., 500 F.3d 66, 74 (1st Cir. 2007). As the Supreme Judicial Court has explained, "multiple damages under G. L. c. 93A serve the twin goals of punishment and deterrence." Kraft Power Corp. v. Merrill, 981 N.E.2d 671, 684 (Mass. 2013)

(citation and internal quotations omitted). Specifically, 93A provides that the total recovery shall be "***up to three but not less than two times*** [the amount of 'actual damages'] if the court finds . . . a willful or knowing violation." Mass. Gen. Laws ch. 93A, § 9(3) (emphasis added). Otherwise stated, if a willful or knowing violation has occurred, the Court has discretion to "award anywhere between double or treble damages." <u>BSE Tech LLC v. Asia Tech Corp.</u>, No. 13-10972-FDS, 2014 U.S. Dist. LEXIS 10932, at *12 (D. Mass. Jan. 29, 2014) (citation omitted).

Although neither the 93A statute nor the case law construing it "provide [] trial judge[s] with clear guidance in deciding how damages should be multiplied," what is clear is that the amount of punitive damages awarded should be "based on the egregiousness of each defendant's conduct." <u>Hug v. Gargano & Assocs., P.C.</u>, 923 N.E.2d 1065, 1071 (Mass App. Ct. 2010) (citation omitted). That said, "[e]gregiousness cannot be measured in a vacuum." <u>Arthur D. Little Int'l v. Dooyang Corp.</u>, 979 F. Supp. 919, 928 (D. Mass. 1997). As one court reasoned in a case involving trade secrets, the appropriate amount of multiple damages was that which was "sufficiently punitive at the same time that it [was] proportional to the wrongdoing at issue." <u>Beninati v. Borghi</u>, No. SUCV2012-1985 BLS2, 2017 Mass. Super. LEXIS 107, at *9 (Mass. Super. Ct. July 3, 2017).

### iii. Application – Willful or Knowing Violations of 93A & Multiple Damages

Here, the jury was asked to answer an advisory question regarding whether either or both of the Corporate Defendants had willfully or knowingly committed any unfair or deceptive trade practices. Specifically, the jury was asked:

> Did KPM prove, by a preponderance of the evidence, the either Blue Sun or ITG or both willfully or knowingly engaged in unfair methods of competition or unfair or deceptive acts or practices? [ECF No. 230, p. 7].

The jury answered "Yes" as to both ITG and Blue Sun. Id. This Court finds that the evidentiary record in this case amply supports the jury's determination that both Blue Sun and ITG committed willful or knowing violations of 93A. Since the jury's finding on this question resolved "all material, factual issues relating" to this particular 93A claim and because the Court has adopted that finding, it is not required to make any further specific findings of fact. See, e.g., Makuc, 835 F.2d at 394; Serv. Publ'ns, Inc., 487 N.E.2d at 527 n.13 ("[a] judge need not make an *express* finding that a person wil[l]fully or knowingly violated G. L. c. 93A, § 2, as long as the evidence warrants a finding of either") (emphasis in original).[9] In light of this determination, the Court must assess punitive damages against both ITG and Blue Sun in an amount "***up to three but not less than two times*** [the amount of 'actual damages'] . . ." Mass. Gen. Laws ch. 93A, § 9(3) (emphasis added).

The Court, in its discretion, assesses punitive "*double*" damages against Blue Sun and ITG such that KPM's ***total*** recovery against each of them shall be as follows:[10]

- Blue Sun: $3,000,000

- ITG: $3,600,000

The Court's reasoning for assessing such "double damages" is as follows. First, the Court finds that these total damages amounts will undoubtedly serve the twin goals of 93A: namely punishment and deterrence. See Kraft Power Corp., 981 N.E.2d at 684. These large sums will send a clear signal to the marketplace that egregious acts of trade secret

---

[9] As was true with respect to the jury's finding of unfair or deceptive practices, the Corporate Defendants dedicated hardly any space in their opposition brief to challenging validity of the jury's finding of willful or knowing 93A violations. See [ECF No. 264].

