UNITED STATES BANKRUPTCY COURT
DISTRICT OF MARYLAND
(Baltimore Division)

| | | |
|---|---|---|
| IN RE: | * | |
| BLUE SUN SCIENTIFIC, LLC | * | No.  25-17998-DER<br>Chapter 11 |
| Debtor | * | |
| IN RE: | * | |
| THE INNOVATIVE TECHNOLOGIES<br> GROUP & CO., LTD | * | No.  25-18000-DER<br>Chapter 11 |
| | * | |
| Debtor | | Jointly administered under 25-17998-DER |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

DISCLOSURE STATEMENT
IN SUPPORT OF CHAPTER 11 PLAN OF REORGANIZATION
PROPOSED BY THE INNOVATIVE TECHNOLOGIES GROUP & CO., LTD

## I.     INTRODUCTION

The Innovative Technologies Group & Co., LTD (the "Debtor"), in the above-captioned bankruptcy case, hereby respectfully submits this disclosure statement (the "Disclosure Statement") pursuant to Bankruptcy Code § 1125, in connection with the Debtor's Plan of Reorganization (the "Plan").  A copy of the Plan is annexed as **Appendix A** to this Disclosure Statement.

This Disclosure Statement sets forth certain information regarding the Debtor's pre-petition history, and significant events that have occurred during related Chapter 11 Case.  This Disclosure Statement also describes terms and provisions of the Plan, certain effects of Confirmation of the Plan, and the manner in which Distributions will be made under the Plan.  In addition, this Disclosure Statement discusses the confirmation process.

Except as otherwise provided herein, capitalized terms not otherwise defined in this Disclosure Statement have the meanings ascribed to them in the Plan.  Unless otherwise noted herein, all dollar amounts provided in this Disclosure Statement and in the Plan are given in United States dollars.

THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE PLAN, CERTAIN DOCUMENTS RELATED TO THE PLAN, CERTAIN EVENTS IN THIS CHAPTER 11 CASE AND CERTAIN FINANCIAL INFORMATION.  ALTHOUGH THE DEBTOR BELIEVES THAT SUCH SUMMARIES ARE FAIR AND ACCURATE,

SUCH SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE FULL TEXT OF SUCH DOCUMENTS.  THE DEBTOR DOES NOT WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN, INCLUDING FINANCIAL INFORMATION, IS WITHOUT ANY INACCURACY OR OMISSION.

II.     PLAN INFORMATION AND PROCEDURES

        A.      Notice to Holders of Claims and Interests.

This Disclosure Statement is being transmitted to Claim Holders for the purpose of describing the terms of the Plan and to others for informational purposes.  The purpose of this Disclosure Statement is to provide adequate information to enable the Holder of a Claim to make a reasonably informed decision with respect to whether to vote to accept or reject the Plan or to object to confirmation of the Plan to the extent such Holder possesses standing to do so.

The Debtor may ask the Bankruptcy Court to approve this Disclosure Statement as containing information of a kind and in sufficient detail adequate to enable the Claim Holders to make an informed judgment with respect to asserting any such objection.  APPROVAL OF THIS DISCLOSURE STATEMENT WILL NOT CONSTITUTE EITHER A GUARANTEE OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT OF THE PLAN BY THE BANKRUPTCY COURT.

ALL CLAIM HOLDERS ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND ITS APPENDICES CAREFULLY AND IN THEIR ENTIRETY BEFORE DECIDING TO ASSERT ANY OBJECTION TO CONFIRMATION OF THE PLAN.  This Disclosure Statement contains important information about the Plan and developments concerning the Chapter 11 Case.

THIS DISCLOSURE STATEMENT IS THE ONLY DOCUMENT AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE CONFIRMATION OF THE PLAN.  No person has been authorized to distribute any information concerning the Debtor or the Plan other than the information contained herein.

CERTAIN OF THE INFORMATION CONTAINED IN ANY DISCLOSURE STATEMENT IS, BY ITS NATURE, FORWARD LOOKING AND CONTAINS ESTIMATES, ASSUMPTIONS AND PROJECTIONS THAT MAY BE MATERIALLY DIFFERENT FROM ACTUAL, FUTURE RESULTS.  Except as otherwise specifically and expressly stated herein, this Disclosure Statement does not reflect any events that may occur subsequent to the date hereof and that may have a material impact on the information contained in this Disclosure Statement.  The Debtor does not anticipate that any amendments or supplements to this Disclosure Statement will be distributed to reflect such occurrences. Accordingly, the delivery of this Disclosure Statement shall not under any circumstance imply that the information herein is correct or complete as of any time subsequent to the date hereof.

EXCEPT WHERE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND HAS NOT NECESSARILY BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

B.      Questions About Information

If (1) you have any questions about (a) the packet of materials that you have received, or (b) the amount of your Claim; or (2) you wish to obtain, at your own expense, unless otherwise specifically required by Bankruptcy Rule 3017(d), an additional copy of the Plan, this Disclosure Statement, or any appendices or exhibits to such documents, please contact:

Jeffrey M. Orenstein, Esq.
Wolff & Orenstein, LLC
15245 Shady Grove Road
Suite 465
Rockville, Maryland 20850
(301) 250-7232
jorenstien@wolawgroup.com

C.      Confirmation Hearing and Deadline for Objections to Confirmation

Pursuant to § 1128 of the Bankruptcy Code and Bankruptcy Rule 3017(c), the Bankruptcy Court has scheduled the Confirmation Hearing for _____, 2026, at _____ (prevailing Eastern time), at the United States Bankruptcy Court for the District of Maryland,101 West Lombard Street, Baltimore, Maryland  21201.  The hearing may be continued from time to time by the Bankruptcy Court without further notice except for the announcement of the new hearing date made at the hearing or at any subsequent continued hearing. The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan must be filed with the Clerk of the Bankruptcy Court and served so that they are RECEIVED on or before _____, by:

Counsel for the Debtor
Jefrey M. Orenstein, Esq.
Wolff & Orenstein, LLC
15245 Shady Grove Road
Suite 465
Rockville, Maryland 20850
(301) 250-7232
jorenstien@wolawgroup.com

III..   **DEFINITIONS**

Except as otherwise indicated, the terms used in this Disclosure Statement have the definitions used in the Bankruptcy Code and applicable Federal Rules of Bankruptcy Procedure and the Local Rules of the United States Bankruptcy Court for the District of Maryland and the

3

United States District Court for the District of Maryland.  All defined terms shall be applicable equally to the singular and plural forms of such terms and to all genders:

Administrative Expense Claim shall mean any Claim which is entitled to administrative priority status pursuant to §§ 503(b) and 507(a)(2) of the Bankruptcy Code, including, without limitation, any Claim arising from the assumption of an executory contract or unexpired lease under § 365 of the Bankruptcy Code, fees and expenses of the any Professionals employed by the Debtor, and any taxes incurred during the pendency of this Bankruptcy Case.

Administrative Expense Claim Bar Date shall mean the date that is thirty (30) days after the Effective Date.

Allowed with respect to any Claim shall mean: (i) a Claim against the Debtor that has been listed on the Debtor's Schedules, as such Schedules may be amended from time to time pursuant to Bankruptcy Rule 1009, as liquidated in amount and not disputed or contingent and for which no contrary Proof of Claim has been filed, (ii) any Claim for which a Proof of Claim was properly and timely filed in accordance with any order of the Bankruptcy Court, the Plan, the Bankruptcy Code, and the Bankruptcy Rules, as to which no objection to allowance is made by the Debtor or a party in interest or as to which any objection has been determined by a Final Order to the extent such objection is determined in favor of the respective Holder or (iii) any Claim expressly Allowed by a Final Order or pursuant to the Plan. Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated or disputed, and for which no Proof of Claim has been timely filed, is not considered Allowed and shall be expunged on the Effective Date without further action by the Debtor and without any further notice to or action, order or approval of the Bankruptcy Court.

Administrative Expense Claim shall mean any Claim which is entitled to administrative priority status pursuant to §§ 503(b) and 507(a)(2) of the Bankruptcy Code, including, without limitation, any Claim arising from the assumption of an executory contract or unexpired lease under § 365 of the Bankruptcy Code, fees and expenses of the any Professionals employed by the Debtor, and any taxes incurred during the pendency of this Bankruptcy Case.

Allowed with respect to any Claim shall mean: (i) a Claim against the Debtor that has been listed on the Debtor's Schedules, as such Schedules may be amended from time to time pursuant to Bankruptcy Rule 1009, as liquidated in amount and not disputed or contingent and for which no contrary Proof of Claim has been filed, (ii) any Claim for which a Proof of Claim was properly and timely filed in accordance with any order of the Bankruptcy Court, the Plan, the Bankruptcy Code, and the Bankruptcy Rules, as to which no objection to allowance is made by the Debtor or a party in interest or as to which any objection has been determined by a Final Order to the extent such objection is determined in favor of the respective Holder or (iii) any Claim expressly Allowed by a Final Order or pursuant to the Plan. Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated or disputed, and for which no Proof of Claim has been timely filed, is not considered Allowed and shall be expunged on the Effective Date without further action by the Debtor and without any further notice to or action, order or approval of the Bankruptcy Court.

Atlantic Union shall mean Atlantic Union Bank.

Appellate Proceedings shall mean the proceedings in the First Circuit by which review of the KPM Judgment is being sought.

Bankruptcy Code shall mean the Bankruptcy Code, 11 U.S.C. §§ 101 et seq., and any amendments thereto.

Bankruptcy Court shall mean the United States Bankruptcy Court for the District of Maryland or any other court having jurisdiction over the Debtor's Chapter 11 case or any proceeding arising under this Chapter 11 Case.

