**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
(Baltimore Division)**

| | |
|---|---|
| In re: | Jointly Administered Under |
| BLUE SUN SCIENTIFIC, LLC, | Case No. 25-17998-DER (Lead Case) |
| THE INNOVATIVE TECHNOLOGIES GROUP & CO., LTD, | Case No. 25-18000-DER |
| Debtors. | Chapter 11 |

**OBJECTION TO DISCLOSURE STATEMENT IN SUPPORT OF CHAPTER 11 PLAN OF REORGANIZATION PROPOSED BY THE INNOVATIVE TECHNOLOGIES GROUP & CO., LTD**

KPM Analytics North America Corporation ("KPM"), by and through undersigned counsel, files its Objection to Disclosure Statement in Support of Chapter 11 Plan of Reorganization Proposed by the Innovative Technologies Group & Co., LTD ("Objection") and, in support, states:

**Introduction**

1.    As this Court is aware, these bankruptcy cases follow KPM's successful prosecution of claims against Blue Sun Scientific, LLC ("Blue Sun") and The Innovative Technologies Group & Co., LTD ("ITG" or "Debtor") for misappropriation of trade secrets, tortious interference, and statutory violations for unfair trade practices in the United States District Court for the District of Massachusetts ("USDC Massachusetts") in the case styled as *KPM Analytics North America Corp. v. Blue Sun Scientific, LLC, et al.*, Case Number 4:21-cv-10572-MRG (D. Mass.) (the "Massachusetts Case").  Rather than meaningfully address the consequences of their conduct, Blue Sun and the Debtor have sought bankruptcy protection in an

1

effort to evade responsibility for the substantial harm caused to KPM.  The Debtor's proposed plan of reorganization and accompanying disclosure statement only confirm this intent.

2.      The disclosure statement should not be approved for two independent reasons. First, it contains deficient information concerning the Debtor's financial projections, rendering it inadequate to provide creditors and parties in interest with sufficient information to make an informed judgment about the plan.  Second, and more significantly, the proposed plan violates the Bankruptcy Code in several material respects.  Most notably, the plan contravenes the absolute priority rule, rendering it patently unconfirmable on its face.  Because the plan cannot be confirmed, approval of the disclosure statement would serve no useful purpose and should be denied.

<u>**Background and Statement of Facts**</u>

3.      The history between KPM, Blue Sun, and the Debtor is well-documented in other filings before this Court.  Key facts relevant to this Objection are set forth below.

4.      In February 2025, following a 9-day jury trial in the Massachusetts Case, the USDC Massachusetts entered a permanent injunction and monetary judgments against ITG and Blue Sun, jointly and severally, in the principal amount of $3 million, plus an additional judgment against ITG in the amount of $3.6 million, plus $1.5 million in attorneys' fees, over $271,000 in costs, as well as pre- and post-judgment interest (collectively the "<u>Judgment</u>").

5.      On March 4, 2025, the Debtor and Blue Sun noted an appeal to the United States Court of Appeals for the First Circuit, commencing case number 25-1222 (the "<u>Appeal</u>").

6.      On August 29, 2025, Blue Sun and the Debtor commenced the above-captioned cases.

7. On December 29, 2025, the Court entered the Order Granting Relief from the Automatic Stay to Permit Continuance of Appellate Proceedings in the United States Court of Appeals for the First Circuit [Dkt. No. 47], which permitted the Appeal to continue.

8. As of the date of this Opposition, the Appeal has not been resolved.

9. On April 29, 2026, ITG filed its Disclosure Statement in Support of Chapter 11 Plan of Reorganization Proposed by the Innovative Technologies Group & Co., LTD [Case No. 25-18000, Dkt. No. 59; Case No. 25-17998, Dkt. No. 82] (the "Disclosure Statement") and Plan of Reorganization [Case No. 25-18000, Dkt. No. 60; Case No. 25-17998, Dkt. No. 83] (the "Plan").