[10] These figures do not account for the imposition of any (to-be-determined) reasonable attorneys' fees and costs.

misappropriation on the one hand and tortious interference with contractual relationships on the other will result in significant, real-world consequences.  Second, the Court is mindful that although Blue Sun and ITG's actions were certainly egregious in their own unique ways, "[e]gregiousness cannot be measured in a vacuum."  Arthur D. Little Int'l, 979 F. Supp. at 928. In addition to ensuring that the total damages awards are sufficiently punitive, the Court must also make sure that the total damages awarded are proportional to the wrongdoing at issue.  See Beninati, 2017 Mass. Super. LEXIS 107 at *9.  When the Court considers that ITG's gross revenue over the last five years has been between $1,000,000 and $1,300,000 [ECF No. 240, p. 85:11-15] and that Blue Sun's five-year average gross revenue has been similar (i.e., $1,116,886) [ECF No. 264-2, p. 2], this Court finds that it will take an appropriately lengthy period of time for the Corporate Defendants to pay off these total damage awards.  To have tripled the compensatory damage figures would not have been proportional.  See Beninati, 2017 Mass. Super. LEXIS 107 at *9.

### iv.  Corporate Defendants' Objections

In their opposition brief, the Corporate Defendants raised a number of objections to KPM's motion for entry of judgment in their favor on the 93A claims.  [ECF No. 264].  The Court did not find any of these objections to have merit, but it does wish to meaningfully engage with each of them.  Since they will be the subject of further discussion at an upcoming motion hearing, the Court need not yet engage with the Corporate Defendants' objections relative to 93A-related attorneys' fees and costs and joint and several liability.

### 1.  Center of Gravity

The Corporate Defendants argue that a judgment under 93A should not

enter against either of them since the unfair or deceptive acts occurred "primarily and substantially outside" the Commonwealth of Massachusetts. [ECF No. 264, pp. 4-7]. They point to various facts that they contend render a place other than Massachusetts as the "center of gravity" of the circumstances that gave rise to KPM's 93A claims -- which, if true, would mean that 93A liability could not attach to their actions. [ECF No. 264, p. 4]; Mass. Gen. Laws c. 93A, § 11 ("No action shall be brought or maintained under this section unless the actions and transactions constituting the alleged unfair method of competition or the unfair or deceptive act or practice occurred primarily and substantially within the commonwealth"). Defendants rightly point out that they bear the burden in making this argument. [ECF No. 264, p. 4].

Among the facts that the Corporate Defendants raise in support of their center of gravity argument include the fact that both ITG and Blue Sun are Maryland-based companies and that all of the Individual Defendants worked remotely from their homes during the relevant time period -- and that none of them live in Massachusetts nor traveled to Massachusetts in their employment capacity. [ECF No. 264, p. 5]. The Corporate Defendants further point out that none of the KPM customers named at trial reside in Massachusetts. [Id.] They also point out that Blue Sun has never conducted business in Massachusetts and that ITG's prior work in the Commonwealth was unconnected from the conduct alleged in this lawsuit. [Id.]

The applicable legal standard for resolving this issue derives from the Supreme Judicial Court's decision in Kuwaiti Danish Computer Co. v. Digital Equipment Corp. 781 N.E.2d 787, 799 (2003). There, the Court explained that the analysis:

> should not be based on a test identified by any particular factor or factors because of a tendency to shift the focus of inquiry away from the purpose and scope of c. 93A. Section 11 suggests an approach in which a judge should, after making findings of fact, and after considering those findings in the context of the entire §

11 claim, determine whether the center of gravity of the circumstances that give rise to the claim is primarily and substantially within the Commonwealth. <u>Id.</u>

Although the <u>Kuwaiti Danish</u> court was clear that no particular factor or factors should control the inquiry, it did acknowledge and did not disapprove of the First Circuit's three-pronged balancing test, which considers "(1) where the defendant commits the unfair or deceptive act or practice; (2) where the plaintiff receives or acts on the wrongful conduct; and (3) where the plaintiff sustained losses caused by the wrongful conduct." <u>Id.</u> at 798 n.13 (citing to, among others, <u>Roche v. Royal Bank of Canada</u>, 109 F.3d 820, 829 (1st Cir. 1997)). Thus, these three factors, while not an exhaustive list, can certainly guide this Court's inquiry. <u>See Uncle Henry's Inc. v. Plaut Consulting Co.</u>, 399 F.3d 33, 45 (1st Cir. 2005) (observing that "the <u>Kuwaiti Danish</u> court certainly did not hold or imply that the factors identified by the district court (derived from our <u>Roche</u> decision) are irrelevant to the Chapter 93A calculus"). Here, factors (2) and (3) weigh very strongly in favor of a finding that Massachusetts was the center of gravity of the circumstances that gave rise to KPM's claims.