Bankruptcy Rules shall mean (i) the Federal Rules of Bankruptcy Procedure and the Official Bankruptcy Forms, as amended and promulgated under § 2075 of Title 28 of the United States Code, (ii) the Federal Rules of Civil Procedure, as amended and promulgated under § 2072 of Title 28 of the United States Code, (iii) the Local Rules of the Bankruptcy Court, and (iv) any standing orders governing practice and procedure issued by the Bankruptcy Court, each as in effect on the Petition Date, together with all amendments and modifications thereto to the extent applicable to this case or proceedings herein, as the case may be.

BFG shall mean Business Finance Group, Inc.

Blue Sun shall mean Blue Sun Scientific, LLC.

Blue Sun Case shall mean In re Blue Sun, LLC, Case No. No.  25-17998, that is pending in this case and that is being jointly administered with the Debtor's bankruptcy case.

Cash Collateral Order shall mean the Consent Order Authorizing Debtor's Use of Cash Collateral and Granting Adequate Protection to Sandy Spring Bank, a Division of Atlantic Union Bank, Pursuant to 11 U.S.C. § 363, entered by the Court on September 16, 2025.

Cash Infusion shall mean the sum of $25,000.00 that shall be paid by Mr. Wilt in five equal annual installments of $5,000.00 as a new value contribution for his equity interest in the Debtor.

Chapter 11 Case shall mean the above-captioned bankruptcy proceeding initiated by the filing of the Debtor's Petition.

Claim shall have the meaning ascribed to such term in § 101(5) of the Bankruptcy Code.

Class shall mean any class in which Allowed Claims are classified pursuant to Article II of this Plan.

Confirmation Date shall mean the date the entry of the Confirmation Order becomes a Final Order.

Confirmation Order shall mean the Order of the Bankruptcy Court in this Chapter 11 Case confirming the Plan pursuant to § 1129 and other applicable sections of the Bankruptcy Code.

Court shall mean the United States Bankruptcy Court for the District of Maryland.

Creditor shall mean the Holder of a Claim, within the meaning of § 101(10) of the Bankruptcy Code, including Secured Creditors, Unsecured Creditors, and Creditors with Administrative Expense Claims, Priority Claims, and Priority Tax Claims.

Debtor shall mean the Innovative Technologies Group & Co., LTD, the debtor in possession in this Chapter 11 Case.

DIP shall mean debtor in possession which in this Case is the Debtor, as it has continued in possession of its assets and operated its business during the course of this Chapter 11 Case.

Disposable Income shall mean the income or other receipts received or to be received by the Debtor, that is not reasonably necessary to be expended for the payment of amounts necessary for the continuation, preservation, operation, or litigation efforts of the business of the Debtor and that is not required to pay Claims in any senior Class in accordance with the provisions of this Plan.  Professional fees incurred after the Effective Date are expenses that are deemed necessary for the continuation, preservation, operation, or litigation efforts of the business of the Debtor.

District Court shall mean the United States District Court for the District of Massachusetts.

Distributions means any distribution pursuant to the Plan to the Holders of Allowed Claims.

Effective Date shall mean the first business day following the date that is thirty (30) days after the entry of the Confirmation Order.

Executory Contracts shall mean all contracts and unexpired leases to which the Debtor is a party and which are executory within the meaning of § 365 of the Bankruptcy Code.

Expenses shall mean the amounts necessary for the continuation, preservation, operation, or litigation efforts of the business of the Debtor.

Final Order shall mean an order or judgment of the Bankruptcy Court which has not been reversed, stayed, modified or amended and as to which the time to appeal or seek reconsideration or rehearing thereof or file a petition for certiorari has expired.

First Circuit shall mean the United States Court of Appeals for the First Circuit.

First Circuit Appeal shall mean the Debtor's appeal of the KPM Judgment which had been filed Pre-Petition and which was pending at the time of the filing of the Petition

Holder shall mean (a) as to any Claim, (i) the owner or Holder of such Claim as such is reflected on the Proof of Claim filed with respect to such Claim, (ii) if no Proof of Claim has been filed with respect to such Claim, the owner or Holder of such Claim as such is reflected on the Schedules or the books and records of the Debtor or as otherwise determined by order of the Bankruptcy Court, (iii) if the owner or Holder of such Claim has assigned or transferred the Claim to a third party and the Debtor has received sufficient written evidence of such assignment or transfer, the assignee or transferee; or (iv) any subrogee of a Holder of a Secured Claim; and (b) as to any interest, the record owner or Holder of such interest as of the Effective Date. Impaired shall mean any Claim or Interest that is impaired within the meaning of § 1124

Interests shall mean, to the extent applicable to this Chapter 11 Case, the interest of any Holder of stock or membership interests in the Debtor.

ITPROP shall mean  ITPROP LLC.

ITPROP Indebtedness shall mean the amounts that ITPROP owed to Sandy Spring.

KPM shall mean KPM Analytics North America Corporation.

KPM Litigation shall mean the Pre-Petition litigation in the District Court that resulted in the KPM Judgment.

KPM Judgment shall mean the Judgment entered in the District Court in favor of KPM and against the Debtor, Blue Sun, and a number of individuals.

Mr. Wilt  shall mean Robert Wilt, the Debtor's one hundred percent (100% )owner.

Petition shall mean the Voluntary Petition filed by the Debtor on August 29, 2025.

Petition Date shall mean August 29, 2025.

Plan shall mean the Debtor's Plan of Reorganization in its present form or as it hereafter may be modified, amended or supplemented.

Post-Petition shall mean any event occurring on or after the Petition Date.

Premises shall mean the real property identified as Suite H, 8017 Dorsey Run Road, Jessup, Maryland  20794, that is owned by ITPROP and at which the Debtor conducts its business.

7

Pre-Petition shall mean any event occurring before the Petition Date.

Pre-Petition Atlantic Union Indebtedness shall mean the amounts owed to Atlantic Union on the Petition Date.

Pre-Petition SBA Indebtedness shall mean the amounts owed to the SBA on the Petition Date.

Priority Claim shall mean any Allowed Claim of a person holding a Claim entitled to priority pursuant to Bankruptcy Code §507(a) other than an Allowed Claim of a governmental unit pursuant to Bankruptcy Code § 507(a)(8).

Priority Tax Claim shall mean any Allowed Claim of a governmental unit pursuant to Bankruptcy Code § 507(a)(8); provided, however, any Claims for penalties asserted by governmental units shall not be a Priority Tax Claim.

Professionals shall mean persons, including attorneys, accountants, the Trustee, and other professionals, retained or appointed in the Chapter 11 case or to be compensated pursuant to §§ 327, 328, 330, 503(b) and 1103 of the Bankruptcy Code and order of the Bankruptcy Court.

Projections shall mean the Debtor's cash flow projections that are attached to the Disclosure Statement as **Appendix B,** as may be modified and amended.

Sandy Spring shall mean Sandy Spring Bank.

Sandy Spring Collateral shall mean all of the Debtor's inventory, chattel paper, accounts, equipment and general intangibles; whether any of the foregoing is owned now or acquired later: all accessions. additions. replacements, and substitutions relating to any of the foregoing: all records of any kind relating to any of the foregoing; all proceeds relating to any of the foregoing (including insurance, general intangibles and other accounts proceeds).

Sandy Spring Guaranty shall mean the Guaranty Agreement executed by the Debtor in connection with the obligations due under the Sandy Spring Note.

Sandy Spring Indebtedness shall mean the amounts due under the Sandy Spring LOC.

Sandy Spring LOC shall mean the $75,000.00 line of credit extended to the Debtor by Sandy Spring Bank in accordance with a Business Loan Agreement that was executed by the Debtor.

Sandy Spring Note shall mean the Note executed on or about March 15, 2011, evidencing Sandy Spring's loan to ITPROP in the original principal amount of $356,500.00.

8

Sandy Spring Pledge shall mean the Business Loan Security Agreement executed by the Debtor by which it pledged its Sandy Spring Collateral as security for its obligations under the Sandy Spring Guaranty.

SBA shall mean the United States Small Business Administration.

SBA Collateral shall mean all assets of the Debtor including but not limited to, equipment, fixtures, inventory, accounts, instruments, chattel paper, general intangibles and furniture.

Secured Claim shall mean a secured Claim pursuant to § 506 of the Bankruptcy Code, and shall mean an Allowed Claim in an amount equal to the present value of the applicable Creditor's interest in the Debtor's interest in the Property, or in the amount subject to setoff, as may be established by this Plan, the Confirmation Order, or separate Order of the Bankruptcy Court.

Smith Duggan shall mean Smith Duggan Cornell & Gollub LLP

Unsecured Claim shall mean any Claim which is not an Administrative Expense Claim, Priority Tax Claim, Priority Claim, or a Secured Claim, including (i) any Claim arising from the rejection of an executory contract or unexpired lease under § 365 of the Bankruptcy Code, (ii) except as otherwise provided in the Plan, any portion of a Claim to the extent the value of the Creditor's interest in the estate's interest in the Debtor's property securing such Claim is less than the amount of the Allowed Claim, or to the extent that the amount of the Claim subject to setoff is less than the amount of the Allowed Claim, as determined pursuant to § 506(a) of the Bankruptcy Code, (iii) any Claim arising from the provision of goods or services to the Debtor prior to the Petition Date, and (iv) any Claim designated as an Unsecured Claim elsewhere in the Plan.

W&O shall mean Wolff & Orenstein, LLC, the Debtor's attorneys in this Case.