**Legal Standard**

10. "At the 'heart' of the chapter 11 process is the requirement that holders of claims in impaired classes be furnished a proper disclosure statement." *In re Crowthers McCall Pattern, Inc.*, 120 B.R. 279, 300 (Bankr. S.D.N.Y. 1990). The principal purpose of a disclosure statement is to provide creditors with all material information that they need in order to make an intelligent decision whether to vote for or against the debtor's proposed plan. *In re Scioto Valley Mortgage Co.*, 88 B.R. 168, 172 (Bankr. S.D.Ohio 1988) ("It is imperative … that the [d]ebtor disclose all pertinent information so that such holders can cast an informed vote accepting or rejecting the plan"). "Creditors not only rely on the disclosure statement to form their ideas about what sort of distribution or other assets they will receive but also what risks they will face." *In re Radco Properties, Inc.*, 402 B.R. 666, 682 (Bankr. E.D.N.C. 2009). For this reason, the Bankruptcy Code requires that a disclosure statement contain "adequate information" in order to be approved. 11 U.S.C. § 1125(b); *In re Williams*, No. 87-4-0093-SD; 1992 WL 521537, at *2 (D.Md. Sept. 1, 1992).

11.     Adequate information is defined by the Bankruptcy Code to mean:

> [I]nformation of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, … any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan.

11 U.S.C. § 1125(a)(1).

12.     The adequate information requirement of 11 U.S.C. § 1125(b) is "intended to help creditors in their negotiations" with a debtor with respect to a proposed plan. *Century Glove, Inc. v. First American Bank*, 860 F.2d 94, 100 (3rd Cir. 1988); *see also Oneida Motor Freight, Inc. v. United Jersey Bank (In re Oneida Motor Freight, Inc.)*, 848 F.2d 414, 417 (3rd Cir. 1988) ("we cannot overemphasize the debtor's obligation to provide sufficient data to satisfy the Code standard of adequate information.") (internal citations omitted).  Whether a disclosure statement provides adequate information must be evaluated on a case by case basis in light of the facts and circumstances of the debtor's bankruptcy case. *See In re Williams*, 1992 WL 521537, at *2.  "A disclosure statement must provide the Debtors' creditors with a *full* knowledge of the assets and liabilities being dealt with." *Id*. (emphasis in original).

13.     Furthermore, "[i]t is now well accepted that a court may disapprove of a disclosure statement, even if it provides adequate information about a proposed plan, if the plan could not possibly be confirmed." *In re Criimi Mae, Inc.*, 251 B.R. 796, 799 (Bankr. D.Md. 2000) (citations omitted).  "There is no sound reason to approve a disclosure statement, and permit voting on an underlying plan, when the plan is fundamentally defective." *In re Harenberg*, 491 B.R. 706, 717 (Bankr. D.Md. 2013).  A bankruptcy court will not approve a disclosure statement when it describes a fatally flawed plan that is incapable of confirmation. *In re Robert's Plumbing & Heating, LLC*, No. 10-23221, 2011 WL 2972092, *2 (Bankr. D.Md.

4

July 20, 2011); *see also In re 266 Washington Assocs.*, 141 B.R. 275, 288 (Bankr. E.D.N.Y. 1992) ("[D]isclosure statement will not be approved where … it describes a plan which is fatally flawed and thus incapable of confirmation."), *aff'd*, 147 B.R. 827 (E.D.N.Y. 1992); *In re S.E.T. Income Properties, III*, 83 B.R. 791, 792 (Bankr. N.D.Okla. 1988) ("A clear showing that the plan is not confirmable justifies denial of sufficiency of disclosure statement to avoid the cost and delay of a fruitless venture."); *In re Pecht*, 53 B.R. 768, 772 (Bankr. E.D.Va. 1985) ("because the disclosure describes a plan which cannot be confirmed, the disclosure statement should not be approved").

## Legal Argument

14.     The Disclosure Statement should not be approved because it relies on confusing financial projections which do not meet the adequacy of information requirement of the Bankruptcy Code.  More significantly the Plan, in its current form, is patently unconfirmable. As set forth below, (i) the Plan violates the absolute priority rule, (ii) impermissibly gerrymanders classes and creates artificially impaired classes, (iii) is not feasible due to its reliance on confusing financial projections in the Disclosure Statement, and (iv) fails to create a distribution reserve.  Because the Plan cannot be confirmed, there is no sound reason to approve the Disclosure Statement and permit voting on an underlying plan that is fundamentally defective.

**A.**     **The Disclosure Statement Contains Misleading and Confusing Financial Projections.**

15.     The Disclosure Statement fails to provide adequate information to parties in interest because it contains misleading errors and misstatements.  Page 32 of the Disclosure Statement cites projected profits from the Debtor's operations over the five-year life of the Plan totaling $899,747.00.  However, Appendix B attached to the Disclosure Statement shows

projected profits totaling $871,650.00.  Not a single annual figure in the Disclosure Statement's narrative corresponds to the profit figure shown for that same year in Appendix B.