As to factor (2), it is clear from the record that KPM "received" the Corporate Defendants' various instances of wrongful conduct in Massachusetts. KPM is a Westborough, Massachusetts-based corporation that "maintains the core of its operations, including databases, email servers, and customer lists and data in Massachusetts." [ECF No. 272, p. 7]. Moreover, the KPM NIR analyzer machines that Gajewski and Eilert serviced while acting on Blue Sun's behalf had been manufactured in Westborough, Massachusetts. [ECF No. 235, p. 15:1-2]. Relatedly, the KPM sales operations that Blue Sun and ITG repeatedly targeted with wrongful conduct was based in Westborough, Massachusetts, too. [<u>Id.</u> at 15:3-5]. And each of KPM's customer relationships that were

42

negatively affected by Blue Sun and ITG's wrongful conduct was governed by
Massachusetts law. [ECF No. 272, p. 6]. Accordingly, there is little doubt that KPM
"received" the vast majority -- if not all -- of the Corporate Defendants' wrongful conduct
in Massachusetts.

Consideration of factor (3) -- the situs of the loss -- weighs even more heavily in
favor of a finding that Massachusetts was the center of gravity for purposes of KPM's
93A claims. Indeed, the trial record revealed that two individuals acting on behalf of
Blue Sun initiated a meeting with a KPM employee designed to lure that employee over
to Blue Sun in the first quarter of 2019. [ECF No. 234, pp. 28:16-29:12]. This meeting,
which is just one example of Blue Sun/ITG's wrongful conduct, occurred in Milford,
Massachusetts. [Id.]. Moreover, KPM's proprietary UCal software -- which Blue Sun
misappropriated -- is available only from KPM, which is based in Massachusetts. [ECF
No. 230, p. 2]; [ECF No. 272, p. 6]. Likewise, KPM's calibration datasets -- which Blue
Sun also misappropriated -- reside within a Massachusetts-based "data library." [ECF No.
230, p. 2]; [ECF No. 235, p. 130:12-19]. As KPM noted, "[a]ll of the data that Rob
Gajewski and Arnold Eilert used on behalf of Blue Sun necessarily came from [a]
centralized database" containing calibration datasets that was located in Massachusetts.
[ECF No. 272, p. 7]. The Court need not go on. The fact is that the Corporate
Defendants have not met their burden here. The totality of the undisputed facts clearly
show that Massachusetts was the "center of gravity of the circumstances that give rise" to
KPM's 93A claims and therefore the Corporate Defendants cannot escape 93A liability
under their location-based argument. See Kuwaiti Danish Comput. Co., 781 N.E.2d at
799.

## 2. Preemption

The Corporate Defendants argue that any award under 93A relative to Blue Sun's acts of trade secrets misappropriation is preempted by MUTSA, which they claim "provides the *exclusive* civil remedies for misappropriation of trade secret claims." [ECF No. 264, p. 6] (emphasis added). The Corporate Defendants do not cite any legal authority for this contention. Instead, they argue that since the MUTSA provides in part that it "supersede[s] *any conflicting laws of the commonwealth* providing civil remedies for the misappropriation of a trade secret," it necessarily follows that "MUTSA supersedes [93A] and tortious interference claims where the underlying conduct is theft of a trade secret but expressly does not affect other civil remedies to the extent that they are not based upon misappropriation of trade secret." Mass. Gen. Laws c. 93, § 42F(a) (emphasis added); [ECF No. 264, p. 6].

This Court has concluded that MUTSA does not preempt any of the other claims brought in this case -- including those under 93A -- for three reasons. First, it appears that the only other Court applying Massachusetts law to have addressed the possibility of a MUTSA claim preempting a 93A claim concluded after a careful and detailed analysis that preemption was not warranted. Neural Magic, Inc., 2020 U.S. Dist. LEXIS 266048 at *8. Second, and as the Neural Magic, Inc. court pointed out, 93A § 42F(a) contains a significant carveout -- and expressly does not affect, among other things, "other civil remedies to the extent that they are not based upon the misappropriation of trade secret." 2020 U.S. Dist. LEXIS 266048 at *7; Mass. Gen. Laws c. 93, §§ 42F(a), (b)(2). The presence of this statutory language signals that the focus of a preemption inquiry should be on the causes of action that give rise to those civil remedies, and "not the factual conduct that [gave] rise to the same." Neural Magic, Inc., 2020 U.S. Dist. LEXIS 266048 at *7 (citations omitted). In other words, since it is undisputed that 93A is not a