## IV.  HISTORY OF THE DEBTOR AND EVENTS LEADING TO COMMENCEMENT OF THE CHAPTER 11 CASE

### A.  History of the Debtor

#### 1.  General Background

The Debtor is a corporation that was formed under the laws of the State of Maryland on June 5, 1997.  Since that time, it has operated as a specialized manufacturer of process and quality control optical instruments serving the food and agriculture, packaging, and oil analysis industries.  Several of the instruments it manufactures are sole-source critical, highly technical, devices and components for companies that the Debtor has served for more than 25 years including any technological upgrades.  The Debtor has designed, invented and manufactured successful NIR products for companies over the course of its 28 years in business,

including selling the Unity Scientific Spectrastar product line to Westco Scientific in 2008 ($5,000,000 in sales per year at peak).  After the selling of the Unity Spectrastar product line in 2008, the Debtor focused on continuing to provide the sole-source components, along with manufacturing consumables used in various analytical instruments and being a unique service provider for a variety instrumentation including support for instruments dating back to 1997.

Over the course of its existence, the Debtor and its employees have successfully patented at least five inventions that have been unique to the products provided to its customers.  One of those patents was assigned to, and remains property of, the Debtor.  The Debtor, its owners, and its employees are proud of the inventions and products the Debtor has produced and of the quality of service it has provided for nearly 30 years. In those 30 years, the Debtor has established a customer base that depends on the Debtor to continue proper quality control for their products for the foreseeable future.

The Debtor created a new NIR product line.  Over the course of 4 years, and through partnerships with influential customers, it was able to fully launch and begin to market that product line in 2014.  The Debtor decided to market and sell this product line directly as its own, unlike the typical OEM (Private Label) model, that it had used in the past.  The acceptance of this product led the Debtor to launch a wholly-owned sales and marketing subsidiary, Blue Sun. In 2018 and 2019, the Debtor began to sell the Phoenix NIR product line through Blue Sun. The Phoenix line began to have good acceptance within the marketplace based upon some unique, and innovative features that increased productivity in the food and agriculture markets.

With a dedicated team of ten employees, including 6 full-time employees with an average of twenty years of service to the Debtor, and operating out Premises, which is owned by ITPROP, an entity that is an insider of the Debtor as that term is defined in the Bankruptcy Code. the Debtor has maintained a strong reputation for quality and reliability.  The Debtor's annual sales range between $1,200,000.00 and $1,800,000.00, and it has a consistent history of meeting its financial obligations, including payroll, taxes, and supplier payments to dozens of vendors, while delivering products on time to its customers.  Those dedicated employees, none of whom have non-compete agreements with the Debtor, are the heart and soul of the Debtor's operations

On April 5, 2021, KPM, a competitor of the Debtor, sued the Debtor, Blue Sun, and a number of individuals in the District Court, asserting claims of trade secret misappropriation and tortious interference centered around the sales of the Phoenix NIR product line.  The details of the KPM Litigation are described in more detail below.  However, during roughly two years of rigorous legal battles, the Debtor and Blue Sun were required to spend large amounts of money for legal fees that otherwise would have gone to the bottom line.  Of equal importance, the litigation occupied significant portions of the time of leadership in engineering, accounting and sales arms of the Debtor.  Beyond creating a heavy debt burden, the distractions caused by the litigation led to less productivity and a reduction in sales growth.  As legal fees mounted and cash flow became an issue, many of the key vendors of the Debtor began to demand advance payment terms.  The vendors' demands significantly impacted the cash flow of the business. The Debtor made adjustments to the number of full-time employees that were on staff and began to use consultants less often.

In order to maintain operations, the Debtor utilized its lines of credit to continue to get the necessary parts to make instrumentation to meet the needs of its customers. These debts continued to pile up as sales decreased slightly in 2024. In order to maintain its customer base, to overcome the negative publicity, and to attempt to attract new distribution channels, the Debtor chose not to increase the price points for their NIR product line. While the end user pricing remained flat, changes in the economy meant that prices for components were increasing in general. These increases were exacerbated by additional price increases due to the Debtor's inability to place larger bulk orders. These changes further negatively affected the Debtor's cash flow.

The Debtor was successful in bringing on new countries for distribution in 2024 through its sales channel; however, there is typically an 18-month lead time for distributors to hit their full stride and, with this in mind, the Debtor does anticipate a significant growth in sales to begin until late 2025. This too will have a significant impact on the cash flow and stability of the Debtor.

Prior to the collection action by KPM, the Debtor was generally paying its trade debts as they came due and, but for what is believed to be an erroneous Judgment, the Debtor would have been able to operate without the intervention of the Bankruptcy Court. Nonetheless, the Debtor knew that the Judgment was going to impact its business and recognized it might eventually need to file for protection under the Bankruptcy Code.

In advance of the enrollment of the Judgment in the United States District Court for the District of Maryland, the Debtor had consulted with W&O to evaluate its options. The Debtor retained W&O to engage in a detailed analysis of its finances to be able to assess what a Chapter 11 case might look like for the Debtor and might provide for creditors. After the entry of the KPM Judgment in the District Court, and knowing that collection activities were on the horizon, the Debtor recognized that pursuit of relief under Chapter 11 in the Bankruptcy Court was probably upon it in order to maximize its chances for long-term success. The issuance of the Writs of Garnishment and the freezing of the Debtor's bank accounts resulting from the Writs sealed that decision.

### 2.    Sandy Spring Bank Debt

As of the Petition Date, the Debtor was indebted to Sandy Spring in the total amount of $58,953.10. The Sandy Spring Indebtedness is evidenced by the Sandy Spring Not, as amended, a Business Loan Agreement. In order to secure the Sandy Spring Indebtedness and the ITPROP Indebtedness (discussed below) due and owing to Sandy Spring, the Debtor previously granted a security interest in the Sandy Spring Collateral described in the Note, including, but not limited to, all inventory, chattel paper, accounts, equipment, and general proceeds of the Debtor and the proceeds thereof and related thereto. Sandy Spring's security interest in the Sandy Spring Collateral was properly perfected by virtue of a UCC-1 Financing Statement recorded with the Maryland State Department of Assessments and Taxation as amended and continued since its initial filing. The Sandy Spring Indebtedness is secured by a valid, perfected and enforceable

11

lien on all of the Sandy Spring Collateral. The Sandy Spring Indebtedness is also secured by an Indemnity Deed of Trust dated October 30, 2019, executed and delivered by the Debtor's owner, Mr. Wilt, and his wife, Cathy L. Wilt.

As of the Petition Date, ITPROP was also indebted to Sandy Spring in the total amount of $220,492.18. The ITPROP Indebtedness is evidenced by, inter alia a Term Promissory and a Guaranty Agreement executed and delivered by the Debtor to Sandy Spring, pursuant to which the Debtor unconditionally and irrevocably guaranteed payment of the ITPROP Indebtedness. The Debtor also executed a Business Loan Security Agreement dated March 15, 2011, delivered to Sandy Spring a Security Agreement, pledging its assets as additional collateral for the payment of the ITPROP Indebtedness.    e. The Financing Statement also secures the ITPROP Indebtedness. The Debtor's obligation on the ITPROP Indebtedness is secured by a valid, perfected and enforceable lien on all of the Sandy Spring Collateral.

Years after these loan transactions, Sandy Spring was acquired by Atlantic Union. Today, Atlantic Union holds all of the rights of Sandy Spring as those rights relate to the Debtor and ITPROP.

### 3.      SBA Debt

Based upon a Proof of Claim filed by the SBA, as of the Petition Date, the Debtor was indebted to the SBA in the total amount of $287,811.68. This portion of the Pre-Petition SBA Indebtedness is evidenced by, inter alia: a Note dated June 8, 2011, executed and delivered by ITPROP in the principal amount of $294,000.00 that was guaranteed by the Debtor.  Based upon a second Proof of Claim filed by the SBA, as of the Petition Date, the Debtor was also indebted to the SBA in the total amount of $172,134.78. This portion of the Pre-Petition SBA Indebtedness is evidenced by, inter alia: a Note dated June 22, 2020, executed and delivered by Debtor in the principal amount of $150,000.00.  The loans are secured by the Premises owned by ITPROP as well as the SBA Collateral.

### 4.      KPM Litigation

On April 5, 2021, KPM, a competitor of the Debtor, sued the Debtor, Blue Sun, and a number of individuals in the District Court, asserting claims of trade secret misappropriation and tortious interference centered around the sales of the Phoenix NIR product line.  The initial basis of this lawsuit framed the accusations in a manner to imply that the technology for the Debtor's product was stolen from KPM through the hiring of new employees.  Initially, KPM requested an injunction banning the creation of the instrumentation, but that request for relief was denied based on the fact that the Debtor was the original inventor of the technology in question.

The suit was filed in Massachusetts notwithstanding that neither the Debtor, Blue Sun, nor any of the other defendants were located in the Commonwealth of Massachusetts, and notwithstanding that there were no agreements between the parties or any of their predecessors that would have permitted jurisdiction to be proper in Massachusetts.  The Debtor raised the

issue of lack of jurisdiction and believes that, from the outset, the District Court misapplied the law on jurisdiction to retain jurisdiction and allow the case to proceed in the District Court.

In August of 2021, a vague preliminary injunction was issued restricting the customer base that was eligible to purchase the NIR instrument from the Debtor. As a result, there was confusion in the customer base that caused a pause in the growth of the product line.

On May 17, 2023, the jury empaneled in the District Court found in favor of the Debtor on the trade secret and misappropriation claims, but against the Debtor for tortious interference. The initial judgment amount allocated to the Debtor was $1,800,000.00. KPM released press releases on social media that created doubts among some of the Debtor's repeat customers and partners about the Debtor's long-term viability. This social media campaign created stagnation in sales for some of the Debtor's product lines.

On February 7, 2025, the District Court issued a final judgment in the litigation. The Judgment included interest and attorneys' fees and totaled more than $9,000,000.00. With post-judgment interest, KPM asserts that the amount of its Claim resulting from the KPM Judgment is $10,130,176.42. The District Court also provided injunctive relief which sets out 46 companies in the United States to whom the Debtor cannot sell its NIR product line for a period of 10 years. While the injunction provides limitations on the Debtor's ability to market its products, the limitations in the injunction have served to clear up some of the market confusion and the Debtor believes that clarification will enable the Debtor to resume the growth trajectory that it saw pre-litigation.