16.     The Disclosure Statement's purpose under Section 1125 is to provide adequate information to parties in interest to enable them to make an informed decision about the Plan. Presenting one set of projected numbers in the body of the Disclosure Statement while attaching an exhibit with materially different numbers undermines the informational function of the Disclosure Statement and generates confusion as to what the Debtor's projected disposable income actually is.  Consequently, the Disclosure Statement should not be approved.

**B.     The Plan Violates the Absolute Priority Rule Thereby Rendering it Unconfirmable.**

17.     The absolute priority rule "provides that a dissenting class of unsecured creditors must be provided for in full before any junior class can receive or retain any property under" a reorganization plan.  *Travelers Insurance Company v. Bryson Properties XVIII (In re Bryson Properties, XVIII)*, 961 F.2d 496, 503 (4th Cir. 1992) (internal quotations omitted).  Section 1129(b)(2)(B)(ii) codifies the rule for unsecured creditors, and provides: "the holder of any claim or interest that is junior to the claims of [the dissenting impaired class] will not receive or retain under the plan on account of such junior claim or interest any property."  11 U.S.C. § 1129(b)(2)(B)(ii).

18.     A new value exception to the absolute priority rule exists, which permits existing owners of a company to retain their ownership stake despite not paying senior creditors in full.

> The general contours of the new value exception are perhaps best described by the Supreme Court in *Bank of America Nat'l Trust and Savings Ass'n. v. 203 North LaSalle Street P'ship*, 526 U.S. 434, (1999).  In *203 North LaSalle*, the Supreme Court held: "A debtor's pre-Bankruptcy equity security holders may not, over the objection of a senior class of impaired creditors, contribute new capital and receive ownership interests in the reorganized entity, when that opportunity is given exclusively to the old equity

6

> security holders under a plan adopted without consideration of alternatives." Lower courts have struggled to define appropriate "alternatives" in the context of the new value exception. More specifically, courts disagree concerning when a debtor must pursue a "market test" for the value of the new equity and when other means might suffice.

*In re Cleary Packaging, LLC*, 657 B.R. 780, 799 (Bankr. D. Md. 2023).

19. Courts analyze the sufficiency of new value by assessing whether it is (1) new, (2) substantial, (3) in money or money's worth, (4) necessary for a successful reorganization, and (5) reasonably equivalent to the value of the stock being retained or received. *Cleary Packaging*, 657 B.R. at 800. Wholly de minimis contributions simply fail the threshold analysis of substantiality. *In re Snyder*, 967 F.2d 1126, 1131 (7th Cir. 1992). New value must be a present contribution that takes place at or before the effective date of the plan, not a contribution in the future. *In re Sovereign Group 1985-27, Ltd.*, 142 B.R. 702, 709 (E.D. Pa. 1992); *In re Hendrix*, 131 B.R. 751, 753 (Bankr.M.D.Fla. 1991); *In re Yasparro*, 100 B.R. 91, 97 (Bankr.M.D.Fla. 1989); *In re Stegall*, 85 B.R. 510, 514 (C.D.Ill. 1987) *aff'd*, 865 F.2d 140 (7th Cir. 1989).

20. As explained by the U.S. Court of Appeals for the Ninth Circuit:

> Commentators have observed that "prior to making the time-consuming determination as to whether the new value contribution is reasonably equivalent to the value being received [the equivalence prong], a significant number of courts have required that the new value contribution be 'substantial' in comparison to such things as" (1) the total unsecured claims against the debtor, (2) the claims being discharged, or (3) the dividend being paid on unsecured claims by virtue of the contribution. J. Ronald Trost, Joel G. Samuels, Kevin T. Lantry, *Survey of the New Value Exception to the Absolute Priority Rule and the Preliminary Problem of Classification*, CA46 A.L.I.–A.B.A. 479, 552 (1995).

*Liberty Nat'l Enterprises v. Ambanc la Mesa Limited P'ship (In re Ambanc la Mesa Limited P'Ship)*, 115 F.3d 650, 655 (9th Cir. 1997).