44

trade secrets-specific or tortious interference-specific statute, it is unwarranted to conclude that claims under 93A would be preempted by MUTSA.  See id.  Thirdly, the underlying conduct relative to KPM's 93A claims against both ITG and Blue Sun were not exclusively related to trade secret misappropriation.  Indeed, the jury found ITG liable for tortious interference with KPM's contractual relationships, but not for trade secret misappropriation.  Compare [ECF No. 230, p. 2] with [Id. at p. 6].  Accordingly, the Corporate Defendants' preemption argument relative to ITG fails on that ground alone.  The underlying conduct for the 93A claim against Blue Sun was not limited to just trade secret misappropriation, either.  Indeed, the jury found Blue Sun liable for tortious interference with contractual relationships, too.  [Id. at p. 6].  Accordingly, this Court finds that KPM's MUTSA claims do not preempt any of KPM's other claims in this case.  See Neural Magic, Inc., 2020 U.S. Dist. LEXIS 266048 at *8 (citations omitted).

### 3.  "Actual Damages"

The Corporate Defendants contend that KPM's "actual damages" for purposes of 93A are not equal to the compensatory damages figures that were awarded against each of them, but that, instead, only KPM's lost profits qualify as "actual damages."  [ECF No. 264, pp. 8-9].  The Corporate Defendants argue that since KPM's damages expert at trial testified that the profit lost by KPM due to the Corporate Defendants' wrongful conduct was $918,520, that figure is "the only suitable Actual Damage multiplier for use in calculating enhanced damages."  [Id.].

The Court rejects this argument.  The compensatory damages that the jury awarded against the each of the Corporate Defendants (i.e., $1,500,000 against Blue Sun and $1,800,000 against ITG) did constitute KPM's "actual damages" for purposes of 93A.  See Mass. Gen. Laws ch. 93, § 11 (providing that the base level of recovery "shall be in the amount of actual damages .

45

. .").  As the Supreme Judicial Court has said, "actual damages" in the 93A context "consist[s] *of all damages* foreseeably flowing from an unfair or deceptive act or practice." Haddad v. Gonzalez, 576 N.E.2d 658, 665 (1991) (emphasis added).

The Corporate Defendants' "actual damages" argument fails for three principal reasons. First, and as explained above, there was no "double counting" in terms of compensatory damages -- a premise that undergirds their "actual damages" argument.  [ECF No. 264 at 7] (incorrectly concluding that the jury awarded "KPM $3M against Blue Sun ($1.5 million for trade secret misappropriation and $1.5 million for tortious interference with contract), and $1.8 million against ITG for tortious interference with contract only . . .").  Second, nothing in the nine-page verdict form asked the jury to indicate what category of damages the jury was awarding.  [ECF No. 230].  This Court declines the invitation to speculate as to whether and how they may have employed KPM's damages expert's opinions.  See Crabar/Gbf, Inc. v. Wright, No. 8:16-CV-537, 2023 U.S. Dist. LEXIS 166069, at *18-19 (D. Neb. Sep. 19, 2023) (rejecting the defendants' arguments about how the jury arrived at a damages figure in a trade secrets case and explaining that "the Court will not speculate as to how the jury arrived at its verdict") (citation omitted) (appeal pending, filed Oct. 20, 2023).

More fundamentally, though, the Corporate Defendants are incorrect that "courts have determined that the proper measure of damage is the plaintiff's lost profits, not the defendant's gain." [ECF No. 264, p. 8].  The Corporate Defendants have not pointed to any controlling precedent standing for this proposition.  Moreover, case law from a number of federal and state courts provides otherwise.  See, e.g., Kelley v. CVS Pharm., Inc, No. 98-0897-BLS2, 2007 Mass. Super. LEXIS 381, at *39-40 (Mass. Super. Ct. Aug. 24, 2007) (then-Justice of the Superior Court Gants explaining that, "[i]n cases involving so-called 'business torts,' *such as the*