### 5.    The First Circuit Appeal

On February 26, 2025, the Debtor and Blue Sun engaged the services of Smith Duggan to handle the appeal from the KPM Judgment entered against the Debtor and Blue Sun in the District Court. On March 4, 2025, Smith Duggan, on behalf of the Debtor and Blue Sun, noted an appeal from the KPM Judgment. The appeal was pending in the First Circuit on the Petition Date.

### B.    Events Leading to Bankruptcy

The Debtor's bankruptcy filing was ultimately precipitated by the commencement of the anticipated collection action by KPM. With the appeal pending in the First Circuit, on July 30, 2025, KPM enrolled the Judgment in the United States District Court for the District of Maryland and sought and obtained Writs of Garnishment on the bank accounts of the Debtor and Blue Sun. But for the collection action, with the completion of the litigation at the trial court level, and engaged in preparations for pursuing the appeal, the Debtor's management team believed it was prepared to focus its full attention on growing the Phoenix product line, thus enabling the Debtor to reach its full potential while continuing to provide the devices, components and services that have been unaffected by litigation.

Prior to the collection action by KPM, the Debtor was generally paying its trade debts as they came due and, but for what is believed to be a reversible Judgment, the Debtor would have been able to operate without the intervention of the Bankruptcy Court.  Nonetheless, the Debtor knew that the Judgment was going to impact its business and recognized it would likely need to file for protection under the Bankruptcy Code.

In advance of the enrollment of the Judgment in Maryland, the Debtor had consulted with W&O to evaluate its options.  The Debtor retained W&O to engage in a detailed analysis of its finances to be able to assess what a Chapter 11 case might look like for the Debtor and might provide for creditors.  After the entry of the Judgment in Massachusetts, and knowing collection action was on the horizon, the Debtor decided that it likely would need to pursue relief under Chapter 11 in the Bankruptcy is Court in order to maximize its chances for long-term success.  The issuance of the Writs of Garnishment and the freezing of the Debtor's bank accounts resulting from the Writs sealed that decision.

### C.      The Chapter 11 Case

#### 1.        Continuation of Business

Since the Petition Date, the Debtor has continued to operate as a Debtor in possession subject to the supervision of the Bankruptcy Court and the United States Trustee's Office in accordance with the Bankruptcy Code. In addition, the Bankruptcy Court will supervise the Debtor's employment of attorneys and other professionals as required by the Bankruptcy Code. An immediate effect of the filing of the Debtor's Voluntary Petition was the imposition of the automatic stay under § 362(a) of the Bankruptcy Code which, with limited exceptions, enjoined the commencement of any new actions against the Debtor or continuation of collection efforts and litigation against the Debtor.  The stay applied to the collection action in Maryland and the appeal that was then pending in the First Circuit.  The automatic stay remains in effect, unless modified by the Bankruptcy Court or applicable law, until the Effective Date.

#### 2.        Significant Events During the Bankruptcy Case

Having obtained a release of its garnished funds by filing the Petition, the Debtor recognized that the resolution of the KPM Judgment, through the continuation of the Appellate Proceedings, was among the most important components of the Debtor's bankruptcy case.  The Debtor believes that the District Court improperly determined that KPM held any Claim against the Debtor and believes that, to the extent any Claim exists, the amount awarded was excessive.  As it stands, the KPM Judgment makes KPM the Holder of a Disputed Claim that makes up close to ninety percent (90%) of the total unsecured Claims against the Debtor.  For that reason, completion of the Appellate Proceedings will have a substantial impact on what creditors will receive in this Case and, perhaps even whether the Debtor will be capable of obtaining an Order confirming a Plan, even one supported by one hundred percent of the Holders of Claims other than KPM itself.

14

For that reason, the Debtor sought the Court's authority to employ Smith Duggan as special counsel for the purpose of continuing its representation of the Debtor in the Appellate Proceedings. Recognizing the importance of the appeal, KPM objected to the Application to employ Smith Duggan and the Bankruptcy Court conducted a hearing. The Court determined that there was no basis for KPM's objection and, by Order entered November 3, 2025, authorized the employment of Smith Duggan.

Because the Appellate Proceedings had been stayed, and having then secured the employment of Smith Duggan to prosecute the appeal, the Debtor next moved to lift the automatic stay to allow the Appellate Proceedings to proceed. Once again, KPM sought to block the Debtor's attempt to move forward with the appeal by filing an objection to the Motion for relief from the stay. As before, the Court conducted a hearing and determined that there was no basis for KPM's objection. By Order entered December 29, 2025, the Court lifted the stay to permit the Appellate proceedings to proceed.

Upon receipt of notification that the stay had been lifted, Smith Duggan immediately notified the First Circuit so that the Appellate Proceedings could go forward. Since that time, the issues in the Appellate Proceedings have been fully briefed. The First Circuit has scheduled oral argument for May 7, 2026. Based upon its research of the law and the facts, Smith Duggan is beyond optimistic that the KPM Judgment will be reversed due to the District Court's clear lack of jurisdiction over the Debtor and Blue Sun, both of which had no connection to the Commonwealth of Massachusetts. Smith Duggan also believes that there are significant errors relating to the substantive issues in the case. If Smith Duggan is correct and the KPM Judgment is set aside, KPM will not hold any Claim against the Debtor in this case and Holders of Claims will receive substantially larger distributions upon confirmation of the Debtor's Plan than they otherwise would if KPM held an Allowed Claim.

### D. Summary of Claims and Bar Date

#### 1. Schedules and Statements of Financial Affairs

The Debtor has filed Schedules of Assets and Liabilities and a Statements of Financial Affairs (collectively, as may be amended, the "Schedules and Statements") with the Bankruptcy Court.

#### 2. Claims Bar Date and Proofs of Claim

The claims bar established by the Court for this case was January 26, 2026 for Holders of Claims other than governmental units and February 25, 2026 for governmental units.

## V. PLAN DESCRIPTION

**THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE, CLASSIFICATION, AND TREATMENT OF THE PLAN AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, WHICH ACCOMPANIES THIS**

**DISCLOSURE STATEMENT, AND TO THE EXHIBITS ATTACHED THERETO. THE PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN WILL CONTROL THE TREATMENT OF CREDITORS AND INTEREST HOLDERS UNDER THE PLAN AND WILL, UPON THE EFFECTIVE DATE, BE BINDING UPON HOLDERS OF CLAIMS AGAINST THE DEBTOR.**

### A.    Overview

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under Chapter 11, a debtor is authorized to reorganize or liquidate its business for the benefit of its creditors. The Debtor has filed the Plan as a means to maximize the value of the Debtor's Estate for the benefit of creditors. The following is a summary of the significant provisions of the Plan. All statements made below are general in nature and are qualified in their entirety by reference to the complete terms of the Plan attached hereto. Creditors and parties-in-interest are urged to read the entire Plan and consult with their respective counsel, accountants, and business advisors in order to fully understand the Plan.

The Plan, upon confirmation by the Bankruptcy Court, shall be legally binding upon the Debtor, its creditors, and other parties-in-interest designated by § 1141(a) of the Bankruptcy Code.

It is essential that Creditors fully understand the Plan in order to make an informed decision with respect to the treatment of their respective Claims or Interests. Unless otherwise defined herein, all capitalized terms shall have the respective meanings assigned in the Plan. In the event that any disclosure herein provided appears to conflict with an express provision of the Plan, the explicit terms of the Plan, as incorporated as an integral element of the Disclosure Statement, are controlling.

The following is a summary of the Plan and a brief description of the treatment of the Classes of Claims and Interests.

### B.    Plan Objectives

The Plan proposes that the Debtor will continue to operate its business and for a period of five (5) years, use its Disposable Income to make distributions to Holders of Allowed Claims in the priority established by the Bankruptcy Code as set forth in more detail herein. After the Appellate Proceedings have been resolved, the existence and amount of KPM's Claim have been finally determined, and any other Claim Objections are resolved, the Debtor will distribute all cash of the estate to general unsecured creditors pro rata basis after the Administrative Claims, the Claims of Priority Creditors, and the claims of creditors with Claims of $2,500.00 or less have been paid in full.

C.    **Classification and Treatment of Claims and Interests**

1.    **Unclassified Claims**

Under the Plan, administrative claims and priority tax claims are unclassified, meaning they are not placed in any specific class. The Debtor has two known administrative claims, professional fees to Wolff & Orenstein and professional fees to Smith Duggan.  To date, the Debtor has no known priority tax claims.  The following is an explanation of how such claims shall be treated under the plan.

a.    **Administrative Claims**

i.    **Allowed Administrative Expense Claims Other than Professional Fees**

Persons that hold Administrative Expense Claims and that do not timely file and serve a motion or application seeking payment in accordance with the Plan and the Bankruptcy Code will be forever barred from asserting those

An Administrative Expense Claim that is not a Professional Fee Claim will be allowed only if: on or before the Administrative Expense Claim Bar Date, the Person holding the Claim both filed with the Bankruptcy Court a motion or application requesting that the Debtor pay the Claim and served the motion or application on the Debtor and the U.S. Trustee. Persons seeking allowance of an Administrative Expense Claim under this paragraph shall be required to file a notice that the deadline to object to such allowance shall be the Administrative Expense Claims Objection Deadline. Provided, however, that the Debtor may elect to deem an Administrative Expense Claim (other than a Professional Fee Claim) incurred in the ordinary course of the Debtor's business to be treated as an Allowed Administrative Expense Claim in accordance with the terms and conditions of the particular transaction that gave rise to the Claim without requiring the Person holding such Administrative Expense Claim to file a request for payment. Any objection to an Administrative Expense Claim must be filed by the Administrative Expense Claims Objection Deadline. In the event that an objection is timely filed to an Administrative Expense Claim, the Bankruptcy Court shall determine the allowed amount of such Administrative Expense Claim.

ii.    **Allowed Professional Fee Claims: Final Fee**

Applications must be filed no later than forty-five (45) days after the Effective Date. Final Fee Applications will be noticed in accordance with the Bankruptcy Rules and Local Rules.  Objections, if any, shall be filed in accordance with the Bankruptcy Rules and Local Rules and served on the Professional whose Final Fee Application is being objected to, the Debtor, and the Office of the U.S. Trustee. Failure to properly object to a Final Fee Application constitutes a waiver of a party's right to object to a Final Fee Application.  Except to the extent that a holder of an Allowed Administrative Expense Claim agrees to a different treatment, each holder of an Allowed Administrative Expense Claim shall receive from the

17

Debtor, in full and complete settlement, satisfaction and discharge of its Allowed Administrative Expense Claim, on the later to occur of (i) the Effective Date (or as soon as reasonably practicable thereafter) and (ii) the date on which such Claim shall become an Allowed Claim, Cash equal to the unpaid portion of such Allowed Expense Administrative Claim; provided, however, that Allowed Administrative Expense Claims with respect to liabilities incurred by the Debtor in the ordinary course of business during the Case may be paid in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto by the Debtor. Holders of Administrative Claims will be paid in full on account of their Claims and are not entitled vote on this Plan.