21.     Here, the Debtor's principal is proposing to provide five equal annual installments of $5,000 for a total of $25,000 as a new value contribution (the "New Value Contribution") to maintain his equity interests in the Debtor.  Simultaneously, general unsecured creditors will not be paid in full.  This proposal violates the absolute priority rule and makes the Plan patently unconfirmable.  To justify the new value amount, the Disclosure Statement ties the New Value Contribution to the Debtor's liquidation analysis.  The Debtor reasons that because $24,963.00 could theoretically remain available for unsecured creditors in the event of a Chapter 7 liquidation, then New Value Contribution is sufficient.  However, the Disclosure Statement fails to provide more information explaining how the New Value Contribution is substantial, whether the Debtor conducted a market analysis, whether the Debtor considered selling its stock, or whether the Debtor considered extending the length of the Plan.  As such, creditors do not have sufficient information available to make an informed decision on why the New Value Contribution is appropriate and should be accepted.

22.     With respect to the Bankruptcy Code's confirmation requirements, the New Value Contribution fails to adhere to established law for two main reasons: (1) it is not a present contribution, and (2) it is not sufficient.  First, the New Value Contribution will be paid in installments over five years.  That alone is sufficient to deny confirmation of the Plan, because caselaw is clear the new value must be provided on or before the effective date of the plan, not at a *future* date or time.  *Sovereign Group 1985-27, Ltd.*, 142 B.R. at 709; *Hendrix*, 131 B.R. at 753; *Yasparro*, 100 B.R. at 97; *Stegall*, 85 B.R. at 514.

23.     Second, the New Value Contribution is insufficient.  Under the Plan, general unsecured creditors are slated to receive a pro-rata portion of the Debtor's disposable income over five years.  Of the two largest general unsecured creditor classes, Class 7 claims amount to

8

$1,278,574.69, and the Class 8 claim amounts to $10,130,176.42, creating total unsecured claims of $11,408,751.11.  This figure excludes Classes 5 & 6 due to their proposed payment of claims in full.

24.    The New Value Contribution represents a mere **0.219%** of the total unsecured claims in Class 7 and 8, and 2.87% of the disposable income available for creditors described in Appendix B.[1]  That figure shrinks if one accounts for the claims in Classes 5 & 6, which must be paid from disposable income.  Such a de minimis contribution is insufficient to meet the requirements of the new value exception.  It barely makes a drop in the proposed distribution to unsecured creditors, nor does it come close to matching even *one percent* of the total unsecured claims the Plan proposes to wipe away after five years.

25.    What the Debtor's proposal signals is that its sole stockholder should be permitted to retain his 100% ownership in the Debtor, continue to retain all of his valuable benefits, salaries, and perks, and be entitled to the full residual value of the Debtor at the end of five years, all while providing unsecured creditors the equivalent of **_less than one percent_** of their claims. Sister courts have held that such an extreme disparity between the amount of claims, the proposed recovery to creditors, and the proposed new value contribution is not substantial.  *See In re Sovereign Group 1985-27, Ltd.*, 142 B.R. 702, 710 (E.D.Pa. 1992) (finding that a new value contribution of 3.6% of an unsecured claim was not substantial); *In re Snyder*, 967 F.2d 1126, 1131 (7th Cir. 1992) (finding that a $30,000 cash contribution that amounted to only 2.7% of the $1,100,000 due to unsecured creditors was unsubstantial).  Here, the same reasoning applies.  The New Value Contribution is unsubstantial, and for that reason the Debtor has not met the requirements of the new value exception and the Plan should not be confirmed.

---

[1] For reasons described in this Opposition, it is unclear whether Appendix B contains the Debtor's intended financial projections.

26.    These deficiencies are fatal to confirmation because they undermine the absolute priority rule's core function – protecting creditors from being forced to accept less than full payment while pre-petition equity holders retain a post-confirmation ownership interest in the reorganized debtor.   As Judge Harner explained in *Cleary Packaging*, permitting such an outcome effectively "says to the creditors, despite not getting paid in full, the debtor's equity holders may keep their ownership interests and all of the residual future value of the enterprise for themselves." 657 B.R. at 803.   That is precisely what the Debtor seeks to accomplish here: shelter behind the protections of bankruptcy while avoiding its obligations to creditors and preserve all the benefits of ownership for itself.