46

*misappropriation of trade secrets*, trademark infringement, and ***tortious interference with contractual relations***, the measure of [93A] damages 'entitles a plaintiff to recover full compensation for his lost profits *and* requires a defendant to surrender the profits which he realized from his tortious conduct'") (citations omitted and emphasis added); Tashkian v. CVS Pharm., Inc., No. 19-11164-TSH, 2020 U.S. Dist. LEXIS 71994, at *26-27 (D. Mass. Mar. 13, 2020), report and recommendation adopted, 19-cv-11164-TSH, ECF No. 30, (D. Mass. Mar. 30, 2020) (applying Kelley at the motion to dismiss stage and concluding that a 93A plaintiff "would be entitled to recover as damages any net profit Defendants obtained as a result of its unfair and deceptive act").  Indeed, as then-Justice Gants reasoned in Kelley, "once the conduct at issue is determined to be unfair or deceptive, it would make no sense to allow the defendants to keep the profits they reaped from such conduct and provide a financial incentive for such unfair and deceptive conduct to continue." 2007 Mass. Super. LEXIS 381 at *42.  Accordingly, the Court declines the Corporate Defendants' invitation to adjust the applicable "actual damages" figures.

### 4. Punitive Damages Against ITG

A fourth objection that the Corporate Defendants raised to KPM's motion is essentially that punitive 93A damages should not enter against ITG because there was insufficient proof that Wilt and/or ITG committed a "willful or knowing" 93A violation.  This argument is a non-starter. This Court will not disturb the jury's findings that ITG engaged in unfair or deceptive trade practices and that, further, these violations were willful or knowing.  [ECF No. 230, p. 7]. Indeed, the Court has already adopted both of these jury findings.  Since these two predicates were satisfied, the Court was statutorily mandated to award "***not less than two times*** [the amount of 'actual damages']." Mass. Gen. Laws ch. 93A, § 9(3) (emphasis added).  Accordingly, the

Court will not entertain arguments about whether punitive damages were warranted vis-à-vis
ITG.

### v. Prejudgment Interest

KPM has requested that the Court award prejudgment interest as follows:

- At a rate of 12% from the date of the filing of the complaint on the single
  damages component of its 93A damages

- at a rate of 12% on the tortious interference and misappropriation of trade secret
  counts, and

- at a rate of 10% of its breach of contract claims.   [ECF No. 253, p. 20].

The Court finds that KPM <u>is</u> entitled to prejudgment interest on any elements of the
jury award(s) that can fairly be classified as "compensatory in nature." <u>Governo Law Firm LLC
v. Bergeron</u>, 166 N.E.3d 416, 428 (Mass. 2021) ("[p]rejudgment interest applies to awards of
compensatory damages because both prejudgment interest and compensatory damages seek to
make a plaintiff whole").  However, the Court <u>will not</u> award prejudgment interest to KPM on
any elements of the jury award(s) that are rightly classified as restitutionary in nature, since
"restitutionary recoveries are not designed to make the plaintiff whole; as such, they are 'distinct
from damages, which measures compensation for loss rather than disgorgement of the
defendant's gain.'" <u>Id.</u> (citation omitted).

The Court cannot presently determine the exact amount(s), if any, that are due KPM in
the form of prejudgment interest, in part, because the chart that KPM supplied in support of its
prejudgment motion [ECF No. 252] seems to have erroneously presupposed certain double
recoveries that, as explained above, are not consistent with the Court's interpretation of the
verdict form.  Relatedly, although the parties seem to agree that at least $918,520 of the total

damages awarded by the jury reflect lost profits (and therefore can be rightly categorized as "compensatory"), they have not each proposed for the Court the way in which this total sum ought to be divided against any, some or all of the Defendants. [ECF No. 264, p. 17 (Corporate Defendants stating that "$918,520 is the only suitable Actual Damage amount for use in calculating prejudgment interest" under 93A)]; [ECF No. 272, p. 18 ("there is no dispute that KPM had lost profits of at least [$918,520] and that KPM was deprived of that money, for which prejudgment interest is appropriate")]. Accordingly, the parties are to confer and to prepare and send to the Court a document setting forth each of their positions relative to the amount of prejudgment interest due KPM in light of the Court's rulings and guidance above. This document is to be filed on ECF no fewer than three (3) days prior to the next motion hearing.