### C.    Priority Tax Claims

The Debtor does not believe that any Priority Tax Claims exist in this Case. To the extent that such claims are discovered to exist, provided that a Priority Tax Claim has not been paid prior to the Effective Date, on, or as soon as reasonably practicable after, the Distribution Date immediately following the date a Priority Tax Claim becomes an Allowed Priority Tax Claim, but in no event later than the date that is five (5) years after the Petition Date, a Holder of an Allowed Priority Tax Claim shall receive, in full and final satisfaction, settlement, and release of and in exchange for such Allowed Priority Tax Claim, (i) Cash in an amount equal to the aggregate principal amount of the unpaid portion of such Allowed Priority Tax Claim, plus interest on the unpaid portion of such Allowed Priority Tax Claim from the Effective Date through the date of payment at the rate of interest determined under applicable nonbankruptcy law as of the calendar month in which Confirmation occurs, or (ii) such other treatment as to which such Holder and the Debtor shall have agreed upon in writing; provided, however, that the Debtor shall have the right to prepay any Allowed Priority Tax Claim, or any remaining balance of any Allowed Priority Tax Claim, in full at any time on or after the Effective Date without premium or penalty. Holders of Priority Tax Claims will be paid in full on account of such Claims and are not entitled to vote on this Plan.

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a different treatment, each holder of an Allowed Priority Tax Claim shall receive from the Debtor, in full and complete settlement, satisfaction and discharge of its Allowed Priority Tax Claim, Cash in an amount equal to such Allowed Priority Tax Claim, with post-petition interest at the Federal Judgment Rate in effect on the Petition Date on, or as soon thereafter as is reasonably practicable, the later of the Effective Date and the first Business Day after the date that is thirty (30) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim.

### Class 1 – Secured Claim of Atlantic Union (ITPROP Loan)

Atlantic Union is the Holder of a first priority lien on substantially all of the Debtor's Assets. Atlantic Union's Secured Claim was perfected by Sandy Spring's filing of a UCC-1 Financing Statement with the Maryland State Department of Assessments and Taxation on March 28, 2011 as extended by the filing of Forms UCC-3.  The obligation evidenced by the First Sandy Spring Note that was executed by ITPROP.  The Debtor guaranteed the obligation of

18

ITPROP and is obligated to Atlantic Union Bank for any payments not made by ITPROP. Atlantic Union has retained its liens on the Debtor's Assets through the Cash Collateral Order. Pursuant to the Cash Collateral Order, the allowed amount of Atlantic Union's Claim is $220,492.18. In full and complete satisfaction of the Allowed Secured Claim of Atlantic Union, ITPROP shall continue to make the payments required under the Loan Documents with the obligation remaining guaranteed by the Debtor. The Holder of the Class 1 Allowed Secured Claim shall retain its lien securing the loan to the same extent and priority that existed on the Petition Date, as enhanced by the Cash Collateral Order, until such time as the Class 1 Allowed Secured Claim is paid in full. Class 1 is Unimpaired and therefore the Holder of the Class 1 Claim is not entitled to vote to accept or reject the Plan.

### Class 2 – Secured Claim of Atlantic Union (Line of Credit)

Atlantic Union is the Holder of a second priority lien on substantially all of the Debtor's Assets. Atlantic Union's Secured Claim is perfected by the same UCC-1 Financing Statement with the Maryland State Department of Assessments and Taxation on March 28, 2011 as extended by the same Form UCC-3. The Debtor has been making regular monthly payments during the course of the Chapter 11 Case in accordance with the Cash Collateral Order and will continue to make those payments under the contract terms until the obligation is paid in full. The Holder of the Class 2 Allowed Secured Claim shall retain its lien securing the loan to the same extent and priority that existed on the Petition Date, as enhanced by the Cash Collateral Order, until such time as the Class 2 Allowed Secured Claim is paid in full. Pursuant to the Cash Collateral Order, the allowed amount of Atlantic Union's Claim is $58,953.10. Class 2 is Unimpaired and therefore the Holder of the Class 2 Claim is not entitled to vote to accept or reject the Plan.

### Class 3 – Secured Claim of the SBA (ITPROP Loan)

The SBA is the Holder of a third priority lien on substantially all of the Debtor's Assets. The SBA's Secured Claim was perfected by the SBA's filing of a UCC-1 Financing Statement with the Maryland State Department of Assessments and Taxation on June 9, 2011 as extended by the filing of Forms UCC-3. The obligation evidenced by the SBA Note that was executed by ITPROP. The Debtor guaranteed the obligation of ITPROP and is obligated to the SBA for any payments not made by ITPROP. In full and complete satisfaction of the Allowed Secured Claim of the SBA, ITPROP shall continue to make the payments required under the SBA Loan Documents with the obligation remaining guaranteed by the Debtor. The Holder of the Class 3 Allowed Secured Claim shall retain its lien securing the loan to the same extent and priority that existed on the Petition Date until such time as the Class 3Allowed Secured Claim is paid in full. By its Proof of Claim No. 3, the SBA asserts that its Claim is $115,676.90. Class 3 is Unimpaired and therefore the Holder of the Class 3 Claim is not entitled to vote to accept or reject the Plan.

## Class 4 – Secured Claim of the SBA

The SBA is the Holder of a fourth priority lien on substantially all of the Debtor's Assets. The SBA's Secured Claim was perfected by the SBA's filing of a UCC-1 Financing Statement with the Maryland State Department of Assessments and Taxation on July 9, 2020.  The Debtor has been making regular monthly payments during the course of the Chapter 11 Case in accordance with the terms of the SBA Loan Documents and will continue to make those payments under the contract terms until the obligation is paid in full.  The Holder of the Class 4 Allowed Secured Claim shall retain its lien securing the loan to the same extent and priority that existed on the Petition Date until such time as the Class 4 Allowed Secured Claim is paid in full. By its Proof of Claim No. 1, the SBA asserts that its Claim is $172,134.78.  Class 4 is Unimpaired and therefore the Holder of the Class 4 Claim is not entitled to vote to accept or reject the Plan.

## Class 5 - Priority Wage Claims

Class 5 consists of Allowed Unsecured Claims of the Debtor's employees in amounts up to, and including, $17,150.00 for wages that were earned, but not paid, in the 180 days immediately preceding the Petition Date.  As reflected in the Debtor's Schedules, those Claims are as follows:

| CLAIMANT | CLAIM AMOUNT | PRIORITY AMOUNT |
| --- | --- | --- |
| Aaron Coleman | $7,080.00 | $7,080.00 |
| Cathy Wilt | $9,030.87 | $9,030.87 |
| David Bush | $10,707.50 | $10,707.50 |
| Lana Sapojnik | $1,898.20 | $1,898.20 |
| Lev Guttman | $100.00 | $100.00 |
| Linda Taylor | $6,992.34 | $6,992.34 |
| Morton Vaughn | $499.18 | $499.18 |
| Robert Wilt | $87,079.83 | $12,479.83 |

In full and complete satisfaction, discharge and release of the Class 5 Claims, the Debtor shall pay each Holder of a Class 5 Claim one hundred percent (100%) of its Allowed Class 5 Claim, in full, without interest, within ninety (90) days of the Effective Date.  Class 5 is Impaired and therefore the Holders of Class 5 Claims are entitled to vote to accept or reject the Plan.

## Class 6 – Unsecured Convenience Claims- Claims under $2,500.00

Class 6 consists of Allowed Unsecured Claims in amounts equal to or less than $2,500.00.  As reflected in the Debtor's Schedules, those Claims are as follows:

| CLAIMANT | SCHEDULED AMOUNT | PROOF OF CLAIM |
| --- | --- | --- |
| AFLAC | $1,152.42 | |
| Allied Waste Service | $662.00 | |
| Baltimore Gas & Electric | $1,463.00 | |

| CLAIMANT | SCHEDULED AMOUNT | PROOF OF CLAIM |
|---|---|---|
| Berkshire Life | $854.87 | |
| Cingular Wireless | $787.65 | |
| Comcast | $581.27 | |
| Hunt Manor Insurance | $2,240.57 | |
| Intelliworks HT | $962.00 | $10,498.55[1] |
| McMaster Carr Supply | $1,073.10 | $1,073.10 |
| Mega Electronics | $174.20 | |
| MSC Industrial Supply | $70.76 | |
| Newark Electronics | $921.66 | |
| The Hartford Insurance Group | $2,240.47 | |
| UPS Corporate Legal Dept | $376.10 | |
| Vital Records Control | $178.20 | |

Each Holder of an Allowed General Unsecured Claim in an amount greater than $2,500.00, which would otherwise be an Allowed General Unsecured Claim in any other Class under the Plan, may voluntarily reduce its Claim to $2,500.00 and be treated as a Holder of an Allowed Unsecured Convenience Claim for purposes of this Plan. Such an election must be made on the Ballot and be received by the Debtor on or prior to the Voting Deadline. Any election after the Voting Deadline shall not be binding upon the Debtor unless the Voting Deadline is expressly waived, in writing, by the Debtor, provided, however, that under no circumstance may such waiver by the Debtor occur on or after the Effective Date. In full and complete satisfaction, discharge and release of the Class 6 Claims, the Debtor shall pay each Holder of a Class 6 Claim one hundred percent (100%) of its Allowed Claim, in full, without interest, within ninety (90) days of the Effective Date Class 6 is Impaired and therefore the Holders of Class 6 Claims are entitled to vote to accept or reject the Plan.