**C.     The Plan Improperly Gerrymanders Classes and Creates Artificially Impaired Classes to Obtain an Accepting Vote.**

27.    "[T]hou shalt not classify similar claims differently in order to gerrymander an affirmative vote on a reorganization plan."   *Bryson Props.*, 961 F.2d at 502 (quoting *In re Greystone III Joint Venture*, 948 F.2d 134, 139 (5th Cir 1992)).   Section 1122(a) of the Bankruptcy Code provides that only "substantially similar" claims may be classified together under a plan of reorganization.   11 U.S.C. § 1122(a).   Although the Code requires substantial similarity between claims that are placed in the same class, it does not require that "all substantially similar claims be placed within the same class, and it grants some flexibility in classification of unsecured claims." *Bryson Props.*, 961 F.2d at 502; *In re Council of Unit of 100 Harborview Drive Condominium*, 572 B.R. 131, 137 (Bankr. D. Md. 2017).   Nevertheless "[t]here must be some limit on the debtor's power to classify creditors ... The potential for abuse would be significant otherwise ... If the plan unfairly creates too many or too few classes, if the classifications are designed to manipulate class voting, or if the classification scheme violates

basic priority rights, the plan cannot be confirmed." *Bryson Props.*, 961 F.2d at 502 (quoting *In re Holywell Corp.*, 913 F.2d 873, 880 (11th Cir. 1990)).

28.     Courts have not found sufficient differences between judgment creditors and general unsecured creditors to permit them to be separately classified, and have denied such classifications as impermissible. *In re Manchester Oaks Homeowners Ass'n, Inc.*, No. 11-10179-BFK, 2014 WL 961167, at *7 (Bankr. E.D. Va. Mar. 12, 2014); *In re Main Line Corp.*, 335 B.R. 476, 480 (Bankr. S.D. Fla. 2005). The same is true when the debtor has appealed the underlying judgment. *In re Porcelli*, 319 B.R. 8, 11 (Bankr. M.D. Fla. 2004) (finding that because the underlying "legal status of the claim and not its disputed status is the appropriate focus of a classification, the segregation of unsecured claims that are disputed [and subject to appeal] is improper").

29.     The classification of claims in the Plan demonstrates the Debtor's gerrymandering effort and intent to influence voting. Because it is unlikely that all impaired classes will vote in favor of the Plan, the Debtor needs one impaired accepting class to proceed with the Bankruptcy Code's cramdown provisions.[2] In order to increase their odds of obtaining an accepting impaired class, the Debtor's plan divides up unsecured claims into four classes – Classes 5, 6, 7, and 8. Class 5 is comprised of priority employee wage claims. Class 6 is comprised of unsecured convenience claims under $2,500. Class 7 is comprised of general unsecured claims. Class 8 is comprised solely of KPM's claim – a general unsecured claim.

30.     Section 1126(c) states that an impaired class accepts the plan only if holders of two-thirds in amount and more than one-half in number of the allowed claims in such class vote in favor of the plan. Whatever class KPM is placed into faces a risk of failing to satisfy the two-

---

[2] The Plan does not meet the cramdown requirements of Section 1129(b) due to its violation of the absolute priority rule as discussed in this Objection.

thirds in amount and one-half in number threshold required for acceptance if KPM votes against the Plan.  The Debtors are aware of this.  By classifying KPM's claim separately, the Debtors can maximize their prospects of obtaining at least one accepting impaired class.

31.     The Disclosure Statement does not clearly explain why KPM's claim is separately classified.  KPM holds a general unsecured claim and should be classified with all other general unsecured creditors.  There is no reasonable basis for classifying KPM's claim separately except to manipulate the classes to maximize the chance for an impaired accepting class.  If the Debtor is basing its decision to separately classify KPM on the pending outcome of the Appeal, then as explained above the pendency of an appeal from a judgment underlying a claim is not, standing alone, a sufficient basis for separate classification.  *Porcelli*, 319 B.R. at 11.

32.     The Debtor's own proposed treatment of KPM's claim further confirms that the separate classification constitutes improper gerrymandering.  Under the Plan, should the First Circuit uphold KPM's claim, the Debtor proposes to treat KPM no differently than all other general unsecured creditors by paying it a pro-rata share of disposable income.  The inescapable conclusion is that the sole purpose of classifying KPM's claim separately is to manipulate the voting process and maximize the likelihood that Class 7 will accept the Plan.

33.     In addition to the improper separate classification of Class 8, the Debtor has also gerrymandered and artificially impaired Classes 5 and 6.  Section 1122(b) provides that a plan "may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience."  11 U.S.C. § 1122(b).  "Generally, an administrative convenience class is one where the claims are so small in amount and large in number as to make dealing with them burdensome."  *In re Tucson Self-Storage, Inc.*, 166 B.R. 892, 898 (9th Cir. BAP 1994).