   **c.   <u>KPM's Motion for the Entry of a Permanent Injunction [ECF No. 257]</u>**

   With this motion, KPM asks the Court to effectively make permanent the as-revised preliminary injunction order that Judge Hillman issued in this case on December 17, 2021. [ECF No. 120]. For their part, the Individual Defendants and Blue Sun have no objection to a permanent injunction that would bar them from using KPM's UCal software and KPM's calibration datasets. [ECF No. 267, p. 1]. However, they do object to a permanent injunction that would bar them in perpetuity from soliciting or doing business with all KPM's customers. [Id.] ITG, for its part, argues that it should be immune from any permanent injunction that might issue, principally because ITG was only found liable under 93A and for tortious interference with contract, and that therefore, the supposedly trade secrets-focused permanent injunction should not apply to it. [ECF No. 265, p.2].

   **i.   Legal Standard**

   The Court may, in its discretion, issue a permanent injunction if it concludes:

"(1) that [a party] has suffered"—or . . . will suffer—"an irreparable injury; (2)
that remedies available at law, such as monetary damages, are inadequate to
compensate for that injury; (3) that, considering the balance of hardships between
the [parties], a remedy in equity is warranted; and (4) that the public interest
would not be disserved by a permanent injunction."

Glob. NAPs, Inc. v. Verizon New England, Inc., 706 F.3d 8, 13 (1st Cir. 2013) (alterations in

original) (quoting eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006)).  As the First

Circuit has explained, "[t]he first two factors together require 'a substantial injury that is not

accurately measurable or adequately compensable by money damages.'" Id. (citation omitted).

### ii. Application

Here, KPM has established that it will suffer irreparable harm in the absence of a

permanent injunction.  The trial record revealed that KPM had expended significant effort,

resources, and time into developing its trade secrets in UCal software, calibration datasets, and

customer information.  Moreover, the record showed that KPM had taken appropriate steps to

protect those trade secrets, including requiring its employees to sign agreements containing

confidentiality/non-disclosure provisions.

Despite being intimately aware of KPM's level of investment, its trade secrets, and these

delicate market dynamics, Blue Sun and each of the Individual Defendants willfully and

maliciously misappropriated various combinations of KPM's trade secrets in the context of a

long-running scheme.  ITG, for its part, was found to have tortiously interfered with KPM's

contracts and to have, along with Blue Sun, committed willful or knowing 93A violations.  The

jury also found that each of the Individual Defendants breached their employment contracts as

well as the covenants of good faith and fair dealing.

The Defendants' brazen actions over a substantial period of time has caused irreparable

injury to KPM.  In fact, given their history of attacks aimed at KPM, it is fair to anticipate that

some or all of the Defendants would commit future, similar misdeeds in the absence of a

permanent injunction. See Benchmark Techs., Inc. v. Yugiang Tu, No. 22-10227-LTS, 2023

U.S. Dist. LEXIS 219369, at *9-10 (D. Mass. May 30, 2023) (concluding that a plaintiff had

established irreparable harm in the absence of a permanent injunction in a trade secrets case and

reasoning that "[g]iven Defendants' past knowing disregard for Benchmark's rights in its trade

secrets and confidential information, irreparable harm from misuse of these two trade secrets by

Defendants in the future may be fairly anticipated in the absence of an injunction").

A finding of irreparable harm is further supported by the fact that some courts have

determined that misappropriation of trade secrets and tortious interference actually carry a

presumption of irreparable harm. See e.g., TouchPoint Sols., Inc. v. Eastman Kodak Co., 345 F.

Supp. 2d 23, 32 (D. Mass. 2004) ("[t]he loss of a trade secret is generally found to constitute

irreparable harm. That is in recognition of the fact that, 'once the trade secret is lost, it is gone

forever'") (citation omitted); Special Purpose Accts. Receivable Co-op Corp. v. Prime One

Capital Co., 125 F. Supp. 2d 1093, 1105 (S.D. Fla. 2000) ("irreparable injury is presumed in

cases involving tortious interference with business relationships. In such cases, irreparable

injury need not be alleged or proven…") (citations omitted). Although it is not necessarily clear

that these sort of presumptions automatically attach upon findings of trade secret

misappropriation and tortious interference, this Court finds that, should it be proper for them to

attach, they offer yet further support for this Court's conclusion that KPM has proven irreparable

injury. See Benchmark Techs., Inc. v. Yugiang Tu, No. 22-10227-LTS, 2023 U.S. Dist. LEXIS

219369, at *10-11 (explaining that "[a]n open question exists in this circuit regarding whether a

[trade secret misappropriation] presumption [] is proper (without a statutory basis) under the

Supreme Court's holding in eBay Inc. v. MercExchange, L.L.C., [547 U.S. 388, 392-93 (2006)])."