### Class 7 - General Unsecured Claims

Class 7 consists of the Allowed non-priority Unsecured Claims including any wage claims that exceed $17,500.00 or that were earned more than 180 days prior to the Petition Date. As reflected in the Debtor's Schedules, those Claims are as follows:

| CLAIMANT | SCHEDULED AMOUNT | PROOF OF CLAIM |
|---|---|---|
| Digi-Key Corporation | $3,983.77 | |
| Esco Products | $7,079.51 | |
| Gordon Feinblatt | $829,497.82 | $894,147,29 |
| GPD Optoelectronics | $3,080.00 | |
| HT Machine Shop, LLC | $101,042.75 | |

---

[1]    Based upon the filed Proof of Claim, Intelliworks will not be included in Class 6 unless it reduces the amount of its claim to $2,500.00.

| CLAIMANT | SCHEDULED AMOUNT | PROOF OF CLAIM |
|---|---|---|
| ITPROP | $4,358.00 | |
| R/S Electronics, Inc. | $8,857.05 | |
| Smith Duggan | $99,000.00 | $101,498.30 |
| T&M Machine Shop | $8,214.00 | |
| Terrace Assembly | $12,626.10 | |
| Todd & Weld, LLP | $6,116.50 | |
| Wells Fargo | $51,609.67 | $52,971.42 |
| Robert Wilt[2] | $74,600.00 | |

In full and complete satisfaction, discharge and release of the Class 7 Claims, the Debtor shall pay each Holder of a Class 7 Allowed Claim, on a pro rata basis, pari passu, with the Allowed Class 8 Claim, on a quarterly basis, without interest, commencing the quarter immediately following the quarter when Class 6 Claims have been paid in full.  Class 7 Claims will be paid from Disposable Income through and including the date that is five (5) years after the Effective Date.

### Class 8 - Disputed Unsecured Claim of KPM

Class 8 consists of the disputed Judgment Claim of KPM on account of the Judgment entered in the District Court.  See Claim #5 in the amount of $10,130,176.42.  The Debtor has appealed the judgment and that appeal remains pending.  Class 7 is treated as disputed until resolution of the appeal.  The Debtor scheduled KPM's Disputed Claim at $10,092,992.14 and KPM has filed its Proof of Claim 5 asserting a Claim of $10,130,176.42.  To the extent that the Appellate Proceedings result in KPM holding an Allowed Claim, in full and complete satisfaction, discharge and release of the Class 8 Claim, the Debtor shall pay the Holder of the Class 8 Allowed Claim pari passu with the Allowed Class 7 Claims, on a quarterly basis, without interest, commencing the quarter immediately following the quarter when Class 6 Claims have been paid in full.  The Class 8 Claim will be paid from Disposable Income through and including the date that is five (5) years after the Effective Date.

### Class 9 - Equity Interests

Class 9 consists of the Equity Interest in the Debtor.  Mr. Wilt, as the sole Holder of a Class 9 Interest, shall have his Interest reinstated under the Plan in exchange for the Cash Infusion, and shall receive all proceeds of the Cash Infusion after payment of all Post-Effective Date Expenses, U.S. Trustee fees, Administrative Expenses, Secured Claims, Priority Claims, and General Unsecured Claims. Class 9 Interests are impaired.

---

[2]    This Claim represents the amount of Mr. Wilt's Wage Claim that is not a priority wage claim because it exceeds the allowed dollar amount and because a portion of the fees were earned more than one hundred eighty days prior to the Petition Date.

**VI.   PLAN IMPLEMENTATION/EFFECT OF CONFIRMATION OF THE PLAN**

**A.   Cash Infusion**

Within 14 days of the Effective Date, Mr. Wilt shall cause to be paid the first $5,000.00 of his Cash Infusion.  On the same date for each of the following four years, Mr. Wilt shall cause to be paid an additional $5,000.00 to the Bankruptcy Estate for a total of $25,000.00.

**B.   Revesting of Property of the Estate**

On the Effective Date, all of the assets of the Debtor shall vest in the Debtor, subject to the Liens and other obligations expressly created or preserved by this Plan, but otherwise free and clear of all other liens, claims, interests and encumbrances. All rights to manage the Debtor shall be vested in the Debtor, including any right to appeal the Confirmation Order.

**C.   Retention of Professionals**

On the Effective Date, the Debtor shall be allowed, without further order of the Bankruptcy Court, to employ and compensate professionals, including, but not limited to, counsel, expert witnesses, accountants, appraisers, consultants, and financial advisors, as needed to assist them in fulfilling their obligations under the Plan, and on whatever fee arrangement they deem appropriate, including, without limitation, hourly fee arrangements and contingency fee arrangements. Professionals engaged by the Debtor after the Effective Date shall not be required to file applications for compensation in order to receive the compensation provided for herein. If the Debtor have any objection to an application for compensation submitted to it by a professional, the Debtor and the Professional which has submitted the application may file a motion with the Bankruptcy Court to decide the matter.

**D.   Operation of Business**

Upon confirmation of the Plan, as may be modified from time to time, the Debtor shall be free to, in a manner not inconsistent with the Plan or any Order issued by the United States Bankruptcy Court, to (1) pay Post-Effective Date Expenses without restriction, (2) operate its business without restriction.

**E.   Indemnification Obligations**

Except as otherwise provided in the Plan or any contract, instrument, release, or other agreement or document entered into in connection with the Plan, any and all indemnification obligations that the Debtor has pursuant to a contract, instrument, agreement, certificate of incorporation, by-law, comparable organizational document or any other document, or applicable law, shall be rejected as of the Effective Date, to the extent executory. Nothing in the Plan shall be deemed to release the Debtor's insurers from any claims that might be asserted by counter parties to contracts or agreements providing the indemnification by and of the Debtor, to the extent of available coverage.

### F.      Entry of a Final Decree

Promptly following i) occurrence of the Distribution Date; ii) the passage of the applicable claims bar dates in the Case, the Debtor may file a motion with the Bankruptcy Court to obtain the entry of a final decree.

### G.      United States Trustee Fees and Reports

All fees then due and payable pursuant to 28 U.S.C. § 1930 Effective Date shall be paid by the Debtor. All such fees that become due and payable thereafter by the Debtor shall be paid by the Debtor when due. The Debtor shall pay quarterly fees to the U.S. Trustee until the Chapter 11 Case is closed or converted and/or the entry of a final decree. The Debtor shall file post-Confirmation quarterly reports or any pre-confirmation monthly operating reports not filed as of the Confirmation Hearing in conformance with the U.S. Trustee Guidelines. The U.S. Trustee shall not be required to file a request for payment of its quarterly fees, which shall be paid by the Debtor.

### H.      Post-Effective Date Effect of Evidences of Claims

Commencing on the Effective Date, notes and other evidences of Claims will represent only the right to receive the Distributions contemplated under the Plan.

### I.      Transfer Tax Exemption

Pursuant to § 1146(a) of the Bankruptcy Code, the issuance, transfer or exchange of any notes or securities under the Plan, or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, including, without limitation, any deeds, deeds of trust, mortgages, bills of sale or assignments executed in connection with any of the transactions contemplated under the Plan, including the sale, conveyance and/or transfer of any or all of the ABP Collateral, and any deed of trust evidencing any loan obtained to purchase said property, shall not be subject to any stamp tax or other similar tax, including, but not limited to, transfer and recordation tax on the conveyance of the ABP Collateral.

### J.      Discharge

Pursuant to Bankruptcy Code section 1141(d)(1), and subject to the occurrence of the Effective Date, Confirmation will discharge all Claims against the Debtor except for the obligations and Liens expressly created or preserved by this Plan. All injunctions or stays provided for in the Chapter 11 Case under Bankruptcy Code section 105 or 362, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect through and including the Effective Date. On the Effective Date, the Discharge will go into effect.

## VII.   LITIGATION

### A.   Pending Litigation and Disclosures

There is no known pending litigation other than the Appellate Proceedings.

### B.   Preservation of Causes of Action and Defenses

Except as otherwise expressly provided in the Plan, and as addressed above, on the Effective Date, all property of the Estate, including, but not limited to, all claims, rights, defenses, Causes of Action of the Debtor, shall vest in the Debtor, free and clear of all liens, Claims, charges or other encumbrances, other than the liens of Atlantic Union and the SBA that are addressed in the Plan.  Unless expressly waived, released or settled in the Plan or any Final Order, the Debtor shall retain, and may exclusively enforce, any and all claims, rights, defenses and Causes of Action (including without limitation, claims, rights, defenses and Causes of Action not specifically identified, or which the Debtor may presently be unaware of, or which may arise or exist by reason of additional facts or circumstances unknown to the Debtor, at this time, or facts or circumstances which may change or be different from those which the Debtor believes to exist), whether arising before or after the Petition Date, in any court or tribunal, including but not limited to the  Bankruptcy Court. The Debtor, is authorized to exercise and perform the rights, powers and duties held by the Debtor's Estate, including without limitation the authority under Bankruptcy Code § 1123(b)(3) to provide for the settlement, adjustment, retention and enforcement of claims, rights, defenses and Causes of Action. The Debtor shall further have the power, and may exercise discretion, to institute, prosecute, abandon, settle, or compromise any and all such claims, rights, defenses and Causes of Action, and shall not be required to seek Bankruptcy Court approval of such decisions.