The legislative history of Section 1122(b) reflects that the intent was to permit the debtor to avoid having to solicit acceptances from a multitude of small unsecured claimholders by simply paying them in full on the effective date. *See* S. Rep. No. 989, 95th Cong., 2d Sess. 118 n.26 (1978); *In re Hanish, LLC*, 570 B.R. 4, 17, (Bankr. D.N.H. 2017).

> [T]he ability to impair an administrative convenience class potentially raises the specter of gerrymandering and thus requires the court to scrutinize the justification for the separate classification. This inquiry includes, *inter alia*, consideration of how many claims fall within the class, the individual amounts of those claims, the total amount of claims within the class, the debtor's financial wherewithal to pay them at an accelerated rate, and a present value comparison of the payments to be received by the administrative convenience class and the general unsecured creditors.

*Hanish*, 570 B.R. at 17.

34.     Here, the Debtor's administrative convenience class fails to satisfy the "reasonable and necessary" standard of Section 1122(b). First, the Disclosure Statement makes no mention of the justification for creating Class 6, including why the $2,500 threshold was chosen, nor why those creditors should receive 100% of their claims within 90 days of the effective date rather than payment in full on the effective date. Second, the number and size of claims do not support administrative convenience treatment. There are only thirty-seven unsecured claims filed against the Debtor, with fifteen of those claims constituting Class 6. This is not a situation where the Debtor faces hundreds of small claims that would be administratively burdensome to solicit and process. Instead, the Debtor is a small business that regularly processes small invoices and has a small number of creditors that can be addressed efficiently through the plan process. Third, the Debtor has the financial wherewithal to pay Class 6 claims in full on the effective date, yet chooses to defer payment for 90 days – a deferral that serves no administrative purpose but rather creates an artificially impaired class. These circumstances

13

demonstrate that the Plan's proposed classification of Class 6 is designed to manufacture multiple classes of unsecured claims to improve the Debtor's chances of obtaining an impaired accepting class, which is a purpose that does not satisfy the requirements of Section 1122(b).

35.     More significantly, Class 6 appears to be artificially impaired. The Debtor's monthly operating reports demonstrate that it has consistently maintained a cash balance above $16,000 each month since filing bankruptcy.  Yet the total claims in Class 6 amount to only $15,276.27, assuming Intelliworks voluntarily reduces its claim to $2,500.  The Debtor therefore has more than enough cash on hand to pay Class 6 claims in full on the effective date of the plan, and Class 6 is not truly impaired.

36.     Class 5 is also artificially impaired. This class is comprised of the Debtor's employees, who are pseudo-insiders with a vested interest in keeping their jobs and, consequently, voting in favor of the Plan.  The composition of Class 5 makes clear that the Debtor has manufactured this class to secure an accepting impaired vote.  First, the three largest claims in Class 5 belong to insiders: Cathy Wilt, David Bush, and Robert Wilt, whose claims total $32,218.20.[3]  Second, like Class 6, the Debtor has the financial ability to pay Class 5 claims in full on the effective date of the Plan.  The Debtor's monthly operating reports demonstrate consistent cash balances exceeding the amount needed to satisfy these claims for five of the last nine months.  Third, the Disclosure Statement provides no justification for deferring payment beyond the effective date.  This omission is telling.  A strong purpose for deferring payment to employees – who are beholden to the Debtor for their continued employment – is to create an artificially impaired class predisposed to accept the Plan.  Fourth, the strategic significance of

---

[3] It should be noted that Robert Wilt, the sole shareholder of the Debtor, is proposing to provide new value of $25,000 over five years, yet will receive $12,479.83 in full within 90 days of the effective date on account of his priority wage claim in Class 5.  This treatment further casts doubt on the sufficiency of the New Value Contribution because nearly half of its stated value is being distributed by the Debtor back to Mr. Wilt in a lump sum within 90 days of the effective date.

14

this artificial impairment cannot be overstated. Assuming the Court accepts that Classes 6 through 8 are gerrymandered and should be combined, Class 5 represents the Debtor's only realistic path to obtaining an impaired accepting class. By deferring payment to loyal employees who have every incentive to vote in favor of the Plan, the Debtor seeks to manufacture the very acceptance it needs to invoke the cramdown provisions of Section 1129(b) – provisions that, as discussed above, the Plan cannot satisfy in any event.