Turning to the second factor, KPM has also established that remedies available at law are inadequate to compensate for its above-described injury. In that connection, the Court notes that evidence at trial showed that the NIR analyzers sold in the parties' market have a lengthy life-span, often somewhere between fifteen and twenty years. [ECF No. 240, p. 100:11-13]. Relatedly, various pieces of trial testimony strongly suggested that in the parties' NIR analyzer market, customer relationships are "vital" in building a strong "service to sale" business model. [ECF No. 258, p. 7]. Accordingly, if the Defendants were allowed to restart their wrongful conduct, additional, immeasurable damage could befall KPM, especially because of the lengthy time intervals in between machine purchases. KPM argues that although the damages it was awarded in this case will address past harms suffered, the company may nevertheless "be rejected by customers months or years from now as a result of the confusion caused by defendants . . ." [ECF No. 258, p 8]. The Court agrees with this contention and finds that KPM has established that remedies available at law are inadequate to compensate for its injury. See Comet Techs. USA Inc. v. XP Power LLC, No. 20-cv-06408-NC, 2022 U.S. Dist. LEXIS 180127, at *6-7 (N.D. Cal. Sept. 30, 2022) ("Here, the damages awarded by the jury compensated for past harm, but they did not address ongoing or future harm from the future development of XP products based on the Comet trade secrets. . . . Therefore, the Court concludes that even the significant monetary award given by the jury does not adequately compensate and is not sufficient to prevent future harm against Comet.").

Turning to the third and fourth elements, for the reasons explained in KPM's memorandum in support of its motion [ECF No. 258, pp. 10-12], the Court finds that both

elements weigh in favor of the entrance of a permanent injunction.  In particular, the Court notes that the Defendants will suffer virtually no harm from being barred from using KPM's trade secrets and are already legally barred from doing so.  Moreover, the Court finds that even though the Defendants will be barred from approaching certain KPM customers for some reasonable length of time (e.g., to be determined, but likely no more than ten years), the record is clear that even despite the restrictions placed on the Defendants by the Court's preliminary injunction order [ECF No. 120], they have been not been prevented from meaningfully competing in the marketplace and with KPM.  [Id.].  Accordingly, the Court concludes that a permanent injunction is warranted in this case.

As the Court has informed the parties, discussion of the scope of the preliminary injunction and its precise terms will be the subject of a Supplemental Memorandum and Order. However, for the avoidance of any doubt, the Permanent Injunction Order will apply with equal force to ITG.  The Court rejects ITG's contentions that it should somehow be immune from coverage under the resulting order merely because the jury did not find that it misappropriated KPM's trade secrets.  The fact remains that ITG was found liable for tortiously interfering with KPM's contracts and for willfully or knowingly engaging in unfair or deceptive trade practices. Moreover, since ITG has ownership and operational control over Blue Sun, the Court cannot and will not allow for a possibility in which a different entity under ITG's control could be allowed to engage in activities that Blue Sun is prevented from doing.

The Court expects to discuss the scope and precise terms of the resulting permanent injunction order at the next motion hearing in this case.

## VI.    REMAINING ISSUES & UPCOMING MOTIONS HEARING

As discussed throughout, the Court will hear oral argument about at least the following issues at the next motion hearing in this case:

- KPM's Motion for Attorneys' Fees and Costs [ECF No. 259];

- Whether the Court should hold ITG and Blue Sun jointly and severally liable for the damages that have been awarded against them;

- The specific amount of prejudgment interest due KPM, and

- The exact terms/scope of the permanent injunction that will issue in due course.

The parties may file any additional briefing on these or other issues that they feel is necessary on ECF no fewer than three (3) days prior to the next motion hearing.

**SO ORDERED.**

**April 10, 2024**

/s/ Margaret R. Guzman_____

Hon. Margaret R. Guzman

United States District Judge