### C.   Preclusion Doctrines

No preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable, or otherwise), or laches shall apply to such claims, rights, defenses or Causes of Action upon, or after, the Confirmation or consummation of the Plan based on the Disclosure Statement, the Plan, or the Confirmation Order, except where such claims, rights, defenses or Causes of Action have been specifically released in the Plan or other Final Order.  No preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable, or otherwise), or laches shall prevent the Debtor from objecting to any Claim, except where such Claim is specifically allowed in the Plan or other Final Order. All Causes of Action are specifically preserved.

No one may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any claim, right, defense or Cause of Action against them as an indication that the Debtor will not pursue any and all available claims, rights, defenses, or Causes of Action against them. The Confirmation Order shall not bar the Debtor by res judicata, collateral estoppel, or

otherwise from collecting, prosecuting, settling, or defending any claim, right, defense, or Cause(s) of Action.

THE DEBTOR WILL MAKE THE DECISION TO PURSUE, NOT PURSUE OR SETTLE VARIOUS CAUSES OF ACTION IN ITS DISCRETION WITH THE ADVICE OF COUNSEL. THIS DECISION MAY BE BASED ON MANY FACTORS, INCLUDING BUT NOT LIMITED TO THE MERITS OF THE VARIOUS CAUSES OF ACTION AND THE COSTS REQUIRED TO PROSECUTE SUCH CAUSES OF ACTION. AS SET FORTH IN ARTICLE IX OF THE PLAN, THE DEBTOR AND ITS PROFESSIONALS, REPRESENTATIVES, SUCCESSORS AND ASSIGNS SHALL NOT HAVE ANY LIABILITY ARISING OUT OF THE DEBTOR'S GOOD FAITH DETERMINATION OF WHETHER OR NOT TO PURSUE PROSECUTION OR SETTLEMENT OF ANY CAUSE OF ACTION.

## VIII.   TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A.   Assumption and/or Rejection of Executory Contracts and Unexpired Leases

Any executory contracts on unexpired leases not assumed in the Plan will be deemed rejected upon entry of the Confirmation Order.

### B.   Bar Date for Rejection Damage Claims

Any Rejection Damage Claims arising from the rejection under the Plan of an Executory Contract or Lease must be filed with the Court and served on the Debtor and its counsel within thirty (30) days after the Effective Date. Any Rejection Damage Claims that are not timely filed and served will be forever barred and unenforceable and the Persons holding these Claims will be barred from receiving any Distributions under the Plan on account of their Rejection Damage Claims. The Debtor reserves the right to object to any such Rejection Damage Claims; provided, however, that any such objections must be served and filed not later than the Claims Objection Deadline.

## IX.   RETENTION OF JURISDICTION

Under Bankruptcy Code sections 105(a) and 1142, and notwithstanding entry of the Confirmation Order, substantial consummation of this Plan, and occurrence of the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising out of, and related to, the Chapter 11 Case and this Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:

1.   Allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim, the resolution of any objections to the allowance or priority of Claims or Interests and the determination of requests for the payment of claims

26

entitled to priority under Bankruptcy Code section 507(a)(1), including compensation of any reimbursement of expenses of parties entitled thereto;

2.      Hear and determine all applications for compensation and reimbursement of expenses of Professionals under this Plan or under Bankruptcy Code sections 330, 331, 503(b), 1103, and 1129(a)(4); provided, however, that from and after the Effective Date, the payment of the fees and expenses of the retained Professionals of the Debtor shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court;

3.      Hear and determine all matters with respect to the assumption or rejection of any executory contract or unexpired lease to which the Debtor is a party or with respect to which the

Debtor may be liable, and to hear, determine and, if necessary, liquidate any Claims arising therefrom;

4.      Effectuate performance of and payments under the provisions of this Plan;

5.      Hear and determine any and all adversary proceedings, motions, applications and contested or litigated matters arising out of, under, or related to the Chapter 11 Case, this Plan, or any Plan Document;

6.      Enter such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of this Plan and all contracts, instruments, releases, and other agreements or documents created in connection with this Plan, the Disclosure Statement, or the Confirmation Order;

7.      Hear and determine disputes arising in connection with the interpretation, implementation, consummation, or enforcement of this Plan, including disputes arising under agreements, documents, or instruments executed in connection with this Plan;

8.      Consider any modifications of this Plan, cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

9.      Issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with implementation, consummation, or enforcement of this Plan or the Confirmation Order;

10.      Enter and implement such orders as may be necessary or appropriate if the Confirmation Order is for any reason reversed, stayed, revoked, modified, or vacated;

11.      Hear and determine any matters arising in connection with or relating to this Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release or other agreement or document created in connection with this Plan, the Disclosure Statement or the Confirmation Order;

12. Enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Case;

13. Except as otherwise limited herein, recover all Assets of the Debtor and property of the Estate, wherever located;

14. Hear and determine matters concerning state, local, and federal taxes in accordance with Bankruptcy Code sections 346, 505 and 1146;

15. Hear and determine all matters related to the property of the Estate from and after the Confirmation Date;

16. Hear and determine any Causes of Action;

17. Hear and determine all disputes involving the existence, nature, or scope of the injunctions, indemnification, exculpation, and releases granted pursuant to this Plan;

18. Hear and determine all matters related to the property of the Estate from and after the Confirmation Date;

19. Hear and determine such other matters as may be provided in the Confirmation Order or as may be authorized under, or not inconsistent with, provisions of the Bankruptcy Code;

20. Enforce all orders previously entered by the Bankruptcy Court;

21. Dismiss the Chapter 11 Case; and

22. Enter a final decree closing the Chapter 11 Case.

If the Bankruptcy Court abstains from exercising jurisdiction, or is without jurisdiction, over any matter, this Article will not affect, control, prohibit, or limit the exercise of jurisdiction by any other court that has jurisdiction over that matter.

## X.      CONDITIONS TO CONFIRMATION AND CONSUMMATION OF THE PLAN

### A.      Conditions to Confirmation

In addition to any other conditions as may be imposed by law, the following are conditions to confirmation of the Plan:

1. A Final Order finding that the Disclosure Statement contains adequate information pursuant to Bankruptcy Code § 1125 shall have been entered by the Bankruptcy Court;

2.      A proposed Confirmation Order in form and substance, reasonably acceptable to the Debtor;

3.      Approval of all provisions, terms and conditions hereof in the Confirmation Order.

## B.      Conditions to Effective Date

The following are conditions precedent to the occurrence of the Effective Date, each of which must be satisfied or waived in writing in accordance with Article VII.C of the Plan:

1.      The Confirmation Order shall have been entered in the Debtor's Chapter 11 Case and shall provide that the Debtor is authorized to take all actions necessary or appropriate to enter into, implement and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with the Plan or effectuate, advance, or further the purposes thereof;

2.      The Confirmation Order shall have become an unstayed Final Order, except that the existence of an appeal absent a stay pending appeal shall not delay the Effective Date;

3.      All Exhibits shall be, in form and substance, reasonably acceptable to the Debtor, and shall have been executed and delivered by all parties' signatory thereto;

4.      The Debtor shall be authorized and directed to take all actions necessary or appropriate to enter into, implement and consummate the contracts, instruments, releases, leases, indentures, and the agreements or documents created in connection with, and expressly provided for under, the Plan; and

5.      All other actions, documents, and agreements necessary to implement the Plan shall have been effected or executed.

## C.      Waiver of Conditions

Each of the conditions set forth in Article VII of this Plan, except for entry of the Confirmation Order, as set forth in Article VII.B.1 of this Plan, may be waived in whole or in part by the Debtor. The failure to satisfy or waive any condition to the Effective Date may be asserted by the Debtor as a basis to not consummate this Plan regardless of the circumstances giving rise to the failure of such condition to be satisfied. The failure of the Debtor to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right that may be asserted at any time.

### D.    Consequences of Non-Occurrence of Effective Date

In the event that the Effective Date does not occur, the Debtor reserves all rights to seek an order from the Bankruptcy Court directing that the Confirmation Order be vacated, that this Plan be null and void in all respects, and/or that any settlement or treatment of Claims provided for in this Plan be null and void. In the event that the Bankruptcy Court shall enter an order vacating the Confirmation Order, the time within which the Debtor may assume and assign or reject all executory contracts and unexpired leases not previously assumed, assumed and assigned, or rejected, shall be extended for a period of thirty (30) days after the date the Confirmation Order is vacated, without prejudice to further extensions as may be approved by the Court either before or after the expiration of such 30-day period.

## XI.    CERTAIN FACTORS TO BE CONSIDERED

The Holders of Claims against the Debtor should read and carefully consider the following factors, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith and/or incorporated by reference herein), before deciding whether to vote to accept or to reject the Plan if it is determined that solicitation of votes on the Plan is necessary.

### A.    Certain Bankruptcy Considerations

The Plan provides for certain conditions that must be fulfilled prior to Confirmation of the Plan and the Effective Date. As of the date of this Disclosure Statement, there can be no assurance that any or all of the conditions in the Plan will be met (or waived) or that the other conditions to Confirmation, if any, will be satisfied.