**D.      The Plan is not Feasible**

37.      To confirm a Chapter 11 plan, the plan must be feasible in that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11).

38.      As mentioned above, the Disclosure Statement contains inconsistent and confusing financial projections. Those projections, in turn, call into question the feasibility of the Plan. Assuming that the figures on Appendix B are intended to be the real projections due to the existence of a detailed cashflow model, the Debtor's profit declines in years three through five as projected costs outpace revenue growth. Appendix B shows that revenue will grow by 71.21% between years one and five. However, G&A expenditures, which are not defined, *grow by 129.58% between years one and five*. The Disclosure Statement does not explain *why* this undefined expense grows so significantly over five years. More significantly, the increased G&A costs eat into the Debtor's projected profit thereby reducing the amount of disposable income available to pay unsecured creditors for years three through five. The bleed into profit is so severe that the projected profit in year five is *less* than the projected profit in year one. Without an explanation of the components of G&A and the assumptions underlying its growth,

15

creditors lack the information necessary to evaluate whether the projections, and the Plan's feasibility, are reasonable.

**E.     The Plan Does not Create a Reserve for Disputed Claims**

39.     In addition to the foregoing objections, the Plan fails to establish a reserve for claims whose allowability is challenged.  Class 8 classifies KPM's claim as disputed and provides that KPM will receive a distribution only in the event that the Appeal results in an allowed claim for KPM.  However, the timeline for resolution of the Appeal is uncertain, creating a substantial risk that distributions to unsecured creditors will commence before the Appeal is resolved.  Without a reserve, KPM would be excluded from those interim distributions entirely.  It is customary, appropriate, and in this case, entirely necessary that the Debtor creates a reserve to hold funds to cover the amount of distributions made on KPM's challenged claim until the Appeal is resolved.  *See, e.g. In re Health Diagnostic Laboratory, Inc*., 551 B.R. 218 (Bankr. E.D.Va. 2016) (Explaining that a reserve was necessary to protect the interests of all creditors and maintain adequate reserve amounts).  Absent the reserve, the Plan improperly discriminates against KPM.

## Reservation of Rights

40.     KPM does not waive and reserves all rights to raise additional objections at the hearing on approval of the Disclosure Statement, and to raise additional objections to confirmation of the Plan if necessary.

## Conclusion

For the foregoing reasons, KPM respectfully requests the Court deny approval of the Disclosure Statement such other relief the Court deems proper.

Dated June 8, 2026                          Respectfully submitted,

                                            */s/ Addison J. Chappell*
                                            Addison J. Chappell, Esq. (#21852)
                                            Michael B. Brown, Esq. (#19641)
                                            MILES & STOCKBRIDGE P.C.
                                            100 Light Street, 7th Floor
                                            Baltimore, MD 21202
                                            Telephone: (410) 385-3481
                                            Telephone: (410) 385-3663
                                            achappell@milesstockbridge.com
                                            mbbrown@milesstockbridge.com

                                            *Counsel for KPM Analytics*
                                            *North America Corporation*

17

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on June 8, 2026, a copy of the foregoing Objection was served on all parties requesting service in this case via this Court's CM/ECF electronic noticing system as follows:

- **Matthew Eliot Abbott**   MAbbott@wolawgroup.com, KDriscoll@wolawgroup.com
- **Hugh M. (UST) Bernstein**   hugh.m.bernstein@usdoj.gov
- **Michael Benjamin Brown**   mbbrown@milesstockbridge.com, jdiaz@milesstockbridge.com
- **Addison J. Chappell**   achappell@milesstockbridge.com
- **Patricia B. Jefferson**   pjefferson@milesstockbridge.com
- **Michael David Nord**   mnord@gebsmith.com
- **Jeffrey M. Orenstein**   jorenstein@wolawgroup.com
- **Elizabeth Drayden Peters**   epeters@gebsmith.com
- **US Trustee - Baltimore**   USTPRegion04.BA.ECF@USDOJ.GOV
- **Maurice Belmont VerStandig**   mac@mbvesq.com, lisa@mbvesq.com;mahlon@dcbankruptcy.com;mac@dcbankruptcy.com;verstandig.mauricer104982@notify.bestcase.com;verstandiglaw@recap.email


*/s/ Addison J. Chappell*
Addison J. Chappell