### B.    Tax Consequences

**THE FOLLOWING IS INTENDED TO BE ONLY A SUMMARY OF SELECTED FEDERAL AND STATE INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH, AND RECEIPT OF TAX ADVICE FROM, A TAX PROFESSIONAL. THE SELECTED FEDERAL AND STATE TAX CONSEQUENCES THAT ARE DESCRIBED HEREIN AND OTHER FEDERAL, STATE AND LOCAL TAX CONSEQUENCES THAT ARE NOT ADDRESSED HEREIN ARE COMPLEX AND, IN SOME CASES, UNCERTAIN. SUCH TAX CONSEQUENCES MAY ALSO VARY BASED ON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER OF AN ALLOWED CLAIM. ACCORDINGLY, AS NOTED ABOVE, EACH HOLDER OF AN ALLOWED CLAIM IS STRONGLY ADVISED TO CONSULT WITH ITS OWN TAX ADVISOR REGARDING THE FEDERAL, STATE AND LOCAL TAX CONSEQUENCES OF THE PLAN.**

**THE DEBTOR DOES NOT INTEND TO REQUEST A TAX RULING FROM THE INTERNAL REVENUE SERVICE OR ANY OTHER TAXING AUTHORITY WITH RESPECT TO ANY OF THE TAX CONSEQUENCES OF THE PLAN.**

30

**CONSEQUENTLY, THE INTERNAL REVENUE SERVICE OR ANOTHER TAXING AUTHORITY MAY DISAGREE WITH AND MAY CONTEST ONE OR MORE OF THE TAX CONSEQUENCES DESCRIBED HEREIN TO THE DEBTOR OR CREDITORS**.

1.      Federal Income Tax Consequences to the Debtor:  As reflected in the Schedules, the Debtor has the benefit of substantial net operating losses that accrued during the prolonged period that it was engaged in the KPM Litigation.  The Debtor does not believe that confirmation of this Plan will result in any adverse tax consequences to the Debtor.

2.      Federal Income Tax Consequences to Creditors: The character, amount and timing of income, gain or loss the Holders of Allowed Claims and Interests may recognize as a consequence of the Distributions under the Plan will depend upon, among other things, (i) the manner in which the Claim or interest was acquired, (ii) the length of time the Claim was held, (iii) whether the Claim was acquired at a discount, (iv) whether the Holder of an Allowed Claim has taken a bad debt deduction for the Claim, (v) whether the Holder has previously included accrued but unpaid interest with respect to the Claim, (vi) the Holder's method of tax accounting, (vii) whether the Claim is an installment obligation under the tax laws, and (viii) the type of consideration received or deemed received by the Holder in exchange for its Claim. Therefore, Holders of Allowed Claims should consult their tax advisors for information that may be relevant to their particular situations and circumstances and the particular tax consequences to such Holders as a result thereof.

## XII.    FEASIBILITY OF THE PLAN AND BEST INTERESTS OF CREDITORS

### A.      Feasibility of the Plan

The Bankruptcy Code requires that Confirmation of a plan is not likely to be followed by the liquidation, or the need for further financial reorganization of the Debtor. The Plan contemplates the payments being made solely from the Cash Infusion and from Disposable Income.  Plan funding is not being made in any guaranteed amount.  For these reasons, the Debtor believes that the Plan meets the feasibility requirement.

### B.      Best Interests Test

The "best interests" test, as set forth in Bankruptcy Code § 1129(a)(7), requires a bankruptcy court to find either that all members of an impaired class of claims or interests have accepted the plan or that the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code.

#### 1.      Projected Disposable Income

The Debtor's Projections that are attached as **Appendix B** reflect projected profits from the Debtor's operations as follow:

31

|       |              |
|-------|--------------|
| Year 1 | $111,040.00 |
| Year 2 | $89,529.00  |
| Year 3 | $160,968.00 |
| Year 4 | $241.160,00 |
| Year 5 | $297,050.00 |
| Total  | $899,747.00 |

### 2.   Liquidation Analysis

As reflected in the Debtor's Schedules, the total value of the Debtor's assets on the Petition Date was $3,744,482.79 at fair market value.  However, that amount includes $2,631,786.00 in net operating losses, and asset that would have no value if the Debtor's business was to be closed and its assets liquidated.  The remaining value of the assets is $1,112,696.79 at fair market value.  The Debtor's assets do not include real property or other assets that would be likely to retain full value upon liquidation.  Receiving as much as fifty percent (50%) of value for assets in a liquidation would be remarkable.  If the case was converted to a case under Chapter 7, a Chapter 7 Trustee was appointed, and the Trustee was able to sell all of the assets for fifty percent (50%) of their value, the Trustee would receive the gross amount of roughly $556,000.00.  The Trustee's commissions under the provisions of 11 U.S.C. 326 would be $56,350.00.  Any liquidator used by the Trustee would likely receive ten percent of the gross liquidation amounts received and thus would receive approximately $55,600.00.  Secured claims in Classes 1 through 4 exceed $560,000.00.  Of that amount, the sum of $231,087.88 relates to loans made directly to the Debtor and not to ITPROP.  The Debtor anticipates that administrative expenses for professional fees in the Chapter 11 case will exceed $125,000.00.  There would be additional administrative expenses in the Chapter 7 case for legal and accounting fees which are conservatively estimated to be $25,000.00.  Finally, before any distribution would be made to general unsecured creditors, the Priority Wage Claims of $48,000.00 would have to be paid first.

In summary, the anticipated costs and distributions that would be incurred and paid before any distribution would be made to general unsecured creditors is as follows:

|                          |                  |
|--------------------------|------------------|
| Chapter 7 Trustee        | $56,350.00       |
| Liquidator               | $55,600.00       |
| Secured Claims           | $231,087.00[3]   |
| Chapter 11 Legal Fees    | $125,000.00      |
| Priority Wage Claims     | $48,000.00       |
| Estimated Chapter 7 Exp. | $25,000.00       |
| Total                    | $541,037.00      |

Applying these expenses and distributions to the $556,000 that would be received from a liquidation **IF** the Trustee received fifty percent (50%) of value, $24,963.00 would remain for

---

[3]    These are the amounts of the loans made directly to the Debtor; however, the Debtor remains liable on its guarantees of the loans made to ITPROP.

distribution to general unsecured creditors.  The Debtor believes that this net recovery is highly unlikely; however, it is for that reason that Mr. Wilt has agreed to provide the $25,000 Cash Infusion.  With that Cash Infusion, and with the ability to receive distributions from Disposable Income over a period of five years, creditors are positioned to receive substantially more under the Debtor's Plan than they would receive through a liquidation of the Debtor's assets and the Plan is in the best interest of the Creditors..

## XIII.   ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

As addressed above, the Debtor believes that the Plan affords Holders of Claims the potential for a better realization on the Debtor's Assets than a Chapter 7 liquidation, and, therefore, is in the best interests of such Holders.

If, however, any requisite acceptances of voting Classes of Claims are not received, or no Plan is confirmed and consummated, the theoretical alternatives include: (a) formulation of an alternative plan or plans of liquidation; (b) liquidation of the Debtor's estate under Chapter 7 of the Bankruptcy Code; (c) appointment of a Chapter 11 trustee or (d) dismissal of the Debtor's case under 11 U.S.C § 1112.

### A.   Alternative Plans

If the Plan is not confirmed, the Debtor or any other party in interest could attempt to formulate and propose a different plan or plans of reorganization or liquidation.

With respect to an alternative liquidation plan, the Debtor has explored various other alternatives in connection with the process involved in the formulation and development of the Plan.  The Debtor believes that the Plan enables Creditors to realize the greatest possible value under the circumstances, and, as compared to any plan of liquidation, has the greatest chance to be confirmed and consummated.

### B.   Liquidation under Chapter 7

If no Plan is confirmed, the Chapter 11 Case may be converted to a case under Chapter 7 of the Bankruptcy Code. As discussed above, the Cash Infusion is calculated to equal the amount that would be available for distribution in a Chapter 7 case.  As a result, the Debtor does not believe that unsecured creditors would receive a greater distribution under Chapter 7 of the Bankruptcy Code than they would under the Plan.

### C.   Dismissal of the Chapter 11 Case

If no Plan is confirmed, the Debtor or other parties in interest may seek dismissal of the Chapter 11 Case pursuant to Bankruptcy Code § 1112. Without limitation, dismissal of the

Chapter 11 Case would terminate the automatic stay and might allow creditors such as Atlantic Union and the SBA to foreclose liens on the Debtor's assets.  Accordingly, the Debtor believes that dismissal of the Chapter 11 Case could reduce the value of the Debtor's assets

Respectfully submitted,

\s\ Jeffrey M. Orenstein
JEFFREY M. ORENSTEIN (#07512)
Wolff & Orenstein, LLC
15245 Shady Grove Road, Suite 465
Rockville, Maryland  20850
(301) 250-7232
jorenstein@wolawgroup.com

Counsel for The Innovative Technologies
 Group & Co, LTD

CERTIFICATE OF SERVICE

I hereby certify that on the 29th day of April, 2026, a copy of the foregoing was served by electronic mail to:

Hugh M. Bernstein, Esq.
Office of the United States Trustee
101 W. Lombard Street
Suite 2625
Baltimore, Maryland 21202
hugh.m.bernstein@usdoj.gov

Michael Nord, Esq.
Gebhardt and Smith, LLP
One South Street, Suite 2200
Baltimore, Maryland 21202
mnor@gebsmith.com

Michael Benjamin Brown, Esq.
Miles & Stockbridge, P.C.
100 Light Street
Baltimore, MD 21202
mbbrown@milesstockbridge.com

Addison Chappell, Esq.
Miles & Stockbridge, P.C.
100 Light Street
Baltimore, MD 21202
achappell@milesstockbridge.com

Maurice B. VerStandig, Esq.
The VerStandig Law Firm, LLC
9812 Falls Road, #114-160
Potomac, Maryland 20854
mac@mbvesq.com

/s/ Jeffrey M. Orenstein
Jeffrey M. Orenstein