# EXHIBIT 4

No. 25-1222

# United States Court of Appeals for the First Circuit

KPM ANALYTICS NORTH AMERICA CORPORATION,
Plaintiff - Appellee,

v.

BLUE SUN SCIENTIFIC, LLC;
THE INNOVATIVE TECHNOLOGIES GROUP & CO., LTD.,
Defendants - Appellants,

ARNOLD EILERT; ROBERT GAJEWSKI; RACHAEL GLENISTER;
GREGORY ISRAELSON; IRVIN LUCAS; PHILIP OSSOWSKII;
MICHELLE GAJEWSKI,
Defendants.

ON APPEAL FROM A JUDGMENT OF THE
UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS
CASE NO. 4:21-CV-10572-MRG

## DEFENDANTS - APPELLANTS' OPENING BRIEF

Christopher A. Duggan (18241)
Dana A. Zakarian (63652)
Patricia A. Hartnett (48631)
Christopher J. Hurst (1188843)
SMITH DUGGAN CORNELL & GOLLUB LLP
55 Old Bedford Road, Suite 300
Lincoln, MA 01773
Tel: 617-228-4416
chris.duggan@smithduggan.com
dana.zakarian@smithduggan.com
phartnett@smithduggan.com
churst@smithduggan.com

Attorneys for Defendants-Appellants

Dated: December 29, 2025

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Defendant-Appellant Blue Sun Scientific, LLC hereby discloses that the Innovative Technologies Group & Co., Ltd. is its sole member.

Defendant-Appellant The Innovative Technologies Group & Co., Ltd. discloses that it has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

Case 25-10798 Doc 118-4 Filed 08/19/26 Page 4 of 268

# TABLE OF CONTENTS


CORPORATE DISCLOSURE STATEMENT ........ i

TABLE OF AUTHORITIES ........ iv

REASONS WHY ORAL ARGUMENT SHOULD BE HEARD ........ ix

JURISDICTIONAL STATEMENT ........ 1

STATEMENT OF THE ISSUES ........ 1

STATEMENT OF THE CASE ........ 3

SUMMARY OF THE ARGUMENT ........ 29

STANDARD OF REVIEW ........ 31

ARGUMENT ........ 33

I. There Is No Personal Jurisdiction Over Defendants ........ 33

*A. KPM Failed to Establish Jurisdiction Over Blue Sun or ITG Under the Massachusetts Long-Arm Statute* ........ 34

*B. KPM Failed to Establish Jurisdiction Under the Constitutional Analysis* ........ 39

1. KPM Did Not and Cannot Establish Relatedness ........ 40

2. KPM Failed to Establish that Defendants Purposefully Availed Themselves of the Massachusetts Forum ........ 45

II. The Court Erred in Awarding Chapter 93A Damages Because the Conduct Giving Rise to the Claim Did Not Occur Primarily and Substantially in Massachusetts ......... 47

III. The District Court Erred by Awarding KPM Exemplary Damages and Attorney's Fees under G.L. c. 93A Because MUTSA Expressly Supersedes Chapter 93A Where, as Here, the Claim Involves Theft of Trade Secrets ............ 51

*A. MUTSA Supersedes Inconsistent State Laws Providing Civil Remedies for the Misappropriation of a Trade Secret* ............ 51

*B. The District Court Erred by Awarding KPM Exemplary Damages and Attorney's Fees Under Chapter 93A* ............ 55

*C. The District Court's Post-Trial Finding that Blue Sun's Misappropriation was "Willful and Malicious" Is Improper and Violates Blue Sun's Seventh Amendment Right to a Jury Trial on the Issue.* ............ 55

IV. The District Court's Erroneous "Head Start" Instruction Permitted the Jury to Disgorge Profits that Were Not Attributable to Either the Defendants' Trade Secret Misappropriation or Tortious Interference. ............ 57

V. The District Court Improperly Altered the Elements of a Tortious Interference Claim by Erroneously Instructing the Jury on Willful Blindness ............ 60

CONCLUSION ............ 64

CERTIFICATE OF COMPLIANCE ............ 66

ADDENDUM

# TABLE OF AUTHORITIES

**CASES:**

Acclaim Sys., Inc. v. Infosys, Ltd.,
679 F. App'x 207 (3d Cir. 2017) .......... 62, 63

Acevedo-Feliciano v. Ruiz-Hernandez,
447 F.3d 115 (1st Cir. 2006) .......... 33

Adelson v. Hananel,
510 F.3d 43 (1st Cir. 2007) .......... 33

Advanced Micro Devices, Inc. v. Feldstein,
No. CV 13-40007-TSH, 2013 WL 10944934
(D. Mass. May 15, 2013) .......... 52

Astro-Med, Inc. v. Nihon Kohden Am., Inc.,
591 F.3d 1 (1st Cir. 2009) .......... 41, 42, 43, 45, 46

Avago Techs. U.S. Inc. v. Nanoprecision Products, Inc.,
No. 16-CV-03737-JCS, 2017 WL 412524
(N.D. Cal. Jan. 31, 2017) .......... 53

BioPoint, Inc. v. Dickhaut,
110 F.4th 337 (1st Cir. 2024) .......... 24, 57

Blackstone v. Cashman,
448 Mass. 255 (2007) .......... 58

Boit v. Gar–Tec Products, Inc.,
967 F.2d 671 (1st Cir. 1992) .......... 32

Buckley v. New York Post Corp.,
373 F.2d 175 (2d Cir. 1967) .......... 36

Daimler AG v. Bauman,
571 U.S. 117 (2014) .......... 29

Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.,
290 F.3d 42 (1st Cir. 2002) .......... 32

Ealing Corp. v. Harrods Ltd.,
790 F.2d 978 (1st Cir. 1986) .......... 35, 36

Ethypharm S.A. France v. Bentley Pharm., Inc.,
388 F. Supp. 2d 426 (D. Del. 2005) .......... 53

Fishman Transducers, Inc. v. Paul,
684 F.3d 187 (1st Cir. 2012) .......... 48

Ford Motor Co. v. Montana Eighth Judicial Dist. Court,
592 U.S. 351 (2021) .......... 40

Goodyear Dunlop Tires Operations, S.A. v. Brown,
564 U.S. 915 (2011) .......... 39

Hamann v. Carpenter,
937 F.3d 86 (1st Cir. 2019) .......... 61

Hoover v. Garfield Heights Mun. Ct.,
802 F.2d 168 (6th Cir. 1986) .......... 56

Jet Spray Cooler, Inc. v. Crampton,
377 Mass. 159 (1979) .......... 58, 59

K.C. Multimedia, Inc. v. Bank of Am. Tech. & Operations, Inc.,
171 Cal. App. 4th 939 (2009) .......... 53

Keane v. Expeditors Int'l of Washington, Inc.,
138 F.4th 613 (1st Cir. 2025) .......... 38

Kenda Corp. v. Pot O'Gold Money Leagues, Inc.,
329 F.3d 234 (1st Cir. 2003) .......... 49

Kuwaiti Danish Comp. Co. v. Digital Equip. Corp.,
438 Mass. 459 (2003) .......... 47, 49

Lipsitt v. Plaud,
466 Mass. 240 (2013) .......... 37

Makino, U.S.A., Inc. v. Metlife Capital Credit Corp.,
25 Mass. App. Ct. 302 (1988) .......... 48

Murphy v. Erwin-Wasey, Inc.,
460 F.2d 661 (1st Cir. 1972) .......... 34-35

N. Laminate Sales, Inc. v. Davis,
403 F.3d 14 (1st Cir. 2005) .......... 46

Nandjou v. Marriott Int'l, Inc.,
985 F.3d 135 (1st Cir. 2021) .......... 31

Neural Magic, Inc. v. Facebook, Inc.,
No. 1:20-CV-10444-DJC, 2020 WL 13538627
(D. Mass. Oct. 29, 2020) .......... 53

Noonan v. Winston Co.,
902 F. Supp. 298 (D. Mass. 1995) .......... 35

Office Depot, Inc. v. Impact Office Prod., LLC,
821 F. Supp. 2d 912 (N.D. Ohio 2011) .......... 53

Pritzker v. Yari,
42 F.3d 53 (1st Cir. 1994) .......... 40

Roche v. Royal Bank of Canada,
109 F.3d 820 (1st Cir. 1997) .......... 32

SCVNGR, Inc. v. PUNCHH, Inc.,
478 Mass. 324 (2017) .......... 34

Skyhook Wireless, Inc. v. Google, Inc.,
86 Mass. App. Ct. 611 (2014) .......... 47-48

Swanset Dev. Corp. v. Taunton,
423 Mass. 390 (1996) .......... 61

The Scuderi Grp., LLC v. LGD Tech., LLC,
575 F. Supp. 2d 312 (D. Mass. 2008) .......... 35

United States v. De La Cruz,
835 F.3d 1 (1st Cir. 2016) .......... 33

United States v. Swiss Am. Bank, Ltd.,
274 F.3d 610 (1st Cir. 2001) .......... 38

United Truck Leasing Corp. v. Geltman,
406 Mass. 811 (1990) .......... 61

Vapotherm, Inc. v. Santiago,
38 F.4th 252 (1st Cir. 2022) .......... 40, 43, 44, 45

Walden v. Fiore,
571 U.S. 277 (2014) .......... 39, 40, 42, 43

**STATUTES:**

18 U.S.C. § 1836, *et seq.* .......... 1, 28, 58
28 U.S.C. § 1291 .......... 1
28 U.S.C. § 1331 .......... 1

G.L. c. 93, § 42B .......... 54, 58
G.L. c. 93, § 42C .......... 28, 54
G.L. c. 93, § 42F .......... *passim*
G.L. c. 93, § 42G .......... 52
G.L. c. 93A .......... *passim*
G.L. c. 93A, § 11 .......... *passim*
G.L. c. 223A, § 3 .......... 34, 35, 36

**RULES:**

Fed. R. App. P. 26.1 ........ i
Fed. R. App. P. 34(a)(1) ........ ix

Fed. R. Civ. P. 12(b)(2) ........ 32
Fed. R. Civ. P. 52 ........ 56

**OTHER AUTHORITIES:**

First Circuit Local Rule 34.0(a) ........ x

Massachusetts Superior Court Model Jury Instructions. https://www.mass.gov/doc/superior-court-model-civil-jury-instructions-tortious-interference-with-contractual-or-advantageous-relationship-pdf/download ........ 62

Restatement (Second) of Torts, § 766 and 766B ........ 61

Uniform Law Commission, Trade Secrets Act, https://www.uniformlaws.org/committees/community-home?communitykey=3a2538fb-e030-4e2d-a9e2-90373dc05792 ........ 51

UTSA, § 7(b) ........ 53

**REASONS WHY ORAL ARGUMENT SHOULD BE HEARD**

Pursuant to Fed. R. App. P. 34(a)(1) and First Circuit Local Rule 34.0(a), the appellants respectfully request that the Court schedule this matter for oral argument. This case involves issues of first impression, and the appellants believe that oral argument will assist the Court in reaching a decision.

## JURISDICTIONAL STATEMENT

This is an appeal from a February 7, 2025 judgment of the United States District Court for the District of Massachusetts. Record Appendix ("RA") 3252-61. Defendants-appellants Blue Sun Scientific, LLC ("Blue Sun") and The Innovative Technologies Group & Co., Ltd. ("ITG") (collectively, "Defendants") timely filed a notice of appeal on March 4, 2025. RA 3262-63. The federal courts have subject matter jurisdiction under 28 U.S.C. § 1331, because plaintiff-appellee KPM Analytics North America Corporation ("KPM") brought federal claims under the Defend Trade Secrets Act, 18 U.S.C. §§ 1836, *et seq*.

This Court has appellate jurisdiction under 28 U.S.C. § 1291 because this is an appeal from a final judgment.

## STATEMENT OF THE ISSUES

1. Did the district court have personal jurisdiction over the Defendants? Defendants neither reside nor transact business in the Commonwealth. KPM claims that Defendants tortiously interfered with KPM's contracts with its former employees by inducing them to disclose KPM's trade secrets. None of the former employees resides or works in Massachusetts. Their contracts with KPM are governed by Connecticut

law and subject to Connecticut jurisdiction. Defendants did not use any KPM trade secrets in Massachusetts. The only connection to Massachusetts is that KPM is located here.

2. Is KPM barred from recovering under G.L. c. 93A because the offending conduct did not occur "primarily and substantially within the commonwealth"?

3. Did the district court err by awarding KPM double damages and automatic attorney's fees under Chapter 93A where its claim was based on theft of trade secrets and the Massachusetts Uniform Trade Secrets Act supersedes all "conflicting laws of the commonwealth providing civil remedies for the misappropriation of a trade secret"? G.L. c. 93, § 42F(a).

4. Did the district court err in denying Blue Sun its jury right on the issue of whether the trade secret misappropriation was "willful and malicious"? The district court did not let the jury decide because, as a matter of law, the evidence did not support a finding of malice. Despite this ruling, the district court found in response to a post-trial motion that Blue Sun's misappropriation was "willful and malicious."

5. Did the district court err by giving a head start instruction that enabled the jury to erroneously disgorge all the Defendants' profits?

6. Was it reversible error for the district court to instruct the jury that it could find that ITG *intentionally* interfered with KPM's employment agreements even if it did not actually know about the agreements? By instructing on "willful blindness" the court converted the intentional tort to a negligence-based claim.

## STATEMENT OF THE CASE

This is a dispute between competitors in the field of near infrared analyzers ("NIR") which use spectroscopy to perform rapid chemical analysis of a variety of materials. RA 896. KPM claims that ITG and its wholly owned distributor Blue Sun misappropriated KPM's trade secrets and violated Chapter 93A by tortiously interfering with confidentiality agreements signed by KPM's former employees, who now work for Blue Sun.

KPM is the *only* party located in Massachusetts. Blue Sun and ITG are both domiciled in Maryland and residents of the state. The KPM former employees at issue are in California, Colorado, Illinois, and

Missouri. RA 48; 1318; 1718; 1426-27; 1524; 1792. The confidentiality agreements at issue are subject to Connecticut law and jurisdiction in Connecticut courts. RA 87-94; 95-111; 112-120; 121-27; 130-49; 150-54.[1] This is because the agreements were originally signed with a Connecticut company.

Neither Blue Sun, ITG, nor any of the KPM former employees ever lived or worked in Massachusetts. Additionally, the alleged misappropriation and use of KPM's trade secrets all occurred *outside* of Massachusetts. Indeed, the *only* thing connecting this case to this forum is that KPM resides in Massachusetts.

## I. The NIR Technology

An NIR is an instrument that shines infrared light on samples. RA 895. Some of the light is absorbed by the sample, and the light data that is reflected back is captured by the instrument. Id. NIRs provide rapid information on the quality of the sample, and information on

[1] The employment agreements of one of the initial individual defendants, Philip Ossowski, had a Massachusetts choice of law provision. RA 128-29. However, the district court dismissed the claims against Ossowski because missing from the complaint was "any claims about any act or omission on the part of Ossowski during or after his KPM employment agreement connected to Blue Sun or any KPM trade secret, confidential information, or customer." RA 387.

multiple constituents at once—for example, protein, fat, and fiber. RA 896. NIR is an alternative to "wet chemistry," or analyzing samples in a lab, which takes longer and requires a more skilled operator. Id. Unlike wet chemistry, NIR does not measure the actual constituents, but predicts the amount of the constituents by using a calibration model or equation to compare the infrared light values of the sample under study to other known infrared light data points for which wet chemistry reference points are available. RA 897-99. Calibration models can be purchased by NIR customers, obtained for free through trade groups, or built by customers using their own data. RA 1054-56.

## II. ITG Sells Its NIR Business to a Connecticut Company

Robert Wilt, along with two other men, founded ITG in Maryland in 1997. RA 1889-90. Wilt is now the sole owner of ITG and its President and CEO. The company has six full-time employees and four part-time. RA 1890. ITG has office space and a machine shop in Maryland where it manufactures all the NIRs it sells and conducts its operations. Id.

Around 2001, ITG developed a NIR called the SpectraStar. RA 1902. ITG later founded a separate company called Unity Scientific

to distribute the SpectraStar. RA 1902; 1904. In 2008, ITG sold Unity Scientific and the rights to manufacture and sell the SpectraStar, to a Connecticut company, Westco Scientific Instruments, Inc. ("Westco"). In connection with the sale, ITG and Wilt agreed not to sell any NIR machines for five years until 2013. RA 1904.

## III. After its Non-Compete Expires, ITG Launches a New NIR

Once the contractual restriction expired, ITG launched a new NIR, called the M5. RA 1905. The M5 had unique patented features—an auto sampler and auto feeder—which allowed sample cups to be fed continuously into the NIR machine. RA 1897.

The leading competitor of ITG and KPM in the NIR space is FOSS, which has the largest market share. RA 949; 1899. In years past FOSS sold a popular NIR with an autoloading feature, but FOSS had discontinued that unit. RA 1899. With the M5, ITG hoped it could capture some of the unmet demand for NIRs with auto samplers. RA 1899. The current SpectraStar model (which ITG had sold to Westco) did not have an auto sampler feature. RA 981-82. ITG brought the M5 to market in 2014.

In 2015, Union Park Capital (a private equity firm which owns KPM) purchased Westco and the Unity Scientific NIR business. RA 985-86; 1904. Following the acquisition, existing Westco employees (including the individual defendants) did *not* execute new confidentiality agreements; KPM was assigned the rights in the existing agreements. RA 1529-30. This is why the confidentiality agreements at issue all contain Connecticut choice of law and jurisdiction provisions.

**IV. ITG Forms Blue Sun to Distribute the M5**

In 2018, defendant Irvin Lucas, a KPM sales employee living in California, contacted Robert Wilt in Maryland regarding employment opportunities. RA 1426-27. The two had not previously met. Id. Lucas was KPM's account manager for the West Coast region who had previously worked for Westco. RA 1320. Lucas and Wilt spoke several times, and eventually Lucas traveled to Maryland to tour ITG's facility and meet the engineers. RA 1428; 1472; 1481.

On July 2, 2018, ITG formed Blue Sun. RA 1323. Although ITG already had sold eighteen M5 NIR machines on its own (RA 1901), it formed Blue Sun to be its distributor—just as Unity Scientific had been its distributor for the SpectraStar before ITG sold it to Westco.

RA 1429. ITG and Blue Sun ultimately renamed the M5—calling it the Phoenix. RA 1308. Lucas was to be Blue Sun's first President, once he left KPM. Id.

## V. While Still Employed at KPM, Lucas Starts Building Blue Sun

Lucas remained a KPM employee until May 17, 2019. RA 1320. Lucas began building Blue Sun's infrastructure while still a KPM employee, although he was not compensated by Blue Sun for this work. RA 1429; 1431. In August 2018, Lucas created some marketing materials for Blue Sun. RA 1324; 1344. In doing so, he solicited and received feedback from another KPM employee, defendant Rachel Glenister. RA 1324; 1344.[2]

In August and September 2018, Lucas spoke twice with Robert Gajewski (a KPM employee who lived in Illinois) about joining Blue Sun. RA 1318; 1718. At the time, Gajewski maintained and calibrated SpectraStar NIRs for certain KPM customers. Maintenance involved cleaning the machine, which can become covered in grease, replacing the light or lamp in the unit and any failed parts, and ensuring the

[2] Lucas eventually asked Glenister to join Blue Sun in 2020. RA 1344.

Case 25-1079 Doc 118-4 Filed 08/19/26 Page 29 of 268

machine is working properly mechanically. RA 1060; 1729. Maintenance does not require any special tools. RA 1060; 1729. Only 20% of KPM's customers have KPM maintain their NIRs—the rest do it themselves. RA 1730. In addition to maintenance, Gajewski helped some KPM customers calibrate their data using KPM's UCal software. RA 1057. Other KPM customers purchased a copy of UCal software and calibrated the data themselves. RA 1059; 1233-34.

## VI. Gajewski Services Customers for Both KPM and Blue Sun

In January 2019, Gajewski transitioned from a KPM employee to an independent contractor. Unbeknownst to KPM, Gajewski also worked for Blue Sun servicing customers' NIRs—including some who owned KPM SpectraStar machines. RA 1618-20. Gajewski used his KPM laptop and a copy of KPM's UCal software even when servicing SpectraStar machines for Blue Sun. RA 1623-25. In May 2019, KPM rehired Gajewski as an employee, but he continued to perform maintenance for both companies until April 2021, when KPM learned what he was doing and fired him. RA 1622-23.

While an employee of KPM, Gajewski used a Blue Sun email address to correspond with customers seeking service for their

SpectraStar and diverted opportunities to Blue Sun. RA 1631-32. Between 2019 and 2021, Gajewski worked for Blue Sun to service thirteen customers with SpectraStar machines. RA 1621; 1709. None of those customers were in Massachusetts. RA 1621; 1709; 4182-87; 4188-214. Instead, they were in Arkansas (Post, RA 3625-47), California (Mariani Packing, RA 1676, 3917-19; Olam Spices, RA 3533-44), Idaho (Basic America Foods, RA 4139-43; Lamb Weston, RA 3617-21), Louisiana (Omega Protein, RA 3569-70), Michigan (Kellogg's, RA 3529; Post, RA 3744-350, 3751-52, 3753, 3754-56, 3757-3761, 3762-66, 3767-70, 3771-76, 3777-79, 3780-92); Nebraska (Kellogg's, RA 3530), North Carolina (Universal Leaf, RA 4144-52), Ohio (Ohio Health, RA 4134-35), Oregon (Lamb Weston, RA 3622-24), Virginia (Omega Protein, RA 3571), Washington (Lamb Weston, RA 3572-96; Viterra, RA 3740-43), Wisconsin (Saputo Dairy, RA 3524-28), Alberta, Canada (Lamb Weston, RA 3610-13; Northern Star Mother's Milk Bank, RA 3507-23), Ontario, Canada (Jungbunzlauer, RA 3545-50, 3551-66; Kellogg's, RA 3531-32), and Saskatchewan, Canada (Viterra, RA 3740-43).

Blue Sun used preventative maintenance services to non-Phoenix customers as an avenue to sell them replacement Phoenix machines.

RA 1490; 1507; 3625-47. However, this strategy only worked with one KPM customer, Post, who was in Arkansas. RA 1490; 1507; 3625-47.

## VII. Gajewski Gives Blue Sun KPM Software Application Notes

Just as KPM used the UCal software to calibrate its NIR (the SpectraStar), Blue Sun used Alligator brand software (which it purchased from a third party) to calibrate its NIR (the Phoenix). RA 1423. In January 2020, while Gajewski was still a KPM employee, Lucas asked him to evaluate the Alligator software. RA 1351; 1424-25. Gajewski told Lucas that the software was buggy and crashed. RA 1750-54. Gajewski recommended that Blue Sun ask KPM to license a version of UCal that would work with the Phoenix. RA 1750-54. Lucas never did this. RA 1462-63.

To explain the customer output provided by UCal to Lucas, who is a salesperson and does not use the software, Gajewski created application notes using the copy of UCal that KPM provided to him, and the calibration datasets that he had on his KPM laptop. RA 1405-407; RA 1754-55. An application note is *not* the same as a source code.[3]

[3] KPM stores its source code files for making and building the UCal software on a cloud-based service named GitHub. RA 1052.

RA 1005. Rather, an application note is a scatter plot graph showing the parameters or performance that is expected for a particular application, for example, chocolate or soy meal, using a calibration data set and calibration model. RA 915-18; 1011-12. Gajewski copied the application notes into Microsoft Word templates that Lucas provided him. RA 1405-407. The application notes falsely claimed that the data points were created using a Phoenix and that graphs were prepared using the Alligator software. Id. Thereafter, Lucas asked another Blue Sun employee to post the application notes on the Blue Sun website and pass them off as their own. RA 1405-07.

## VIII. Arnold Eilert Leaves KPM to Join Blue Sun

Arnold Eilert is another former KPM employee who now works for Blue Sun. Among other things he conducts preventative maintenance and calibration work, responsibilities which he had at KPM. RA 1793-1795. He lives in Illinois. RA 1792. Eilert resigned from KPM effective December 31, 2020, and started working for Blue Sun on January 4,

Gajewski did not have access to GitHub, and KPM did not present any evidence that Blue Sun or ITG downloaded any materials from GitHub or used UCal source code in its Alligator software. RA 1240-41; 1422; 1585; 4114.

2021. RA 1797-1798. Eilert had permission from KPM to keep his laptop that he used while he was employed by KPM, which had a copy of UCal on it. RA 1801. Eilert told KPM that he was resigning because he needed to involve himself in his family's farming operation but not that he was going to work for Blue Sun. RA 1798.

Eilert performed preventative maintenance for Blue Sun on SpectraStar machines for certain customers he had previously serviced while at KPM. RA 1815-1831. None of these customers was in Massachusetts.[4]

KPM presented evidence that Eilert used service records he had from his employment with KPM to determine when he had last been at a customer's location—Viterra in Manitoba, Canada—and to determine the serial number on one customer's machine—Blommer Chocolate in East Greenville, Pennsylvania. RA 1816; 1821; 3842; 3484-3485. KPM also presented evidence that Eilert used his copy of UCal to perform calibration work for Ingredion and troubleshoot for SGS in California.

[4] Ingredion Inc. (Illinois), Blommer Chocolate (Pennsylvania and Illinois), Texas A&M (Texas), Disney's Animal Kingdom (Florida), and Olam Spices (California). RA 1816-1831; 3363-3370; 3468-3471; 3472-3476; 3484-3485.

RA 3363-70; 3689-92. In short, none of Eilert's alleged misconduct occurred in Massachusetts.

## IX. KPM Determines that Gajewski Gave Blue Sun Application Notes that He Created from Data and Software Stored on His Laptop

In February 2021, KPM employee Robert Schumann discovered the application notes posted on Blue Sun's website and concluded that Blue Sun must have used KPM's data sets. RA 915-24. KPM's vice president, Eric Olson, investigated the matter and issued a report with his findings. RA 1151-52; 3651-60. Olson concluded that Gajewski had used files saved on his laptop as well as his copy of the UCal software to create the application notes that he gave to Blue Sun. RA 1153-54; 1156-57. Olson further concluded that while some of the files on Gajewski's computer used to create the application notes were similar or nearly identical to those in the KPM shared repository, many of the data sets were *not* in the shared repository. RA 1246-48. As such, Olson conceded that KPM did *not* know whether Gajewski had used any data from the shared library to create the application notes. RA 1247. At trial, Gajewski denied having done so, and that testimony stood undisputed. RA 1625.

KPM presented no evidence at trial that the application notes led to any sales for Blue Sun, or that any KPM customers ever viewed the notes. Beyond creating the application notes for marketing purposes, no evidence was presented that Blue Sun used the calibration data underlying those notes. Blue Sun has never sold calibration data to customers. RA 1386.

As part of its investigation, KPM remotely installed tracking software on Gajewski's laptop, which took screen shots or captures at set intervals. RA 1137. On March 24, 2021, while Gajewski's computer was in his home in Illinois, KPM captured him transferring customer files from his laptop's hard drive to a Lexar brand USB thumb drive. RA 1137-38; 3504.

## X. KPM Terminates Gajewski and Files Suit

A KPM manager, Ron Geis, fired Gajewski over the phone while he was in Illinois and then immediately went to Gajewski's house to collect his KPM property. RA 1140-43. KPM was monitoring Gajewski's laptop remotely and observed him make an archive of his email inbox and remove the web browser application, before it disabled the laptop. RA 1140-43. Geis collected two laptops from Robert Gajewski and one

Case 25-1799 Doc 118-4 Filed 08/19/26 Page 27 of 258

that belonged to his wife Michelle, another KPM employee, who Geis also terminated. RA 1140-43.

Thereafter, KPM immediately filed this action. RA 1143. In discovery, Gajewski produced two Western Digital hard drives, but could not locate the Lexar thumb drive. RA 1144-45; 4284-87. Gajewski had received a new computer from KPM, and KPM allowed him to use the Western Digital hard drives to transfer over the files of his old laptop. RA 1759-60. Gajewski forgot to return the hard drives to Geis because he was stressed. RA 1759-61. There was no evidence at trial that Gajewski provided any information from the Lexar or Western Digital drives to Blue Sun or ITG.

## XI. The Preliminary Injunction

On August 23, 2021, the district court preliminarily enjoined the individual defendants and Blue Sun from using any KPM trade secrets and offering to sell any NIR products or services to KPM's customers. RA 412-13. The court also ordered Defendants to return all KPM's confidential information and trade secrets. Id. The court later revised the preliminary injunction, but these core restrictions remained in place through trial. RA 414. Early in the case, KPM claimed that Defendants

Case 25-10998 Doc 118-4 Filed 08/19/26 Page 28 of 268

violated the preliminary injunction, but the court denied KPM's contempt motion. RA 20. KPM did not move for contempt again before trial or present any evidence at trial that the defendants had violated the preliminary injunction.

The district court wrestled with how to handle the preliminary injunction at trial—as it was highly prejudicial to Defendants as to liability but also could curtail KPM's damages claim. RA 878-80; 966-67; 1478-79; 1494-97; 1505-23; 1651; 1914-20. Defendants made the obvious point that if they were enjoined from making the offending sales, KPM could not possibly have been damaged post injunction. RA 1494.

Defendants further moved *in limine* to exclude evidence from plaintiff's damages expert Neil Zoltowski that KPM suffered damages following the court's issuance of the preliminary injunction. RA 27; 1811. Because the court did not decide the motion prior to trial, Defendants renewed their objection before Zoltowski took the stand. RA 1811; 1914-20. Ultimately, the court admitted evidence of the preliminary injunction and permitted evidence of post-injunction profits

by Blue Sun through Zoltowski. RA 878-80; 966-67; 1478-79; 1494-97; 1505-23; 1651; 1914-20.

## XII. KPM's Expert Improperly Overstates Its Alleged Damages

Zoltowski opined that KPM was entitled to the greater of its lost profits, or Blue Sun's and ITG's combined profits, which could be disgorged under both the tortious interference and the trade secret claims. RA 1944-48. Zoltowski opined that KPM lost $3,041,457 in revenue because of the alleged trade secret misappropriation claims. RA 1973-75. He then applied a 30.2 percent profit margin to calculate $918,520 in KPM's lost profits. RA 1975. Zoltowski testified that KPM's lost profits on the tortious interference were $211,691 greater than the trade secret claims because of increased costs of KPM hiring replacement employees. RA 1981.

Zoltowski further calculated Defendants' unjust enrichment from their trade secret misappropriation as follows: $2,701,974 for Blue Sun; and $1,143,127 for ITG. RA 1953. To calculate these damages, Zoltowski used two spreadsheets that list all revenue received by Blue Sun from its creation until the time of trial for sales of service, NIR machines, and replacement parts or consumables. RA 1953; 2015-2016;

4182-87; 4188-214. Zoltowski assumed that *all* Blue Sun's sales were attributable to KPM's trade secrets. RA 1841-42. His opinion, however, was belied by undisputed evidence that many of the machine sales and service were unrelated to KPM's trade secrets. RA 2043-45; 4182-87; 4188-214. Instead, these sales/service related to customers that owned FOSS or other non-Unity/KPM brand NIRs at the time that Blue Sun contacted them and secured their business. RA 4182-87; 4188-214. When confronted with the errors in his calculation, Zoltowski claimed that the "whole market" was tainted by the defendants' action.[5] RA 1997.

Zoltowski's unjust enrichment damages also included Blue Sun's sales after the preliminary injunction issued. Specifically, Zoltowski suggested that the jury should award all Blue Sun's profits from 2018 until March 31, 2023 (a month before trial started) even though the court had issued the preliminary injunction on August 23, 2021. Almost half ($2,611,88.20) of Blue Sun's total sales ($5,438,076.90) occurred *after* the preliminary injunction was entered. RA 4182-87; 4188-214.

---

[5] KPM tried to rehabilitate Zoltowski by invoking the head start doctrine, but the district court properly precluded him from offering an opinion on the matter. RA 2026.

Defendants' damages expert, G. William Kennedy, opined that Zoltowski had overstated the damages by including Blue Sun sales that related to consumables, customers already in ITG's pipeline prior to Blue Sun's alleged wrongful conduct, and customers that did not have a SpectraStar machine at the time Blue Sun contacted them. RA 2052-62. Removing those sales, Dr. Kennedy calculated unjust enrichment damages at $600,669. RA 2052-62. That figure would have been lower had the trial been bifurcated and Defendants been permitted to argue that no post-injunction profits should have been awarded.

## XIII. The Jury Instructions

### *A. The District Court Decided that There was Insufficient Evidence to Charge the Jury on "Willful and Maliciousness," a Factual Predicate for Multiple Damages and Attorney's Fees Under the Trade Secret Statutes*

After the close of the defense case, and before the charge conference set for the following morning, the district court raised on its own initiative the issue of KPM's request for a jury charge that the defendants' conduct was "willful and malicious" for purposes of G.L. c. 93A. The court rejected KPM's submission, finding "no case law that it supports its conclusion." RA 2078. The court reviewed the evidence at

trial and heard argument. RA 2078-81. The court invited KPM to submit case law to support its requested charge, which KPM did:

> THE COURT: All right. There's another issue that I want to raise with all of you, and I will hear you on this. *I have some concerns about putting to the jury the question of whether or not the defendants' behavior was willful and malicious* under the definition -- under that specific claim, which is subsection B under the trade secrets . . .
>
> *I have serious misgivings about this*. We found no case law that supports its conclusion. This count, the willful and malicious appropriation, requires proof that the defendants acted willfully and maliciously and not just for the purpose of, not just for the purpose of looking at behavior saying, he was in two emails working for both companies. It's what their motive was. Pure greed or whatever is not the intent to bring about the likelihood of themselves with ill will, hatred, hostility or evil motive. I mean, greed may be evil but it's not an evil motive. In this case, it believed it brought about very bad character actions, but I think when they're talking about willful and malicious, they're talking about things like trying to put a company out of business or fighting within a family and poisoning the well kind of thing. So I'm going to give you tonight to talk me out of that. *I'm telling you I have very serious misgivings about how the jury, from the evidence that we heard, even in the best light by the plaintiff, they could find that the intent was evil.*

RA 2078-79 (emphasis added); see RA 2180-81, 2102.

At the charge conference, the district court provided the following explanation of its ruling:

> The willful and malicious element under trade secrets is literally what is a -- what is the actor's motive; and in this case, the motive was money, additional money. In all of the

cases that we've seen that -- and there're not a lot of cases out there, but all of the cases under that prong is looking at evil intent, and evil intent is not necessarily profit. It could be profit, but it generally is to harm someone's either reputation, their financial standing or the viability of the company in and of itself. And so that is a competitor who doesn't have as good a product and maybe -- maybe maligns it or destroys it or does something of that nature, but other -- there's many other circumstances. *That's not the facts that we have here.*

So we're -- the -- certainly, you are free to argue multiple theories, but the evidence, the credible evidence has to at least support the inclusion of the instruction, and there's no – there's no evidence – there's lots of evidence, if you -- if the jury believes it of motive to have profit. *There's no evidence that I've heard of of motive to harm for the -- as the malicious intent is -- covers. That kind of behavior is not here.* So to, you know, on the one hand, they wanted to make money, but on the other hand if they -- if you don't think they just wanted to make money, that evidence isn't here to offer those two theories. So that's my thinking. And I don't find any -- I have not found any cases that would tell me otherwise.

* * *

I don't want to confuse the jury. We want to give them all the tools they need, but we don't want -- *they can't be speculating on that. So that element is -- is not going in. There's just no credible evidence that I've seen that would allow it to go in.*

MR. GUTKOSKI: Even as to the defendants, the individual defendants, and Blue Sun separate and apart from ITG?

THE COURT: Yeah, I mean, it was -- I never -- there was all kinds of behavior that wasn't complimentary, if the jury believes it, but it doesn't rise to the level of evil, because its

> motive didn't appear to be for evil. It appeared to be -- it wasn't really malicious. It was -- it was selfish.
>
> MR. GUTKOSKI: But isn't that a question for the jury?
>
> THE COURT: The -- *it is a question for the jury as long as there is some credible basis for the jury to question it.*

RA 2101-03 (emphasis added).

### *B. The District Court's Head Start Instruction*

Early in the case, KPM's witness was asked whether a competitor possessing KPM's calibration data would have a "head start in the marketplace." RA 923. The prejudice of this damages theory, which had no place in the case under existing Massachusetts and federal trade secret law, was cemented by the head start jury instruction given at KPM's request:

> Improperly obtaining a head start in the marketplace for misappropriating another's trade secrets is a form of unjust enrichment. To establish that a misappropriated trade secret gave a defendant a head start, plaintiff must proffer evidence: One, that the alleged misappropriation gave the defendant a head start in the marketplace; and two, that the head start helped to bring about certain earnings over the following months or years.

RA 2222. The Defendants objected to the instruction. RA 2249.[6]

---

[6] KPM defended its requested instruction by pointing out that the instruction was based on a district court decision in the BioPoint case.

### *C. The District Court's Willful Blindness Instruction*

The district court's willful blindness instruction allowed the jury to find ITG liable for tortious interference without any evidence of actual knowledge of the contracts interfered with. KPM argued that the contracts interfered with were the employment agreements, which was pled in the complaint. RA 2265-74.

Wilt testified that he never asked Lucas if he had a confidentiality agreement with KPM and only learned about it after the lawsuit was filed. RA 1880. Wilt admitted that he was aware that Lucas was only hiring people from KPM but again denied any knowledge that the employees that Lucas was hiring had confidentiality agreements. RA 1881-82. Lucas also denied disclosing the KPM employment agreement to Wilt and ITG. RA 1372. Besides Lucas, Wilt interviewed one other employee that came over from KPM (Ossowoski) to test his technical ability before Blue Sun hired him. RA 1879-80. No evidence

---

The dissent in <u>BioPoint</u> criticized the district court's invocation of the head start doctrine, saying that the "district court's unjust enrichment award cannot be squared with the governing law." <u>BioPoint, Inc. v. Dickhaut</u>, 110 F.4th 337, 358 (1st Cir. 2024) (Rikelman, J., Dissenting in part).

Case 25-1079 Doc 118-4 Filed 08/29/26 Page 36 of 258

was presented that Wilt or ITG was involved in any other Blue Sun hiring decisions.

## XIV. Jury's Verdict

The jury found that KPM's UCal software, calibration datasets, and customer information were trade secrets, and that KPM took reasonable steps to protect them. RA 784-85. The jury also found that Blue Sun—but not ITG—misappropriated these trade secrets. RA 785. The jury found that each of the individual defendants, misappropriated one or more of the trade secrets, breached their KPM confidentiality agreements, and violated the covenant of good faith and fair dealing. RA 786. The jury also found that Blue Sun and ITG violated G.L. c. 93A, and that their conduct was willful and knowing. RA 789. The jury decided that KPM sustained $1,500,000 in damages for Blue Sun's misappropriation of trade secrets. RA 786. The jury found Defendants liable for tortious interference and awarded $1,500,000 against Blue Sun and $1,800,000 against ITG. RA 789.

## XV. Post-Trial Motions and Final Judgment

Following trial, the district court set a briefing schedule for post trial motions. Defendants moved to alter or amend the judgment, or in

the alternative, for remittitur. RA 2288-317. KPM filed four motions seeking: (1) damages under G.L. c. 93A (RA 2318-22); (2) an order that the defendant's conduct was willful and malicious under the trade secret statutes (RA 2394-97); (3) a permanent injunction (RA 34); and (4) attorney's fees and costs (RA 2408-30). Following hearing, the district court ruled on the Defendants' motion, and KPM's Chapter 93A, willful and malicious, and permanent injunction motions in one decision. RA 3099-101; 3102-209. The court issued a decision on the motion for attorney's fees and costs in a separate decision following a further hearing. RA 3223-24; 3225-51.

In deciding Defendants' post-trial motion, the court interpreted the jury's verdict, which seemingly awarded KPM $1.5M from Blue Sun twice, once for trade secret violations and a second time for tortious interference. RA 1506; 3102-09. The district court decided that the jury did not intend to award those damages twice. RA 1506; 3102-209. The court also denied ITG's request to remit the jury's $1.8M damages award to the amount identified by KPM's expert ($1,143,127). In doing so, the court noted that the jury may have awarded more damages against ITG based on evidence that ITG received 65% of the revenue

Case 25-10798 Doc 118-4 Filed 08/19/25 Page 38 of 268

that Blue Sun generated from Phoenix sales. RA 3114. This rationale, however, conflicts with the jury's allocating 54.5% of the corporate defendant damages to ITG (not 65%). RA 3114.

### *A. Willful and Maliciousness*

Despite its prior ruling that there was insufficient evidence for the jury to find "willful and malicious" misappropriation, the district court found that Blue Sun and the individual defendants' conduct was "willful and malicious." Blue Sun properly objected as this issue had already been decided and was one for the jury—not the court—to decide. RA 2431-42. Even though the court ruled that Blue Sun's conduct was willful and malicious, the court declined to award exemplary double damages to KPM under the federal and state trade secret statutes because it was awarding multiple damages under G.L. c. 93A. RA 3132.

### *B. 93A Award*

The court adopted the jury's advisory verdict on G.L. c. 93A and found that the Defendants' conduct violated the statute and was "willful and knowing." RA 3134-41. The court rejected Defendants' argument that KPM could not recover under G.L. c. 93A, § 11 because the offending conduct did not occur "primarily and substantially within the

Case 25-10798 Doc 118-4 Filed 01/19/26 Page 39 of 268

commonwealth." RA 3141-45.[7] The court also rejected the Defendants' argument that relief under G.L. c. 93A was preempted by the MUTSA's preemption clause, G.L. c. 93, § 42F. RA 3145-46. Finally, the court decided to enter a permanent injunction, leaving the exact conditions for another day. RA 3150-54.

In a later decision, the district court awarded KPM attorney's fees and costs under G.L. c. 93A, § 11, which the statute mandates for prevailing plaintiffs. The court noted that attorney's fees were discretionary under the federal (18 U.S.C. § 1836(b)(3)(D)) and Massachusetts (G.L. c. 93, § 42C) trade secrets statutes and did not elect to exercise her discretion one way or the other under those provisions. The judge relied solely on G.L. c. 93A for the fee award. RA 3227-28. The district court awarded KPM $1,519,800 in fees and $314,167 in costs.

[7] At the outset of the case, Blue Sun and ITG moved to dismiss KPM's Chapter 93A, § 11 claims because the "primarily and substantially" requirement for cases filed under that section was not satisfied. RA 354. The district court denied the motion because KPM resides in Massachusetts and claims an injury in Massachusetts. RA 354-55.

Case 25-1079 Doc 118-4 Filed 12/29/25 Page 40 of 268

On February 7, 2025, the district court entered a final judgment totaling over $9M. RA 3252-61. Despite the plain language of the jury verdict to the contrary (and the fact that the corporate veil was never pierced), the judgment imposes joint and several liability on ITG for the compensatory damages, attorney's fees, and prejudgment interest awarded against Blue Sun. Id. Defendants timely filed a notice of appeal on March 4, 2025, and these proceedings followed. RA 3262.

## SUMMARY OF THE ARGUMENT

There is no basis for personal jurisdiction because the Defendants did not engage in any activities in Massachusetts that "gave rise to the liabilities sued on." Daimler AG v. Bauman, 571 U.S. 117, 127 (2014)(citation modified). Blue Sun's trade secret misappropriation and tortious interference occurred outside Massachusetts, and the only connection to the forum is that KPM was injured in Massachusetts. On the motion to dismiss, KPM presented no evidence that ITG did anything wrong in Massachusetts, or elsewhere. Nor did KPM plead or argue that the district court should pierce ITG's corporate veil. As such, the court was required to dismiss the complaint for lack personal jurisdiction. Similarly, the jurisdiction requirement of Chapter 93A,

§ 11, is not met because the supposedly offending did not occur "primarily and substantially" in Massachusetts—in fact nothing relevant was even alleged to have occurred in the Commonwealth.

Judgment must be vacated and the case remanded for a new trial for material substantive errors as well. To begin, KPM's Chapter 93A claim, which is based on the theft of trade secrets is barred by the Massachusetts Uniform Trade Secrets Act ("MUTSA"). See G.L. c. 93, § 42F(a). MUTSA expressly supersedes all "conflicting laws of the commonwealth providing civil remedies for the misappropriation of a trade secret." Chapter 93A and MUTSA conflict because multiple damages and attorney's fees are only available under MUTSA when a plaintiff proves that a trade secret misappropriation was "willful and malicious"—Chapter 93A does not require proof of malice. Removing the 93A award alone cuts the judgment in half.

Second, the jury should not have been instructed on "willful blindness." At trial there was no evidence that ITG had actual knowledge of the KPM employment agreements that were allegedly intentionally interfered with. The "willful blindness" instruction erroneously permitted the jury to find ITG liable for an intentional tort

based on negligent conduct—i.e., that ITG "should have known" that the former KPM employees were bound by employment agreements. That result is irreconcilable with Massachusetts law, and if left undisturbed by this Court, would endorse a new tort in the Commonwealth—"negligent interference with contractual relations."

Finally, a new trial is warranted because the court improperly instructed the jury that it could disgorge profits based on the "head start" doctrine. As a result, the jury erroneously disgorged millions of dollars in profits which were *not* attributable to Blue Sun's use of a KPM trade secret. Indeed, despite causation being a fundamental element of proof for both claims, there was no evidence linking the damages awarded to the Defendants' allegedly wrongful conduct. Instead, the jury awarded KPM *all* the Defendants' profits from the time of Blue Sun's formation until trial—even though there was no evidence to support the award.

## STANDARD OF REVIEW

1. This Court reviews *de novo* a denial of a motion to dismiss for lack of personal jurisdiction. Nandjou v. Marriott Int'l, Inc., 985 F.3d 135, 148 (1st Cir. 2021) ("We review the District Court's application of

Case 25-1799 Doc 118-4 Filed 01/09/26 Page 43 of 268

that standard [prima facie] to the record de novo."). "To hear a case, a court must have personal jurisdiction over the parties." Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A., 290 F.3d 42, 50 (1st Cir. 2002). The burden of establishing the court's personal jurisdiction over a non-resident defendant rests with the plaintiff. See id. When faced with a motion to dismiss for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2), a plaintiff cannot rely on bare allegations in the complaint. Rather, a plaintiff must make a *prima facie* showing of personal jurisdiction "based on evidence of specific facts set forth in the record." Boit v. Gar–Tec Products, Inc., 967 F.2d 671, 675 (1st Cir. 1992).

2. This Court reviews *de novo* the issue of whether offending conduct occurred "primarily and substantially within the commonwealth." G.L. c. 93A, § 11; Roche v. Royal Bank of Canada, 109 F.3d 820, 827 (1st Cir. 1997).

3. Whether MUTSA, G.L. c. 93, § 42F(a), supersedes KPM's G.L. c. 93A claim is a pure issue of law that is reviewed *de novo*.

4. The district court's post-jury trial decision that Blue Sun's misappropriation of KPM's trade secrets was "willful and malicious,"

Case 25-1079 Doc 118-4 Page 43 Filed 08/19/26 Page 44 of 268

after having taken the issue away from the jury for insufficient evidence, violated the Defendants' procedural due process rights, and this Court reviews it *de novo*. Acevedo-Feliciano v. Ruiz-Hernandez, 447 F.3d 115, 121 (1st Cir. 2006).

5. The district court's head start and willful blindness instructions materially misstated the law and this Court reviews them *de novo*. United States v. De La Cruz, 835 F.3d 1, 12 (1st Cir. 2016).

## ARGUMENT

### I. There Is No Personal Jurisdiction Over Defendants

To establish a *prima facie* case for personal jurisdiction, KPM must prove that: (1) the Massachusetts long-arm statute was satisfied; and (2) the court had specific jurisdiction[8] over Blue Sun and ITG (the constitutional analysis). See, e.g., Adelson v. Hananel, 510 F.3d 43, 48-49 (1st Cir. 2007). Here, KPM failed to meet that burden. Indeed, the district court based its entire analysis on the notion that Defendants' alleged conduct harmed a Massachusetts company (KPM). In other words, the court erroneously based its jurisdiction on the fact that the

[8] KPM conceded that neither Blue Sun nor ITG is subject to general jurisdiction in Massachusetts. See RA 292-98; 337.

*plaintiff* (KPM) is in Massachusetts. The court's flawed analysis contravenes the United States Constitution not to mention Supreme Court and First Circuit precedent.

### *A. KPM Failed to Establish Jurisdiction Over Blue Sun or ITG Under the Massachusetts Long-Arm Statute*

The first step in the analysis is to determine whether the requirements of the long-arm statute are satisfied.[9] The Massachusetts long-arm statute, G.L. c. 223A, § 3, lists eight specific grounds on which a defendant may be subjected to personal jurisdiction by a Massachusetts court. G.L. c. 223A, § 3(a)-(h).

Here, KPM's sole argument was that jurisdiction was proper under Section 3(c) because Defendants caused "tortious injury by an act or omission in this commonwealth." RA 295; 335-37. To satisfy that section, KPM must establish that Defendants' offending conduct occurred in Massachusetts. Murphy v. Erwin-Wasey, Inc., 460 F.2d 661,

[9] See SCVNGR, Inc. v. PUNCHH, Inc., 478 Mass. 324, 325 (2017) ("Because the long-arm statute imposes specific constraints on the exercise of personal jurisdiction that are not coextensive with the parameters of due process, and in order to avoid unnecessary consideration of constitutional questions, a determination under the long-arm statute is to precede consideration of the constitutional question.").

Case 25-10798 Doc 118-4 Filed 08/19/26 Page 46 of 268

664 (1st Cir. 1972) (analyzing legislative history and concluding that "Section 3(c) is intended to apply only when the act causing the injury occurs within the Commonwealth."); Noonan v. Winston Co., 902 F. Supp. 298, 306 (D. Mass. 1995) ("In similar fashion, section 3(c) requires a well-pleaded allegation that a defendant did some act *in* the Commonwealth that caused the plaintiff harm.") (emphasis in original).

KPM concedes that neither Blue Sun nor ITG acted in Massachusetts, as required by the long-arm statute. Nevertheless, KPM argues that an exception applies where out-of-state conduct causes tortious injury in Massachusetts. RA 295-96. As demonstrated in the cases cited by KPM (and the district court), that narrow exception *only* applies where *fraudulent misrepresentations* are directed at Massachusetts businesses from outside the Commonwealth.[10] In that limited circumstance, courts compare the intent in sending a fraudulent

[10] See, e.g., Ealing Corp. v. Harrods Ltd., 790 F.2d 978, 982 (1st Cir. 1986) (Section 3(c) satisfied where the British defendant sent a telex message containing an allegedly fraudulent statement to the Massachusetts plaintiff, and the parties had daily communications related to a failed business deal); The Scuderi Grp., LLC v. LGD Tech., LLC, 575 F. Supp. 2d 312, 320-21 (D. Mass. 2008) (Michigan defendant sent false statements to Massachusetts intending that they be relied upon to the injury of a Massachusetts resident).

misrepresentation into the state with "the frequently hypothesized but rarely encountered gunman firing across a state line"—where the intent follows the bullet. See Ealing, 790 F.2d at 983 (quoting Buckley v. New York Post Corp., 373 F.2d 175, 178-79 (2d Cir. 1967).

Here, the narrow exception to Section 3(c)'s in-state conduct requirement does *not* apply because KPM does not claim that Defendants sent fraudulent statements to Massachusetts. Instead, KPM argued that: (1) the individual defendants (former KPM employees) misappropriated KPM's trade secrets while outside Massachusetts for the benefit of Blue Sun (a Maryland LLC); and (2) Blue Sun and ITG tortiously interfered with the employment agreements of former KPM employees who all resided and worked for KPM outside Massachusetts. RA 292-95.

Specifically, KPM relied upon the following alleged conduct to satisfy Section 3(c) of the long-arm statute: (1) two former KPM employees (Robert Gajewski and Gregory Israelson) simultaneously maintained both Blue Sun and KPM email addresses; and (2) Blue Sun posted eleven application notes on its website that contain data that is identical to data contained on Gajewski's KPM computer, and appear to

have been created on his KPM computer. RA 296. None of this conduct occurred in Massachusetts.

It is undisputed that Gajewski resided in Illinois and Israelson resided in Missouri and Florida. Both men's confidentiality agreements with KPM are governed by Connecticut law and have them consenting to jurisdiction in Connecticut. RA 48; 79; 82; 119; 137.

KPM alleged that while in Illinois, Gajewski used calibration data saved on his KPM laptop to create the application notes that he then gave to Blue Sun (located in Maryland), and that Blue Sun posted those notes on its website. RA 65, ¶ 65; RA 65-66, ¶¶ 66-67; RA 69, ¶ 72. Again, ***none*** of this occurred in Massachusetts.

KPM's attempt to establish long-arm jurisdiction over ITG fares no better. KPM did not present any evidence (or argument) to show that ITG acted in Massachusetts. KPM merely argued that ITG is the corporate parent of Blue Sun. RA 48. However, KPM did not seek to pierce the corporate veil or disregard the corporate form in its Complaint, which is legally required to hold ITG responsible for Blue Sun's actions. RA 46-260; Lipsitt v. Plaud, 466 Mass. 240, 253–54 (2013) (holding veil piercing factors must be plead with sufficient

factual heft). In short, Blue Sun's jurisdictional contacts (if any) cannot be imputed to ITG.

This Court's recent decision in Keane v. Expeditors Int'l of Washington, Inc. is directly on point. 138 F.4th 613, 617-18 (1st Cir. 2025) ("But [Plaintiff]'s complaint contains insufficient allegations or even a request to pierce the corporate veil, nor does it allege sufficient facts on which [parent] can be held liable for [subsidiary's] actions."). As in Keane, KPM's complaint contains neither a request to pierce the corporate veil nor sufficient allegations to support such a theory under the factors analyzed under Massachusetts law. Id. see also United States v. Swiss Am. Bank, Ltd., 274 F.3d 610, 627 (1st Cir. 2001) (holding that personal jurisdiction only extends to parent company if plaintiff makes a prima facie case for jurisdiction over subsidiary, and the plaintiff can establish alter ego liability). Because KPM failed to establish jurisdiction under the long-arm statute over ITG on either an individual or alter ego basis, the district court should have dismissed the claims against ITG.

In sum, KPM failed to establish jurisdiction over ITG or Blue Sun under the Massachusetts long-arm statute. For this reason alone, this Court should vacate the judgment.

### ***B. KPM Failed to Establish Jurisdiction Under the Constitutional Analysis***

KPM also failed to establish that jurisdiction was permissible under the constitutional analysis. The Supreme Court has firmly held that "[f]or a State to exercise jurisdiction consistent with due process, the defendant's suit-related conduct must create a *substantial connection* with the forum State." Walden v. Fiore, 571 U.S. 277, 284 (2014) (emphasis added); see also Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915, 919 (2011) (specific jurisdiction "depends on an affiliation between the forum and the underlying controversy.").

To determine whether specific personal jurisdiction exists, courts utilize a three-part analysis:

> *First*, the claim underlying the litigation must directly arise out of, or relate to, the defendant's forum-state activities. *Second*, the defendant's in-state contacts must represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's court foreseeable. *Third*, the exercise of jurisdiction must, in light of the Gestalt factors, be reasonable.

Case 25-1222 Doc 118-4 Filed 01/19/26 Page 51 of 268

Pritzker v. Yari, 42 F.3d 53, 60-61 (1st Cir. 1994) (internal quotations omitted) (emphasis added). KPM failed to establish any of these three prongs.

**1. KPM Did Not and Cannot Establish Relatedness**

KPM did not satisfy the relatedness prong. The jurisdictional facts it presented at best demonstrate that KPM was injured in Massachusetts. The Supreme Court has long held that "mere injury to a forum resident is not a sufficient connection to the forum." Walden, 571 U.S. at 290. Instead, "[t]o determine relatedness for tort claims under the requirements of the Due Process Clause, [courts] must probe the causal nexus between the defendant's contacts and the plaintiff's cause of action." Vapotherm, Inc. v. Santiago, 38 F.4th 252, 255 (1st Cir. 2022) (internal quotations omitted). Specifically, the tort claim must "arise out of or relate to the defendant's contacts with the forum." Ford Motor Co. v. Montana Eighth Judicial Dist. Court, 592 U.S. 351, 359 (2021).

Here the district court disregarded the Constitution and this controlling precedent—ruling instead that an out-of-state defendant is subject to jurisdiction in Massachusetts simply because it allegedly

tortiously interfered with a contract to which a Massachusetts resident is a party with no other contact with Massachusetts:

> [w]hether the Corporate Defendants' contact with KPM's employees or former employees occurred outside of Massachusetts is immaterial; as alleged, the Corporate Defendants conduct relates to contracts between a Massachusetts company and its employees. *Therefore, the tortious harm resulting the Corporate Defendants' alleged interference is an in-forum injury and the relatedness condition is fulfilled.*

RA 339 (emphasis added). The district court's decision was based entirely on a misreading of this Court's decision in Astro-Med, Inc. v. Nihon Kohden Am., Inc., 591 F.3d 1 (1st Cir. 2009). Indeed, the rationale of Astro-Med demands the dismissal of KPM's claims.

In Astro-Med, a Rhode Island company sued a California competitor for tortiously interfering with its employment contract with a Florida based employee. See 591 F.3d at 6-7. The California competitor reviewed the employee's contract with its counsel and was aware that it contained Rhode Island choice of law and jurisdictional provisions. Id. at 10. This Court held that relatedness was satisfied because the California competitor *knew* that by hiring the employee "it was running the risk that [the employee] would thereby have breached its Rhode Island contract with a Rhode Island company and any

Case 25-10798 Doc 118-4 Filed 03/19/26 Page 53 of 268

ensuing suit would be initiated in Rhode Island and interpreted under Rhode Island law." Id. at 10.

Unlike Astro-Med, the employment contracts in this case all contain Connecticut choice of law and venue provisions. RA 87-154. The rationale of Astro-Med would support jurisdiction in Connecticut but specifically *not* Massachusetts. These dispositive facts were apparent on the record and argued by Defendants. RA 316. Indeed, the employment agreements in dispute, including the choice of law and jurisdictional consent provisions were even attached to KPM's complaint. RA 87-154. The employment agreements of one of the employees, Michelle Gajewski, had a provision that all disputes related to the agreement had to be filed *exclusively* in the Connecticut courts. RA 150-54. The district court was aware of this provision because it dismissed the claims against Ms. Gajewski based upon it. Given this dismissal, the district court's reliance on Astro-Med to support jurisdiction is puzzling.

The Astro-Med decision was made without the benefit of the United States Supreme Court's decision in Walden, which came five years later. 571 U.S. 277 (2014). In Walden, a DEA agent at a Georgia airport illegally seized a bag of cash from a couple that was boarding a

connecting flight on their way from Puerto Rico to their home in Nevada, and initiated forfeiture proceedings in Georgia. 571 U.S. at 279-80. The couple sued the agent in Nevada, and he moved to dismiss for lack of personal jurisdiction. The Supreme Court held that the Nevada courts lacked specific jurisdiction over the agent. The Court reasoned that the agent's "actions in Georgia did not create sufficient contacts with Nevada simply because he allegedly directed his conduct at plaintiffs whom he knew had Nevada connections." Id. at 289.

On the jurisdictional issue this case is exactly like Walden which arose from an out-of-forum theft. In Walden, a bag of cash was stolen in Georgia. Here, every action KPM alleges happened in a foreign state. KPM's trade secrets were taken from Gajewski's computer in Illinois. RA 293-94. The trade secrets at issue were used outside of Massachusetts to secure and service customers also outside of Massachusetts. KPM had a number of available jurisdictions to choose from—it chose, instead, to file in Massachusetts where, Walden and Astro-Med explained clearly, it had no right to do so.

This Court's decision in Vapotherm further demonstrates that there is no "relatedness" on a theory that Defendants tortiously

interfered with the KPM employment contracts. See 38 F.4th 252 (1st Cir. 2022). Vapotherm involved a former account manager for a New Hampshire medical device manufacturing company, who lived in Georgia and focused his efforts on sales in Georgia and Florida. Id. at 255 & n.1. The account manager left his position to work for a competitor, which coincidently was also a New Hampshire business. Id. at 255, 256 & n.4. The former employer sued the account manager and his new employer alleging breach of his employment contract and a violation of the non-solicitation clause by encouraging three other employees to leave the former employer and work for the competitor. Id. at 255. The three employees resided in Georgia and Florida (two of them) and provided training to hospitals in those states. Id. at 255 & n.2. During his employment with the plaintiff, the account manager "had limited contact with the State of New Hampshire, primarily arising from his communications with the company's headquarters in Exeter." Id. at 256. "[H]e visited New Hampshire five to seven times to attend corporate events, and in total spent approximately two weeks there." "The product which [he] sold . . . was manufactured in New Hampshire." Id. The Vapotherm court held that relatedness was not

established because the action forming the basis of the tort claim (*i.e.*, the solicitation of his former co-workers and breach of the employment agreement) occurred in Florida and Georgia—not New Hampshire. Id. at 261.

Here, as in Vapotherm, the actions underlying KPM's tortious interference claim all occurred outside of Massachusetts. As such, the relatedness prong of the specific jurisdiction analysis is *not* satisfied.

### 2. KPM Failed to Establish that Defendants Purposefully Availed Themselves of the Massachusetts Forum

Like with the relatedness prong, the district court erroneously concluded that "purposeful availment" was satisfied under Astro-Med. RA 341. The court thought that Lucas was aware of the confidentiality agreement in the other employees' agreements because he himself signed one with KPM, and that his knowledge made it foreseeable to Blue Sun that it might be held accountable in Massachusetts. Id. But the court was wrong. Lucas' employment agreement (just like the others) identified Connecticut—*not* Massachusetts—for both the controlling law and forum for disputes. RA 121-27. If Lucas' confidentiality agreement gave rise to any subjective knowledge of

Case 25-1099 Doc 118-4 Filed 01/09/26 Page 57 of 268

jurisdiction, it shows that he had no reason to believe he was subject to jurisdiction in Massachusetts—Connecticut, perhaps, but not in Massachusetts.

As such, the foreseeability reasoning of Astro-Med cuts against jurisdiction. See Astro-Med, 591 F.3d at 10 (California competitor "was fully aware of the Astro-Med – Plant Employee Agreement, including its Rhode Island provisions, and persisted in negotiations in the face of legal advice from its own counsel that to do so would pose a risk. It must have been foreseeable to [California competitor] that it might be held accountable for its actions in a Rhode Island forum."). Moreover, there was no evidence that the KPM employment agreements were vetted by counsel, or that Blue Sun was informed that there is a risk that it might be sued by KPM, as there was in Astro-Med.[11]

Likewise, KPM presented no evidence or argument as to why jurisdiction was proper as to ITG under either the relatedness or purposeful availment prongs—and the district court did not articulate

[11] The other case on which the district court relied likewise should have had no bearing. See RA 341; N. Laminate Sales, Inc. v. Davis, 403 F.3d 14, 26 (1st Cir. 2005) (holding purposeful availment satisfied where New York defendant sent fraudulent misrepresentation to New Hampshire plaintiff).

any. As such, the district court should have found that KPM waived or forfeited any argument that ITG was subject to personal jurisdiction.

## II. The Court Erred in Awarding Chapter 93A Damages Because the Conduct Giving Rise to the Claim Did Not Occur Primarily and Substantially in Massachusetts

KPM's Chapter 93A claim also failed the statutory jurisdictional requirements because Defendants' conduct did *not* "occur primarily and substantially in Massachusetts." Instead, everything relevant occurred primarily in Maryland, Illinois, and California.

Chapter 93A provides that "[n]o action shall be brought or maintained under [the Massachusetts unfair trade-practices act] unless the actions and transactions constituting the alleged unfair method of competition or the unfair or deceptive act or practice occurred primarily and substantially within the commonwealth." G.L. c. 93A, § 11. Under Section 11, courts must "determine whether the center of gravity of the circumstances that give rise to the claim is primarily and substantially within the Commonwealth." Kuwaiti Danish Comp. Co. v. Digital Equip. Corp., 438 Mass. 459, 473 (2003).

To that end, only the alleged unfair and deceptive conduct may be considered. Skyhook Wireless, Inc. v. Google, Inc., 86 Mass. App.

Ct. 611, 622 (2014) ("Contacts with Massachusetts that were neither unfair nor deceptive do not play a part in this assessment."). The location of the injury does *not* control:

> if the place of injury were the only test, practically no case involving a Massachusetts plaintiff would be exempt from 93A status, no matter how negligible the defendants' business activity in this State. Such a result would effectively nullify the words "primarily and substantially within the commonwealth."

Makino, U.S.A., Inc. v. Metlife Capital Credit Corp., 25 Mass. App. Ct. 302, 309-10 (1988); see Fishman Transducers, Inc. v. Paul, 684 F.3d 187, 197 (1st Cir. 2012) (fact that all the harm occurred in Massachusetts, where plaintiff was based, was insufficient for 93A to apply).

Here, Massachusetts was *not* the "center of gravity" for KPM's trade secrets and tortious interference claims. RA 784-94. Defendants are both Maryland-based companies. RA 284. Neither have any employees or agents that live or work in Massachusetts. Blue Sun has never conducted business or sales in Massachusetts. RA 285-86. The individual defendants live and work in Illinois, Colorado, Missouri, California, and North Carolina—and none of them traveled to Massachusetts for work. RA 48; 1359; 1834. Similarly, none of the

named KPM customers resides in Massachusetts.[12] None of the alleged offending conduct originated from or took place in Massachusetts or affected any Massachusetts-based customer. Instead, these acts initiated from outside of Massachusetts and affected out-of-state customers. This Court has long held that when "'virtually all the conduct that can be said to be unfair or deceptive' occurs outside the Commonwealth, there can be no Chapter 93A liability." Kenda Corp. v. Pot O'Gold Money Leagues, Inc., 329 F.3d 234, 236 (1st Cir. 2003) (quoting Kuwaiti, 438 Mass. at 475). As such, KPM's Chapter 93A claim fails to meet the jurisdictional requirements of the statute.

The conduct relied upon by the district court does not establish Massachusetts as the center of gravity. RA 3197-98. There was evidence of a single ten-minute meeting in Milford, Massachusetts in which Doug Evans and Greg Israelson, KPM employees who later joined Blue Sun, pitched the idea of forming a new company with

---

[12] KPM's damages expert analyzed revenue spreadsheets from Defendant's sales of services and equipment to customers from 2018 to March 31, 2023 and not a single one of the KPM customers were in Massachusetts. RA 1403; 4182-87; 4188-214.

Case 25-10798 Doc 118-4 Filed 08/29/26 Page 61 of 268

Robert Shuman, another KPM employee. RA 911-12. There was no evidence that Evans or Israelson pitched the new venture at the behest of Defendants. RA 911-12. Evans and Israelson were not individual defendants at the trial, and there was no proof that either man tortiously interfered with any of the employment contracts in dispute or misappropriated any trade secrets.

The district court correctly noted that KPM stores calibration datasets on a database located in Massachusetts. RA 911-12. True, but irrelevant to the Chapter 93A issue. The undisputed evidence at trial proved that the calibration datasets that Gajewski took came from his laptop in Illinois, not the server in Massachusetts. KPM investigated the matter using cloud remote backups of Gajewski's laptop, and KPM conceded at trial that it was unable to determine whether Gajewski used any data from the shared library in Massachusetts. RA 1153-54; 1156-57; 1246-48. Gajewski testified that he used the application notes he had saved on his computer from working with customers, and that testimony was unchallenged by KPM. RA 1625. As such, there was no evidence that Gajewski downloaded the data from the Massachusetts server. Gajewski's actions with the calibration data sets occurred in

Illinois and there is not a single other fact that supports a finding that anything happened in Massachusetts to make the state the center of gravity. The district court should not have relied on that point to find Massachusetts as the center of gravity.

## III. The District Court Erred by Awarding KPM Exemplary Damages and Attorney's Fees under G.L. c. 93A Because MUTSA Expressly Supersedes Chapter 93A Where, as Here, the Claim Involves Theft of Trade Secrets

MUTSA explicitly supersedes other laws of the Commonwealth to the extent they are inconsistent with MUTSA. G.L. c. 93, § 42F(a). Here, KPM's claims were for trade secret misappropriation and tortious interference where the improper means was theft of trade secrets. As such, KPM's claims all were governed by MUTSA, and the court erred by awarding exemplary damages and attorney's fees under Chapter 93A.

### *A. MUTSA Supersedes Inconsistent State Laws Providing Civil Remedies for the Misappropriation of a Trade Secret*

Massachusetts was one of the last states to adopt some form of the Uniform Trade Secrets Act ("UTSA"), doing so over forty years after the uniform law was first promulgated. Uniform Law Commission, Trade Secrets Act, https://www.uniformlaws.org/committees/community-

home?communitykey=3a2538fb-e030-4e2d-a9e2-90373dc05792. Prior to the enactment of MUTSA, Massachusetts plaintiffs could pursue claims for misappropriation of trade secrets under the common law or by the statutory predecessor to MUTSA; however, statutory and common law claims were often subject to different legal standards, creating ambiguity and disharmony in the law surrounding trade secrets. See, e.g., Advanced Micro Devices, Inc. v. Feldstein, No. CV 13-40007-TSH, 2013 WL 10944934, at *7 (D. Mass. May 15, 2013) (discussing the different definitions of misappropriation which apply to common law and statutory claims).

The stated legislative purpose of MUTSA is to "make uniform the law with respect [sic] trade secrets." G.L. c. 93, § 42G. To that end, MUTSA states that its provisions "shall supersede any conflicting laws of the commonwealth providing civil remedies for the misappropriation of a trade secret." Section 42F(a). The law clarifies, however, that it does "not affect . . . other civil remedies to the extent that they are not based upon misappropriation of a trade secret." Section 42F(b)(3).[13]

[13] The UTSA, upon which MUTSA is based, contains similar language: "this [Act] displaces conflicting tort, restitutionary, and other

Neither this Court nor the Massachusetts appellate courts have addressed the extent to which MUTSA supersedes Chapter 93A claims. The only reported Massachusetts district court level decision on the issue decided that MUTSA supersedes Chapter 93A claims that are based on misappropriation of trade secrets. See Neural Magic, Inc. v. Facebook, Inc., No. 1:20-CV-10444-DJC, 2020 WL 13538627, at *3 (D. Mass. Oct. 29, 2020) (emphasis added).

This is important because MUTSA and Chapter 93A conflict as to both the quantum of proof required for exemplary damages and the

---

law of this State providing civil remedies for misappropriation of a trade secret . . . this [Act] does not affect other civil remedies that are not based upon misappropriation of a trade secret." UTSA, § 7(b). The majority of courts analyzing the analog provision in the UTSA have interpreted it broadly, to supersede all claims "'based on the same nucleus of facts as the misappropriation of trade secrets claim for relief.'" Avago Techs. U.S. Inc. v. Nanoprecision Products, Inc., No. 16-CV-03737-JCS, 2017 WL 412524, at *5 (N.D. Cal. Jan. 31, 2017); K.C. Multimedia, Inc. v. Bank of Am. Tech. & Operations, Inc., 171 Cal. App. 4th 939, 958 (2009) (California's enact of the UTSA "'occupies the field' of common law claims based on the misappropriation of a trade secret," preempting interference with contract and unfair competition claims); Office Depot, Inc. v. Impact Office Prod., LLC, 821 F. Supp. 2d 912, 919 (N.D. Ohio 2011) (Ohio UTSA preempts unjust enrichment and tortious interference); Ethypharm S.A. France v. Bentley Pharm., Inc., 388 F. Supp. 2d 426, 433 (D. Del. 2005) (Delaware UTSA preempts fraud, unjust enrichment, and, to the extent based on misappropriation, intentional interference with contractual relations claims).

maximum measure of exemplary damages. MUTSA permits double damages only where the misappropriation was *both* willful *and malicious*. See G.L. c. 93, §42(B)(b) ("if willful and malicious misappropriation exists, the court may award exemplary damages in an amount not exceeding twice any award under subsection (a)." In contrast, Chapter 93A does not require malice and permits double or treble damages. G.L. c. 93A, § 11.

MUTSA and Chapter 93A also conflict as to quantum of proof required and the court's discretion for an award of attorney's fees. Under MUTSA, the court *may* (but is not required to) award attorney's fees, again only *if* the misappropriation was "willful and malicious." G.L. c. 93, § 42C. In contrast, Chapter 93A, imposes reasonable attorney's fees automatically for any violation of the statute. G.L. c. 93A, § 11 ("petitioner . . . *shall* be awarded reasonable attorneys' fees . . . .") (emphasis added).

In short, MUTSA and Chapter 93A conflict with respect to the civil remedies available for claims based on theft of trade secrets.

### *B. The District Court Erred by Awarding KPM Exemplary Damages and Attorney's Fees Under Chapter 93A*

Here, the district court based its finding of Chapter 93A liability on the jury's finding of misappropriation of trade secrets and tortious interference with KPM's employment agreements with the individual defendants by having them divulge KPM's trade secrets. As such, KPM's Chapter 93A claim (which is based on the theft of trade secrets) is superseded by MUTSA. For this reason, this Court should vacate the award of exemplary damages and attorneys' fees under Chapter 93A.

### *C. The District Court's Post-Trial Finding that Blue Sun's Misappropriation was "Willful and Malicious" Is Improper and Violates Blue Sun's Seventh Amendment Right to a Jury Trial on the Issue*

KPM may argue that court *could have* awarded attorney's fees and double damages under MUTSA because *the court* ultimately found that Defendants acted with malice. This argument fails for three reasons. *First*, the court did *not* make the award under MUTSA—it went under Chapter 93A, which is superseded. *Second*, as the district court acknowledged, the issue of malice was for the jury to decide—not the court. RA 2101-03. The court essentially directed a defense verdict on this issue finding that there was no evidence at trial from which a

reasonable juror could find malice. RA 2078-79; 2102; Hoover v. Garfield Heights Mun. Ct., 802 F.2d 168, 177 (6th Cir. 1986) ("[W]hen an instruction prevents the jury from considering a material issue, it is equivalent to a directed verdict on that issue and therefore cannot be considered harmless."). Third, KPM urged the district court that the malice issue was for the jury alone to decide. RA 2103. For that reason, KPM waived or forfeited any argument that the district court could decide the issue after the fact.

The court cannot serve as the "unreasonable juror" and find malice after the fact. Defendants had a jury right on this issue, and the court should not have changed the rules of the game after the game had been played out. In reaching its decision, the district court did not cite to any new evidence or to a change in controlling law, which might have provided a basis for revisiting the issue after it had been decided with finality. Nor did the court hold an evidentiary proceeding, and issue separate findings of fact and ruling of law, as is required by Fed. R. Civ. P. 52. To impose multiple damages based on the district court's willful and malicious finding tramples the Defendants' jury trial and due process rights.

### IV. The District Court's Erroneous "Head Start" Instruction Permitted the Jury to Disgorge Profits that Were Not Attributable to Either the Defendants' Trade Secret Misappropriation or Tortious Interference

The district court's "head start" instruction permitted the jury to disgorge the entirety of Blue Sun's profits for five years—including several years *after* the court's preliminary injunction, which stopped Defendants from using KPM's trade secrets. Moreover, the jury awarded disgorgement damages sales that had nothing to do with the trade secret misappropriation or tortious interference—*i.e.*, sales of machines to customers already in ITG's pipeline, preventative maintenance for customers that did not even have KPM machines, and sales of replacement parts for non-KPM machines, like FOSS machines, another competitor. RA 4182-87; 4188-214. The gross misapplication of the head start doctrine allowed the jury to disgorge profits from those sales even though the sales were not attributable to Blue Sun's use of the trade secret. BioPoint, Inc. v. Dickhaut, 110 F.4th 337, 359 (1st Cir. 2024) (Rikelman, J., dissenting in part) ("First, however one frames the head start theory, it cannot overcome the explicit requirement in the

Case 25-1099 Doc 118-4 Filed 08/29/26 Page 69 of 268

trade secret statutes of a causal connection between the misappropriation and the extent of the unjust enrichment award.").

Causation is an essential predicate for disgorgement damages under both trade secret law and tortious interference law. Both MUTSA and the DTSA require that only profits that are attributable to the stolen trade secrets may be disgorged. See, e.g., G.L. c. 93, § 42B ("Damages can include . . . unjust enrichment caused by misappropriation . . . ."); 18 U.S.C. § 1836(b)(3)(B)(i)(II) (a court may award "damages for any unjust enrichment caused by the misappropriation of the trade secret . . . ."). Causation is also one of the essential elements of a tortious interference under Massachusetts law. See Blackstone v. Cashman, 448 Mass. 255, 260 (2007) (reciting elements).

The "head start" rule applies in cases involving products and limits damages to the "***period of time*** in which others in the trade are likely, through legitimate business procedures, to have become aware of these secrets." Jet Spray Cooler, Inc. v. Crampton, 377 Mass. 159, 171

n.11 (1979)(emphasis added, internal citations omitted).[14] Thus, to prove damages under the "head start" theory, there must be evidence of the "head start"—*i.e.*, *how long* it would have taken Defendants (or others) to achieve the same result *without* using KPM's trade secrets. Id. There must be admissible evidence tying that head start to a measure of unjust enrichment. However, instead of imposing a limitation on damages to a period, KPM used the head start doctrine to receive an award of *all* Defendants' profits regardless of whether they were causally connected to the offending conduct.

Here, KPM presented *neither evidence*: (1) sufficient to determine the "head start" period; nor (2) tying that head start to the profits that were earned over five years. KPM's expert explained the head start theory to the jury during his direct examination. RA 2026. When he was asked whether he applied the doctrine to the facts of this case, the district court sustained objections to those questions. RA 2026. During

[14] "Generally, the 'head start rule' has been applied in cases where the plaintiff's product, including the trade secret, has been marketed. The marketing of the product gives competitors a legitimate opportunity to study the product and to learn the principles of the trade secret through reverse engineering or similar procedures." Jet Spray Cooler, Inc., 377 Mass. at 171 n.11.

his cross-examination he explained the reasoning behind his decision to include all Defendants' profits in his damages opinion—he said that the Defendants' actions had "tainted" the market. RA 2132.

The head start instruction should never have been given because it was not supported by evidence and does not apply to the trade secret theories pursued, which the district court conceded. RA 2251. The instruction unfairly prejudiced Defendants because most of the disgorged profits were *not* attributable to KPM's trade secrets. For these reasons, the Court should grant the Defendants a new trial on damages.

## V. The District Court Improperly Altered the Elements of a Tortious Interference Claim by Erroneously Instructing the Jury on Willful Blindness

The district court's erroneous "willful blindness" instruction impermissibly altered the elements of KPM's tortious interference claim. Specifically, the instructions permitted the jury to find ITG liable for an intentional tort based on mere negligence.

To prevail on its tortious interference claim, KPM must prove that: (1) KPM had a contract with a third party, (2) ITG *knowingly* interfered with that contract, (3) that ITG's interference, in addition to

being intentional, was improper in motive or means, and (4) that KPM was harmed by ITG's actions. Hamann v. Carpenter, 937 F.3d 86, 90 (1st Cir. 2019) (emphasis added). No reported decision applying Massachusetts law has held that willful blindness may be substituted for the "knowingly interfered" element in a tortious interference with contract claim. Massachusetts law does not recognize a claim for *negligent* interference with a contract. ITG's failure to investigate whether Lucas—the only KPM employee that ITG hired away to form Blue Sun—had a confidentiality agreement with KPM, does not equate to actual knowledge that such an agreement existed, which is required. See Swanset Dev. Corp. v. Taunton, 423 Mass. 390, 397 (1996) ("To establish intentional interference with contractual or business relations, the plaintiffs must show . . . the defendants knowledge of the contract or business relationship . . . ."). Massachusetts has adopted the Restatement (Second) of Torts, § 766. United Truck Leasing Corp. v. Geltman, 406 Mass. 811, 816 (1990) (adopting Restatement § 766 and 766B. Comment i. to the Restatement makes clear that the tortious interference tort requires actual knowledge of the contract. ("To be subject to liability under the rule stated in this Section, the actor must

have knowledge of the contract with which he is interfering and of the fact that he is interfering with the performance of the contract. Although the actor's conduct is in fact the cause of another's failure to perform a contract, the actor does not induce or otherwise intentionally cause that failure if he has no knowledge of the contract."). The actual knowledge requirement is even incorporated into the Massachusetts Superior Court Model Jury Instructions. https://www.mass.gov/doc/superior-court-model-civil-jury-instructions-tortious-interference-with-contractual-or-advantageous-relationship-pdf/download.

The case Acclaim Sys., Inc. v. Infosys, Ltd., is instructive on this point. 679 F. App'x 207, 209-10 (3d Cir. 2017). The Third Circuit affirmed summary judgment granted to a defendant that hired employees who had non-compete contracts with the plaintiff. Id. In opposing summary judgment, plaintiff submitted evidence that non-compete agreements were standard in the industry and argued that the defendant did not conduct due diligence or ask proper questions to determine the existence of the non-compete agreements. Id. at 211. The Acclaim court rejected these arguments reasoning that plaintiff sought

to "to create liability for negligent interference with contractual relations, which is not a tort under Pennsylvania law." Id. at 212. The evidence merely proved the defendant was negligent in interfering with the plaintiff's contract. Id. The law, however, requires intentional interference. Id. The court further reasoned that even if willful blindness were a substitute for proof of actual knowledge, which the plaintiff argued, there was no evidence that the defendant acted with a "conscious purpose to avoid learning the truth" about such contracts. Id.

Here, there was no evidence that Wilt or ITG knew of KPM's contract with Lucas. Indeed, Wilt denied any such knowledge, and KPM had no evidence to the contrary. To fill the evidentiary gap, KPM argued "willful blindness" as a substitute for actual knowledge. But at most, this would prove negligence—not tortious interference. See Acclaim, 679 F. App'x at 212.

Because KPM failed to prove the elements of tortious interference, this Court should vacate the judgment against ITG. Alternatively, the Court should grant ITG a new trial due to the erroneous willful blindness instruction.

Case 25-1799 Doc 118-4 Filed 01/29/26 Page 75 of 268

## CONCLUSION

For these reasons, the Court should vacate the judgment against Defendants in its entirety for lack of personal jurisdiction. Alternatively, the Court should: (1) vacate the Chapter 93A award against Defendants both because the relevant conduct did not occur primarily and substantially in Massachusetts and because the claim is superseded by MUTSA; (2) vacate the tortious interference award against ITG because KPM failed to prove intentional interference; (3) vacate the trade secret award against Blue Sun and remand for a new trial on damages because the jury was not properly instructed and the damages award cannot be reconciled under trade secret law; and (4) modify the judgment to relieve ITG of joint and several liability.

Dated: December 29, 2025

Respectfully submitted,

/s/ Christopher J. Hurst

Christopher A. Duggan (18241)
Dana A. Zakarian (63652)
Patricia A. Hartnett (48631)
Christopher J. Hurst (1188843)
SMITH DUGGAN CORNELL
GOLLUB, LLP
55 Old Bedford Road, Suite 300
Lincoln, MA 01773
Tel: 617-228-4416
chris.duggan@smithduggan.com
dana.zakarian@smithduggan.com
churst@smithduggan.com
phartnett@smithduggan.com

Attorneys for Defendants-
Appellants BLUE SUN
SCIENTIFIC, LLC and THE
INNOVATIVE TECHNOLOGIES
GROUP & CO., LTD.

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

**Certification of Compliance with Type-Volume Limitation, Typeface Requirements, and Type Style Requirements**

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,703 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word Version 16.66.1 in 14-point Century Schoolbook.

/s/ *Christopher J. Hurst*
Christopher J. Hurst (1188843)

# ADDENDUM
## TABLE OF CONTENTS

**Appealed Judgment and Orders**

ECF 64 Order on Motions to Dismiss ........ Add. 1

ECF 230 Jury Verdict ........ Add. 72

ECF 296 Order on Post-Trial Motions ........ Add. 83

ECF 297 Memorandum and Order dated 4/10/24 ........ Add. 86

ECF 315 Memorandum and Order on Motion for Attorneys' Fees ........ Add. 140

ECF 317 Order Entered: Final Judgment and Permanent Injunction ........ Add. 167

**Statutes**

18 U.S.C. § 1836 ........ Add. 177

G.L. c. 93, § 42B ........ Add. 183

G.L. c. 93, § 42C ........ Add. 184

G.L. c. 93, § 42F ........ Add. 185

G.L. c. 93, § 42G ........ Add. 186

G.L. c. 93A, § 11 ........ Add. 187

G.L. c. 223A, § 3 ........ Add. 189

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

**KPM ANALYTICS NORTH AMERICA CORPORATION,**
**Plaintiff,**

**v.**

**BLUE SUN SCIENTIFIC, LLC, THE INNOVATIVE TECHNOLOGIES GROUP & CO., LTD., ARNOLD EILERT, MICHELLE GAJEWSKI, ROBERT GAJEWSKI, RACHAEL GLENISTER, GREGORY ISRAELSON, IRVIN LUCAS, and PHILIP OSSOWSKI,**
**Defendants.**

**CIVIL ACTION**
**NO. 4:21-CV-10572-TSH**

**ORDER AND MEMORANDUM ON DEFENDANTS' MOTIONS TO DISMISS (Docket Nos. 20, 23, 25, 27, 29, 31, 33, & 35)**

**July 15, 2021**

**HILLMAN, D.J.**

KPM Analytics North America Corporation ("Plaintiff" or "KPM") filed this action against Blue Sun Scientific, LLC, ("Blue Sun") and The Innovative Technologies Group & Co., Ltd. ("ITG") (collectively, "Corporate Defendants"); Robert Gajewski; Michelle Gajewski; Arnold Eilert; Rachael Glenister; Gregory Israelson; Irvin Lucas; and Philip Ossowski (collectively, "Individual Defendants"). KPM alleges violations of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, *et seq.*, the Massachusetts Uniform Trade Secrets Act ("MUTSA"), conversion, and unjust enrichment against all Defendants. It also alleges breach of contract, violations of the covenants of good faith and fair dealing, and breach of duty of loyalty against certain Individual Defendants and tortious interference with contractual relations and

unfair or deceptive trade practices, in violation of M.G.L. 93A, § 11, against the Corporate Defendants.

The Corporate Defendants move to dismiss for lack of personal jurisdiction and for failure to state a claim. (Docket No. 20). The Individual Defendants move to dismiss for failure to state a claim, and one moves for dismissal based upon improper venue. (Docket Nos. 23, 25, 27, 29, 31, 33, 35). After hearing and for the following reasons, the Court issues this ruling to dismiss certain claims and certain Defendants. Please see the Appendix attached to this Order for a chart summarizing which motions have been granted and which motions have been denied.

**Background**[1]

KPM is a corporation with a principal place of business in Milford, Massachusetts. (Compl., ¶ 3, Docket No. 1). KPM's business division Unity Scientific ("Unity") manufactures instruments which analyze the chemical composition of common substances found in consumer products, such as the amount of moisture, oil or protein in flour, agricultural ingredients, chocolate, or processed foods. (¶¶ 1, 18-19). These instruments are designed to be easy to operate and maintain in a production line or in a quality control laboratory. (*Id.*). Each analyzer contains the measuring apparatus and a computer which can report the data from each measurement to KPM for chemical analysis.

KPM's analyzers use near infrared ("NIR") spectroscopy, a scientific technique which measures the diffraction of light or other electromagnetic radiation and provides faster results than traditional wet chemistry testing methods. (¶ 21). The readings that the analyzers produce

[1] The following facts are taken from the Plaintiff's Verified Complaint (Docket No. 1) and assumed true for the purposes of this motion.

must be referenced against the proprietary data in KPM's calibration database, which uses calibration datasets to match the measurements reported by the analyzer to the properties associated with certain chemicals (water, oil, protein) based on samples and reference values in the database. (¶ 24). Per KPM, each calibration dataset in its calibration database is drawn from as many as 50-100 samples that KPM has collected over the past twenty years, and the database includes tens of thousands of samples and over 500,00 reference chemistry values. (¶ 26). KPM's technicians and engineers work with customers to collect and process observed variations of constituent materials with simultaneously measured laboratory results to create calibration datasets. (¶ 28). One calibration dataset may take weeks or months to prepare; the more samples, the more accurate the calibration and the analysis. (¶ 26). KPM asserts that it would require decades of effort, significant investments, and an extensive customer base for a competitor to establish a comparable calibration database. (¶ 29).

Once NIR spectroscopy is performed on a sample and referenced to the appropriate calibration dataset in the database, KPM reports the results of the analysis to the customer using its proprietary UCAL Software. That software has been continuously developed, updated, tested, and released for the past twelve years. (¶ 30). KPM asserts that significant investment and several years of effort would be required to replace or replicate the software, which is critical to support NIR analyzers. (*Id.*).

In order to ensure that only its employees and consultants that work with the calibration data can access it, KPM's IT provider has established procedures to protect this information. They require management sign-off and instituted access-control processes and the calibration database is stored on a protected, confidential Windows File Server. (¶¶ 30-31). KPM also

requires non-disclosure and confidentiality agreements with its employees to prevent dissemination. (*Id*.).

Blue Sun, a Maryland-based limited liability corporation, entered the NIR analyzer market in 2018 as KPM's direct competitor. (¶¶ 4, 40). ITG is Blue Sun's parent company and owner and is also incorporated and headquartered in Maryland. (*Id.*).

In early 2021, KPM began to suspect that Blue Sun had persuaded seven of KPM's current and former employees (the Individual Defendants) to misappropriate KPM's trade secrets and confidential information in violation of their non-disclosure and/or non-competition agreements. (¶ 41). Blue Sun later hired those employees when they left KPM and have used and continue to use KPM's trade secrets and confidential data to attract new customers and poach KPM's existing clients and business opportunities. (*Id.*).

*Robert Gajewski*

Robert Gajewski worked for KPM from 2003 until January 13, 2019 as an employee; from February 1, 2019 to May 13, 2019 as an independent contractor; and from May 13, 2019 to April 5, 2021 as an employee. (¶ 37). On September 25, 2008, he executed a Confidentiality and Non-Competition Agreement agreeing to maintain as secret KPM's confidential information. (Docket No. 1-6 at 1-9). Upon his resignation as an employee in 2019, he signed a letter acknowledging that "all trade secrets, business plans and procedures, client contact list and other confidential information of KPM" were proprietary information that he could not use pursuant to his prior 2008 agreement. (*Id*. at 10-11). When he rejoined KPM as a business development director in June 2019, his offer letter included and referenced an employee handbook, which contained restrictions on the use of KPM's confidential information. (*Id*.). As an employee of KPM, Robert Gajewski had access to trade secrets and confidential information, including

datasets, source code, and customer files. (Compl. ¶ 37). KPM alleges that Gajewski acted on behalf of Blue Sun while employed by KPM on numerous occasions. (¶¶ 42, 44–45, 48, 50–51, 53, 64–81).

On January 11, 2019, KPM employee Arnold Eilert sent Michelle Gajewski and rob@bluesunscientific.com an email that a KPM customer was dissatisfied with KPM's human breast milk application, which KPM was "de-emphasizing." Eilert wrote that, "[w]hat I would like to have told [the KPM client] is that I know of a start-up company that may be interested in continuing where Unity left off, but I don't know if that is true. If Blue Sun is looking to pursue sales/development for this application it might make sense for someone to contact Jae to discuss how they might be able to move it forward." (Docket No. 1-8).

On July 18–19, 2019, Gajewski traveled to Michigan to service KPM analyzers for KPM's customer, Post Foods, but documentation from the visit identifies Mr. Gajewski as a "Blue Sun Service Engineer." (Docket No. 1-10; Compl. ¶ 44). On August 14, 2019, KPM customer Lamb Weston's employee sent an email about an error code on her KPM analyzer to Michelle Gajewski's KPM email address and to rob@bluesunscientific.com—KPM believes that the rob@bluesunscientific.com email address belongs to Robert Gajewski. (Compl. ¶ 45).

On January 17, 2020, KPM customer Olam sent emails requesting assistance with the calibration dataset for garlic powder to Gajewski's KPM email address and irvin@bluesunscientific.com; Gajewski responded to assist the customer and removed irvin@bluesunscientific.com from the ensuing email chain. (Docket No. 1-12; Compl. ¶ 48).

On March 26, 2020, Post Consumer Foods, another KPM customer, sent a $900 purchase order for equipment to Rob Gajewski's KPM email address, but the order form showed that Blue

Sun, not KPM, was the equipment supplier, and that Gajewski had provided the reference quote for the transaction three days earlier. (Docket No. 1-16 at 3).

On November 24, 2020, KPM discovered an anonymous email sent to info@kpmanalytics.com which claimed that Mr. Gajewski was working for both KPM and Blue Sun. (Compl. ¶ 53).

By March 29, 2021, Blue Sun had published 34 application notes on its website about its NIR Spectroscopy products. (¶ 54). Application notes are a "critical component" of the sale of NIR spectroscopy equipment because they "create confidence and trust that a supplier has the calibration history to perform certain measurements for their product of interest." (¶¶ 59, 62). When a customer purchases an NIR spectroscopy product, it also purchases the ability of the accompanying calibration database to take the measurements collected by the analyzer, measure it against the calibration database, and have accurate parameter/constituent results compared to traditional reference methods. (¶ 60). An application note demonstrates the ability of a specific calibration to perform on a range of samples—in other words, how accurate the analyzer's measurements are compared to more traditional (and time-consuming) chemistry reference methods. (*Id.*). Each data point in the application note reflects a unique sample that has been measured using both NIR spectroscopy and a traditional chemistry reference method. (¶ 55). A standard application note has thousands of data points. (¶ 57).

As of March 29, 2021, 13 of Blue Sun's 34 application notes listed "robga" as the author—KPM alleges that "robga" is Mr. Gajewski, who was still employed by KPM when Blue Sun's application notes were published. (¶ 64). KPM conducted a digital search of the work computer it had supplied to Gajewski. (¶ 65). It reviewed the various KPM datasets, calibration models, and software on Mr. Gajewski's KPM's computer, used them to generate application

notes for specific products, and compared those application notes with Blue Sun's published application notes. (¶ 65). According to KPM, at least 11 of the 13 Blue Sun application notes authored by "robga" identically match the versions found on Mr. Gajewski's KPM computer. (¶ 66).

For example, Blue Sun's skim milk powder application note, by "robga," is a pdf file dated January 2, 2021. (¶ 70). It includes four graphs which purport to show the accuracy of Blue Sun analyzers in measuring four constituents in powdered skim milk: fat, lactose, moisture, and protein. (Docket No. 1-17). KPM's records show that Gajewski accessed and modified KPM's data on skim milk powder on January 2, 2021. (¶ 72). KPM used the values in the files that Gajewski had accessed on his KPM computer on January 2, 2021 to generate graphs for fat, lactose, moisture, and protein, and compared that application note to Blue Sun's skim milk powder application note and found that they were identically matched. (¶¶ 73-9). KPM believes that ten other application notes on Blue Sun's website show similar identicality, and alleges that Blue Sun's application notes, its underlying datasets, calibrations, and reporting software tool were all derived from KPM confidential information taken from Gajewski's KPM computer. (¶ 80-81).

On April 5, 2021, after learning of this and other conduct, KPM terminated both Robert Gajewski and Michelle Gajewski's employment. (¶¶ 37–38).

*Michelle Gajewski*

Michelle Gajewski, Robert Gajewski's wife, worked for KPM as a consultant from 2008 to 2014; she become an employee in January 2014 in the role of Service Coordinator/Sales Support. (¶ 38). On December 27, 2013, she signed a Non-Disclosure Agreement agreeing to protect KPM's confidential information. (Docket No. 1-7). § 11 of the Agreement provides that

any dispute arising out of the Agreement or the parties' relationship "shall be mediated, arbitrated or litigated solely within the state of Connecticut." Through her employment at KPM and/or as Robert Gajewski's spouse, Michelle Gajewski had access to KPM's trade secrets and confidential information, including datasets, source code, and customer files. (Compl. ¶ 38).

On several occasions, Michelle Gajewski received tracking notifications at her KPM email address regarding UPS packages related to Blue Sun. (¶ 46). On September 5, 2019, UPS emailed Gajewski that a package had been delivered to Blue Sun. (*Id.*). On December 16, 2019, UPS notified her, at the request of Blue Sun, about a package sent to Gerald Saporito at Post Foods; Post Foods was the client that Robert Gajewski visited in July 2019 to service KPM analyzers, although the client's records indicated he was a Blue Sun technician. (¶ 47). On July 9, 2020, UPS emailed Michelle Gajewski that her package to Blue Sun had been delivered, presumably implying that she had sent the second package to Blue Sun herself. (¶ 52). KPM does not know what any of the packages contained and is not aware of any legitimate business reason for Gajewski to receive shipping alerts about packages to Blue Sun or track packages sent by KPM customers on Blue Sun's behalf.

On January 11, 2019, KPM employee Arnold Eilert sent Michelle Gajewski and rob@bluesunscientific.com an email that a KPM customer, UC San Diego Medical Center, was dissatisfied with KPM's human breast milk application, which KPM was "de-emphasizing." Eilert wrote that: "[w]hat I would like to have told him is that I know of a start-up company that may be interested in continuing where Unity left off, but I don't know if that is true. If Blue Sun is looking to pursue sales/development for this application it might make sense for someone to contact Jae to discuss how they might be able to move it forward." (Docket No. 1-8). The complaint does not state whether either responded.

On August 14, 2019, KPM client Lamb Weston sent an email to Michelle Gajewski and rob@bluesunscientific.com seeking help with an error message on a KPM analyzer. (¶ 45). The complaint does not state whether either responded.

*Arnold Eilert*

Arnold Eilert worked for KPM as an Applied Technology Manager from 2008 to 2020. (¶ 32). On September 30, 2008, he signed a Confidentiality and Non-Competition Agreement agreeing to maintain as secret KPM's confidential information. (Docket No. 1-1). In his role with KPM, Eilert had access to KPM's trade secrets and confidential information, including datasets, source code, and customer files. (¶ 32).

On January 11, 2019, Eilert sent an email from his personal email account to Michelle Gajewski at her KPM email address and to rob@bluesunscientific.com which informed the recipients that a KPM customer, UC San Diego Medical Center, was not satisfied with KPM's human breast milk application, that Eilert had informed the customer that KPM was "de-emphasizing this application," suggested that Blue Sun may be able to develop a better system, mused that "someone" should reach out to the customer, and provided the customer's contact person and phone number. (¶ 42; Docket No. 1-8). Specifically, Eilert wrote that: "[w]hat I would like to have told him [the KPM customer] is that I know of a start-up company that may be interested in continuing where Unity left off, but I don't know if that is true. If Blue Sun is looking to pursue sales/development for this application it might make sense for someone to contact Jae to discuss how they might be able to move it forward." (Docket No. 1-8).

On January 20, 2020, KPM customer A&L Canada forwarded an email chain to Eilert's KPM email address. The email chain was a discussion between A&L and a former KPM employee who had since moved to Blue Sun about phasing out the use of KPM's analyzers and

using Blue Sun analyzers instead. (¶ 49; Docket No. 1-13). Mr. Eilert, still a KPM employee, took no action to prevent the loss of KPM's customer to Blue Sun. (*Id.*). Instead, he forwarded the email chain from his KPM email to his personal email account. (Docket No. 1-14).

Eilert left KPM on December 31, 2020, and is now employed by Blue Sun. (¶ 32).

*Rachael Glenister*

Rachael Glenister worked for KPM from August 24, 2015 to July 10, 2020. (¶ 33). On August 23, 2015, she signed a Confidentiality and Non-Competition Agreement agreeing to maintain KPM's confidential information. (Docket No. 1-2). In her role with KPM, Glenister had access to KPM's trade secrets and confidential information, particularly its customer files. (Compl. ¶ 33).

KPM alleges that Glenister caused KPM to lose at least three sales opportunities to Blue Sun, either while she was employed by KPM or in violation of her non-competition agreement. On September 4, 2019, Glenister generated a $61,000 sales opportunity from Texas A&M AgriLife, but she closed the opportunity on June 9, 2020, reporting that the customer had "No Budget/Lost Funding." (¶ 83). KPM later learned that Blue Sun received an order from Texas A&M AgriLife on April 20, 2020 and amended it on July 20, 2020, the date that Glenister left KPM. [2] (*Id.*). Glenister also created a sales opportunity with Panhandle Milling while employed by KPM, but after Glenister left KPM, Panhandle placed an order with Blue Sun in late 2020. (¶ 84). Finally, Glenister created a sales opportunity with Agri-King, Inc. before she left KPM, but Agri-King Inc. ultimately placed an order with Blue Sun. (¶ 85).

[2] The Complaint provides two different end dates for Glenister's employment at KPM: July 10, 2020 (¶ 33) and July 20, 2020 (¶ 83). Therefore, Blue Sun either amended its purchase order from AgriLife the day that Glenister left KPM, or ten days later.

Glenister left KPM on July 10, 2020, and is now employed by Blue Sun. (¶ 33). KPM alleges her employment at Blue Sun violates her non-competition agreement. (*Id.*).

*Gregory Israelson*

Gregory Israelson worked for KPM from March 4, 2016 to March 12, 2021. (¶ 34). On March 3, 2016, Israelson signed a Confidentiality and Non-Competition Agreement agreeing to maintain as secret KPM's confidential information. (Docket No. 1-3). In his role with KPM, Israelson had access to KPM's trade secrets and confidential information, including datasets, source code, and customer files. (¶ 34).

On July 9, 2020, while employed by KPM, Israelson received an email at his KPM email address from greg@bluesunscientific.com, which KPM believes also belongs to Israelson. (Docket No. 9). The email contained a link for a software program used for remote copying of files with a request to join a session. (¶ 43). KPM alleges that Mr. Israelson's purpose in sending this software copying tool was to provide confidential KPM information to Blue Sun without KPM's knowledge or authorization, and that there is no reason why Israelson should have had a Blue Sun email address while employed by KPM. (*Id.*).

KPM alleges that Mr. Israelson is now an employee of Blue Sun (or has acted on Blue Sun's behalf) in violation of his non-competition agreement with KPM. (¶ 34).

*Irvin Lucas*

Irvin Lucas worked for KPM from January 5, 2015 to May 7, 2019. (¶ 35). On January 5, 2015, Lucas signed a Confidentiality and Non-Competition Agreement agreeing to maintain as secret KPM's confidential information. (*Id.*). In his role with KPM, Lucas had access to KPM's trade secrets and confidential information, including datasets, source code, and customer files. (¶ 35).

Lucas became an employee of Blue Sun in 2020, conduct which KPM alleges violates his non-competition agreement. (*Id.*). KPM believes Lucas is now the president of Blue Sun. (*Id.*). Lucas wiped his KPM company computer before returning it and leaving KPM. (*Id.*). Per KPM, this action suggests that Lucas was involved in improper conduct that he wished to conceal from KPM, including the potential disclosure of KPM trade secrets to Blue Sun or others. (*Id.*).

On January 17, 2020, KPM customer Olam emailed Robert Gajewski at his KPM email address and Lucas, who was then employed at Blue Sun, asking for assistance with the garlic powder application on a KPM analyzer. (Docket No. 1-12).

On March 30, 2020, ProAnalytics, a KPM distributor, purchased replacement parts from Blue Sun through Gajewski, rather than from KPM; the purchase order for the parts was emailed to Gajewski, with Lucas copied as a secondary recipient. (*Id.*). KPM alleges that Lucas remained bound by his non-competition agreement with KPM during both the Olam and ProAnalytics correspondences.

*Philip Ossowski*

Philip Ossowski worked for KPM from March 26, 2019 to January 29, 2021. (¶ 36). On April 10, 2019, he signed a Confidentiality and Non-Competition Agreement agreeing to maintain as secret KPM's trade secrets and confidential information. (*Id.*). In his role with KPM, Ossowski had access to KPM's trade secrets and confidential information including datasets and/or customer files. (¶ 36). There are no specific allegations concerning Ossowski's conduct in the complaint, besides Blue Sun's allegation that Ossowski's current employment with Blue Sun violates his noncompetition agreement with KPM. (*Id.*).

KPM brings six claims against the Corporate Defendants: violation of the Defend Trade Secrets Act (Count I); violation of the Massachusetts Uniform Trade Secrets Act (Count II);

tortious interference with contractual relations (Count VII); conversion (Count VIII); unjust enrichment (Count IX); and unfair or deceptive trade practices, in violation of M.G.L. 93A, §11 (Count X). KPM raises seven claims against the Individual Defendants: violation of the Defend Trade Secrets Act (Count I); violation of the Massachusetts Uniform Trade Secrets Act (Count II); breach of contract (Count III); violation of the implied covenant of good faith and fair dealing (Count IV); breach of duty of loyalty (Count V); conversion (Count VIII); and unjust enrichment (Count IX). KPM also raises a breach of contract claim against Defendants Glenister, Israelson, Lucas, and Ossowski based on violation of noncompetition agreements they signed with KPM (Count VI). Defendants move to dismiss all claims. (Docket Nos. 20, 23, 25, 27, 29, 31, 33, & 35).

## **Legal Standards**

*Lack of Personal Jurisdiction – Federal Rule of Civil Procedure 12(b)(2)*

When considering a Rule 12(b)(2) motion, "the inquiry is whether the plaintiff had proffered evidence which, if credited, is sufficient to support findings of all facts essential to personal jurisdiction." *Phillips v. Prairie Eye Ctr.*, 530 F.3d 22, 26 (1st Cir. 2008). The plaintiff bears the burden of showing that the court may exercise personal jurisdiction over the defendant and "must put forward evidence of specific facts to demonstrate that jurisdiction exists." *A Corp. v. All Am. Plumbing*, 812 F.3d 54, 58 (1st Cir. 2016) (internal quotation marks and citation omitted). Further, courts "take the plaintiff's evidentiary proffers as true and construe them in the light most favorable to the plaintiff's claim." *C.W. Downer & Co. v. Bioriginal Food & Sci. Corp.*, 771 F.3d 59, 65 (1st Cir. 2014). Finally, courts also "consider uncontradicted facts proffered by the defendant." *Id.*

*Failure to State a Claim – Federal Rule of Civil Procedure 12(b)(6)*

In evaluating a Rule 12(b)(6) motion to dismiss, the court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Langadinos v. American Airlines, Inc*., 199 F.3d 68, 69 (1st Cir. 2000). To survive the motion, the complaint must allege "a plausible entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 559 (2007). "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555. "The relevant inquiry focuses on the reasonableness of the inference of liability that the plaintiff is asking the court to draw from the facts alleged in the complaint." *Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 13 (1st Cir. 2011). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (quoting Fed. R. Civ. P. 8(a)(2)).

## **Discussion**

## **I. Corporate Defendants**

### A. Lack of Personal Jurisdiction

"In determining whether a non-resident defendant is subject to its jurisdiction, a federal court exercising diversity jurisdiction is the functional equivalent of a state court sitting in the forum state." *Sawtelle v. Farrell*, 70 F.3d 1381, 1387 (1st Cir. 1995). Thus, to establish personal jurisdiction over the Corporate Defendants, KPM must satisfy the requirements of both the Massachusetts long-arm statute and the Due Process Clause of the Fourteenth Amendment. *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 290, 100 S.Ct. 559, 62 L.Ed.2d 490

(1980). "[C]ourts should consider the long-arm statute first, before approaching the constitutional question." *SCVNGR, Inc. v. Punchh, Inc.*, 478 Mass. 324, 330, 85 N.E.3d 50 (2017). Determining first whether the long-arm statute's requirements are met is consistent with the duty to avoid "decid[ing] questions of a constitutional nature unless absolutely necessary to a decision of the case." *Burton v. United States*, 196 U.S. 283, 295, 25 S.Ct. 243, 49 L.Ed. 482 (1905).

*1. Massachusetts Long-Arm Statute*

The Massachusetts long-arm statute provides, in relevant part: "A court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action in law or equity arising from the person...causing tortious injury by an act or omission in this commonwealth." M.G. L. c. 233A, § 3(c). Thus, a defendant must have caused tortious injury in the Commonwealth and the plaintiff's claims must have arisen from that injury. This requirement has been considered satisfied in cases where out-of-state conduct has allegedly caused tortious injury in Massachusetts. *Ealing Corp. v. Harrods Ltd.*, 790 F.2d 978, 982 (1st Cir. 1986) (fraudulent representations made by out-of-state defendant to Massachusetts company constituted acts that conferred jurisdiction under subsection (c)).

Corporate Defendants argue that §3(c) does not apply because none of their alleged actions occurred within the forum. KPM relies on the decision in *Captivate, LLC v. Datalock Sys., Inc.*, 198-cv-02429-BLS2, 2019 WL 7707968 (Mass. Sup. Ct. Dec. 10, 2019) to support its argument that the alleged out-of-state conduct can satisfy §3(c).

In *Captivate*, the Superior Court found that §3(c) permits personal jurisdiction over a non-resident defendant for actions directed at a Massachusetts corporation. *Id.* Captivate, a Massachusetts corporation, alleged that a long-time employee, Kenneth Hafen, had stolen $5

million from the company. *Id.* at *1. The theft was allegedly accomplished through the creation of a sham corporation, DataLock, that billed Captivate for goods and services it never received. *Id.* Captivate further alleged that Eric Frommer, Hafen's son-in-law and a resident of Florida, had allegedly assisted in the illegal scheme via DataLock. *Id.* at *2. The physical address connected to the P.O. Box listed on DataLock's invoices was Frommer's home address. *Id.* DataLock's bank records showed that checks drawn from its account were made payable directly to Frommer. *Id.* Captivate claimed that Fommer's conduct had resulted in substantial injury to the company, but Frommer moved to dismiss for lack of personal jurisdiction. *Id.* The Superior Court found that P.O. Box and bank record allegations were sufficient to support Captivate's claim that Frommer was involved in the theft, that there was a basis to infer Frommer knowingly participated in intentional misconduct directed at a Massachusetts company, and that it could exercise personal jurisdiction over Frommer pursuant to §3(c). *Id.*

As in *Captivate*, KPM's allegations against the Corporate Defendants are sufficient to establish personal jurisdiction under § 3(c). KPM has alleged that the Corporate Defendants knowingly and intentionally used the Individual Defendants to steal KPM's trade secrets and other confidential information. Two of the Individual Defendants—Robert Gajewski and Gregory Israelson—had active Blue Sun email addresses while they were still employed by KPM. (Compl. ¶¶ 34, 42-3). Blue Sun posted eleven application notes on its website that contain data identical to the proprietary data found on Robert Gajewski's KPM computer which appear to have been created by Gajewski in January 2021, when he was still a KPM employee. (¶ 64). These allegations are sufficient to support KPM's claim that the Corporate Defendants were involved in the alleged theft of trade secrets and knowingly participated in intentional

misconduct directed at a Massachusetts company. Accordingly, §3(c) of the long-arm statute supports a finding of jurisdiction over the Corporate Defendants.

KPM also relies on the decision in *The Scuderi Grp., LLC v. LGD Tech., LLC*, 575 F. Supp. 2d 312, 320-21 (D. Mass. 2008), where the court concluded that a chapter 93A violation constitutes a tortious injury for the purposes of § 3(c). *Id.* (citing *La Vallee v. Parrot–Ice Drink Prods. of Am., Inc.*, 193 F. Supp. 2d 296, 300 (D. Mass. 2002) ("[T]he First Circuit Court of Appeals has 'assume[d], without deciding, that a Chapter 93A violation would constitute a tortious injury under [subsection (c)].'") (quoting *Lyle Richards Int'l, Ltd. v. Ashworth, Inc.*, 132 F.3d 111, 114 (1st Cir.1997))). KPM's allegation that the Corporate Defendants violated Chapter 93A (Count X) further supports a finding of jurisdiction under § 3(c) of Massachusetts' long-arm statute.

*2. Constitutional Due Process*

"The exercise of personal jurisdiction may, consistent with due process, be either 'specific or case-linked' or 'general or all-purpose.'" *Cossart v. United Excel Corp.*, 804 F.3d 13, 20 (1st Cir. 2015) (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919, 131 S.Ct. 2846, 180 L.Ed.2d 796 (2011)). Because KPM waives any argument that Massachusetts may exercise general jurisdiction over the Corporate Defendants, it must establish that the Corporate Defendants' contacts with the Commonwealth are sufficient for this Court to assert specific jurisdiction.

The inquiry into whether a defendant has the requisite "minimum contacts" necessary to support specific personal jurisdiction is inherently imprecise: "the criteria which we mark the boundary line between those activities which justify the subjection of a corporation to suit, and those which do not, cannot be simply mechanical or quantitative." *International Shoe Co. v.*

*Washington*, 326 U.S. 310, 319, 66 S.Ct. 154, 90 L.Ed. 95 (1945). To assist in this necessarily individualized assessment, a plaintiff seeking to establish specific jurisdiction must demonstrate that three conditions are satisfied:

> "First, the claim underlying the litigation must directly arise out of, or relate to, the defendant's forum-state activities. Second, the defendant's in-state contacts must represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's courts foreseeable. Third, the exercise of jurisdiction must ... be reasonable."

*Phillips v. Prairie Eye Ctr.*, 530 F.3d 22, 27 (1st Cir. 2008) (quoting *Adelson v. Hananel*, 510 F.3d 43, 49 (1st Cir. 2007)).

*(a) Relatedness*

The relatedness inquiry "serves the important function of focusing the court's attention on the nexus between a plaintiff's claim and the defendant's contacts with the forum." *Sawtelle v. Farrell*, 70 F.3d 1381, 1389 (1st Cir. 1995). The court "must consider the contacts between the defendants and the forum state viewed through the prism of plaintiff['s] ... claim." *Cossart*, 804 F.3d at 20 (alterations in original) (citation omitted). "The evidence produced to support specific jurisdiction must show that the cause of action either arises directly out of, or is related to, the defendant's forum-based contacts." *Harlow v. Children's Hosp.*, 432 F.3d 50, 60-61 (1st Cir. 2005). Thus, "[t]here must be more than just an attenuated connection between the contacts and the claim." *Phillips*, 530 F.3d at 27; *see also Walden v. Fiore*, 571 U.S. 277, 290, 134 S.Ct. 1115, 188 L.Ed.2d 12 (2014) ("The proper question is not where the plaintiff experienced the particular injury or effect but whether the defendant's conduct connects him to the forum state.").

The Corporate Defendants contend that KPM's claims do not "arise out of or relate to" any of their activities within Massachusetts, while KPM relies on *Astro-Med* to demonstrate that a nonresident defendant's out-of-state conduct can constitute a sufficient nexus to confer

jurisdiction in the forum state. *See Astro-Med, Inc. v. Nihon Kohden America, Inc.*, 591 F.3d 1 (1st Cir. 2009). In *Astro-Med*, a California corporation violated a Florida-based employee's Employment Agreement with a Rhode Island company. *Id.* at 10. The Rhode Island plaintiff sued the California-based corporate defendant for tortious interference with contractual relations and misappropriation of trade secrets in the District of Rhode Island, but the California defendant argued that jurisdiction could not lie in Rhode Island because all the company's dealings with the employee took place in either California or Florida. *Id*. at 6,10. The First Circuit rejected that premise, concluding that a defendant "need not be physically present in the forum state to cause injury (and thus 'activity' for jurisdictional purposes) in the forum state." *Id* at 10. (quoting *N. Laminate Sales v. Davis*, 403 F.3d 14, 25 (1st Cir. 2005)). Instead, it determined that the relatedness requirement was satisfied because the California defendant's conduct in California and Florida was the cause of the breach of contract in Rhode Island and the in-forum injury was clearly related to the Rhode Island company's tortious interference claim. *Id.*

Like the plaintiff in *Astro-Med*, KPM's allegations against the Corporate Defendants are sufficient to demonstrate relatedness. Whether the Corporate Defendants' contact with KPM's employees or former employees occurred outside of Massachusetts is immaterial; as alleged, the Corporate Defendants conduct relates to contracts between a Massachusetts company and its employees. Therefore, the tortious harm resulting from the Corporate Defendants' alleged interference is an in-forum injury and the relatedness condition is fulfilled.

To provide support for its other claims against the Corporate Defendants, KPM relies on *Conning v. Halpern,* 2019 WL 2514730 (D. Mass. June 18, 2019). In *Conning*, the court articulated that "the effects of intentional torts in the forum state may suffice to satisfy the relatedness requirement where intentional conduct was expressly aimed at the forum state and

caused harm the defendant knew would likely be suffered in the forum state. *Id.* at *6 (citing *Calder v. Jones*, 465 U.S. 783, 789 (1984)). KPM asserts that it stores its confidential information and trade secrets on servers physically located in Massachusetts. (Docket No. at 4). As alleged, the Corporate Defendants' misappropriation of trade secrets and conversion of KPM's confidential information constitute intentional conduct aimed and causing harm in Massachusetts. Accordingly, the relatedness requirement is also met for those claims.

*(b) Purposeful Availment*

"In determining whether the purposeful availment condition is satisfied, our key focal points are the voluntariness of the defendants' relevant Massachusetts contacts and the foreseeability of the defendants falling subject to Massachusetts's jurisdiction." *Copia Communications, LLC v. AMResorts, L.P.*, 812 F.3d 1, 5 (1st Cir. 2016) (quotation marks and citation omitted). Voluntariness requires that the defendant's contacts with the forum state are "not based on the unilateral actions of another party or a third person." *Nowak v. Tak How Investments, Ltd.*, 94 F.3d 708, 716 (1st Cir. 1996) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475, 105 S.Ct. 2174 (1985)). Foreseeability requires that "the defendant's contacts with the forum state be such that he should reasonably anticipate being haled into court there." *Id.* (citing *World-Wide Volkswagen*, 444 U.S. at 297, 100 S.Ct. 559). When inquiring whether Defendant has purposefully availed itself of the forum, however, the only relevant contacts are those that gave rise to the cause of action. *See Copia*, 812 F.3d at 5.

The Corporate Defendants argue that they never purposefully availed themselves of the Massachusetts forum. Blue Sun's only contact with Massachusetts is communications with former KPM employees which did not take place in the Commonwealth (none of the seven Individual Defendants reside in Massachusetts). Further, Blue Sun does not maintain an office,

mailing address, or own property in Massachusetts. Blue Sun also does not market products, conduct business, pay taxes, make sales, or employ anyone in Massachusetts. (Docket No. 21 at 10–11).

KPM alleges that Blue Sun was fully aware of the confidentiality agreements between KPM and its former employees. KPM claims that Lucas, who was subject to a KPM confidentiality and non-compete agreement, likely knew agreements of that nature were standard practice at KPM. Given that the Complaint alleges Lucas was Blue Sun's president at the time of the complained-of conduct, KPM argues that the Corporate Defendants were aware that other KPM employees were subject to similar agreements.

KPM again relies on *Astro-Med* to support its argument. There, the defendant company's knowledge of the employee's Employment Agreement with the Rhode Island-based plaintiff was sufficient to constitute purposeful availment. *Astro Med*, 591 F.3d at 10. The court determined that it must have been foreseeable to the defendant corporation that it might be held accountable for its conduct in the Rhode Island forum. *Id.* Here, KPM has plausibly alleged that the Corporate Defendants had knowledge of the employment agreements between KPM and its former employees requiring confidentiality. Given that KPM is a Massachusetts-based employer, that knowledge makes it foreseeable that the Corporate Defendants might be held accountable for their conduct in Massachusetts. (Docket No. 50 at 12). Accordingly, the Corporate Defendants have purposefully availed themselves of the Massachusetts forum.

Regarding KPM's tort claims, the First Circuit's decision in *N. Laminate* is illustrative. *N. Laminate v. Davis*, 403 F.3d 14 (1st Cir. 2005). There, the court determined that the Defendant knew that his misrepresentations in New York would likely cause financial injury to the plaintiff in New Hampshire, and this knowledge made it foreseeable that the Defendant could

be held accountable for his actions in a New Hampshire court. *Id.* Here, KPM alleges that the Corporate Defendants are responsible for misappropriation of KPM's trade secrets and conversion of its confidential information (Counts I, II, and VIII). It is similarly reasonable to presume that the Corporate Defendants knew this conduct would likely cause financial injury to Massachusetts-based KPM. Such knowledge makes it sufficiently foreseeable that the Corporate Defendants may be held accountable for these actions in Massachusetts, satisfying the purposeful availment requirement.

*(c) Reasonableness*

Asserting jurisdiction must comport with traditional notions of "fair play and substantial justice." *International Shoe*, 326 U.S. at 320. "Out of this requirement, courts have developed a series of factors that bear on the fairness of subjecting a nonresident to a foreign tribunal." *Nowak*, 94 F.3d at 717. These "gestalt factors" are:

> (1) the defendant's burden of appearing [in the forum state], (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the judicial system's interest in obtaining the most effective resolution of the controversy, and (5) the common interests of all sovereigns in promoting substantive social policies.

*C.W. Downer*, 771 F.3d at 69 (alterations in original) (quoting *Ticketmaster-New York, Inc. v. Alioto*, 26 F.3d 201, 209 (1st Cir. 1994)). The gestalt factors help the court do substantial justice, especially where the relatedness and purposeful availment inquiries are close. *Nowak*, 94 F.3d at 717. "In such cases, the gestalt factors may tip the constitutional balance." *Id.* Consequently, our assessment of these factors operates on a sliding scale: "[T]he weaker the plaintiff's showing on the first two prongs (relatedness and purposeful availment), the less a defendant need show in terms of unreasonableness to defeat jurisdiction." *Ticketmaster*, 26 F.3d at 210. "The reverse is

equally true: a strong showing of reasonableness may serve to fortify a more marginal showing of relatedness and purposefulness." *Nowak*, 94 F.3d at 717.

*(i) Burden of Appearance*

While it is always a burden for a foreign defendant to appear in the forum state, to accord this factor any substantial weight, the defendant must show that the "exercise of jurisdiction in the present circumstances is onerous in a special, unusual, or other constitutionally significant way." *Pritzker v. Yari*, 42 F.3d 53, 64 (1st Cir. 1994).

Because they are Maryland-based entities, the Corporate Defendants argue that defending themselves in Massachusetts presents a significant burden. They emphasize that Blue Sun has no contact with Massachusetts and that ITG has only limited and unrelated contacts. This burden, however, is no different than the burden that any other foreign defendants haled into a court in the Commonwealth faces. Since the Corporate Defendants have done nothing to demonstrate that their burden is special or unusual, this factor tips in favor of exercising jurisdiction.

*(ii) Interest of the Forum*

"Massachusetts has a significant interest in ensuring that contracts entered into by Massachusetts residents are given full effect." *Champion Exposition Servs., Inc. v. Hi-Tech Elec., LLC*, 273 F. Supp. 2d 172, 179 (D. Mass. 2003). Further, a forum state has a significant interest in asserting jurisdiction over a defendant who causes tortious injury within its borders. *Ticketmaster*, 26 F.3d at 211.

Here, both propositions provide the Commonwealth with an interest in this case. The forum state has an interest in giving KPM's confidentiality and non-compete agreements full effect. In addition, Massachusetts has an interest in asserting jurisdiction over the Corporate

Defendants for tortuously interfering with KPM's employer-employee relationships and consequently causing injury to KPM inside the Commonwealth. Thus, this factor also tilts in favor of asserting jurisdiction.

*(iii) Remaining Factors*

The Corporate Defendants do not challenge this Court's jurisdiction based on the remaining gestalt factors.

KPM's allegations are sufficient to establish specific personal jurisdiction over the Corporate Defendants. Accordingly, this Court's exercise of jurisdiction over Corporate Defendants comports with Constitutional Due Process. Given that KPM's allegation are also sufficient to satisfy the Massachusetts long-arm statute, the Corporate Defendants' 12(b)(2) motion to dismiss is *denied.*

B. Failure to State a Claim

The Corporate Defendants assert that KPM has failed to state a claim on all six counts brought against them: violation of the Defend Trade Secrets Act (Count I); violation of the Massachusetts Uniform Trade Secrets Act (Count II); tortious interference with contractual relations (Count VII); conversion (Count VIII); unjust enrichment (Count IX); and violation of M.G.L. 93A, §11 (Count X).

*1. Defend Trade Secrets Act (Count I) and Misappropriation of Trade Secrets (Count II)*

Counts I and II assert that Corporate Defendants misappropriated KPM's trade secrets in violation of the federal Defend Trade Secrets Act ("DTSA") and the Massachusetts Uniform Trade Secrets Act ("MUTSA"), M.G.L. c. 93, § 42.

The DTSA and MUTSA are nearly equivalent. *Allscripts Healthcare, LLC v. DR/Decision Resources, LLC*, 386 F. Supp. 3d 89, 94 (D. Mass. 2019) (citing *Optos, Inc. v. Topcon Medical Sys., Inc.*, 777 F. Supp. 2d 217, 238 (D. Mass. 2011)). To establish a claim for misappropriation of trade secrets under either statute, a plaintiff must show that: (1) the information at issue qualifies as a trade secret, (2) it "took reasonable steps to preserve the secrecy of the information," and (3) "the defendant used improper means, in breach of a confidential relationship, to acquire and use the trade secret." *Incase Inc. v. Timex Corp.*, 488 F.3d 46, 52 (1st Cir. 2007). The DTSA also requires that the trade secret be "used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. §1836(b)(1).

*(a) Whether the Information at Issue Constitutes a Trade Secret*

The Corporate Defendants argue that KPM has failed to sufficiently allege that the information at issue qualifies as a trade secret because some of the data in its calibration database is collected from customer samples rather than KPM's own data. KPM retorts that the calibration data sets are trade secrets because they represent decades of investment of time and resources, that customer data is only one element of the database, and that customer contributions to the calibration data sets are not disqualifying.

"A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." *T.H. Glennon Co., Inc. v. Monday*, No. 18-30120, 2020 WL 1270970, at *14 (D. Mass. Mar. 17, 2020) (quoting *J.T. Healy & Son, Inc. v. James A. Murphy & Son, Inc.*, 357 Mass. 728, 736, 260 N.E.2d 723 (1970)). "[G]enerally, a compilation of information which is used in a business can be a trade secret," including equipment service manuals that contain information provided by component manufacturers and which are publicly

available for purchase, where the manuals were produced for employee use only and also contained the plaintiff's proprietary information. *Picker Int'l Corp. v. Imaging Equip. Servs., Inc.,* 931 F. Supp. 18, 38 (D. Mass. 1995), *aff'd sub nom. Picker Int'l Inc. v. Leavitt*, 94 F.3d 640 (1st Cir. 1996); *Data General v. Digital Computer Controls, Inc.,* 297 A.2d 433, 359 (Del.Ch.1971); J.*T. Healy & Son, Inc. v. James A. Murphy & Son, Inc.*, 357 Mass. 728, 736, 260 N.E.2d 723, 729 (1970); RESTATEMENT OF TORTS § 757, comment b. Even a compilation of publicly available information is protected if the business has combined it in a unique way. *Id.* (citing *ISC–Bunker Ramo Corp. v. Altech, Inc.*, 765 F. Supp. 1310, 1321–22 (N.D.Ill.1990); *Anacomp, Inc. v. Shell Knob Services, Inc.*, 1994 WL 9681, at *8 (S.D.N.Y.1994).

Like the equipment service manuals in *Picker*, KPM's calibration data sets constitute protected trade secrets. While the calibration datasets do include information from customer samples, KPM's investment of time and resources to collect, organize, and compile that information into datasets for particular constituents that can be utilized in conjunction with its NIR spectroscopy equipment renders them protected. Furthermore, KPM has not made its database of customer-contributed information publicly available. These allegations are sufficient, for purposes of R. 12(b)(6), to establish that the calibration datasets at issue are trade secrets.

*(b) Reasonable Steps to Secure the Trade Secret's Confidentiality*

The Corporate Defendants alternatively claim that KPM did not take reasonable steps to maintain the calibration datasets' secrecy, again relying on the fact that KPM's data was sourced from KPM's customers.

"A trade secret must be secret; '[m]atters of public knowledge or of general knowledge in an industry cannot be appropriated by one as his secret.'" *FabriClear, LLC v. Harvest Direct, LLC*, 481 F. Supp. 3d. 27, 35 (D. Mass. 2020) (citing *Iconics, Inc. v. Massaro*, 266 F. Supp. 3d

449, 452 (D. Mass. 2017) (quoting *J.T. Healy & Son, Inc.*, 357 Mass. at 736, 260 N.E.2d 723)). In *FabriClear*, the defendant argued that because the plaintiff had published the names of the four ingredients in its pest repellent, the formula was no longer protected. *Id.* I disagreed, finding that without publishing the proportion of each of the four ingredients in the final product, the formula could not be considered public knowledge and was a protected trade secret. *Id.* Accordingly, the formula was protected. *Id.*

Like the pest repellent formula in *FabriClear*, KPM's calibration datasets are protected. While some values of the datasets may be known to the individual KPM customers who submitted them to KPM, neither the customer nor the public have knowledge of the many remaining values from multiple sources that go into creating each dataset. (Docket No. 50 at 18). Therefore, despite the partial customer sourcing, KPM's calibration datasets constitute protected trade secrets.

*(c) Improper Means of Obtaining the Trade Secret*

The Corporate Defendants posit that KPM cannot bring a trade secrets claim against them unless the alleged disclosures violated a confidential relationship between KPM and the Corporate Defendants. *See Burten v. Milton Bradley Co.*, 763 F. 2d 461, 463 (1st Cir. 1985) ("In order to successfully establish a cause of action for misappropriation, therefore, a plaintiff must show that he or she shared a confidential relationship with the defendant…."). Under their reading of the trade secret statutes, no trade secret claim against the Corporate Defendants is viable since the only confidential relationships alleged are between KPM and the Individual Defendants (KPM's former employees).

The Court takes issue with such a narrow reading of the DTSA and MUTSA. "Under Massachusetts trade secret law, a third party who knowingly benefits from a trade secret which a

person in a confidential relationship obtained from the plaintiff is liable to the plaintiff for the misappropriation of that trade secret." *Data Gen. Corp. v. Grumman Sys. Support Corp.*, 795 F. Supp. 501, 507 (D. Mass. 1992), *aff'd*, 36 F.3d 1147 (1st Cir. 1994). In an oft-cited case dating back to 1980, the Supreme Judicial Court held that a corporation which received and used a competitor's trade secrets from a third party could be liable for misappropriation under state law even though the corporation had no confidential relationship with the competitor, so long as the information claimed to be a trade secret was in fact secret and the corporation who received it had notice that the third party had disclosed it in violation of a legal duty to keep it secret. *Curtiss-Wright Corp. v. Ede-Brown Tool & Die Co.*, 381 Mass. 1, 5-6 (Mass. 1980) (citing Third Restatement of Torts § 757).

Furthermore, the plain text of both statutes implies that a defendant can be liable for inducing a third party to disclose confidential information in breach of a confidential relationship. MUTSA creates a private right of action for misappropriation of trade secrets by improper means and defines improper means broadly to include the use or disclosure of another's trade secret if the recipient knew or had reason to know that the knowledge was derived from or though a person who had a duty to limit its use, disclosure, or acquisition. M.G.L. 93A § 42. DTSA contains very similar language. 18 U.S.C. § 1839(5).

The Corporate Defendants' citation to *Craft Beer Seller* is inapposite, as the defendant in that case, a company which hosts anonymous reviews of major employers for prospective job hunters, was not in a position the same position to have notice of the plaintiff's trade secrets before they were posted online. *See Craft Beer Seller, LLC v. Glassdoor, Inc.*, 2018 WL 5505247 (D. Mass. Oct. 17, 2018).

KPM has sufficiently pled that Blue Sun had notice that at least 11 of the 34 application notes it published on its website to advertise its Phoenix analyzers were derived from KPM's calibration database which are protectible trade secrets. As KPM has also sufficiently pled that it took reasonable steps to protect that confidential information, Corporate Defendants' motion to dismiss Counts I and Count II for trade secret misappropriation under the DTSA and MUTSA is denied.

*2. Tortious Interference with Contractual Relations (Count VII)*

Count VIII asserts that the Corporate Defendants tortiously interfered with Confidentiality and Nondisclosure Agreements between KPM and certain Individual Defendants. Under Massachusetts law, a claim for tortious interference with contractual relations requires a plaintiff to show that: "(1) he had a contract with a third party; (2) the defendant knowingly interfered with that contract; (3) the defendant's interference, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions." *Harrison v. NetCentric Corp.*, 433 Mass. 465, 476, 744 N.E.2d 622 (2001).

The Corporate Defendants challenge the sufficiency of KPM's allegations regarding the third element. They argue that KPM has merely alleged that Blue Sun communicated with and hired former KPM employees. According to the Corporate Defendants, the alleged conduct does not constitute improper motive. The Corporate Defendants rely on *Pembroke Country Club, Inc. v. Regency Savings Bank*, *F.S.B*, 62 Mass. App. Ct. 34, 39 (Mass. App. Ct. 2004), to support their argument. (Docket No. 21 at 16–17). In *Pembroke*, the court decided that when the defendant's purpose is the legitimate advancement of its own economic interest, that motive is not improper for purpose of a tortious interference claim. *Id.*

KPM suggests a different characterization of the Corporate Defendants' motive in communicating with and hiring its former employees. KPM argues that the improper motive element is satisfied by the allegations regarding the Corporate Defendants' misappropriation of KPM's trade secrets. Specifically, KPM cites the allegation that the Corporate Defendants provided certain Individual Defendants with Blue Sun email accounts while they were still employed by KPM. KPM also points to the email containing the remote file copying software that Gregory Israelson sent from his Blue Sun email address to his KPM email account. Further, KPM emphasizes its allegation that Blue Sun posted KPM's confidential data on its website in the form of application notes after receiving it from Mr. Gajewski.

These allegations make it plausible that the Corporate Defendants were not merely engaged in permissible employee recruiting in a competitive market. Rather, the allegations plausibly establish that the Corporate Defendants' motive was to encourage KPM employees to provide confidential information to Blue Sun. This Court finds that motive sufficiently improper to satisfy the third element. *See Optos, Inc. v. Topcon Medical Sys.*, 777 F. Supp. 2d 217, 241 (D. Mass. 2011) (concluding that a defendant likely to succeed on the merits of a misappropriation of trade secrets claim was also likely to prevail on its tortious interference with contractual relations claim). Corporate Defendants' motion to dismiss Count VII is ***denied***.

*3. Conversion (Count VIII)*

The Corporate Defendants claim that KPM has failed to state a claim for conversion because under Massachusetts law a viable conversion claim can only be based on tangible chattels, while KPM argues that the disputed trade secrets, software, and its customer information can be suitable chattels to support a conversion claim.

To prevail on a claim for conversion under Massachusetts law, a "plaintiff must show that (1) the defendant intentionally and wrongfully exercised control or dominion over the personal property; (2) the plaintiff had an ownership or possessory interest in the property at the time of the alleged conversion; (3) the plaintiff was damaged by the defendant's conduct; and (4) if the defendant legitimately acquired possession of the property under a good-faith claim of right, the plaintiff's demand for its return was refused." *United States v. Peabody Const. Co., Inc.*, 392 F.Supp.2d 36, 37 (D. Mass 2005) (citing *Evergreen Marine Corp. v. Six Consignments of Frozen Scallops*, 4 F.3d 90, 95 (1st Cir. 1993)).

The Corporate Defendants rely on *Blake* to support their argument but misconstrue the court's conclusion in that case. *Blake v. Professional Coin Grading Service*, 898 F. Supp. 2d 365, 386 (D. Mass. 2012). The *Blake* court granted the defendant's motion to dismiss plaintiff's claim for conversion for sales proceeds, intellectual property, royalties and trade secrets noting that generally, Massachusetts law limits conversation claims on intangible property to property which has merged with some sort of document, and conversion claims for trade secrets are further limited to the extent that the owner has taken steps to assert his property right by protecting the intellectual property from disclosure. *Id.* at 386. Where the plaintiff's coin grading system was already available for public use and known in the coin collecting industry, there could be no conversation claim because he had not taken steps to shield his purported trade secret from disclosure. *Id.* Here, having already concluded that the disputed trade secrets are not public knowledge and finding nothing to indicate voluntary dissemination, *Blake* is not relevant.

Intangible property can be the subject of a conversion claim in certain circumstances. (Docket No. 50 at 21). Under the merger doctrine discussed in *Blake*, intangible property that is in some way merged with or contained in a physical object can be converted. *Sentient Jet, LLC*

*v. Apollo Jets, LLC*, No. 13-CV-10081, 2014 WL 1004112, at *11 (D. Mass. Mar. 17, 2014). For example, a viable conversion claim exists where a plaintiff has plausibly alleged that its confidential information, including customer information, was transmitted to the defendant's computer system; although plaintiff did not specifically allege that the confidential information was downloaded onto a physical device such as a flash drive, the court decided that such an inference was reasonable and denied defendant's motion to dismiss, as determining the manner in which the customer information was transmitted could be resolved through discovery. *Id.*

Somewhat like *Sentient*, KPM has not specially alleged that Blue Sun downloaded the calibration datasets, software, and confidential customer information onto a physical device, like a computer hard drive or flash drive or printout. However, KPM does claim that its calibration datasets and UCAL software were used to generate the application notes that Blue Sun uploaded to its website, and that Blue Sun used KPM's confidential customer information to poach KPM sales opportunities. (Compl. ¶¶ 82–86). Given those allegations and the *Sentient Jet* precedent, it is reasonable to infer at the motion to dismiss stage that at some point KPM's trade secrets were transmitted between electronic devices or were converted to a physical format, especially as pertaining to the information KPM alleges Robert Gajewski diverted from his KPM laptop to produce the application notes. Accordingly, the calibration datasets, software, and customer information do constitute property that can be converted at this stage, though information learned in discovery may later invalidate this and related conversion claims in the case. *See Governo Law Firm LLC v. Bergeron,* 166 N.E.3d 416, 422 (Mass. 2021) (concluding that databases that were downloaded onto a removable electronic device were property that could be converted). Thus, the Corporate Defendants' motion to dismiss Count VIII is *denied*.

*4. Unjust Enrichment (Count IX)*

To state a claim for unjust enrichment, the Plaintiff must demonstrate: (1) a benefit conferred on the Defendant by the Plaintiff; (2) an appreciation or knowledge of the benefit by the Defendant; and (3) the acceptance or retention of the benefit by the Defendant under circumstances which make the acceptance or retention inequitable. *Steven v. Thacker*, 550 F. Supp. 2d 161, 165 (D. Mass. 2018). Unjust enrichment serves as an "equitable stopgap for inadequacies in contractual remedies at law." *Mass. Eye and Ear Infirmary v. QLT Phototherapeutics, Inc.*, 412 F.3d 215, 234 (1st Cir. 2009) (citing *Fox v. F & J Gattozzi Corp.*, 41 Mass. App. Ct. 581, 672 N.E.2d 547, 552 (1996)). Accordingly, the First Circuit has held that "a party with an adequate remedy at law cannot claim unjust enrichment." *Shaulis v. Nordstrom, Inc.*, 865 F.3d 1, 16 (1st Cir. 2017) (citing *ARE-Tech Square, LLC v. Galenea Corp.*, 91 Mass.App.Ct. 1106, 2017 WL 634771 (Mass. App. Ct. 2017)).

The Corporate Defendants claim that KPM has failed to state a claim for unjust enrichment for two reasons. First, they argue that the claim fails because Massachusetts law prohibits plaintiffs with an adequate remedy at law from maintaining a parallel unjust enrichment claim. Alternatively, the Corporate Defendants assert that KPM has not sufficiently alleged that it conferred a benefit on Blue Sun.

I find that the second ground for dismissal is sufficient. Unlike trade secrets law, which will allow recovery against a defendant who received the plaintiff's trade secret from a third party, unjust enrichment requires that the plaintiff directly bestowed a benefit on the defendant. No cause of action lies where a plaintiff discloses the trade secret to a third party, who then disclosed the trade secret to defendant. *See Blake* at 391 (rejecting plaintiff's unjust enrichment claim against Professional Coin Grading Inc., which had received plaintiff's trade secrets from

Numismatic and used them, while upholding plaintiff's unjust enrichment claim against Numismatic).

Corporate Defendants' Motion to Dismiss Count IX is *granted*.

*5.. Massachusetts General Laws Chapter 93A § 11 (Count X)*

The Corporate Defendants argue that KPM's 93A claim for unfair or deceptive business practices should be dismissed for failure to allege that the disputed conduct occurred primarily and substantially within Massachusetts, as the statute requires. KPM replies that it is improper to make the factual determination about where the complained-of conduct occurred at the Rule 12(b)(6) stage. This Court agrees.

M.G.L. c. 93A § 11 requires that "the actions and transactions constituting the alleged unfair method of competition or the unfair or deceptive act or practice occurred primarily and substantially within the Commonwealth." It further provides that "the burden of proof shall be upon the person claiming that such transactions and actions did not occur primarily and substantially within the commonwealth." *Id.* The Supreme Judicial Court has explained:

> "Section 11 suggests an approach in which a judge should, after making findings of fact, and after considering those findings in the context of the entire § 11 claim, determine whether the center of gravity of the circumstances that give rise to the claim is primarily and substantially within the Commonwealth."
>
> *Kuwaiti Danish Computer Co. v. Digital Equip. Corp.,* 781 N.E.2d 787, 799 (Mass. 2003).

In accordance with *Kuwaiti*, courts commonly decline to dismiss § 11 claims on center of gravity grounds. *See, e.g.*, *Sentient Jet, LLC*, 2014 WL 1004112, at *13; *Back Bay Farm, LLC. v. Collucio*, 230 F. Supp. 2d 176, 179 (D. Mass. 2002); *Workgroup Tech. Corp. v. MGM Grand Hotel, LLC*, 246 F. Supp. 2d 102, 118 (D. Mass. 2003). Further, courts have concluded that a § 11 cause of action should survive a center of gravity challenge at

the motion to dismiss stage if the complaint alleges that the plaintiff is located and claims an injury within Massachusetts. *Sentient Jet* at *12 (quoting *Back Bay Farm* at 179 (D. Mass. 2002).

KPM has sufficiently alleged that it is based in Massachusetts and that its injury occurred within the Commonwealth, where the disputed trade secrets are electronically stored. Corporate Defendants' motion to dismiss Count X is *denied*.

## II. Individual Defendants

### A. Robert Gajewski

*1. Defend Trade Secrets Act (Count I) and Misappropriation of Trade Secrets (Count II)*

To establish a claim for misappropriation of trade secrets, a plaintiff must show that: (1) the information at issue qualifies as a trade secret, (2) it "took reasonable steps to preserve the secrecy of the information," and (3) "the defendant used improper means, in breach of a confidential relationship, to acquire and use the trade secret." *Incase Inc. v. Timex Corp.*, 488 F.3d 46, 52 (1st Cir. 2007). The DTSA also requires that the trade secret be "used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. §1836(b)(1).

KPM's allegations that Robert Gajewski misappropriated its trade secrets are substantial: KPM has plausibly alleged that while was employed by KPM, Gajewski used the calibration data sets from KPM's database and KPM's UCAL software to produce at least 13 of the 34 application notes published on Blue Sun's website to attract new customers, and that he serviced KPM equipment on behalf of Blue Sun, which would have required him to use KPM's proprietary technology on Blue Sun's behalf. As discussed in the context of the Corporate Defendants' motion to dismiss, *see supra* Part I.B.1(a), the calibration datasets and KPM's

UCAL software are clearly protected trade secrets. KPM also took reasonable steps to prevent Gajewski from disclosing this confidential information: on September 25, 2008, at KPM's request Gajewski executed a Confidentiality and Non-Competition Agreement in which he committed not to disclose, make use of, or copy any KPM company or client confidential information *during or after* his employment with KPM without KPM's express, written consent. (Docket No. 1-6 at 8-9). Because Gajewski used KPM's calibration datasets and UCAL software to benefit another company at the expense of his unwitting employer, the allegations also show an improper purpose.

Gajewski objects that KPM's allegations against him are innuendo because there are no allegations about "when or how" he misappropriated the application notes. However, KPM's internal investigation revealed the specific date and time that Gajewski accessed and modified the same KPM skim milk data replicated in Blue Sun's application note on his KPM laptop, and that he had accessed that data on the same date that Blue Sun published its skim milk application note. Because KPM's calibration datasets are not publicly available and KPM can track which users access them (and when), it has more than sufficiently stated a claim for trade secret misappropriation against Gajewski based on the data used to assemble the Blue Sun application notes attributed to "robga" alone.

Gajewski's motion to dismiss Counts I and II is *denied*.

*2. Breach of Contract (Count III)*

To succeed on a breach of contract claim, a plaintiff must "show that (1) a valid contract between the parties existed, (2) the plaintiff was ready, willing, and able to perform, (3) the defendant was in breach of the contract, and (4) the plaintiff sustained damages as a result." *Bose Corp. v. Ejaz*, 732 F.3d 17, 21 (1st Cir. 2013).

The parties dispute whether the KPM Confidentiality and Non-Competition Agreement that Gajewski signed on September 25, 2008 still bound Gajewski at the time of his alleged misconduct, which occurred between July 18, 2019 and April 5, 2021. Under that contract, Gajewski agreed, during and after his employment with KPM, to maintain the confidentiality of KPM's corporate and client information. (Docket No. 1-6 at 1-9). However, Gajewski points out that he left KPM in February 2019 to work as an independent contractor, and when he returned to KPM as an employee in May 2019, he did not sign a new confidentiality agreement.

I find that KPM has sufficiently pled that the 2008 contract binding Gajewski to maintain company and client confidentiality with KPM (whether KPM was his current or former employer) remained in force during the events set out in the complaint, and that KPM has also alleged that Gajewski breached that contract to KPM's detriment. KPM provided an executed contract which contains a confidentiality clause and alleged that that contract remained in force after Gajewski left KPM, and when he returned. (Compl. ¶ 37; Docket No. 1-6). It has also credibly alleged that Gajewski breached the 2008 Agreement by, among other acts, using KPM's client data to produce application notes to sell Blue Sun analyzers without KPM's consent.

Gajewski emphasizes that he never signed a new confidentiality agreement when he was rehired in 2019, but his opposition does not allege that Gajewski was unable or willing to enter into the contract in 2008 or explain why the post-termination provisions in the 2008 Agreement would be presumptively invalid in February 2019 when Gajewski briefly worked as an independent contractor, or why the current employee provisions would be presumptively invalid when Gajewski was rehired and resumed working for KPM as an employee in May 2019. In short, he has provided no reason the Court should discredit the 2008 Agreement at the motion to dismiss stage.

Gajewski's motion to dismiss Count III is _denied_.

*3. Violation of Good Faith and Fair Dealing (Count IV)*

"To prevail on an implied duty of good faith and fair dealing claim, "a plaintiff must prove that there existed an enforceable contract between the two parties and that the defendant did something that had the effect of destroying or injuring the right of [the plaintiff] to receive the fruits of the contract." *Boyle v. Douglas Dynamics, LLC*, 292 F.Supp.2d 198, 209-10 (D. Mass. 2003). "[T]he implied covenant of good faith and fair dealing governs conduct of parties after they have entered into a contract; without a contract, there is no covenant to be breached." *Massachusetts Eye & Ear Infirmary*, 412 F.3d at 230. "Conceptually, claims for breach of the implied covenant of good faith and fair dealing are distinct from simple breach of contract claims and require additional factual allegations of unfairly leveraging the contract terms for undue economic advantage." *Christensen v. Kingston Sch. Comm.*, 360 F.Supp.2d 212, 229 (D. Mass. 2005).

Gajewski has recycled the same arguments to dismiss Count III as he did for the breach of contract claim: that KPM has not adequately pled that the particulars of how or when Gajewski actually used or disclosed confidential information, and that KPM has not adequately alleged that any action he took had the effect of destroying or injuring KPM's rights under the contract. I have previously rejected those arguments, and reiterate my prior finding that the 2008 Agreement remained in force and barred Gajewski from using KPM's confidential client or company information at the time of his alleged misconduct, including using KPM's calibration datasets and UCAL software to prepare application notes for Blue Sun. Furthermore, the fact that KPM has credibly pled that Gajewski collected a salary from KPM while he diverted business to Blue Sun (the $900 purchase order that KPM customer Post Consumer Foods placed with Blue

Sun, after Gajewski provided a reference quote) and used KPM's trade secrets to boost the sales of KPM's competitor provides the additional factual allegations that *Christensen* requires to plead a good faith and fair dealing claim.

Gajewski's motion to dismiss Count IV is *denied*.

*4. Breach of Duty of Loyalty (Count V)*

KPM further alleges that Gajewski's disclosure of confidential information breached his duty of loyalty to KPM.

A duty of loyalty only attaches to employees who occupy positions of trust and confidence, which includes corporate officers, executives, partners, directors, and extends to certain rank and file employees who are given access to confidential information, such as law firm associates. *TalentBurst, Inc. v. Collabera, Inc.*, 567 F.Supp.2d 261, 265-66 (D. Mass. 2008). Here, KPM has alleged that Gajewski owed it a duty of loyalty arising out of the 2008 Agreement, in which he promised to keep KPM's confidential client and corporate information secret, and that he breached that duty when he disclosed confidential information on at least two occasions: using KPM's trade secrets to generate application notes for Blue Sun, and using KPM's client information to steer a $900 purchase order to Blue Sun while employed by KPM. As KPM's Business Director working directly under KPM's North America President and an employee who could access the calibration datasets on his employer-issued laptop, Gajewski was clearly an executive with access to confidential information to whom the duty of loyalty attaches.

Gajewski argues that an at-will employee can change employers freely and "may properly plan to go into competition with his employer . . . while still employed . . . without violating any duty to his employer." *See Augat, Inc. v. Aegis, Inc.*, 409 Mass. 165, 172 (1991). However, the facts alleged against him—actively using KPM trade secrets to help Blue Sun

market its competing products and steering at least one customer towards Blue Sun—go far beyond the permissible bounds of job hunting or planning to go into competition with one's present employer. Gajewski's motion to dismiss Count V is *denied*.

*5. Conversion (Count VIII)*

KPM also alleges that Gajewski converted KPM's propriety datasets, calibration models, and software when he disclosed them to Blue Sun by using the information to generate at least 11 of the 34 application notes published on its website, which Blue Sun attributed to "robga." Gajewski argues that KPM has not alleged what property he converted or what damage KPM suffered because of his conduct.

To prevail on a claim for conversion under Massachusetts law, a "plaintiff must show that (1) the defendant intentionally and wrongfully exercised control or dominion over the personal property; (2) the plaintiff had an ownership or possessory interest in the property at the time of the alleged conversion; (3) the plaintiff was damaged by the defendant's conduct; and (4) if the defendant legitimately acquired possession of the property under a good-faith claim of right, the plaintiff's demand for its return was refused." *United States v. Peabody Const. Co., Inc.*, 392 F.Supp.2d 36, 37 (D. Mass 2005) (citing *Evergreen Marine Corp. v. Six Consignments of Frozen Scallops*, 4 F.3d 90, 95 (1st Cir. 1993)).

Here, KPM has sufficiently alleged that Gajewski had access to KPM's intellectual property through his KPM-issued laptop, including data sets, calibration models, and software; that he accessed that property; and that he used that intellectual property to produce at least 11 of the application notes attributed to Mr. Gajewski and published on Blue Sun's website. As previously articulated, *see supra* Part I.B.1(a)., KPM's data sets, calibration models, and software constitute property that can be converted under the merger doctrine despite their

intangibility, and it is reasonable to assume at the motion to dismiss stage that this intellectual property was transferred using a physical device, although the manner in which the data was transmitted must be determined through discovery. Gajewski's motion to dismiss Count VIII is *denied*.

*6. Unjust Enrichment (Count IX)*

To state a claim for unjust enrichment, a plaintiff must demonstrate: (1) that the plaintiff conferred a benefit on the defendant; (2) an appreciation or knowledge of the benefit by the defendant; and (3) the acceptance or retention of the benefit by the defendant under circumstances which make the acceptance or retention inequitable. *Steven v. Thacker*, 550 F. Supp. 2d 161, 165 (D. Mass. 2018).

KPM has failed to state a claim for unjust enrichment against any of the Individual Defendants. KPM has not clearly stated what benefit any Individual Defendant—including Robert Gajewski—derived from the disclosure of KPM's confidential or client information. (Compl. ¶¶ 127-30). As Gajewski observes, Count IX of the Complaint lumps all the Individual Defendants together and asserts conclusorily that they "benefitted" from disclosing KPM's trade secrets, without saying how. While KPM has alleged that five of the Individual Defendants now work for Blue Sun, it has not alleged that they earned those positions or any other consideration from Blue Sun because of any disclosures of KPM confidential information.[3] In the absence of any allegations that any of the Individual Defendants received any kind of benefit for their disclosures, Count IX fails as to all Individual Defendants.

Gajewski's motion to dismiss Count IX is *granted*.

---

[3] KPM filed this Complaint on April 5, 2021, the same date that it terminated Robert and Michelle Gajewski, so whether or not either Gajewski was subsequently employed by Blue Sun was not an available fact.

B. Michelle Gajewski

*1. Motion to Dismiss for Improper Venue*

Michelle Gajewski moves to dismiss all claims against her for improper venue because KPM brought this case in the District of Massachusetts despite the fact that § 11 of her 2013 Non-Disclosure Agreement with KPM provides that any dispute arising out of the Agreement or the parties' relationship "shall be mediated, arbitrated or litigated solely within the state of Connecticut." (Docket No. 1-7).

KPM does not dispute that its tort and contract claims against Gajewski arise out of the Agreement or Gajewski's relationship with KPM, and so are subject to § 11's mandatory forum selection clause. Instead, KPM argues that the Court should not enforce the forum selection clause in the interest of judicial economy; because of Massachusetts' strong interest in adjudicating the case in the Commonwealth, where the alleged injury occurred; and because severing the claims against a single Defendant and requiring KPM to re-file them in the designated forum would "dramatically delay and inconvenience KPM's pursuit of relief," especially considering that the Court has already ordered expedited discovery and a hearing on KPM's preliminary injunction. (Docket No. 51 at 19-20).

The First Circuit "treat[s] a motion to dismiss based on a forum selection clause as a motion alleging the failure to state a claim for which relief can be granted under Rule 12(b)(6)." *Rivera v. Centro Medico de Turabo, Inc.*, 575 F.3d 10, 15 (1st Cir. 2009). Forum selection clauses "are prima facie valid and should be enforced unless enforcement is shown by the resisting party to be 'unreasonable' under the circumstances." *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 10 (1972). There are only four grounds for a court to set aside a mandatory forum selection clause whose scope covers the plaintiffs' claims: "(1) the clause was the product

of "fraud or overreaching;" (2) "enforcement would be unreasonable or unjust;" (3) proceedings "in the contractual forum will be so gravely difficult and inconvenient that [the party challenging the clause] will for all practical purposes be deprived of his day in court;" or (4) "enforcement would contravene a strong public policy of the forum in which the suit is brought, whether declared by statute or by judicial decision." *Claudio-De Leon v. Sistema Universitario Ana G. Mendez*, 775 F.3d 41, 49 (1st Cir. 2014).

KPM has not met its "heavy burden" to show why the forum selection clause should not be enforced under any of the four grounds set forth in *Claudio-De Leon*. *See Bremen* at 17. Its protests that enforcing the clause would inconvenience KPM by delaying relief and adding to its litigation costs are inadequate because "[m]ere inconvenience or additional expense is not the test of unreasonableness since it may be assumed that the plaintiff receive under the contract consideration for these things." *In re Mercurio*, 402 F.3d 62, 66 (1st Cir. 2005) (citation omitted). Nor has KPM furnished a factual record establishing that dismissing the claims against Gajewski would effectively deprive KPM of its day in court. *See Fireman's Fund Am. Ins. Cos. v. Puerto Rican Forwarding Co.*, 494 F.2d 1294, 1297 (1st Cir. 1974). Furthermore, it has not identified a strong Massachusetts public policy that would be injured by enforcement other than the Commonwealth's general interest in adjudicating claims that arose in Massachusetts and injured Massachusetts citizens within its borders. The First Circuit has acknowledged that to the extent the selected forum does not recognize a unique Massachusetts statutory claim, such as a c. 93A or a Massachusetts Wage Act claim, a forum selection clause can be set aside, but KPM has made no showing that any of its claims against Gajewski cannot be pursued in Connecticut to the extent that dismissal would violate a strong Massachusetts public policy. *See Atlas Glass & Mirror, Inc. v. Tri-North Builders, Inc.*, 997 F.3d 367, 377 (1st Cir. 2021) (upholding a

Wisconsin forum selection clause where plaintiff failed to show how enforcement could violate a Supreme Judicial Court policy against transferring 93A claims to states which do not recognize such causes of action). Finally, KPM has not cited any authority which allows a federal court to ignore a valid and mandatory forum selection clause based on judicial economy.

Gajewski's Rule 12(b)(6) motion to dismiss all claims against her for improper venue in light of the forum selection clause in her KPM contract is *granted*. This includes the dismissal of all remaining counts against Gajewski for misappropriation of trade secrets (Counts I and II); breach of contract (Count III); breach of the implied covenant of good faith and fair dealing (Count IV); breach of the duty of loyalty (Count V); conversation (Count VIII); and unjust enrichment (Count X).

C. Arnold Eilert

KPM has alleged five acts concerning Eilert: 1) that he had access to KPM's confidential information and he signed a Non Disclosure Agreement agreeing to maintain confidentiality on September 24, 2008; 2) that on January 11, 2019, he emailed Michelle Gajewski at her KPM email address and rob@bluesunscientific.com to inform them that KPM client UC San Diego Medical Center was dissatisfied with the human breast milk analyzer application that KPM was planning to "de-emphasize," that "it might make sense for someone" to contact the client to discuss how Blue Sun could "continu[e] where Unity left off," and to provide the client's name and phone number; 3) that on January 20, 2020, another KPM client, A&L Canada, forwarded Eilert a long email with its plan to transition from KPM analyzers to Blue Sun analyzers, and Eilert did nothing to alert KPM or prevent the loss of business; 4) that he forwarded the A&L Canada email from his KPM work email account to his personal email account on January 21,

2020; and 5) that he left KPM on December 31, 2020, and is now an employee of Blue Sun. (Docket Nos. 1-8, 1-13, 1-14).[4]

*1. Defend Trade Secrets Act (Count I) and Misappropriation of Trade Secrets (Count II)*

To establish a claim for misappropriation of trade secrets, a plaintiff must show that: (1) the information at issue qualifies as a trade secret, (2) it "took reasonable steps to preserve the secrecy of the information," and (3) "the defendant used improper means, in breach of a confidential relationship, to acquire and use the trade secret." *Incase Inc. v. Timex Corp.*, 488 F.3d 46, 52 (1st Cir. 2007).

KPM has stated a claim for trade secret misappropriation based on the 2019 email to Blue Sun regarding UC San Diego Medical Center, but not the 2020 email regarding A&L. Eilert was a passive recipient of the 2020 email and there are no allegations that he provided any KPM trade secrets to Blue Sun or A&L which would facilitate A&L's transition plan from KPM analyzers to Blue Sun analyzers. Therefore, Eilert cannot be said to have "acquire[d]" or "use[d]" KPM's trade secrets, as required under the DTSA and MUTSA. The 2019 email, when read in the light most favorable to KPM, suggests that Eilert reached out to Blue Sun by emailing

[4] On May 19, 2021, KPM submitted a letter informing the Court that after the hearing on its motion for expedited discovery, it learned that in August 2020 Eilert and Michelle Gajewski arranged for KPM client Disney to renew its NIR spectroscopy contract with Blue Sun instead of KPM by misrepresenting that KPM had changed its name to "Blue Sun." (Docket No. 43). The attached documentation included emails between a Disney representative and Eilert, as well as internal corporate emails within KPM discussing their very recent phone call with Disney. KPM asks that we consider the additional allegations contained therein against Eilert and Michelle Gajewski. Courts may not consider any documents that fall outside of the complaint, or which are not expressly incorporated into a complaint, except "for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiff's claim; or for documents sufficiently referred to in the complaint" when deciding a motion to dismiss. *Alternative Energy, Inc. v. St. Paul Fire and Marine Ins. Co.*, 267 F.3d 30, 33-34 (1st Cir. 2001). Because Disney was not referenced in the complaint and none of the documents fall under any of the exceptions set forth in *Alternative Energy*, the new evidence concerning Disney does not form part of the record for the pending motions to dismiss.

rob@bluesunscientific.com to inform KPM's competitor that there was an opportunity to poach UC San Diego Medical Center because KPM had decided to stop investing resources into its human breast milk application.

Under Massachusetts law, non-technical confidential information such as customer or supplier lists can qualify as a protected trade secret. *FrontRunner HC, Inc. v. Waveland RCM, LLC*, 202 WL 7321161 at *9 (D. Mass. Dec. 11., 2020) (citing *Jet Spray Cooler, Inc. v. Crampton*, 361 Mass 835, 840 (1972)). Massachusetts courts consider six relevant factors when determining whether the information sought to be protected is confidential: "(1) the extent to which the information is known outside the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the employer to guard the secrecy of the information; (4) the value of the information to the employer and to his competitors; (5) the amount of effort or money expended by the employer in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others." *Jet Spray* at 840 (citing RESTATEMENT OF TORTS § 757).

The scope of information defined as confidential in the Agreement implies that the information Eilert shared constitutes a trade secret, and that KPM had made substantial efforts to protect it. At the time that he emailed rob@bluesunscientific.com to provide the name, phone number, and reason why KPM's client might be open to an overture from Blue Sun, Eilert's Non-Disclosure Agreement was still in force and specifically barred him from disclosing confidential information, including the names and contact persons of KPM's clients and technologies and developments or any information relating to the KPM's business. (Docket No. 1-1 at 3).

Eilert objects that he was "simply trying to help an existing customer" and that he was not diverting business from KPM because KPM no longer planned to support the product application that its customer was interested in. That argument is a fact issue which cannot be resolved here at the motion to dismiss stage.

Eilert's motion to dismiss Counts 1 and II is _denied_.

*2. Breach of Contract (Count III)*

To succeed on a breach of contract claim, a plaintiff must "show that (1) a valid contract between the parties existed, (2) the plaintiff was ready, willing, and able to perform, (3) the defendant was in breach of the contract, and (4) the plaintiff sustained damages as a result." *Bose Corp. v. Ejaz*, 732 F.3d 17, 21 (1st Cir. 2013).

KPM alleges that Eilert violated his 2008 Confidentiality and Non-Competition Agreement by disclosing KPM's confidential information. Eilert raises no argument that the Agreement is unenforceable. The 2008 Agreement defines confidential information broadly as, among other information, "names, addresses, contact persons, purchasing histories and prices, credit standing and other information relating to [KPM's] clients or prospective personnel;" and "business expansion plans, including business development;" "technologies, developments, inventions, or improvements; and any other information relating to the business of [KPM] or its clients . . ." (Docket No. 1-1 at 3). While KPM did not allege that its decision to "de-emphasize" the human breast milk application was a trade secret, a term which carries a specific legal definition, that information appears to be confidential under the terms of the Agreement. By alleging that Eilert disclosed that information to a Blue Sun email address, KPM has stated a claim for breach of contract. Furthermore, providing Blue Sun with the client's phone number is also a breach of the contractual provision protecting the identities and contact information of

KPM's clients. Eilert objects that he was merely trying to assist a customer obtain a service that KPM could not provide, but on a motion to dismiss, the Court construes the evidence in the light most favorable to the nonmovant.

Eilert's motion to dismiss Count III is *denied*.

*3. Violation of the Implied Covenant of Good Faith and Fair Dealing (Count IV)*

"To prevail on an implied duty of good faith and fair dealing claim, "a plaintiff must prove that there existed an enforceable contract between the two parties and that the defendant did something that had the effect of destroying or injuring the right of [the plaintiff] to receive the fruits of the contract." *Boyle v. Douglas Dynamics, LLC*, 292 F.Supp.2d 198, 209-10 (D. Mass. 2003). "Conceptually, claims for breach of the implied covenant of good faith and fair dealing are distinct from simple breach of contract claims and require additional factual allegations of unfairly leveraging the contract terms for undue economic advantage." *Christensen v. Kingston Sch. Comm.*, 360 F.Supp.2d 212, 229 (D. Mass. 2005).

As discussed above in the context of the breach of contract claim against Eilert, Eilert's January 11, 2019 disclosure to Blue Sun that KPM planned to discontinue or stop developing a certain application that a KPM client wanted, as well as that client's name and contact information, violated Eilert's 2008 Confidentiality and Nondisclosure Agreement. KPM has also alleged that Eilert leveraged the violation for undue economic advantage by gaining employment with Blue Sun sometime after December 31, 2020. Eilert's act of forwarding the 2020 email memorializing A&L's plan to transition from KPM to Blue Sun analyzers reinforces the theory that Eilert was collecting clients for an eventual move to Blue Sun. Two years passed between the January 2019 Email and Eilert's subsequent employment with Blue Sun and Eilert's hiring

could be wholly unconnected to the 2019 email, but at the motion to dismiss stage KPM has scraped together enough plausible allegations to move the claim forward.

Eilert's motion to dismiss Count IV is ***denied***.

*4. Breach of Duty of Loyalty (Count V)*

A duty of loyalty only attaches to employees who occupy positions of trust and confidence, which includes corporate officers, executives, partners, directors, and extends to certain rank and file employees who are given access to confidential information, such as law firm associates. *TalentBurst, Inc. v. Collabera, Inc.*, 567 F.Supp.2d 261, 265-66 (D. Mass. 2008). As an Applied Technology Manager whose position involved "designing software and programming," Eilert's work provided him access to enough of KPM's prized confidential information—particularly its calibration database—for the duty of loyalty to attach. (Docket No. 1-1 at 1). Eilert promised to keep KPM's confidential client and corporate information secret, and KPM has plausibly alleged that he breached that duty on January 11, 2019, as discussed previously.

Eilert's motion to dismiss Count V is ***denied***.

*5. Conversion (Count VIII)*

To prevail on a claim for conversion under Massachusetts law, a "plaintiff must show that (1) the defendant intentionally and wrongfully exercised control or dominion over the personal property; (2) the plaintiff had an ownership or possessory interest in the property at the time of the alleged conversion; (3) the plaintiff was damaged by the defendant's conduct; and (4) if the defendant legitimately acquired possession of the property under a good-faith claim of right, the plaintiff's demand for its return was refused." *United States v. Peabody Const. Co.,*

*Inc.*, 392 F.Supp.2d 36, 37 (D. Mass 2005) (citing *Evergreen Marine Corp. v. Six Consignments of Frozen Scallops*, 4 F.3d 90, 95 (1st Cir. 1993)).

The 2019 and 2020 email exchanges show that Eilert was in possession of KPM customer information. (Compl. ¶¶ 42, 49). Additionally, the January 11, 2019 email to rob@bluesunscientific.com credibly alleges that he used confidential customer information to lure KPM customers to Blue Sun while employed by KPM. However, KPM fails to allege that Eilert's conduct harmed KPM. Unlike the allegations against Rachael Glenister, KPM has no allegations that it lost sales or business opportunities with either UC San Diego Medical Center or A&L, the two clients connected to Eilert, due to any action of Eilert's. *See infra* Sec. II.d.vi. Without pleading damages resulting from Mr. Eilert's use of customer information, KPM has failed to plausibly establish a conversion claim. *See Peabody*, 392 F.Supp.2d at 37.

Eilert's motion to dismiss Count VIII is *granted*.

*6. Unjust Enrichment (Count IX)*

Eilert's motion to dismiss Count IX is *granted*.

D. Rachael Glenister

KPM alleges that Glenister diverted three sales to Blue Sun while she was employed by KPM, and that her current employment violates the terms of her August 23, 2015 Confidentiality and Non-Competition Agreement. (Docket No. 1-2).

On September 4, 2019, Glenister generated a $61,000 sales opportunity from Texas A&M AgriLife, but she closed the opportunity on June 9, 2020, reporting that the customer had "No Budget/Lost Funding." (¶ 83). KPM has learned that Blue Sun received an order from Texas A&M AgriLife on April 20, 2020 and amended it on July 20, 2020, either on the day that

Glenister left KPM, or ten days later.[5] (*Id.*). Glenister also created a sales opportunity with Panhandle Milling while employed by KPM, but after Glenister left KPM, Panhandle placed an order with Blue Sun in late 2020. (¶ 84). Finally, Glenister created a sales opportunity with Agri-King, Inc. before she left KPM, but Agri-King Inc. ultimately placed an order with Blue Sun. (¶ 85).

*1. Defend Trade Secrets Act (Count I) and Misappropriation of Trade Secrets (Count II)*

To establish a claim for misappropriation of trade secrets, a plaintiff must show that: (1) the information at issue qualifies as a trade secret, (2) it "took reasonable steps to preserve the secrecy of the information," and (3) "the defendant used improper means, in breach of a confidential relationship, to acquire and use the trade secret." *Incase Inc. v. Timex Corp.*, 488 F.3d 46, 52 (1st Cir. 2007).

Weighing the six *Jet Spray* factors, I find that KPM has stated a claim that Glenister's diversion of the three sales from KPM to Blue Sun violated the DTSA and the MUTSA by disclosing confidential information. See *Jet Spray Cooler, Inc. v. Crampton*, 361 Mass 835, 840 (1972). Glenister's Confidentiality and Non-Competition Agreement barred her from disclosing any information relating to KPM's prospective clients, including potential or prospective prices or products during or after her employment with KPM. (Docket No. 1-2). According to the allegations against her, three prospective clients that she unsuccessfully solicited for KPM—AgriLife, AgriKing, and Panhandle Milling, became Blue Sun clients shortly before or after she left KPM for Blue Sun on July 10 or 20, 2020. KPM and Blue Sun sell similar types of NIR analyzers. Taking the facts alleged in the light most favorable to KPM, it is plausible that

[5] The Complaint provides that two different end dates for Glenister's employment at KPM: July 10, 2015 (¶ 33) and July 20, 2020 (¶ 83). Therefore, Blue Sun either amended its purchase order from AgriLife the day that Glenister left KPM, or ten days later.

Glenister used the confidential information she learned during her solicitation of the three companies at KPM to diver their business to Blue Sun, especially given KPM's allegations that Glenister left KPM for Blue Sun. While KPM has not identified any specific instances of solicitation, there is no requirement to do so without the benefit of discovery at such an early stage of the litigation.

Glenister's motion to dismiss Counts I and II is *denied*.

*2. Breach of Contract (Count III)*

KPM's first breach of contract claim against Glenister alleges that she violated the terms of her 2015 Confidentiality and Non-Competition Agreement with KPM by disclosing confidential information. To succeed on a breach of contract claim, a plaintiff must "show that (1) a valid contract between the parties existed, (2) the plaintiff was ready, willing, and able to perform, (3) the defendant was in breach of the contract, and (4) the plaintiff sustained damages as a result." *Bose Corp. v. Ejaz*, 732 F.3d 17, 21 (1st Cir. 2013).

For the same grounds provided in my decision concerning the trade secret claims (Counts I and II) against Glenister, I decline to dismiss the breach of contract claim. Glenister has argued that the Agreement's restrictive covenant is invalid, *see supra* Part II.D.5, but not that the remainder of the Agreement between her and KPM is unenforceable. Therefore, where KPM has plausible pled that a valid contract existed, and Glenister breached the confidentiality requirement of that contract to divert sales away from KPM to Blue Sun, and KPM was injured, KPM has sufficiently pled breach of contract. In particular, KPM's allegation that Glenister informed KPM in July 2020 that the $61,000 sales opportunity to AgriKing she had been pursuing for the past ten months had lapsed because AgriKing had lost funding or had no budget is curious, for if Glenister had truly been courting AgriKing on KPM's behalf for ten months it

seems likely she would be aware of AgriKing's April order with Blue Sun, and would have informed KPM.

Glenister's motion to dismiss Count III is *denied*.

*3. Violation of Good Faith and Fair Dealing (Count IV)*

Under Massachusetts law, "the covenant of good faith and fair dealing is implied in every contract," *UNO Rests., Inc. v. Boston Kenmore Realty Corp.*, 441 Mass. 376, 385 (2004), and provides that "neither party shall do anything that will have the effect of destroying or injuring the rights of the other party to receive the fruits of the contract." *Anthony's Pier Four, Inc. v. HBC Associates*, 411 Mass. 451, 471–72 (1991).

While there are other explanations for AgriKing, AgriLife, and Panhandle Milling's decisions to purchase analyzers from KPM rather than BlueSun, the coinciding timing of their decisions with Glenister's transition from KPM to Blue Sun, and the fact that Glenister had solicited all three on behalf of KPM, creates a plausible allegation that Glenister used the confidential information she was barred from disclosing for Blue Sun's benefit to poach those three customers. At the motion to dismiss stage, KPM has pleaded, albeit barely, enough to state a claim.

Glenister's motion to dismiss Count IV is *denied*.

*4. Breach of Duty of Loyalty (Count V)*

A duty of loyalty only attaches to employees who occupy positions of trust and confidence, which includes corporate officers, executives, partners, directors, and extends to certain rank and file employees who are given access to confidential information, such as law firm associates. *TalentBurst, Inc. v. Collabera, Inc.*, 567 F.Supp.2d 261, 265-66 (D. Mass. 2008).

Glenister joined KPM as an entry level field sales representative. (Docket No. 1-2 at 2). Because she was not an executive, officer, or director of KPM, an employee's duty of loyalty does not apply unless she occupied "a position of trust and confidence." *Advanced Micro Devices, Inc. v. Feldstein*, 951 F.Supp.2d 212, 220 (D. Mass. 2013). Nevertheless, as a sales representative, it is likely that Glenister had access to KPM's confidential information, including customer lists and product information, which is supported by the fact that the Confidentiality and Non-Competition Agreement that KPM required her to sign as a condition of her employment barred her from disclosing any customer information. (Docket No. 1-2 at 5). Since KPM is "a high-tech business that generates much of its revenue from intellectual property" it is likely that Glenister, who was tasked with selling this equipment, "had access to confidential information of substantial value." *Feldstein* at 220. While at summary judgment KPM will have to prove that a fiduciary duty did attach to Glenister, Count V survives the motion to dismiss.

Glenister's motion to dismiss Count V is *denied*.

*5. Breach of Contract (Count VI)*

KPM's second breach of contract claim against Glenister alleges that she violated the restrictive covenant in her 2015 Non-Disclosure and Non-Competition Agreement by competing with her former employer. Glenister argues that the restrictive covenant is invalid under Connecticut law, which governs the Agreement, because it prevents her from practicing her occupation, is impermissibly overbroad in temporal and geographic scope, and exceeds what is necessary to protect KPM's legitimate interests.

For a period of two years following the end of her employment with KPM, § 2 of the Agreement bars Glenister from, directly or indirectly: 1) competing with KPM or its affiliates; 2) consulting or advising, owning, managing, operating, financing, joining, controlling, or having

any connection, in any manner, with any business related to KPM's NIR spectroscopy business; 3) any contact, solicitation, or consulting business with any KPM client or affiliate she worked with or solicited, <u>including any active KPM prospects that she worked with or solicited in the 12 months prior to her departure from KPM</u>; 4) inducing any KPM customer or employee to leave KPM; and 4) interfering with any KPM contracts or relationships with KPM's customers or suppliers. (Docket No. 1-2 at 6) (emphasis added). These restrictions apply within any geographic area in which KPM and its affiliates conduct business, though the contract does not define the scale of a geographic area or list the geographical areas where KPM operates. (*Id.*). Significantly, the provision permits Glenister to work in the NIR industry in a role which would not directly or indirectly compete with KPM's NIR business. (*Id.*).

The Connecticut Supreme Court has specified five criteria for evaluating the reasonableness of a restrictive covenant:

> "(1) the length of time the restriction is to be in effect; (2) the geographical area covered by the restriction; (3) the degree of protection afforded to the interest of the party in whose favor the covenant is made; (4) the restrictions imposed on the employee's ability to pursue his occupation; and (5) the potential for undue interference with the interests of the public."

*Scott v. General Iron & Welding Co.*, 368 A.2d 111, 114–15 (Conn. 1976). This five-prong test is disjunctive, meaning that a finding of unreasonableness in any one of the criteria is enough to render the covenant unenforceable. *New Haven Tobacco Co., Inc. v. Perrelli*, 528 A.2d 865, 867 (Conn. App. Ct. 1989). The party challenging the covenant bears the burden of proving that the restriction is not enforceable. *Fairfield County Bariatrics and Surgical Associates, P.C. v. Ehrlich*, 2010 WL 1375397 (Conn. Super. Ct. 2010).

*(a) Temporal and Geographic Restrictions*

Time and geographic restrictions in a covenant not to compete are enforceable if they are "reasonably limited and fairly protect the interests of both parties." *Robert S. Weiss & Associates, Inc. v. Weiderlight*, 546 A.2d 216, 220 (Conn. 1988). "[T]ime and geographical restrictions are to be reviewed as intertwined considerations when a determination is made on the reasonableness of the limitations of an employee's post-termination activities." *Van Dyck Printing Co. v. DiNicola*, 648 A.2d 898, 902 (Conn. Sup. Ct. 1993) (citing *Weiderlight*, 546 A.2d at 546). A restriction with a large geographic scope with a short duration may be reasonable, while one that covers a small area for a longer duration may be reasonable. *Id.* Generally, the application of a restrictive covenant must be confined to a geographical area and length of time which are reasonable in view of the *particular* situation. *See Scott*, 368 A.2d at 115 (emphasis added). Often facts beyond what are available at the motion to dismiss stage are required to determine the reasonableness of time and geographic limitations. *See, e.g.*, *Southern Home Care Servs., Inc. v. Visiting Nurse Servs., Inc. of Southern Connecticut*, 2014 WL 12756150 at *3 (D. Conn. 2014) ("[F]uther factual development is required to determine the import of the lack of express time and geographical limitation in the Agreement."). I find that to be the case here.

The Agreement prohibits Glenister from competing with KPM or its affiliates within "any geographic area" in which KPM and its affiliates do business. (Docket No. 1-2 at 6). In the absence of information that more precisely defines that geographic area, its breadth cannot be determined. Given the interconnectedness of the geographic and temporal restrictions, the validity of the two-year restriction is also an open question. Accordingly, further fact finding is required to reach a conclusion on the reasonableness of the Agreement's geographic and temporal restrictions.

*(b) Protection of KPM's Legitimate Interests*

Connecticut courts have invalidated restrictive covenants that bar former employees from having *any connection* to businesses that may compete with their former employer. *See, e.g.*, *DeLeo v. Equale & Cirone, LLP*, 202 Conn.App. 650, 679-83, n.15 (Conn. App. Ct. Feb. 23, 2021); (*Sylvan R. Shemitz Designs, Inc. v. Brown*, 2013 WL 6038263, at *8 (Conn. Super. Ct. Oct. 23, 2013) ("The court finds particularly problematic that the noncompetition clause specifically prohibits any employment by a "Specialized Lighting Business," regardless of the importance of the position or its relatedness to those duties which the employee held with the plaintiff.").

§ 2 effectively precludes Glenister from working as a sales representative in the NIR spectroscopy industry, which has been her occupation for the past five years. Under § 2, she cannot work for any NIR spectroscopy company in any capacity if that company competes indirectly or directly with KPM, even if she only solicits clients that she had no contact with during her time at KPM. Because the *Scott* factors are disjunctive, the unreasonableness of the protection afforded to KPM by this provision is sufficient to render the restrictive covenant of the Agreement unenforceable. *Perrelli*, 528 A.2d at 867.

Glenister's motion to dismiss Count VI is *granted*.

*6. Conversion (Count VIII)*

To prevail on a claim for conversion under Massachusetts law, a "plaintiff must show that (1) the defendant intentionally and wrongfully exercised control or dominion over the personal property; (2) the plaintiff had an ownership or possessory interest in the property at the time of the alleged conversion; (3) the plaintiff was damaged by the defendant's conduct; and (4) if the defendant legitimately acquired possession of the property under a good-faith claim of

right, the plaintiff's demand for its return was refused." *United States v. Peabody Const. Co., Inc.*, 392 F.Supp.2d 36, 37 (D. Mass 2005) (citing *Evergreen Marine Corp. v. Six Consignments of Frozen Scallops*, 4 F.3d 90, 95 (1st Cir. 1993)). Following the legal analysis in *Sentient Jet, LLC v. Apollo Jets*, LLC, 2014 WL 1004112 at *2 (D. Mass. March 17, 2014), I decline to dismiss KPM's conversion claim that Glenister misappropriated KPM's confidential information under the merger doctrine. KPM did not allege the specific means by which Glenister transmitted this customer information to Blue Sun. Because discovery will reveal how any confidential information was transmitted to Blue Sun, dismissing the claim now would be premature. *Id.*

Glenister's Motion to Dismiss Count VIII is *denied*.

*7. Unjust Enrichment (Count IX)*

Glenister's motion to dismiss Count IX is *granted*.

E. Gregory Israelson

KPM has alleged scant facts about Israelson. In sum, Israelson: 1) worked for KPM as a Sales Engineer from March 2016 to March 2021 (Compl. ¶ 34); 2) had access to KPM's confidential information and trade secrets, including its valuable datasets, source code and/or customer files (*Id.*); 3) is now employed by Blue Sun (*Id.*); and 4) sent an email from a Blue Sun email address bearing his first name (greg@bluesunscientific.com) to his KPM email address on July 29, 2020 containing a link to a software tool used for remote copying of files, with a request "to join a session." (Docket No. 1-9). Per KPM, Israelson's "sole purpose in sending this software copying tool to himself at his kpmanalytics.com email address was to permit the copying of files from KPM to Blue Sun without KPM's authorization." (¶ 43).

*1. Defend Trade Secrets Act (Count I) and Misappropriation of Trade Secrets (Count II)*

To establish a claim for misappropriation of trade secrets, a plaintiff must show that: (1) the information at issue qualifies as a trade secret, (2) it "took reasonable steps to preserve the secrecy of the information," and (3) "the defendant used improper means, in breach of a confidential relationship, to acquire and use the trade secret." *Incase Inc. v. Timex Corp.*, 488 F.3d 46, 52 (1st Cir. 2007).

KPM has plausibly alleged that Israelson had access to its confidential information or trade secrets, but it has not alleged that Israelson ever actually acquired and used any trade secrets. It has not alleged that Israelson responded to the greg@bluesunscientific.com email or used the copying tool to take files without KPM's knowledge or connected any information Blue Sun now possesses to information that within Israelson's reach in July 2020.

Moreover, KPM's report of its internal investigation into Robert Gajewski shows that KPM has the ability to digitally track whenever its employees access or modify electronic files within its calibration database. (*See* Compl. ¶¶ 70, 72). If KPM knows the date that Israelson received the invitation to "join a session" of the software copying tool, then the Court presumes based on the pleadings that KPM should also know whether Israelson accessed or modified any confidential files related to its calibration database on that same date. If Israelson worked in a sales capacity like Glenister rather than in a technical capacity with the calibration database like Robert Gajewski, then there should be allegations about his contacts with KPM clients to substantiate the trade secrets claim, as there were with Glenister. The offer letter he received from KPM indicates that he might have done both technical and sales-oriented work. (Docket No. 1-3 at 2). KPM's silence in both regards is conspicuous.

The additional fact that an individual with the same first name as Israelson possessed a Blue Sun email address while Israelson was employed by KPM does not compensate for the lack of evidence that Israelson ever acquired and used a KPM trade secret.

Israelson's motion to dismiss Counts I and II is *granted*.

*2. Breach of Contract (Count III)*

Just as the Complaint contains no allegations that Israelson used and acquired a KPM trade secret, it contains no allegations no allegations that Israelson committed any conduct which breached the terms of his March 2016 Confidentiality and Non-Competition Agreement. Israelson's motion to dismiss Count III is *granted*.

*3. Violation of Good Faith and Fair Dealing (Count IV)*

For the reasons previously provided, Israelson's motion to dismiss Count IV is *granted*.

*4. Breach of Duty of Loyalty (Count V)*

For the reasons previously provided, Israelson's motion to dismiss Count V is *granted*.

*5. Breach of Contract (Count VI)*

KPM also claims that Israelson's current employment with Blue Sun violates the restrictive covenant in his 2016 Confidentiality and Non-Competition Agreement with KPM. Israelson's noncompete agreement is identical to the provision in Glenister's agreement, which I have already held is invalid under Connecticut law. *See supra* Part II.D.5. Accordingly, Israelson's Motion to Dismiss Count VI is *granted*.

*6. Conversion (Count VIII)*

For the reasons previously provided, Israelson's motion to dismiss Count V is *granted*.

*7. Unjust Enrichment (Count IX)*

Israelson's motion to dismiss Count IX is *granted*.

F. Irvin Lucas

KPM alleges that Lucas disclosed KPM's confidential information after he left KPM in May 2019 and began working for Blue Sun..

Lucas worked for KPM in an undefined capacity from January 5, 2015, to May 7, 2019, during which time he had access to KPM's trade secrets and confidential information; he became employed by Blue Sun at some point between May 2019 and January 2020 and is now Blue Sun's President. (Compl. ¶ 35; Docket No. 1-4). When Lucas left KPM, he "wiped clean" his company-issued computer. (*Id.*).

On January 17, 2020, KPM client Olam sent an email to Robert Gajewski's KPM email address (Gajewski was still employed by KPM) and Lucas at irvin@bluesunscientific.com to troubleshoot an issue with Olam's KPM analyzer. (Docket No. 1-12 at 8). The Olam contact, Dr. Fong, noted that he had received Gajewski and Lucas' contact information from a colleague, but did not explain why Olam would be reaching out to KPM and an employee of its competitor for help with a KPM analyzer. Gajewski responded to Dr. Fong privately, removing Lucas from the ensuing email chain. (*Id.* at 2-7).

On March 30, 2020, a manager for KPM distributor ProAnalytics emailed Gajewski and Lucas an order form for $900 worth of analyzer replacement parts. (Docket No. 1-15). The manager sent the order form directly to Gajewski, but she copied Lucas as a secondary recipient, and the email salutation reads: "Hi Rob/Irvin, Hope you are both well. Please find attached new order for lamps . . ." (*Id.* at 2). The purchase order identifies Blue Sun as the supplier, and lists a phone number with a Maryland area code and info@bluesunscientific.com as the supplier contact. (*Id.*). The order description notes that Rob Gajewski provided the reference quote for the order. (*Id.* at 6).

*1. Defend Trade Secrets Act (Count I) and Misappropriation of Trade Secrets (Count II)*

To establish a claim for misappropriation of trade secrets, a plaintiff must show that: (1) the information at issue qualifies as a trade secret, (2) it "took reasonable steps to preserve the secrecy of the information," and (3) "the defendant used improper means, in breach of a confidential relationship, to acquire and use the trade secret." *Incase Inc. v. Timex Corp.*, 488 F.3d 46, 52 (1st Cir. 2007).

The Court is mindful that "trade secret misappropriation may be demonstrated by circumstantial evidence, such as access to the trade secret by the misappropriating party and similarity between the secret and the defendant's design . . ." *Contour Design, Inc v. Chance Mold Steel Co., Ltd.*, 693 F.3d 102, 109-110 (1st Cir. 2012). To be sure, Lucas' act of wiping his KPM-issued company computer blank together with the knowledge that seven months later Lucas became Blue Sun's President, raises the Court's suspicion. But KPM has alleged no information about what files Lucas had access to on his company computer, and whether information from any of those files subsequently appears to have ended up in the hands of Blue Sun.

As to the Olam email, KPM alleges that there is no "legitimate reason" why one of its customers would email a KPM employee and anyone else at Blue Sun about KPM equipment, as Dr. Fong did when he emailed Robert Gajewski and Irvin Lucas at irvan@bluesunscientific.com to ask for help with his KPM analyzer, implying that Lucas had been working behind the scenes to poach Olam from Blue Sun, and that work must necessarily have involved Lucas' disclosure of KPM trade secrets. But Lucas never responded, and there is no evidence in the email itself which indicates any bad acts on Lucas' part.

Wiping his KPM computer and his subsequent employment at Blue Sun alone do not state a claim for trade secret misappropriation, but the March 2020 email from a KPM customer to Gajewski and Lucas submitting an order for Blue Sun equipment is evidence that Lucas used confidential KPM information he learned from Gajewski or during his time at KPM for an improper purpose—here, to divert a $900 sale that would otherwise go to KPM to Blue Sun.

In a somewhat similar case, another court in this District denied injunctive relief for trade secret misappropriation against the plaintiff's consultant, who had downloaded what the court determined were likely trade secrets from the plaintiff's cloud-based DropBox electronic storage system onto his personal computer and then "delinked" his personal computer so that the plaintiff could not retrieve the client files that the consultant had downloaded. *Maine Pointe, LLC v. Collins*, 2018 WL 5303038 at *5-6 (D. Mass. Oct. 25, 2018). The plaintiff argued that the act of "delinking" was overwhelming circumstantial evidence that the consultant intended to use its trade secrets for the benefit of his new employer and merited injunctive relief, just as KPM has emphasized Lucas' act of wiping his KMP computer. *Id*. In *Maine Pointe* the district court denied injunctive relief, noting that the plaintiff had not established a likelihood of success in proving that the consultant intended to convert the trade secrets for his own use where there was no evidence that the consultant had made copies or used the files beyond the scope of his consultancy agreement. *Id*. at 6. Not only does KPM have a lower burden to proof opposing a motion to dismiss than the aggrieved corporation in *Maine Pointe*, it has evidence through the ProAnalytics correspondence and the order that the defendant seeking dismissal actually used the confidential information he had access to.

Construing the ProAnalytics email, Lucas' act of wiping his computer clean before leaving KPM to obscure the transfer or taking of any confidential information, and his

subsequent employment with Blue Sun in the most favorable light possible to KPM, there is enough circumstantial evidence to state a claim for misappropriation.

Lucas' motion to dismiss Counts I and II is _denied_.

*2. Breach of Contract (Count III)*

KPM alleges that Lucas breached the confidentiality terms of his January 2015 Confidentiality and Non-Competition Agreement (Docket No. 1-4) with KPM by disclosing its trade secrets or confidential information, as confidential information is defined within the Agreement. To succeed on a breach of contract claim, a plaintiff must "show that (1) a valid contract between the parties existed, (2) the plaintiff was ready, willing, and able to perform, (3) the defendant was in breach of the contract, and (4) the plaintiff sustained damages as a result." *Bose Corp. v. Ejaz*, 732 F.3d 17, 21 (1st Cir. 2013).

Lucas has not argued that the Agreement is invalid, but instead objects that KPM has not alleged the circumstances of the alleged breach. I find that the 2015 Agreement was still in place in March 2020, when KPM has credibly alleged that Lucas was involved in diverting a sale of replacement parts or equipment from a KPM customer to Blue Sun. KPM has credibly alleged that to divert the sale, Lucas would have needed to use confidential information shielded by the Agreement, including information about KPM's customers, prices, and technology.

Lucas' motion to dismiss Count III is _denied._

*3. Violation of Good Faith and Fair Dealing (Count IV)*

"To prevail on an implied duty of good faith and fair dealing claim, "a plaintiff must prove that there existed an enforceable contract between the two parties and that the defendant did something that had the effect of destroying or injuring the right of [the plaintiff] to receive the fruits of the contract." *Boyle v. Douglas Dynamics, LLC*, 292 F.Supp.2d 198, 209-10 (D.

Mass. 2003). "[T]he implied covenant of good faith and fair dealing governs conduct of parties after they have entered into a contract; without a contract, there is no covenant to be breached." *Massachusetts Eye & Ear Infirmary*, 412 F.3d at 230. "Conceptually, claims for breach of the implied covenant of good faith and fair dealing are distinct from simple breach of contract claims and require additional factual allegations of unfairly leveraging the contract terms for undue economic advantage." *Christensen v. Kingston Sch. Comm.*, 360 F.Supp.2d 212, 229 (D. Mass. 2005).

As with the breach of contract claim (Count III), I find that the March 2020 emails do state a claim that Lucas violated the duty of good faith and fair dealing which he owed to KPM, his former employer, under the 2015 Agreement. That he (together with Robert Gajewski) successfully diverted the ProAnalytics order to Blue Sun shows that he leveraged the confidentiality terms of his agreement for undue economic advantage by causing the exact harm that KPM sought to prevent when it attained his consent to enter into the agreement in 2015. Lucas' motion to dismiss Count IV is *denied*.

*4. Breach of Duty of Loyalty (Count V)*

Because KPM did not provide Lucas' title or scope of work, it is unclear whether he was an executive, officer, or director to which a fiduciary duty attaches. However, the fact that KPM required Lucas to enter into a Confidentiality and Non-Competition Agreement demonstrates that he likely occupied "a position of trust and confidence" or had such access to confidential information that the duty does attach. *See Advanced Micro Devices, Inc. v. Feldstein*, 951 F.Supp.2d 212, 220 (D. Mass. 2013). Since KPM is "a high-tech business that generates much of its revenue from intellectual property" it is likely that like the other Individual Defendants, Lucas "had access to confidential information of substantial value." *Feldstein* at 220. While at

summary judgment KPM will have to prove that a fiduciary duty did attach to Lucas, KPM has alleged enough to allow the claim to move forward.

Lucas' motion to dismiss Count V is _*denied*_.

*5. Breach of Contract (Count VI)*

KPM also claims that Lucas' current employment with Blue Sun violates his January 2015 Confidentiality and Non-Competition Agreement with KPM. The restrictive covenant in Lucas' Agreement is identical to the provisions in Glenister and Israelson's agreements, which I have already held are invalid under Connecticut law. See *supra* Part II.D.5. Accordingly, Lucas' motion to dismiss Count VI is _*granted*_.

*6. Conversion (Count VIII)*

To prevail on a claim for conversion under Massachusetts law, a "plaintiff must show that (1) the defendant intentionally and wrongfully exercised control or dominion over the personal property; (2) the plaintiff had an ownership or possessory interest in the property at the time of the alleged conversion; (3) the plaintiff was damaged by the defendant's conduct; and (4) if the defendant legitimately acquired possession of the property under a good-faith claim of right, the plaintiff's demand for its return was refused." *United States v. Peabody Const. Co., Inc.*, 392 F.Supp.2d 36, 37 (D. Mass 2005) (citing *Evergreen Marine Corp. v. Six Consignments of Frozen Scallops*, 4 F.3d 90, 95 (1st Cir. 1993)).

Pursuant to *Sentient Jet, LLC v. Apollo Jets*, LLC, 2014 WL 1004112 at *2 (D. Mass. March 17, 2014), I decline to dismiss KPM's conversion claim that Lucas misappropriated KPM's confidential information concerning its client relationship with ProAnalytics under the merger doctrine. Although KPM did not allege the specific means by which Lucas transmitted

customer information to Blue Sun, dismissing the claim would be premature before discovery on the mechanics of the exchange. *Id.*

For the reasons previously stated, Lucas' motion to dismiss Count VIII is _denied_.

*7. Unjust Enrichment (Count IX)*

Lucas' motion to dismiss Count IX is _granted_.

G. Philip Ossowski

KPM has asserted eight claims (Counts I, II, III, IV, V, VI, VIII, and IX) against Philip Ossowski despite an utter absence of allegations against him. Ossowski began working for KPM on March 26, 2019, at which time he executed a Non-Competition, Non-Solicitation and Confidentiality Agreement. (Docket No. 1-5). KPM claims that during Ossowski's employment, he had access to KPM's trade secrets and confidential information. (Compl. ¶ 36). Finally, KPM states that Ossowski left KPM on January 29, 2021 and now works for Blue Sun. (*Id.*). Missing are any claims about any act or omission on the part of Ossowski during or after his KPM employment connected to Blue Sun or any KPM trade secret, confidential information, or customer.

*1. Counts I, II, III, IV, VI, VIII, and IX*

I agree that the facts alleged are entirely insufficient to state any contract or statutory claims based on Ossowski's use, disclosure, or misappropriation of KPM's trade secrets or confidential information. KPM has not alleged whether or how Ossowski violated his non-disclosure agreement or acted on behalf of Blue Sun while employed by KPM, or after his departure from KPM. Ossowski was not party to any of the email communications between certain Individual Defendants and KPM customers detailed in the Complaint, and there are no

allegations tying him to Blue Sun's Application Notes published on Blue Sun's website or lost customers and sales opportunities. Simply put, there is nothing connecting Ossowski to the use of KPM's trade secrets and confidential information by himself or any other party. Accordingly, Ossowski's motion to dismiss is *granted* as to Counts I, II, III, IV, VI, VIII, and IX.

*2. Breach of Contract (Count VI)*

KPM alleges that Ossowski's current employment with Blue Sun breaches his April 10, 2019 Non-Competition, Non-Solicitation and Confidentiality Agreement with KPM. (Docket No. 1-5). Unlike Glenister, Lucas, and Israelson's agreements, Ossowski's contract contains materially different terms and is governed by Massachusetts law.

As KPM appeared to concede at the hearing, Ossowski's Agreement violates the Massachusetts Noncompetition Agreement Act, M. G. L. c. 149, § 24L. The Act sets out eight requirements for a noncompetition agreement to be legally binding: Ossowski's Agreement violates the first and seventh conditions. The first requirement mandates that the agreement "expressly state that the employee has the right to consult with counsel prior to signing." *Id.* § 24L(b)(i). The seventh requirement mandates that the agreement be supported by "a garden leave clause or other mutually-agreed upon consideration between the employer and the employee." *Id.* § 24L(b)(vii). Ossowski's agreement does not expressly state that Mr. Ossowski has the right to consult with counsel prior to signing, and it does not contain a garden leave clause or another mutually agreed upon form of consideration. *Id.*

Ossowski's motion to dismiss Count VI is *granted*.

## Conclusion

For the reasons set forth above:

- Corporate Defendants' motion to dismiss (Docket No. 20) for lack of personal jurisdiction is ***denied***; their motion to dismiss for failure to state a claim is also ***denied*** except as to the claim for unjust enrichment (Count IX), which is ***granted***.
- Robert Gajewski's motion to dismiss (Docket No. 27) is ***denied in part and granted in part***.
- Michelle Gajewski's motion to dismiss for improper venue (Docket No. 25) is ***granted***.
- Rachael Glenister's motion to dismiss (Docket No. 29) ***is denied in part and granted in part.***
- Arnold Eilert's motion to dismiss (Docket No. 23) is ***denied in part and granted in part.***
- Gregory Israelson's motion to dismiss (Docket No. 31) is ***granted.***
- Irvin Lucas' motion to dismiss (Docket No. 33) is ***denied in part and granted in part***.
- Philip Ossowski's motion to dismiss (Docket No. 35) is ***granted***.

**SO ORDERED.**

***/s/ Timothy S. Hillman***
**TIMOTHY S. HILLMAN**
**DISTRICT JUDGE**

**Appendix**

| Corporate Defendants | | |
|---|---|---|
| **Count** | **Claim** | **Order** |
| | 12(b)(2) - Personal Jurisdiction | Deny |
| I | Defend Trade Secrets Act | Deny |
| II | Misappropriation of Trade Secrets | Deny |
| VII | Tortious Interference w/ Contr. Rel. | Deny |
| VIII | Conversion | Deny |
| IX | Unjust Enrichment | Grant |
| X | M. G. L. c. 93A, § 11 | Deny |

| Robert Gajewski | | |
|---|---|---|
| **Count** | **Claim** | **Order** |
| I | Defend Trade Secrets Act | Deny |
| II | Misappropriation of Trade Secrets | Deny |
| III | Breach of Contract | Deny |
| IV | Good Faith and Fair Dealing | Deny |
| V | Duty of Loyalty | Deny |
| VIII | Conversion | Deny |
| IX | Unjust Enrichment | Grant |

| Michelle Gajewski | | |
|---|---|---|
| **Count** | **Claim** | **Order** |
| I | Defend Trade Secrets Act | Grant |
| II | Misappropriation of Trade Secrets | Grant |
| III | Breach of Contract | Grant |
| IV | Good Faith and Fair Dealing | Grant |
| V | Duty of Loyalty | Grant |
| VIII | Conversion | Grant |
| IX | Unjust Enrichment | Grant |

| Arnold Eilert | | |
|---|---|---|
| **Count** | **Claim** | **Order** |
| I | Defend Trade Secrets Act | Deny |
| II | Misappropriation of Trade Secrets | Deny |
| III | Breach of Contract | Deny |
| IV | Good Faith and Fair Dealing | Deny |
| V | Duty of Loyalty | Deny |
| VIII | Conversion | Grant |
| IX | Unjust Enrichment | Grant |

**Rachel Glenister**

| Count | Claim | Order |
|---|---|---|
| I | Defend Trade Secrets Act | Deny |
| II | Misappropriation of Trade Secrets | Deny |
| III | Breach of Contract | Deny |
| IV | Good Faith and Fair Dealing | Deny |
| V | Duty of Loyalty | Deny |
| VI | Breach of Contract | Grant |
| VIII | Conversion | Deny |
| IX | Unjust Enrichment | Grant |

**Gregory Israelson**

| Count | Claim | Order |
|---|---|---|
| I | Defend Trade Secrets Act | Grant |
| II | Misappropriation of Trade Secrets | Grant |
| III | Breach of Contract | Grant |
| IV | Good Faith and Fair Dealing | Grant |
| V | Duty of Loyalty | Grant |
| VI | Breach of Contract | Grant |
| VIII | Conversion | Grant |
| IX | Unjust Enrichment | Grant |

**Irvin Lucas**

| Count | Claim | Order |
|---|---|---|
| I | Defend Trade Secrets Act | Deny |
| II | Misappropriation of Trade Secrets | Deny |
| III | Breach of Contract | Deny |
| IV | Good Faith and Fair Dealing | Deny |
| V | Duty of Loyalty | Deny |
| VI | Breach of Contract | Grant |
| VIII | Conversion | Deny |
| IX | Unjust Enrichment | Deny |

**Philip Ossowski**

| Count | Claim | Order |
|---|---|---|
| I | Defend Trade Secrets Act | Grant |
| II | Misappropriation of Trade Secrets | Grant |
| III | Breach of Contract | Grant |
| IV | Good Faith and Fair Dealing | Grant |
| V | Duty of Loyalty | Grant |
| VI | Breach of Contract | Grant |
| VIII | Conversion | Grant |
| IX | Unjust Enrichment | Grant |

Entered 5/17/23 @ 3:25 pm jml

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

KPM ANALYTICS NORTH AMERICA CORPORATION,
*Plaintiff.*

v.

BLUE SUN SCIENTIFIC, LLC, THE INNOVATIVE TECHNOLOGIES GROUP & CO., LTD., ARNOLD EILERT, ROBERT GAJEWSKI, RACHAEL GLENISTER, AND IRVIN LUCAS,

*Defendants.*

Civil Action No. 21-CV-10572-MRG

**CHARGE TO THE JURY**

**VERDICT FORM**

We, the jury, unanimously return the following verdict:

**PLAINTIFF KPM'S CLAIMS**

*Trade Secret Misappropriation Claims*

**Question 1**: Has KPM Analytics North America Corporation ("KPM") proven, by a preponderance of the evidence, that any of the following items constitute trade secrets under the Defend Trade Secrets Act and the Massachusetts Uniform Trade Secrets Act:

| | Yes | No |
|---|---|---|
| a. UCal software | ✓ | |
| b. Calibration datasets | ✓ | |
| c. Customer information | ✓ | |

*If you answered "Yes" to any of the above, continue to Question No. 2.*

*If you answered "No" to all of the above,* ***STOP****, and continue to Question No. 5.*

**Question 2**: Did KPM prove, by a preponderance of the evidence, that it took reasonable steps to preserve the secrecy of the item(s) that you identified as constituting trade secrets in **Question 1**?

✓ Yes ____ No

*If you answered "Yes," continue to Question No.3.*

*If you answered "No,"* ***STOP****, and continue to Question No. 5.*

**Question 3**: Did KPM prove, by a preponderance of the evidence, that Blue Sun, ITG, Arnold Eilert, Robert Gajewski, Rachael Glenister, Irvin Lucas, or any combination of the Defendants misappropriated any of the item(s) that you determined constituted a trade secret in **Question 1**?

*If so, please indicate who misappropriated which trade secret(s) by writing "Yes" in the appropriate boxes below. Please write in "No" where appropriate.*

| **Did Defendant...** | **Misappropriate UCal Software?** | **Misappropriate Calibration datasets?** | **Misappropriate Customer information?** |
|---|---|---|---|
| Blue Sun | yes | yes | yes |
| ITG | NO | NO | NO |
| Arnold Eilert | yes | yes | NO |
| Robert Gajewski | yes | yes | yes |
| Rachael Glenister | NO | NO | yes |
| Irvin Lucas | yes | yes | yes |

**Question 4**: For Defendants for whom you answered "Yes" in Question No. 3, what total sum of money do you find would fairly and reasonably compensate KPM for the damage caused by that Defendant's misappropriation of trade secrets.

Please write in the amount in dollars and cents (if any) in the space below.

As to Blue Sun (if applicable) $ 1.5m One million five hundred thousand

As to ITG (if applicable) $ 0 zero

As to Arnold Eilert: (if applicable) $ 2,500 Two thousand five hundred

As to Robert Gajewski: (if applicable) $ 15,000 fifteen Thousand

As to Rachael Glenister: (if applicable) $ 10,000 ten Thousand

As to Irvin Lucas: (if applicable) $ 20,000 twenty thousand

*Alleged Breach of Contractual Non-Disclosure Obligations*

**Question 5**: Did KPM prove, by a preponderance of the evidence, that any of the following is KPM's confidential information: names, addresses, contact persons, purchasing histories and prices, credit standing and other information relating to KPM's clients or prospective clients and their personnel; current, past, potential or prospective prices, costs, profits, markets, products, and innovations; business expansion plans, including business development; internal practices and procedures; trade secrets; technologies, developments, inventions or improvements; and any other information relating to the business of KPM or its clients, including, without limitation, information related to detection systems operating in the range from ultraviolet through infrared, and/or any similar or related products, inventions or improvements which employ discrete testing technology or any other detection systems either developed or acquired by KPM?

✓ Yes ____ No

*If you answered "Yes,", continue to Question No. 6.*

*If you answered "No", **STOP**, and continue to Question No. 8.*

**<u>Question 6</u>**: Did KPM prove, by a preponderance of the evidence, that Arnold Eilert, Robert Gajewski, Rachael Glenister, Irvin Lucas, or any combination of the Individual Defendants breached their Non-Disclosure Agreements by taking action with respect to any of the items that you determined to be KPM confidential information in **Question 5**?

As to Arnold Eilert: YES ✓ NO ____

As to Robert Gajewski: YES ✓ NO ____

As to Rachael Glenister: YES ✓ NO ____

As to Irvin Lucas: YES ✓ NO ____

*If you answered "Yes" to any of the above, continue to Question No. 7.*

*If you answered "No" to all of the above, **STOP**, and continue to Question No. 9.*

**<u>Question 7</u>**: Did KPM prove, by a preponderance of the evidence, that it suffered damages as a result of the breach(es) that you indicated in your answer to Question 5?

✓ Yes ____ No

*Alleged Violation of the Covenant of Good Faith and Fair Dealing*

**<u>Question 8</u>**: Did KPM prove, by a preponderance of the evidence, that Arnold Eilert, Robert Gajewski, Rachael Glenister, Irvin Lucas, or any combination of the Individual Defendants violated the implied covenant of good faith and fair dealing owed to KPM?

As to Arnold Eilert: YES ✓ NO ____

As to Robert Gajewski: YES ✓ NO ____

As to Rachael Glenister: YES ✓ NO ____

As to Irvin Lucas: YES ✓ NO ____

*Alleged Violation of the Duty of Loyalty*

**Question 9**: Did KPM prove, by a preponderance of the evidence, that any of the Individual Defendants owed KPM a duty of loyalty?

As to Arnold Eilert: YES ________ NO ✓

As to Robert Gajewski: YES ________ NO ✓

As to Rachael Glenister: YES ________ NO ✓

As to Irvin Lucas: YES ________ NO ✓

**Question 10**: Did KPM prove, by a preponderance of the evidence, that any of the Individual Defendants that owed KPM a duty of loyalty breached that duty?

As to Arnold Eilert: YES ________ NO ✓

As to Robert Gajewski: YES ________ NO ✓

As to Rachael Glenister: YES ________ NO ✓

As to Irvin Lucas: YES ________ NO ✓

*If you answered "Yes" to Question 6, Question 7, Question 8,* ***and/or*** *Question 10, please continue to Question No. 11.*

*If you answered "No" to Question 6, Question 7, Question 8* ***and*** *Question 10,* ***STOP****, and continue to Question No. 12.*

*Contract Damages*

**Question 11**: With respect to only those Individual Defendants for whom you answered "Yes" to Question Nos. 6, 7, 8, and/or 10, what total sum of money do you find would fairly and reasonably compensate KPM for the damage caused by those Individual Defendants' contractual breach(es)? Please write in the amount in dollars and cents (if any) in the space below.

As to Arnold Eilert: $ 2,500 two thousand five hundred
(if applicable)

As to Robert Gajewski: $ 15,000 fifteen thousand
(if applicable)

As to Rachael Glenister: $ 10,000 ten thousand
(if applicable)

As to Irvin Lucas: $ 20,000 twenty thousand
(if applicable)

*Alleged Tortious Interference with Contractual Relations*

**Question 12**: Did KPM prove, by a preponderance of the evidence, that either Blue Sun or ITG or both tortiously interfered with KPM's contractual relationships in a way or ways that caused KPM economic harm?

*Answering "Yes" below indicates a finding for KPM.*

*Answering "No" below indicates a finding for the Defendant(s).*

As to Blue Sun: YES ✓ NO ____

As to ITG: YES ✓ NO ____

*If you answered "Yes" to Question 12, continue to Question No. 13.*

*If you answered "No" to all of the above, **STOP**, and continue to Question No. 14.*

**Question 13**: What amount of money would fairly and reasonably compensate KPM for the economic harm that this tortious inference caused?

As to Blue Sun: $ 1.5m one million five hundred thousand
(if applicable)

As to ITG: $ 1.8m one million eight hundred thousand
(if applicable)

*Unfair and Deceptive Trade Practices (Chapter 93A)*

**Question 14**: Did KPM prove, by a preponderance of the evidence, that either Blue Sun or ITG or both engaged in any competition, or any attempt at competition, using unfair or deceptive acts or unfair methods of competition in the conduct of trade or commerce?

As to Blue Sun: YES ✓ NO ____

As to ITG: YES ✓ NO ____

*Answering "Yes" indicates a finding for KPM.*

*Answering "No" indicates a finding for Defendant(s).*

**Question 15**: Did KPM prove, by a preponderance of the evidence, that either Blue Sun or ITG or both willfully or knowingly engaged in unfair methods of competition or unfair or deceptive acts or practices?

As to Blue Sun: YES ✓ NO ____

As to ITG: YES ✓ NO ____

*Answering "Yes" indicates a finding for KPM.*

*Answering "No" indicates a finding for Defendant(s).*

*Two Individual Defendants' Counterclaims*

**Question 16**: Did Individual Defendant Arnold Eilert prove, by a preponderance of the evidence, that KPM had a contractual obligation to pay Mr. Eilert a severance payment after his employment at KPM concluded?

____ Yes ✓ No

*If you answered "Yes," continue to Question No. 17.*

*If you answered "No,", **STOP**, and continue to Question No. 19.*

**Question 17**: Did Individual Defendant Arnold Eilert prove, by a preponderance of the evidence, that KPM breached their contractual obligation to pay Mr. Eilert a severance payment after his employment at KPM concluded?

______ Yes ✓ No

*If you answered "Yes," continue to Question No. 18.*

*If you answered "No,", **STOP**, and continue to Question No. 19.*

**Question 18**: If you answered "Yes" to Question 17, what amount of money would fairly and reasonably compensate Mr. Eilert this breach of contract?

As to Arnold Eilert: $ ______________________
(if applicable)

**Question 19**: Did Individual Defendant Robert Gajewski prove, by a preponderance of the evidence, that KPM had a contractual obligation to pay Mr. Gajewski a severance payment after his employment at KPM concluded?

______ Yes ✓ No

*If you answered "Yes," continue to Question No. 20.*

*If you answered "No" to all of the above, **STOP**.*

**Question 20**: Did Individual Defendant Robert Gajewski prove, by a preponderance of the evidence, that KPM breached their contractual obligation to pay Mr. Gajewski a severance payment after his employment at KPM concluded?

______ Yes ______ No

*If you answered "Yes," continue to Question No. 21.*

*If you answered "No,", **STOP**.*

**Question 21**: If you answered "Yes" to Question 20, what amount of money would fairly and reasonably compensate Mr. Gajewski this breach of contract?

As to Robert Gajewski: $ ______________________
(if applicable)

**Foreperson Name (Please Print)**

Abigail Godbout

**Foreperson Signature:**

______________________

**Date Jury Reached Verdict:**

5/17/23

In reference to Question 12, is the third party other vendors such as postoer or is it the four named defendants?

alyúr Sutt

5/17/23
11:10
AM

jury has a verdict

Aljin Sito

5/17/23
2:45pm
JM



B

**Lake, Lauren E.**

| | |
|---|---|
| **From:** | ECFnotice@mad.uscourts.gov |
| **Sent:** | Thursday, April 4, 2024 3:52 PM |
| **To:** | CourtCopy@mad.uscourts.gov |
| **Subject:** | [EXTERNAL] Activity in Case 4:21-cv-10572-MRG KPM Analytics North America Corporation v. Blue Sun Scientific, LLC et al Order on Motion to Alter Judgment |

***Attention: This email was sent from someone outside of Gordon Feinblatt LLC. Always use caution when opening attachments or clicking links from unknown senders or when receiving unexpected emails.***

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
*****NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

**United States District Court**

**District of Massachusetts**

## Notice of Electronic Filing

The following transaction was entered on 4/4/2024 at 3:51 PM EDT and filed on 3/31/2024

| | |
|---|---|
| **Case Name:** | KPM Analytics North America Corporation v. Blue Sun Scientific, LLC et al |
| **Case Number:** | 4:21-cv-10572-MRG |
| **Filer:** | |
| **Document Number:** | 296(No document attached) |

**Docket Text:**

**District Judge Margaret R. Guzman: ELECTRONIC ORDER entered:**

**Regarding several of the pending post-trial motions in this case, the Court rules as described below. By April 10, 2024, the Court will issue an Omnibus Memorandum explaining in full its reasoning and providing all related particulars. That a specific issue or objection is not raised here does not mean that the Court will not address it in its Omnibus Memorandum.**

**RULINGS**

**The Individual Defendants' motion to alter the judgment [DKT 251] is DENIED AS MOOT. The Corporate Defendants' motion to Alter/Amend the Judgment or, in the Alternative, for Remittitur [DKT 250] is DENIED IN PART AS MOOT and DENIED IN PART on the merits. The Individual Defendants' motion [DKT 251] and the Corporate Defendants' motion [DKT 250] are rendered partially and entirely moot because of the way that the Court has interpreted the**

**Verdict Form. Specifically, the Court interprets the Verdict Form such that the Jury awarded the following total amounts as compensatory damages:**

**Blue Sun $1,500,000; ITG $1,800,000; Robert Gajewski $15,000; Arnold Eilert $2,500; Rachael Glenister $10,000; Irvin Lucas $20,000.**

**Plaintiff's Motion for a Finding of Willful and Malicious Trade Secret Misappropriation and for Exemplary Damages [DKT 255] is GRANTED IN PART. Specifically, the Court finds that Blue Sun and each of the Individual Defendants willfully and maliciously misappropriated those KPM trade secrets that the jury found they had misappropriated. [DKT 230, p.2]. In terms of exemplary damages, the Court, in its discretion, declines to assess any exemplary damages against Blue Sun, particularly in light of the Court's Chapter 93A-related determinations (explained below). The Court assesses exemplary damages in an amount equal to 50% of the compensatory damages awarded against Mr. Irvin Lucas and Mr. Robert Gajewski. Otherwise stated, Mr. Irvin Lucas is assessed $10,000 in exemplary damages and Mr. Gajewski is assessed $7,500 in exemplary damages. The Court, in its discretion, will not assess any exemplary damages against either Mr. Arnold Eilert or Ms. Rachael Glenister.**

**Plaintiff's Motion for Entry of Judgment in their Favor on its Chapter 93A Claims and For Prejudgment Interest [DKT 252] on All Counts is GRANTED IN PART. Specifically, the Court has, in its discretion, decided to apply the Jury's findings relative to Questions 14 and 15 on the Verdict Form. [DKT 230, p. 7]. Further, the Court will assess double 93A damages against ITG and Blue Sun's respective compensatory damages figures; such that ITG is liable for a total of $3,600,000 (not including any possibly applicable attorney's fees/costs) and Blue Sun is liable for $3,000,000 (not including any possibly applicable attorney's fees/costs). The Court, as it signaled it would during a post-trial hearing, declined to consider evidence of alleged violations of this Court's preliminary injunction that were not addressed at trial. The Court also grants, in part, KPM's request for prejudgment interest.**

**Plaintiff's Motion for a Permanent Injunction [DKT 257] is GRANTED IN PART. The resulting Permanent Injunction Order will follow in due course and its terms will be informed, in part, by the submission that the parties will send to the Court. This submission was discussed during last week's hearing. [DKT 294]. Notably, the Permanent Injunction will apply to ITG as well as to the other Defendants. The Permanent Injunction Order will also bear an effective date on which it will come into immediate effect.**

**The Court requests that the parties confer with Clerk Castles regarding scheduling a remote videoconference to resolve KPM's Motion for Attorney Fees and Costs [DKT 259] as well as any other issues that the parties wish to raise in light of the Court's orders issued today. This hearing should be scheduled for a date after the issuance of the Courts Omnibus Memorandum, which, as noted, will issue by April 10, 2024. (Castles, Martin)**

**4:21-cv-10572-MRG Notice has been electronically mailed to:**

Christopher R. O'Hara cohara@toddweld.com, jmcgonagle@toddweld.com

William L. Prickett wprickett@seyfarth.com, 6308209420@filings.docketbird.com, bosdocket@seyfarth.com, mviglas@seyfarth.com

Robert S. White rsw@bourgeoiswhite.com, rsw@bw.legal

Case 25-10998 Doc 118-4 Filed 08/19/25 Page 163 of 268

John T. Gutkoski jgutkoski@sunsteinlaw.com, jcreedon@sunsteinlaw.com, sramsdell@sunsteinlaw.com

Scott R. Magee smagee@morse.law

Dawn M. Mertineit dmertineit@seyfarth.com, 8893710420@filings.docketbird.com, bosdocket@seyfarth.com, goleary@seyfarth.com

George Faulkner Ritchie, IV gritchie@gfrlaw.com, alazo@gfrlaw.com, choran@gfrlaw.com, phenderson@gfrlaw.com

Maria T. Davis mdavis@toddweld.com, shatzisaroglou@toddweld.com

Dallin R. Wilson drwilson@seyfarth.com, 7416035420@filings.docketbird.com, BOSdocket@seyfarth.com, LIRusso@seyfarth.com

Paige K. Zacharakis pzacharakis@morse.law

Kevin R. Mosier kmosier@sunsteinlaw.com, fpena@sunsteinlaw.com

Craig Royal rcraig@gfrlaw.com

Lauren Lake llake@gfrlaw.com

**4:21-cv-10572-MRG Notice will not be electronically mailed to:**

Michael A. Kippins
Lawyers for Civil Rights
61 Batterymarch Street
Boston, MA 02110

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KPM ANALYTICS NORTH AMERICA CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>BLUE SUN SCIENTIFIC, LLC, THE INNOVATIVE TECHNOLOGIES GROUP & CO., LTD., ARNOLD EILERT, ROBERT GAJEWSKI, RACHAEL GLENISTER, AND IRVIN LUCAS,<br><br>Defendants. | Civil Action No.<br>21-10572-MRG |

**GUZMAN, D.J.**

**MEMORANDUM & ORDER**

## I. INTRODUCTION

Following a nine-day jury trial, five post-trial motions are presently before the Court. The Court will first address the Defendants' motions -- of which there are two. Blue Sun Scientific, LLC, ("Blue Sun") and The Innovative Technologies Group & Co., LTD. ("ITG") (collectively, the "Corporate Defendants") have filed a motion to alter or amend the judgment or, alternatively, for remittitur. For their part, Arnold Eilert, Robert Gajewski, Rachael Glenister, and Irvin Lucas (collectively, the "Individual Defendants") have filed a motion to alter judgment.

The Court will then turn to Plaintiff KPM Analytics North America Corporation's ("Plaintiff" or "KPM") three pending motions. KPM has moved for: (1) a finding of willful and malicious trade secret misappropriation and exemplary damages, (2) a judgment in its favor on

its Massachusetts General Law Ch. 93 § 11 ("93A") claims and for prejudgment interest on all counts, and (3) a permanent injunction.[1]

## II. RELEVANT BACKGROUND

At this late stage of the case, both the Court and parties are well-acquainted with the facts. Prior sessions of this Court have provided detailed factual findings, including at the preliminary injunction stage, [ECF No. 94]; [ECF No. 119], and at the summary judgment stage [ECF No. 165]. However, the Court will nevertheless provide an abbreviated recitation of certain key facts as well an accounting of the outcome at trial before turning to the parties' post-trial motions.

### a. Abbreviated Factual Background

Plaintiff KPM is a Massachusetts-based corporation. Its Unity Scientific division[2] manufactures and sells machines known as called Near Infrared ("NIR") analyzers. These devices "measure the diffraction of light to determine the chemical composition of common substances found in consumer products, such as the amount of moisture, oil or protein in flour, agricultural ingredients, chocolate, or processed foods." [ECF No. 119, p. 2] (citation omitted). These analyzers have a variety of research and industrial uses, and they offer users a relatively affordable and efficient way to perform on-demand, rapid quality control testing of various substances. An alternative to using these devices would be to perform wet chemistry on the testable substances, but that can be expensive in terms of time and money.

[1] The Court has already informed the parties that the Court will hear argument regarding KPM's motion for attorneys' fees and costs [ECF No. 259] at an upcoming motion hearing. For a list of those other issues about which the Court will hear oral argument during this upcoming hearing, please see Section VI of this Memorandum and Order.

[2] Throughout, any reference to Unity is a reference to KPM. This fact is undisputed.

In terms of its business model, KPM earns NIR analyzer-related revenue through both the sale of these devices and also through continuing service relationships with its customers. Evidence adduced at trial suggested that the lifecycle of these machines can be rather lengthy – somewhere between fifteen to twenty years. [ECF No. 240, p. 100:11-13]. The trial record also revealed that KPM's NIR analyzers, which it calls the "SpectraStars," sell for about $35,000 - $60,000 each and that KPM charges about $5,000 for each customer's annual service visit. KPM established at trial that it owned three species of trade secrets. Specifically, KPM proved that trade secret protection extended to its proprietary UCal software, its calibration datasets, and its customer information. [ECF No. 230, p. 1].

ITG is a Maryland-based corporation that has a long history with NIR analyzers. Its President and CEO, Robert Wilt ("Wilt") founded the company in 1996. ITG founded the Unity business which designed and manufactured the machines that are predecessors to the SpectraStars. In 2008, ITG sold its partial interest in Unity -- and along with its related patents -- to a company called Westco Scientific. In 2015, "[t]hrough several corporate transactions, Westco became KPM." [ECF No. 119]. After being away from the NIR analyzer market for several years, ITG decided to re-enter the NIR analyzer market around the same time, when it began selling a machine it called the "M5."

In 2018, a KPM sales employee named Irvin Lucas "Lucas" approached Wilt about possibly working together. This partnership culminated in ITG incorporating Blue Sun -- also a Maryland-based corporation -- on July 2, 2018. Lucas concealed from KPM the fact that he was working simultaneously for KPM and its new direct competitor, Blue Sun. Blue Sun rebranded ITG's M5 machines under the name "Phoenix" and it became ITG's sales arm.

Lucas left KPM's employ on May 17, 2019. However, before he had even left KPM, he began surreptitiously maneuvering to Blue Sun's benefit. By way of just one example, he began to recruit KPM-affiliated individuals and employees, such as Robert Gakewski ("Gajewski"), to join and/or materially assist Blue Sun. Gajewski later became a secret Blue Sun employee, too -- until KPM found out and terminated him in April of 2021. It was later discovered that Gajewski, who had a technical background, had been, among other things, diverting customers away from KPM and towards Blue Sun and had also been using certain of KPM's trade secrets while acting on behalf of Blue Sun. Notably, the secret Blue Sun network relied on a set of pseudonymic e-mail addresses designed to keep the owner of the email account's true name concealed.

Lucas recruited several other KPM employees to join Blue Sun, including among them Rachel Glenister ("Glenister") and Arnold Eilert ("Eilert"). Lucas had first approached Glenister, a KPM sales representative sometime in 2018-2019 timeframe, and Glenister was a secret Blue Sun employee prior to her departure from KPM in July 2020. Trial evidence revealed that before she left, Glenister had exploited a number of opportunities to strengthen her future full-time employer while weakening her current one. Eilert, for his part, was another technical KPM employee that Lucas had approached and recruited. Eilert accepted a position at Blue Sun in December of 2020. When he resigned from KPM, his stated reason was that he was going to work full-time on his family's farm. However, very soon after joining Blue Sun, Eilert began to reach out directly to KPM customers in an effort to lure their business to his new employer. He also used KPM's trade secrets in performing work on behalf of Blue Sun.

Notably, every KPM employee -- and each of the Individual Defendants -- had signed KPM non-disclosure agreements designed to ensure that they did misappropriate any of KPM's confidential information.

One final preliminary factual issue is worth noting. In the lead-up to this litigation, Blue Sun changed e-mail providers and migrated its emails from GSuite (i.e., Gmail) to a service called Zoho. As Judge Hillman found during the preliminary injunction stage, this e-mail migration resulted in "GSuite ***delete[ing] emails*** sent or received from Eilert (don@bluesunscientific.com), Gajewski (rob@bluesunscientific.com), and a third former KPM employee's accounts before March 5, 2021." [ECF No. 93, p. 14]. At the preliminary stage, Judge Hillman imposed a "modest adverse inference" against Blue Sun for this spoilation of evidence. Testimony regarding this spoilation of evidence was also adduced at trial. See, e.g., [ECF No. 31:11-24].

**b. Outcome at Trial**

On May 17, 2023, following a nine-day trial, the jury returned a verdict that was mostly in favor of KPM. [ECF No. 230]. Specifically, the jury found that each of the Individual Defendants and Blue Sun had misappropriated at least some of KPM's trade secrets. [ECF No. 230, p. 2]. The jury did not find that ITG had misappropriated any trade secrets, however. [Id.] Further, the jury found that each of the Individual Defendants violated their non-disclosure agreements with KPM and that they also violated the implied covenant of good faith and fair dealing. [Id. at 4]. However, the jury did not find that any of the Individual Defendants owed or violated any duty of loyalty to KPM. [Id. at 5]. The jury further found that both Blue Sun and ITG tortiously interfered with KPM's contractual relationships. [Id. at 6]. And, as described in more detail below, the jury found that both Blue Sun and ITG engaged in unfair or deceptive practices -- and that both did so willfully or knowingly. [Id. at 7]. The jury rejected Eilert and Gajewski's counterclaims, which were premised on the argument that KPM had breached its

contractual obligations by not paying them severance upon their departures from the company. [Id. at 7-8].

The jury awarded compensatory damages against those Defendants that were found liable. The exact amounts awards that the jury awarded are the subject of the following section regarding the Court's interpretation of the verdict form.

## III. INTERPRETATION OF THE VERDICT FORM

Before turning to the parties' motions, the Court will first explain how it has interpreted the jury's completed verdict form with respect to the money damages awarded. [ECF No. 230]. Given the complexity of the case and the claims-at-issue, the Court determined before trial that a detailed verdict form asking the jury to engage in step-by-step fact-finding would be most appropriate. See, e.g., Geffon v. Micrion Corp., 76 F. Supp. 2d 134, 143 (D. Mass. 1999) (explaining, in the context of a "complex" class action securities fraud case that, "[u]sing a Verdict Form requiring answers to a series of separable questions enables the court to break apart the total array of instructions into more easily understood parts"). To that end, the Court crafted a comprehensive nine-page verdict form. In accordance with the Court's instructions, the jury fully completed the verdict form.

At least with respect to the post-trial motions presently before the Court, the parties have, collectively, only raised one issue with respect to the verdict form. Specifically, they have pointed out that one interpretation of the verdict form would indicate that the jury intended to award compensatory damages against Blue Sun and each of the Individual Defendants twice -- in identical amounts. However, as explained below, the Court finds that this would be an erroneous interpretation of the verdict form. Although all parties seem to agree that the Court's interpretation is correct, the Court has an obligation to explain its final determination regarding

the jury's compensatory damages awards here -- especially because this finding bears on the analysis of multiple of the parties' motions.

As a general rule, if a party "raises a potential inconsistency in the verdict after the jury has been discharged, the court has an obligation to attempt to harmonize that potential inconsistency if it is possible under a fair reading of the verdict form." Perez v. Cnty. Of Rensselaer, No. 1:14-CV-950, 2020 U.S. Dist. LEXIS 27849, at *6-7 (N.D.NY. Feb. 19, 2020) (citations and internal quotations omitted). This obligation to harmonize "***seemingly*** inconsistent answers," if possible, arises under the Seventh Amendment to the U.S. Constitution. See, e.g., Pinasco v. California, No. CIV S-09-0777 KJM CKD, 2012 U.S. Dist. LEXIS 70767, at *4-5 (E.D. Cal. May 19, 2012) (emphasis added and internal quotations omitted).

Here, the only *seeming* inconsistency lies in the fact that the jury was asked the write how much each Defendant that was found liable under certain counts owed in compensatory damages in more than one place on the verdict form. See [ECF No. 230, pp. 3, 5-6]. Both the Corporate Defendants and the Individual Defendants initially interpreted this fact as suggesting that they might somehow be held liable for a combined total of the individual amounts listed next to their personal and/or corporate names throughout the verdict form -- as opposed to being liable for one total amount, which just happened to be written more than once. [ECF No. 250, p. 3 (Corporate Defendants arguing that "[t]he Court [s]hould [a]lter or [a]mend the [a]wards to [e]liminate [d]ouble [c]ounting [a]gainst Blue Sun . . .")]; [ECF No. 251, p. 1 (Individual Defendants moving to amend (their initial understanding of) the jury verdict against them because "the jury improperly awarded [KPM] damages twice for the same harm")].

Here, it is easy to harmonize the *seemingly* inconsistent answers contained within the jury's verdict form. Notwithstanding the fact that the jurors wrote the same damages number

twice, the Court finds that they jury intended for the Individual Defendants and the Corporate Defendants to be liable -- *at least in terms of compensatory damages* -- as follows:

| ***Defendant*** | ***Amount Liable (Compensatory Damages Only)*** |
|---|---|
| Blue Sun | $1,500,000 |
| ITG | $1,800,000 |
| Robert Gajewski | $15,000 |
| Arnold Eilert | $2,500 |
| Rachael Glenister | $10,000 |
| Irvin Lucas | $20,000 |

Indeed, KPM has rightly pointed out that these are the amounts that they are owed in terms of compensatory damages under a fair reading and have wisely not tried to pursue a double recovery of compensatory damages under what would be an erroneous reading of the verdict form. [ECF No. 283, p. 92:2-5 (counsel for KPM stating at oral argument, “I can confirm that [KPM] is not seeking to double count . . . the damages awarded by the jury against the defendants”)].

Accordingly, the Court concludes that the jury did not intend for there any “double-counting” in terms of compensatory damages, and that, consequently, the jury intended for the total compensatory damages owed by each Defendant to be in the amounts owed listed in the table above.

## IV. DEFENDANTS’ MOTIONS

### a. Corporate Defendants’ Motion to Alter Judgment or, in the Alternative, For Remittitur [ECF No. 250]

In their motion to alter or amend the judgment or, alternatively, for remittitur, the Corporate Defendants advance two, related arguments -- both under the banner of Federal Rule of Civil Procedure 59(e) (“Rule 59(e)”). First, they argue that, as alluded to above, the jury impermissibly “double-counted” in its compensatory damages findings and that, therefore, the

Court should amend the judgment accordingly. [ECF No. 250, pp. 3-5]. Secondly and alternatively, they argue that in any case, the Court should exercise its discretion and remit the compensatory damages award *against ITG* down from $1,800,000 to $1,248,127 in compensatory damages -- essentially on the basis that no rational jury could have assigned $1,800,000 in compensatory damages against it. [Id. at p. 6].

**i. Legal Standard**

A motion to alter or amend a judgment under Rule 59(e) "must be filed no later than 28 days after the entry of the judgment." Fed. R. Civ. P. 59(e). The Court may grant a Rule 59(e) motion "if the movant presents (1) new evidence not previously available; (2) an intervening change in controlling law; or (3) the need to correct a clear error of law or to prevent manifest injustice." Storie v. Household Int'l, Inc., No. 03-40268-FDS, 2005 U.S. Dist. LEXIS 40292, at *11 (D. Mass. Sept. 22, 2005) (citing Hayes v. Douglas Dynamics, Inc., 8 F.3d 88, 90 n.3 (1st Cir. 1993)). As the First Circuit has explained, the discretion to grant Rule 59(e) relief "must be exercised with considerable circumspection" since "revising a final judgment is an extraordinary remedy and should be employed sparingly." Ira Green, Inc. v. Military Sales & Serv. Co., 775 F.3d 12, 28 (1st Cir. 2014) (citation omitted).

A party seeking remittitur under a Rule 59(e) motion "bears a heavy burden of showing that an award is grossly excessive, inordinate, shocking to the conscience of the court, or so high that it would be a denial of justice to permit it to stand." Sánchez v. Foley, 972 F.3d 1, 17 (1st Cir. 2020) (citations omitted). Indeed, before a district court in this Circuit can remit a jury's damages award, there must be a finding that the award exceeds "any rational appraisal or estimate of the damages that could be based upon the evidence before it." Climent-García v. Autoridad de Transporte Marítimo y las Islas Municipio, 754 F.3d 17, 21 (1st Cir. 2014) (citation

omitted). Remittitur is inappropriate "if the court merely perceives that the award is extremely generous or the damages are considerably less." Arborjet, Inc. v. Rainbow Treecare Sci. Advancements, Inc., 187 F. Supp. 3d 217, 225-26 (D. Mass. 2016) (citation and internal quotations omitted).

When damages experts testify, juries are not mechanically bound by their estimates. See, e.g., Fredette v. Allied Van Lines, 66 F.3d 369, 373, 373 n.2 (1st Cir. 1995) (explaining that "the jury can depart upward, as well as downward, from the opinion of the expert" and citing approvingly to a Wisconsin state appellate court's statement of the rule that "the jury is not bound by an expert's estimate of damages") (citation omitted); Cal-Agrex, Inc. v. Van Tassell, 258 F.R.D. 340, 349 (N.D. Cal. 2009) ("[t]he jury is not bound to accept the bottom line provided by any particular damages expert, but the jury is bound to follow the law") (citation omitted). Rather than being bound by a damages expert's bottom-line figure, the jury is "free to select the highest figures for which there is adequate evidentiary support, as long as the figure remains in the universe of acceptable awards." Am. Steel Erectors, Inc. v. Local Union No. 7, Int'l Ass'n of Bridge, Structural, Ornamental & Reinforcing Iron Workers, 815 F.3d 43, 58 (1st Cir. 2016) (internal citations and quotations omitted).

**ii. Application**

As a threshold matter, the Corporate Defendants' motion is technically premature. As the Corporate Defendants rightly pointed out, a final judgment had not yet entered when they filed their Rule 59(e) motion. [ECF No. 250, p. 3 n. 2]. Plaintiff did not oppose the motion on the grounds that it was untimely. Although the Court could decline to reach merits of the Corporate Defendants' Rule 59(e) motion, it concludes that judicial efficiency favors considering the merits of the motion today. See, e.g., Hilst v. Bowen, 874 F.2d 725, 726 (10th Cir.

1989) ("[a]lthough Rule 59 motions are to be served not later than ten days after entry of judgment, courts and commentators generally agree that this ten-day limit sets only a maximum period and does not preclude a party from making a Rule 59 motion before a formal judgment has been entered"); Kersey v. Dennison Mfg. Co., 3 F.3d 482, 485 n.7 (1st Cir. 1993) (concluding that although "premature," a party's Rule 59(e) motion was not untimely even though a final judgment had not yet entered) (citing 11 Charles Wright & Arthur Miller, Federal Practice and Procedure § 2812, at 81-82, 81 n.44 (1973 & Supp. 1993)).

Turning to the merits, the Court concludes that to the extent that the motion seeks to prevent any "double-counting" of the compensatory damages that the jury awarded vis-à-vis the Corporate Defendants, the motion is **DENIED AS MOOT** in light of the Court's aforementioned determinations regarding its interpretation of the verdict form.

A simple reduction based on the now-mooted double-counting issue is not all that the Corporate Defendants seek with their motion, however. Corporate Defendants also ask this Court to remit the jury's compensatory damages award relative to ITG (i.e., $1,800,000) principally on the basis that the Plaintiff's trial damages expert -- Mr. Neil Zoltowski -- had testified at trial that his calculations showed that, among many other things, ITG had "unjustly . . . received . . . additional profits" of $1,143,127. [ECF No. 241, p. 8:6-12]. In the Corporate Defendant's view, KPM's damages expert's figure constituted a firm, upper ceiling above which the jury was not allowed to assign compensatory damages against ITG. [ECF No. 250, p. 5] (Corporate Defendants arguing that "[since] Mr. Zoltowski's damage calculations derived from the entirety of ITG's machine sales to Blue Sun -- there was no additional 'unjust enrichment' from which the jury could derive nearly $700,000 in additional damages").

This argument is unavailing and the Court declines to remit the jury's compensatory damages award against ITG. As a threshold matter, the Corporate Defendants have not directed the Court to any new evidence not previously available, any intervening change in the controlling law, or the need to correct clear error or prevent manifest injustice. See Storie, 2005 U.S. Dist. LEXIS 40292 at *11. Instead, they contend that the jury's verdict constituted "manifest error[]" because its compensatory damages award against ITG exceeded the bottom line estimate proffered by KPM's damages expert. [ECF No. 250, p. 5]. This argument is unavailing.

First, the jury was not mechanically bound to stay within the range of Mr. Zoltowski's damages estimates. See, e.g., Fredette, 66 F.3d at 373 n.2. Indeed, the Corporate Defendants have cited no legal authority for this proposition. Accordingly, it is incorrect to say that simply because the compensatory damages award against ITG exceeded Mr. Zoltowski's damages estimate, it necessarily follows that the award must be remitted.

Instead, the proper question for this Court is whether the compensatory damages award against ITG exceeds "*any rational appraisal or estimate of the damages* that could be based upon the evidence before it." See Climent-García, 754 F.3d at 21. It is the Court's considered opinion that there was ample evidence in the trial record from which the jury could have rationally concluded that ITG owed KPM $1,800,000 in compensatory damages. Just by way of example, the Court notes that the very damages expert whose testimony the Corporate Defendants have put at issue in their remittitur motion had opined that the "total amount of damages available against [the Corporate Defendants] for tortious interference" was "$3,426,792," which is actually *more* than the grand total of all compensatory damages awarded against both ITG and Blue Sun (i.e., $3,300,000). [ECF No. 241, p. 19:8-10].

Notwithstanding the Corporate Defendants' argument that the compensatory damages award against ITG was "either irrational" or "impermissibly designed to punish ITG," the jury learned the undisputed fact at trial that Blue Sun is a wholly-owned subsidiary of ITG, and that ITG subsumes 65% of all Blue Sun's analyzer sales revenue. [ECF No. 240, p. 102:4-8] (ITG President and CEO Robert Wilt stating that ITG receives 65% "of the price that [Blue Sun] sell[s] the instrument[s] for"). Accordingly, it was not irrational for the jury to assign a higher total compensatory damages figure to ITG than to Blue Sun. In fact, in terms of sheer arithmetic, ITG's portion of the total compensatory damages awarded against the Corporate Defendants is only approximately 54.5%, more than 10% less than the jury could have assigned if it had chosen to be guided purely by the framework of the Corporate Defendants' distributor relationship. In sum, the Corporate Defendants have not met their "heavy burden" of demonstrating that the compensatory damages award against ITG is "grossly excessive, inordinate, shocking to the conscience of the court, or so high that it would be a denial of justice to permit it to stand." See Sánchez, 972 F.3d at 17. Accordingly, remittitur is unwarranted with respect to the Corporate Defendants and the Corporate Defendants' motion [ECF No. 250] is hereby **DENIED**.

**b. Individual Defendants' Motion to Alter or Amend the Judgment [ECF No. 251]**

The Individual Defendants have moved to amend or alter the judgment, as well. [ECF No. 251]. In their motion, they only ask the Court to amend the judgment to prevent the possibility of "double-counting." [Id. at p. 1]. Unlike the Corporate Defendants, they have not sought remittitur. [ECF No. 270, p. 1] (Individual Defendants writing that "[we] have not moved for remittitur…") Since the Individual Defendants only sought to have the compensatory damages amounts assessed against them set to the amounts that the Court has already determined flow from the correct reading of the verdict form, no further discussion of this motion is

necessary. Accordingly, the Individual Defendants' motion [ECF No. 270] is **DENIED AS MOOT**.

## V. PLAINTIFF'S MOTIONS

### a. KPM's Motion for a Finding of Willful and Malicious Trade Secret Misappropriation & Exemplary Damages [ECF No. 255]

With this motion, KPM asks the Court to find that Blue Sun and each of the Individual Defendants committed trade secret misappropriation that was "willful[] and malicious[]" within the meaning of the Defend Trade Secrets Act ("DTSA") and the Massachusetts Uniform Trade Secrets Act ("MUTSA"). 18 U.S.C. § 1836(b)(3)(C); Mass. Gen. Laws ch. 93, § 42B(b). If the Court makes any such predicate findings, it may then, in its discretion, assess against any such defendant(s) exemplary (i.e., punitive) damages in an amount not to exceed twice the applicable compensatory damages award, as well as reasonable attorney's fees and costs. 18 U.S.C. § 1836(b)(3)(D); Mass. Gen. Laws ch. 93, § 42B(b); Mass. Gen. Laws ch. 93, § 43C. Blue Sun and the Individual Defendants have opposed this motion -- first on the ground that their given acts of trade secret misappropriation were not "willful and malicious," and, alternatively, that even if their trade secret misappropriation was "willful and malicious," the Court should nevertheless not assess any exemplary damages, reasonable attorney's fees or costs against any of them.

#### i. Preliminary Points

Three preliminary points are in order. First, the Court will not depart from the jury's verdict that Blue Sun and each of the Individual Defendants misappropriated certain of KPM's trade secrets. [ECF No. 230, p. 2]. Second, throughout its "willful and malicious" analysis, the Court will, as the jury was asked to do, consider the conduct of Blue Sun and each of the Individual Defendants separately.

Third, the Court rejects Blue Sun and the Individual Defendants' contention that the Court has already ruled on this issue. [ECF No. 263, pp. 4-5]. In their opposition to KPM's motion, they devote nearly two pages to arguing that the Court had previously determined that their trade secret misappropriation was not willful and malicious. [Id.]. This argument is incorrect for three different reasons.

First and most fundamentally, nowhere in the quoted language (or elsewhere) did the Court rule on this question. Secondly, the entire discussion-at-issue occurred *before* the end of the trial and before the jury had even determined that any trade secret misappropriation had occurred; a predicate for any factfinder -- the Court or otherwise -- being able to find that any such misappropriation was willful and malicious. Third, all of the quoted language arose in the context of a charge conference, where the issue was not whether Blue Sun and/or any of the Individual Defendants had willfully and maliciously misappropriated any trade secrets, *but whether KPM was entitled to a willful and malicious-related jury instruction.* The question of whether to give a certain jury instruction is entirely different from the question now before the Court. Accordingly, the Court finds that it has not ruled on the present issue and that it now stands ripe for decision.

**ii. Legal Standard – "Willful and Malicious"**

Since Plaintiff's motion asks this Court to determine whether any of the trade secret misappropriation that occurred in this case was "willful[] and malicious[]" within the meaning of the federal and state trade secrets statutes, a discussion of the relevant legal standard must necessarily begin with some commentary about those statutes themselves. 18 U.S.C. § 1836(b)(3)(C); Mass. Gen. Laws ch. 93, § 42B(b).

First, both the DTSA and the MUTSA are relatively new -- with the former having become law in 2016 and the latter having become law in 2018. Second, both statutes are based on the same model statute -- the Uniform Trade Secrets Act ("UTSA") -- which was written by the Uniform Law Commission. See AirFacts, Inc. v. de Amezaga, No. DKC 15-1489, 2022 U.S. Dist. LEXIS 224367, at *39 n.14 (D. Md. Dec. 12, 2022) (explaining that the Uniform Law Commission drafted the UTSA); Calendar Research LLC v. StubHub, Inc., No. 2:17-cv-04062-SVW-SS, 2017 U.S. Dist. LEXIS 222745, at *6 (C.D. Cal. Aug. 16, 2017) ("[t]he DTSA was modeled on the Uniform Trade Secrets Act . . ."); Neural Magic, Inc. v. Meta Platforms, Inc., No. 20-cv-10444-DJC, 2020 U.S. Dist. LEXIS 266048, at *2 (D. Mass. Oct. 29, 2020) ("Massachusetts adopted the MUTSA, its version of the Uniform Trade Secrets Act . . .").

Indeed, as courts within this District have recognized, these two statutes set out "substantially similar" standards relative to the misappropriation of trade secrets. Milliman, Inc. v. Gradient A.I. Corp., 651 F. Supp. 3d 438, 442 (D. Mass. 2023) ("[t]he standard for misappropriation under Massachusetts law is substantially similar to that under the DTSA") (citation omitted); Moog, Inc. v. ClearMotion, Inc., No. 1:19-cv-12066-IT, 2020 U.S. Dist. LEXIS 194913, at *20 (D. Mass. Oct. 21, 2020) (same).

A close reading of the specific, parallel provisions containing the phrase "willful[] and malicious[]" reveals that these provisions are substantially similar, as well. Compare 18 U.S.C. § 1836(b)(3)(C) with Mass. Gen. Laws ch. 93, § 42B(b). Given that the DTSA and the MUTSA share the common DNA of the Uniform Trade Secrets Act; have been found to be generally substantially similar; and because the specific provisions-at-issue are similar, as well, the Court need only and will only conduct one "willful[] and malicious[]" inquiry.

The DTSA does not define the phrase "willful[] and malicious[]," nor does it independently define the terms "willful" or "malice". As a general principle, "courts typically look to the state UTSA when interpreting the DTSA inasmuch as the two are substantively identical." Trent P. Fisher Enters., LLC v. SAS Automation, LLC, No. 3:20-cv-216, 2021 U.S. Dist. LEXIS 62914, at *16 (S.D. Ohio Mar. 31, 2021). Since it is well-established that the DTSA and the MUTSA are substantially similar, the Court could certainly apply the MUTSA's definition of "willful and malicious," but the state statute neither defines that phrase nor defines the terms "willful" or "malice." Accordingly, this Court must look elsewhere for guidance.

Permissible sources of that guidance can include, among other things, how the phrase "willful[] and malicious[]" is defined in other contexts under Massachusetts state laws, out-of-circuit case law, and legal treatises and legal dictionaries. See, e.g., Steves & Sons, Inc. v. Jeld-Wen, Inc., 988 F.3d 690, 726-27 (4th Cir. 2021) (considering the DTSA's lack of a definition of "malicious" and observing that, in similar circumstances, courts have looked to how the term "malice" was defined "in other contexts under the relevant state's laws"); Allstate Ins. Co. v. Fougere, No. 16-11652-JGD, 2021 U.S. Dist. LEXIS 253232, at *7 (D. Mass. Mar. 21, 2021) (considering the meaning of the phrase "willful and malicious" under DTSA and looking to out-of-state cases for guidance); Caudill Seed & Warehouse Co. v. Jarrow Formulas, Inc., 53 F.4th 368, 394 (6th Cir. 2022) (observing in a trade secrets case that "Kentucky's courts have looked to Black's Law Dictionary when defining 'willful and malicious injury'") (citation omitted).

As the Fourth Circuit observed in Steves & Sons, Inc., courts that have not had the benefit of a clear and controlling definition of willful and malicious have generally adopted one of two different approaches -- with the real difference of opinion relating to how to define the malice prong. 988 F.3d at 726-27. Some such courts have adopted what might be called the

"intent to cause injury or harm" standard, while others have adopted a standard that turns primarily on whether the trade secret misappropriating defendant showed a "conscious disregard for the rights of another." Id. (collecting cases). Compare Contour Design, Inc. v. Chance Mold Steel Co., No. 09-cv-451-JL, 2011 U.S. Dist. LEXIS 145321, at *36–41 (D.N.H. 2011), aff'd in part & rev'd in part, 693 F.3d 102 (1st Cir. 2012) (determining that the phrase "willful and malicious misappropriation" under New Hampshire's version of the UTSA "requires a finding that the defendant engaged in the acts of misappropriation with the intent to bring about their likely results and with ill will, hatred, hostility, ***or*** evil motive") (emphasis added and citations omitted)[3] with Macquarie Bank Ltd. v. Knickel, 793 F.3d 926, 940 (8th Cir. 2015) ("[w]e believe that the North Dakota Supreme Court would not define malice to require ill will, hatred, or intent to cause injury. . . . [A] conscious disregard of another's rights constitutes malice.").

Here, the Court has not identified any Massachusetts statutory or case law definition of "willful and malicious" that is sufficiently related to the trade secret misappropriation context to be instructive. Accordingly, the Court has reviewed a large set of out-of-jurisdiction cases and has determined that, as signaled by the Fourth Circuit in Steves & Sons, Inc., the apparent majority approach is to employ an "intent to injure"-type standard. See 988 F.3d at 726-27. Indeed, the leading trade secrets treatise adopts this approach in its plainly-worded and succinct definition of "willful and malicious" trade secret misappropriation:

> Under the UTSA, exemplary damages and attorneys' fees are available where the misappropriation was "willful," i.e., ***done with actual or constructive knowledge of its probable consequences***, and "malicious," i.e., ***done with intent to cause injury***. 1 MILGRIM ON TRADE SECRETS § 1.01[2][c][iv][C] (emphasis added and citations omitted).

[3] Incidentally, Blue Sun and the Individual Defendants repeatedly cite approvingly to the legal standard articulated in Contour throughout their opposition brief. [ECF No. 263]. For its part, KPM has argued that Contour supports findings of willful and malicious trade secret misappropriation in this case. [ECF No. 273, pp. 2-7].

This Court finds the above-cited treatise definition of "willful[] and malicious[]" in the context of trade secret misappropriation (the "Milgrim Definition") is the most appropriate definition available and therefore will adopt it as its own for use in its "willful[] and malicious[]" analysis.[4]

Relatedly, case law from courts that have embraced the "intent to injure standard" articulated in the Milgrim Definition at the post-trial stage constitutes helpful and persuasive authority here. See e.g., Contour, 2011 U.S. Dist. LEXIS 145321 at*36–41; Int'l Med. Devices, Inc. v. Cornell, No. 2:20-cv-03503-CBM, 2024 U.S. Dist. LEXIS 56663, at *20-22 (C.D. Cal. Mar. 28, 2024) (citing to California Supreme Court precedent for the proposition that "[m]alice may be proven either expressly by direct evidence probative of the existence ***of ill-will***, or by implication from indirect evidence") (emphasis added and citations omitted); Hair Club for Men, LLC v. Ehson, No. 1:16-cv-236, 2017 U.S. Dist. LEXIS 51370, at *6 (E.D. Va. Apr. 3, 2017) (citing to Supreme Court of Virginia precedent for the proposition that "[w]illful and malicious misappropriation is

[4] In that connection, the Court notes that imputing definitions of "willful" and/or "malicious" from too far outside of the trade secrets realm would be ill-advised since both of the trade secrets statutes-at-issue provide for a distinction between damages for misappropriation and damages for "willful[] and malicious[]" misappropriation.

For that distinction to make a meaningful difference, it follows that the applicable legal standard should be higher than in other, less analogous contexts and should be closer to a subjective intent to injure. See, e.g., Caudill Seed & Warehouse Co., 53 F.4th at 394 (explaining that definitions of "[w]illful and [m]alicious injury" from Black's Law Dictionary and elsewhere were "an ***awkward fit*** for trade-secret law" since "to find liability in a KUTSA [Kentucky Uniform Trade Secrets Act] case, a plaintiff must already establish intentional misappropriation. A plaintiff could thus argue that the court may award exemplary damages ***in every KUTSA case***: every businessperson presumably 'knows [it] to be his duty' that he should not steal a competitor's trade secrets.") (emphasis added and internal citations omitted).

acting consciously in disregard of another person's rights or acting with reckless indifference to the consequences, with the defendant aware, from his knowledge of existing circumstances and conditions, ***that his conduct probably would cause injury to another***") (emphasis added and citations omitted); Nucar Consulting, Inc. v. Doyle, No. 19756-NC, 2005 Del. Ch. LEXIS 43, at *49-50 (Del. Ch. Apr. 5, 2005) (considering the legal standard for willful and malicious trade secret misappropriation under the Delaware version of the UTSA and concluding that, "Delaware case law generally characterizes wil[l]fulness as an awareness, either actual or constructive, of one's conduct and a realization of its probable consequences, and malice ***as ill-will, hatred or intent to cause injury***") (emphasis added and citations omitted); Highland Consulting Grp., Inc. v. Soule, 19-CV-81636, 2024 U.S. Dist. LEXIS 22722, at *26 (S.D. Fla. Feb. 8, 2024) (finding that the defendant had willfully and maliciously misappropriated the plaintiff's trade secrets under "any of the possible civil legal standards").

Now that the Court has determined that it will apply the Milgrim Definition, it will turn to its defendant-by-defendant analysis. At each turn, KPM bears the burden of proving willful and malicious trade secret misappropriation. See 1 MILGRIM ON TRADE SECRETS § 1.01[2][c][iv][C].

**iii. Application – "Willful and Malicious" Trade Secret Misappropriation**

As noted, the jury did not find ITG liable for trade secret misappropriation. [ECF No. 230, p.2]. Accordingly, this Court has no predicate basis to find that ITG committed any willful and malicious trade secret appropriation and will therefore not engage in any willful and malicious trade secret misappropriation analysis relative to ITG.

**1. Blue Sun**

The Court finds that the evidentiary record is replete with examples of Blue Sun willfully and maliciously misappropriating KPM's trade secrets. As previously noted, the jury found that Blue Sun had misappropriated all three species of KPM's trade secrets (*i.e.*, UCal software; calibration datasets, and customer information). [ECF No. 230, p.2].

In terms of willfulness, three illustrative examples point strongly towards the conclusion that Blue Sun's acts of trade secret misappropriation were "done with actual knowledge of their probable consequences." See 1 MILGRIM ON TRADE SECRETS § 1.01[2][c][iv][C].[5]

First, Blue Sun supplied pseudonymous e-mail accounts to various KPM-affiliated individuals as a means of helping them avoid detection and create confusion in the marketplace that Blue Sun could exploit. See, e.g., [ECF No. 238, pp. 133:20-134:9] (Gajewski explaining that Lucas had given him a Blue Sun e-mail address associated with the name "Rob Roberts" years before Gajewski was ultimately terminated from KPM); [ECF No. 239, p. 147:10-16] (Eilert explaining that, before he left KPM, he had been using a Blue Sun e-mail address associated with the name "Don Donaldson"). Blue Sun's attempts to conceal the real names of these KPM-affiliated individuals clearly signals that its trade secret misappropriation was willful. See Contour, 2011 U.S. Dist. LEXIS 145321, at *37-38 (collecting cases and explaining that, "[a] defendant's ***attempts to conceal*** its misappropriation support a finding that it was willful and malicious") (emphasis added and citations omitted).

Second, the trial record showed that Blue Sun recruited certain KPM-affiliated individuals and then promptly benefited from their acts of misappropriation despite having been

[5] As KPM notes, the trade secret misappropriating Defendants virtually conceded willfulness by dedicating almost all of their opposition brief [ECF No. 263] to arguments relating to the malice element. [ECF No. 273, p. 5, n. 2]. That said, the Court does not find that the trade secret misappropriating Defendants waived their arguments relative to willfulness.

well aware that they were under strict contractual obligations to protect KPM's intellectual property. [ECF No. 236, pp. 149:22-150:4] (Blue Sun's President Lucas admitting that he recruited nearly all of the former KPM-affiliated individuals to Blue Sun despite knowing that they had employment contracts with KPM). Blue Sun's intentional disregard for the valid legal restrictions that had been placed on the KPM-affiliated individuals further supports the conclusion that Blue Sun's misappropriation was willful.

A final example of Blue Sun's willfulness can be found in an e-mail from Gajewski to Lucas in February 2019. At that time, both Gajewski and Lucas were simultaneously affiliated with both KPM and Blue Sun. In one e-mail exchange, Gajewski is seen trying to leverage pricing information that he knew from his role at KPM to convert a KPM customer into a Blue Sun customer. [ECF No. 239, pp. 17:8-18:25]. Gajewski tells Lucas that they "have to be a little careful that [a KPM employee] does not find out and *blow the whistle*. Thanks." [Id. at p. 18:8-12] (emphasis added). This example is illustrative of Blue Sun's clear understanding and knowledge of the "probable consequences" of its trade secret misappropriation. See 1 MILGRIM ON TRADE SECRETS § 1.01[2][c][iv][C]. More specifically, Blue Sun knew that if the whistle was blown, they faced severe legal consequences once KPM found out. Each of these three representative examples lead this Court to easily conclude that Blue Sun's trade secret misappropriation was willful.[6]

[6] A final note on Blue Sun's willfulness. The Court recognizes that the evidentiary record might have contained even more evidence tending to show Blue Sun's willfulness and/or its maliciousness but for the above-described spoilation of evidence that occurred right before this lawsuit commended.

This Court also finds that Blue Sun "maliciously" (*i.e.,* with the intent to cause injury) misappropriated KPM's trade secrets. See id. Three selected examples from the trial record strongly support this finding.

First, Blue Sun intentionally poisoned the NIR analyzer market with misrepresentations regarding the present and future state of KPM's business. For example, Glenister admitted to coaching a member of the Blue Sun sales team to advertise to potential customers that KPM had "discontinued service" on its SpectraStar instruments and also that Blue Sun had hired "over 80 percent of [KPM's] original engineering service and sales staff of [KPM]." [ECF No. 238, pp. 72:7-73:23]. However, Blue Sun knew that these sorts of attacks were either false or contrived. [ECF No. 237, pp. 60:9 – 61:3] (Lucas admitting that he personally did not agree with a Blue Sun statement that KPM had "discontinued service" on its Spectrastar machines); [ECF No. 238, p. 73:11-14] (Glenister admitting that the 80 percent figure "was just a figure I threw out…").[7] These and similar misrepresentations went beyond the bounds of commercial gamesmanship; they were an attempt to unfairly attack the relationship between KPM and its customers. Such conduct is analogous to certain of the defendant's conduct in Contour. See 2011 U.S. Dist. LEXIS 145321, at *36-37 (citations omitted). There, the defendant had, among other things, "embarked on a conscious effort to exploit" the ending of a long-term business relationship with the plaintiff and had engaged in what the court termed "treacherous opportunism." Id. Here, Blue Sun employees were on the one hand surreptitiously leveraging close friendships with KPM

[7] In that connection, the Court notes that Blue Sun was apparently not just making misrepresentations about KPM; it was also apparently making misrepresentations about itself. For example, evidence adduced at trial revealed that Blue Sun -- which was founded on July 2, 2018 -- had created marketing materials falsely suggesting that it was founded in 1996. Compare [ECF No. 236, p. 159:3-4] (Lucas stating that Blue Sun was founded on July 2, 2018) with [ECF No. 237, p. 27:8-11] (Lucas explaining that Blue Sun was not founded in 1996 -- despite the fact that a customer-facing PowerPoint falsely stated as much).

employees to lure some of them away while on the other hand strongly suggesting to KPM's customers that KPM's future was in doubt due in part to certain departures. This is the very sort of "treacherous opportunism" that mandates the conclusion that KPM acted with the requisite level of malice. See id.

A second example of Blue Sun's maliciousness can be found in the company's attempts to wrongly divert to Blue Sun certain KPM customers that had reached out intending to do business with KPM. For example, in February 2021, a representative from a KPM customer reached out to Gajewski, who was then a KPM employee with a secret Blue Sun affiliation. The representative told Gajewski about the customer's possible interest in buying a new KPM NIR analyzer machine. [ECF No. 239, p. 42:8-14]. Acting on behalf of Blue Sun and seeing a diversion opportunity, Gajewski wrote back, in part, "I would send you a quote for ***our*** Phoenix system, which is a replacement." [Id. at p. 42:15-20] (emphasis added). After the customer responded and asked, in part, "[is the] Phoenix system the newest ***you guys*** have?", Gajewski responded in part, "***Yes***, all the calibrations ***we*** currently use can be moved over." [Id. at p. 42:23-25] (emphasis added). Gajewski, acting on behalf of Blue Sun, knew that the KPM customer was operating under the assumption that he was speaking for KPM. However, he took wrongful advantage; deliberately confused the customer, and diverted the business to direct competitor Blue Sun. This is textbook malicious trade secret misappropriation. See, e.g., Contour, 2011 U.S. Dist. LEXIS 145321 at *37-38 (finding that the fact that the defendant had "engaged in a series of efforts to ***obscure the source of the products it sold*** to [a non-party customer]" supported a finding that the trade secret misappropriation at-issue was willful and malicious) (emphasis added).

Third and finally, trial evidence revealed that Blue Sun exploited KPM's misappropriated customer information in order to generate quotes to customers that were designed to undercut KPM. One example in the record showed how Gajewski and Lucas worked in concert to generate these undercutting bids. [ECF No. 238, pp. 148:7-9] (KPM's counsel asking Gajewski in relation to Tr. Ex. 115, "you were speaking with [Irvin Lucas] about setting a price for Blue Sun that was based upon Unity's [KPM's] pricing?" Gajewski: "Yes.") In so doing, Blue Sun was not just exploiting KPM's customer information in order to beat out its general pool of competitors, but to instead deliberately harm and undercut KPM, which further supports a finding of maliciousness. See Nucar Consulting, Inc., 2005 Del. Ch. LEXIS 43, at *50-52 (concluding post-trial that the defendant had maliciously misappropriated trade secrets where, among other things, he had "aggressively solicited . . . an identified 'active prospect' [of plaintiff] with whom [the defendant] recently had dealt . . . and others with the intent to cause injury to [plaintiff]") Accordingly, the Court concludes that Blue Sun willfully and maliciously misappropriated KPM's trade secrets.

**2. Arnold Eilert**

The jury found that Eilert misappropriated KPM's UCal software and calibration datasets. [ECF No. 230, p. 2]. Upon a review of the entire trial record, the Court concludes that Eilert's trade secret misappropriation was willful and malicious. In terms of willfulness, the Court finds that, in December 2020, Eilert concocted a pretextual reason designed not to arise suspicion as to why he was leaving KPM. Specifically, Eilert told his colleagues at KPM, "I need to involve myself in a family farming operation in which I have a considerable interest and investment. This recently-developing need is going to require my ***full and concentrated attention*** for some time going forward and it is a responsibility that I cannot shirk." [ECF No. 239, p. 144:18-22]

(emphasis added). The truth was that Eilert had already begun working with Blue Sun, and that he had actually signed a Blue Sun offer letter about a month prior. [Id. at p. 142:1-8]. This example highlights Eilert's willfulness.

The Court further finds that Eilert's misappropriation was malicious. In one illustrative example from the trial record, Eilert, while acting on behalf of Blue Sun, capitalized on a customer relationship that he had built while at KPM. [ECF No. 240, pp. 13:13-15:2]. In March 2021, Eilert went out into the field to perform maintenance on a KPM machine and used KPM's UCal software to do so, despite having been contractually obligated to return this and other trade secrets to KPM upon his December 2020 departure from KPM. See id. The Court finds that Eilert's trade secret misappropriation was willful and malicious. See, e.g., Highland Consulting Grp., Inc., 2024 U.S. Dist. LEXIS 22722 at *25-26 (concluding that the defendant had committed willful and malicious trade secret misappropriation "[u]nder any of the possible civil legal standards" and citing as one example of such conduct the fact that there had been "evidence that [the defendant] immediately began working for one of [plaintiff's] business competitors, servicing a former [one of plaintiff's] client on the same project on which [the defendant] had been working for [the plaintiff]" where "[t]he trade secrets were directly relevant to this project.").

**3. Robert Gajewski**

The jury found that Gajewski misappropriated all three species of KPM's trade secrets. [ECF No. 230, p. 2]. This Court, after considering the entire trial record, finds that Gajewski committed willful and malicious trade secret misappropriation. Since many of the Court's above-cited examples in the Blue Sun analysis involve Mr. Gajewski, the Court incorporates

each of those by reference here. However, two additional examples highlight the willfulness and the maliciousness of Gajewski's trade secret misappropriation.

With respect to willfulness, Gajewski -- while acting surreptitiously on Blue Sun's behalf -- sent an e-mail to a KPM distributor about Blue Sun's business operations and cautioned them, "please, please, please be careful to where you are sending emails to me. You can't send Blue Sun emails to my Unity address. Please be extra careful." [ECF No. 239, p. 56:19-21]. Clearly, Gajewski actually knew about the probable consequences of his trade secret misappropriation and was trying to ensure that he evaded detection. See 1 MILGRIM ON TRADE SECRETS § 1.01[2][c][iv][C].

With respect to malice, the Court finds that Gajewski acted maliciously when he acted in concert with Lucas to publish several "application notes" (which derived entirely from KPM's trade secrets in UCal software) onto Blue Sun's public website. Lucas testified that while Gajewski was still affiliated with KPM, he had prepared and sent Lucas several application notes for Blue Sun's publication in January 2020, despite the fact that all of the application notes were derived from KPM's proprietary information. [ECF No. 237, pp. 76:20-78:13]. Gajewski later acknowledged that he had created about twenty or so or these application notes. The scale of this misappropriation suggests that Gajewski's actions cannot be written off as a mere accident or one-off lapse in judgment. [ECF No. 238, p. 132:15-20]. Moreover, Gajewski later admitted to conducting calibration work for KPM customers but then billing the work to Blue Sun. [ECF No. 239, p. 36:3-14]. All of these examples point conclusively towards a finding that Gajewski's trade secret misappropriation was willful and malicious.

**4. Rachel Glenister**

The jury found that Glenister misappropriated KPM's customer information. [ECF No. 230, p.2]. The Court concludes that Glenister's trade secret misappropriation was willful and malicious. As to willfulness, when Glenister announced that she was leaving KPM in the Summer of 2020, KPM sent her a letter dated July 1, 2020, that stated, in part, "[y]ou are reminded that all trade secrets, business plans and procedures, client contact list and other confidential information of KPM Analytics North America are proprietary and may not be used by you in any way." [ECF No. 238: 34:9-24]. At trial, Glenister admitted to not only seeing this letter, but to signing it right before her departure from KPM. [Id. at 34:15-24]. Nevertheless, within less than one month after signing this letter, Glenister was working for Blue Sun and was continuing to misappropriate KPM's trade secrets to KPM's detriment. Accordingly, there is no question that Glenister understood that what she was doing flew in the face of her legal obligations to KPM. Accordingly, her trade secret misappropriation was willful. See, e.g., Int'l Med. Devices, 2024 U.S. Dist. LEXIS 56663, at *21-22 (concluding that the defendant-doctor had willfully and maliciously misappropriated plaintiff's trade secrets and citing as one example that "[w]ithin days" of signing an NDA with the plaintiff, defendant promptly began misappropriating certain of plaintiff's trade secrets).

In addition to the example featuring Glenister above regarding the marketing misrepresentations that is incorporated here by reference, a further example demonstrates that Glenister's trade secret misappropriation was malicious. Evidence adduced at trial showed that Glenister's efforts to abscond with KPM's customer information continued until the very final minutes of her employment at KPM. About twenty-two minutes before the close of business on Glenister's last day at KPM (July 10, 2020), Glenister was forwarding certain KPM customer

information to her personal e-mail account. [ECF No. 238, pp. 49:10-50:2]. This sort of "treacherous opportunism" points towards a finding of malicious trade secret misappropriation. See Contour, 2011 U.S. Dist. LEXIS 145321, at *36-37 (citations omitted). Accordingly, this Court finds that Glenister's trade secret misappropriation was willful and malicious.

**5. Irvin Lucas**

Like Gajewski, the jury found that Lucas misappropriated all three species of KPM's trade secrets. [ECF No. 230, p. 2]. Upon review of the entire trial record, the Court can easily conclude that Lucas' trade secret misappropriation was willful and malicious. In addition to the above-cited examples featuring Lucas -- each of which are incorporated here by reference -- several other examples weigh strongly in favor of such a finding. First and foremost, Lucas' long period of duplicitous behavior strongly indicates a desire to injure KPM. From around the time of the Blue Sun's founding (July 2, 2018) until his departure from KPM on May 17, 2019, Lucas was collecting regular paychecks from both KPM and, secretly, Blue Sun. [ECF No. 236, p. 155:6-12]. Indeed, despite apparently having some interesting ideas about the future of the NIR analyzer market, Lucas never shared these ideas with his employer KPM -- but instead secretly acted in concert with Wilt and others to build Blue Sun under the radar. Id. at pp. 153:22-154:10 (Lucas admitting that he did not inform anyone at KPM about his ideas for Blue Sun or his conversations with Wilt). Moreover and as noted above, his recruitment of KPM personnel was done despite his having been fully on notice of their -- and his -- contractual obligations. See [ECF No. 236, pp. 149:22-150:4]

The only logical conclusion that the Court can draw from Lucas' actions is that consciously chose to injure KPM; depleting it of everything from wages to employees to

customers, and, most relevant here, trade secrets. Lucas' actions, without question, constitute willful and malicious trade secret misappropriation.

**iv. Legal Standard – Exemplary Damages**

Having found that Blue Sun and each of the Individual Defendants willfully and maliciously misappropriated KPM's trade secrets, the Court must now turn to the question of whether it will consequently award any additional exemplary damages against any of the trade secret misappropriating Defendants. Both the DTSA and the MUTSA provide that, where willful and malicious trade secret misappropriation has occurred, the Court may award additional exemplary damages in an amount not to exceed double the compensatory damages award. See 18 U.S.C. § 1836(b)(3)(C); Mass. Gen. Laws ch. 93, § 42B(b).

However, merely because the Court concludes that willful and malicious trade secret misappropriation has occurred does not mean that the Court must grant any amount of exemplary damages. See e.g., AgroFresh Inc. v. Essentiv LLC, No. 16-662, 2020 U.S. Dist. LEXIS 222898, at *73 (D. Del. Nov. 30, 2020) (explaining in this context that "[w]hether to award exemplary damages is committed to the Court's discretion"); 4 MILGRIM ON TRADE SECRETS § 15.02[3][i] (2022) ("[a]n award of exemplary damages is within the discretion of the court").

Rather than awarding exemplary damages automatically, courts consider a wide variety of factors to determine whether any such damages award are proper against a given defendant. This Court has determined that there is no one set of criteria that it must apply in this case. However, other courts have offered a number of useful factors -- some of which will bear on this Court's analysis. See e.g., AgroFresh Inc., 2020 U.S. Dist. LEXIS 222898 at *73 (explaining that, under the Pennsylvania version of the UTSA, "courts have considered the duration of misappropriative conduct, the defendant's consciousness of resulting injury and any efforts to

cover up malfeasance"); Proofpoint, Inc. v. Vade Secure, Inc., No. 19-cv-04238-MMC, 2021 U.S. Dist. LEXIS 223204, at *10-11 (N.D. Cal. Nov. 18, 2021) (listing other, additional factors including, "the degree of reprehensibility associated with the wrongdoer's actions, . . . the need to deter similar misconduct in the future, . . . the amount of compensatory damages awarded, . . . and the wealth of the particular defendant") (citations and internal quotation marks omitted).

**1. Blue Sun**

Here, there is no question that, if KPM's trade secrets misappropriation claim existed against Blue Sun in pure isolation, exemplary damages would be warranted against Blue Sun. Blue Sun's misappropriative conduct seems to have gone on at least from around the time of its founding in June 2018 until at least until April 2021 when KPM filed its Complaint in this case. [ECF No. 1]. Moreover, Blue Sun took various, above-described efforts to conceal its malfeasance. Additionally, there would seem to be a public interest in deterring similar misappropriative conduct in the future.

However, given that this Court has determined (as described below) that Blue Sun is liable to KPM for an additional $1,500,000 in punitive 93A damages, the Court, in its discretion, will not award any additional, exemplary damages under the trade secrets statutes. This decision ensures that Blue Sun is not assigned any punitive damages that might be construed as unfairly duplicative. Indeed, this decision is in accord with the spirit of cases that counsel consideration of the "amount of compensatory damages awarded" when determining whether to apply exemplary damages. Although the 93A damages award against Blue Sun in this case are of course punitive in nature, this Court nevertheless recognizes that the total sum owed will be very substantial and is sufficiently proportional to Blue Sun's wrongdoing. See e.g., Bladeroom Grp., Ltd. v. Emerson Elec. Co., 11 F.4th 1010, 1024-1025 (9th Cir. 2021) (explaining in the trade

secrets context that consideration of the "amount of compensatory damages awarded" factor helps "balance a punitive damages award with actual harm that is caused") (citation omitted).

**2. Arnold Eilert and Rachel Glenister**

This Court finds that exemplary damages are not warranted against Eilert and Glenister. As a starting point, the Court notes that the jury did not find either of these two Individual Defendants liable for misappropriating all of KPM's trade secrets, but instead just a subset of them. [ECF No. 230, p. 2]. Secondly, the record at trial revealed that both Eilert and Glenister were involved with Blue Sun and its wrongful scheme for a shorter period than Lucas and Gajewski. Moreover, while the type of conduct that they committed should of course be deterred, it is also the case that the compensatory damages awarded against them are both a sufficient deterrent against future, similar behavior and are appropriately indexed to the actual harm that Eilert and Glenister each caused. Accordingly, this Court will not assess any exemplary damages against Eilert or Gajewski.

**3. Rob Gajewski and Irvin Lucas**

With respect to Gajewski and Lucas, however, the Court finds that exemplary damages are very much an appropriate consequence for the willful and malicious trade secret misappropriation that these two perpetrated against KPM for a long period of time and to KPM's great detriment. Unlike Eilert and Glenister, the jury found that both Lucas and Gajewski each misappropriated all three species of KPM's trade secrets. [ECF No. 230, p. 2]. Accordingly, this Court, in its discretion, assesses an exemplary damages penalty in an amount equal to 50% of the compensatory damages that were awarded against each of them. Therefore, Lucas shall owe $10,000 in exemplary damages and Gajewski shall owe $7,500 in exemplary damages. The Court finds that these amounts reflect, among other things, the duration of their misappropriative

conduct, their consciousness of the injuries that they had caused, and their efforts to cover up their malfeasance. See AgroFresh Inc., 2020 U.S. Dist. LEXIS 222898 at *73.

**b. KPM's Motion for Judgment in its Favor on its 93A Claims and for Prejudgment Interest on All Counts [ECF No. 255]**

With this motion, KPM asks the Court to find that both Corporate Defendants not only engaged in unfair or deceptive trade practices under 93A, but also that they both did so knowingly and/or willingly. Consequently, KPM asks that this Court treble the compensatory damage figures awarded against each of the Corporate Defendants -- and also enter a finding that they be held jointly and severally liable for the total amount awarded against them. KPM further requests reasonable attorneys' fees and costs -- certain of which would be mandatory if the Court finds that the Corporate Defendants committed unfair or deceptive trade practices. KPM also asks the Court to award it additional damages against the Corporate Defendants based on allegations that there have been violations of the Court's preliminary injunction [ECF No. 120] that were not presented to the jury. Lastly, KPM requests that the Court award it prejudgment interest on all counts against each of the Defendants.

The Court will reach the merits of most of KPM's motion today, but, as it informed the parties during a post-trial motions hearing, it will not address the merits of KPM's argument that there have been violations of this Court's preliminary injunction order that were not presented to the jury. [ECF No. 283, p. 97:9-14]. If KPM wishes to seek redress for those alleged violations, it must do so by means other than a post-trial motion related to the jury's verdict. And, as the Court has already informed the parties, the issue of any attorneys' fees and costs that might be awarded in this case will be discussed in a global fashion during an upcoming motions hearing. Relatedly, the Court reserves judgment on the issue of joint and several liability until after that upcoming motion hearing.

**i. Legal Standard – Unfair or Deceptive Trade Practices Under 93A**

KPM alleged that the Corporate Defendants had violated 93A by, among other things, misappropriating its trade secrets and by tortiously interfering with its contractual relationships. [ECF No. 1, ¶¶ 131-136]. Under 93A, it is unlawful for those that are engaged in trade or commerce to use "unfair methods of competition and unfair or deceptive acts or practices in business transactions with others engaged in trade or commerce." Arthur D. Little, Inc. v. Dooyang Corp., 147 F.3d 47, 55 (1st Cir. 1998) (internal citation and quotations omitted). As the Supreme Judicial Court has explained, 93A was designed to "to encourage more equitable behavior in the marketplace . . . [and impose] liability on persons seeking to profit from unfair practices." Linkage Corp. v. Trustees of Boston Univ., 679 N.E.2d 191, 208 (Mass. 1997) (citation omitted). In order for 93A to possibly apply to a given dispute, there must be "a commercial transaction between a person engaged in trade or commerce and another person engaged in trade or commerce, such that they were acting in a 'business context.'" Milliken & Co. v. Duro Textiles, LLC, 887 N.E.2d 244, 259 (Mass. 2008).

Although the statute does not define "unfair" or "deceptive", Massachusetts courts have developed definitions of each term as used in the 93A context. A practice or act is "unfair" under 93A, "if it is (1) within the penumbra of a common law, statutory, or other established concept of unfairness; (2) immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to competitors or other business people." Morrison v. Toys "R" Us, Inc., 806 N.E.2d 388, 392 (Mass. 2004) (citation omitted). A practice or act is "deceptive" under 93A "if it possesses a tendency to deceive" (quotation and citation omitted). Aspinall v. Philip Morris Cos., 813 N.E.2d 476, 487 (Mass. 2004). A finding of trade secret misappropriation can constitute an unfair or deceptive act under 93A. Mass Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.,

412 F.3d 215, 243 (1st Cir. 2005) ("[u]nder Massachusetts law, misappropriation of trade secrets alone can constitute a violation of Chapter 93A"). Relatedly, a finding of tortious interference can constitute an unfair or deceptive practice, as well. See People's Choice Mortg., Inc. v. Premium Cap. Funding, LLC, No. 06-3958-BLS2, 2010 Mass. Super. LEXIS 61, at *54 (Mass. Super. Ct. Mar. 31, 2010).

There is no constitutional or statutory right to a jury trial for 93A claims. Nei v. Burley, 446 N.E.2d 674 (Mass. 1983) ("there is no right to a trial by jury for actions cognizable under G.L. c. 93A"). However, in its discretion, a court may allow such claims to be tried to a jury. Serv. Publ'ns, Inc. v. Goverman, 487 N.E.2d 520, 527 (Mass. 1986). When a party brings a 93A claim along with other common law claims and the court is inclined to allow the 93A claims to be tried to a jury, the "preferred practice" is for them to be tried together. See Global Investors Agent Corp. v. Nat'l Fire Ins. Co., 927 N.E.2d 480, 490 (Mass. App. Ct. 2010). During such a jury trial, the Court has three options relative to the 93A claim(s): it may (1) allow the jury to decide the 93A question; (2) take from the jury a nonbinding advisory opinion of the 93A question, or (3) decide the 93A question independently. Id.

Just because a court allows a jury to render advisory findings on the 93A-related claims does not mean that the court is bound to accept those findings. See e.g., Columbia Chiropractic Grp. v. Tr. Ins. Co., 712 N.E.2d 93, 96 (Mass. 1999) ("[t]he judge was not bound by the jury's advisory special verdict that Columbia's G. L. c. 93A violation caused Trust no damages"). As an independent trier of fact, a court may, in its discretion, "come to its own conclusions as to the findings of fact and rulings of law." Reddish v. Statuta, No. 03-1775-G, 2006 Mass. Super. LEXIS 485, at *19 n. 9 (Aug. 28, 2006) (citation omitted). Cf. Perdoni Bros. v. Concrete Sys., 35 F.3d 1, 5 (1st Cir. 1994) ("in the Chapter 93A context, the court has

recognized that judge and jury, sitting as independent triers of fact, may reach conflicting conclusions") (citation omitted). However, if a court determines that a jury's verdict appropriately resolved "all material, factual issues relating to the 93A claim" the court is "not required to make specific findings of fact." See Makuc v. Am. Honda Motor Co., 835 F.2d 389, 394 (1st Cir. 1987); Biopoint, Inc. v. Dickhaut, No. 20-10118-RGS, 2023 U.S. Dist. LEXIS 71656, at *21 (D. Mass. Apr. 25, 2023) (concluding that "the jury's verdict amply supports a determination that Catapult violated Chapter 93A and that no further findings of fact on this issue are required").

Lastly, vicarious liability "applies in a Chapter 93A context when an agent's acts taken in service of or for the benefit of the corporation fall within the scope of his or her employment." Id. at *22. These principles apply when multiple damages are at issue. Id.

**i. Application – Unfair or Deceptive Trade Practices Under 93A**

Here, the Court asked the jury to answer an advisory[8] question regarding whether either or both of the Corporate Defendants engaged in an unfair or deceptive trade practices. Specifically, the jury was asked:

> Did KPM prove, by a preponderance of the evidence, the either Blue Sun or ITG or both engaged in any competition, or any attempt at competition, using unfair or deceptive acts or unfair methods of competition in the conduct of trade or commerce? [ECF No. 230, p. 7].

[8] The Court treated both of the 93A-related questions submitted to the jury as advisory. [ECF No. 242, p. 8:11-14] (the Court explaining to the parties that "if the jury makes a determination that the 93A elements have been met, then the Court . . . ***will be reserving for itself what impact that would have on any ruling***") (emphasis added). See Linkage Corp., 679 N.E.2d at 206 n.31 (explaining that "[t]he judge's decision to treat the jury verdict as advisory was within his prerogative").

The jury answered "Yes" as to both ITG and Blue Sun. Id. The Court finds that the evidentiary record amply supports the jury's determination that both Blue Sun and ITG violated 93A. Since the jury's finding resolved "all material, factual issues relating to the[se] 93A claim[s]," and because the Court has adopted that finding, it is not required to make any further specific findings of fact. See, e.g., Makuc, 835 F.2d at 394; Biopoint, Inc., 2023 U.S. Dist. LEXIS 71656 at *21. In that connection, the Court notes that neither of the Corporate Defendants has even substantively challenged the jury's determination that 93A violations occurred, but they have instead raised more technical and procedural challenges (which are addressed below). See [ECF No. 264, pp. 4-14].

**ii. Legal Standard – Willful or Knowing Violations of 93A & Multiple Damages**

If a factfinder determines that a 93A violation has occurred, "the next area of inquiry" is whether that violation was "willful or knowing." Morani-Vegnani v. Travelers Ins. Co., No. 93-2028F, 1996 Mass. Super. LEXIS 705, at *10-11 (Mass. Super. Ct. Jan. 31, 1996). Establishing a "willful or knowing" violation requires a plaintiff to "prove that defendant had a 'subjectively culpable state of mind.'" BioPoint, Inc., 2023 U.S. Dist. LEXIS 71656 at *22-23 (citation omitted). In this context, willfulness "implies not only intent to do an act, but also intent that the act be unfair or deceptive" and knowing violations occur "where a defendant is aware that his act is unfair or deceptive or will cause such a result." BioPoint, Inc., 2023 U.S. Dist. LEXIS 71656 at *22 (internal citations and quotations omitted).

If the Plaintiff proves that a "willful or knowing" violation occurred, 93A requires multiple damages. Anderson v. Comcast, Corp., 500 F.3d 66, 74 (1st Cir. 2007). As the Supreme Judicial Court has explained, "multiple damages under G. L. c. 93A serve the twin goals of punishment and deterrence." Kraft Power Corp. v. Merrill, 981 N.E.2d 671, 684 (Mass. 2013)

(citation and internal quotations omitted). Specifically, 93A provides that the total recovery shall be "***up to three but not less than two times*** [the amount of 'actual damages'] if the court finds . . . a willful or knowing violation." Mass. Gen. Laws ch. 93A, § 9(3) (emphasis added). Otherwise stated, if a willful or knowing violation has occurred, the Court has discretion to "award anywhere between double or treble damages." BSE Tech LLC v. Asia Tech Corp., No. 13-10972-FDS, 2014 U.S. Dist. LEXIS 10932, at *12 (D. Mass. Jan. 29, 2014) (citation omitted).

Although neither the 93A statute nor the case law construing it "provide [] trial judge[s] with clear guidance in deciding how damages should be multiplied," what is clear is that the amount of punitive damages awarded should be "based on the egregiousness of each defendant's conduct." Hug v. Gargano & Assocs., P.C., 923 N.E.2d 1065, 1071 (Mass App. Ct. 2010) (citation omitted). That said, "[e]gregiousness cannot be measured in a vacuum." Arthur D. Little Int'l v. Dooyang Corp., 979 F. Supp. 919, 928 (D. Mass. 1997). As one court reasoned in a case involving trade secrets, the appropriate amount of multiple damages was that which was "sufficiently punitive at the same time that it [was] proportional to the wrongdoing at issue." Beninati v. Borghi, No. SUCV2012-1985 BLS2, 2017 Mass. Super. LEXIS 107, at *9 (Mass. Super. Ct. July 3, 2017).

**iii. Application – Willful or Knowing Violations of 93A & Multiple Damages**

Here, the jury was asked to answer an advisory question regarding whether either or both of the Corporate Defendants had willfully or knowingly committed any unfair or deceptive trade practices. Specifically, the jury was asked:

> Did KPM prove, by a preponderance of the evidence, the either Blue Sun or ITG or both willfully or knowingly engaged in unfair methods of competition or unfair or deceptive acts or practices? [ECF No. 230, p. 7].

The jury answered "Yes" as to both ITG and Blue Sun. Id. This Court finds that the evidentiary record in this case amply supports the jury's determination that both Blue Sun and ITG committed willful or knowing violations of 93A. Since the jury's finding on this question resolved "all material, factual issues relating" to this particular 93A claim and because the Court has adopted that finding, it is not required to make any further specific findings of fact. See, e.g., Makuc, 835 F.2d at 394; Serv. Publ'ns, Inc., 487 N.E.2d at 527 n.13 ("[a] judge need not make an *express* finding that a person wil[l]fully or knowingly violated G. L. c. 93A, § 2, as long as the evidence warrants a finding of either") (emphasis in original).[9] In light of this determination, the Court must assess punitive damages against both ITG and Blue Sun in an amount "***up to three but not less than two times*** [the amount of 'actual damages'] . . ." Mass. Gen. Laws ch. 93A, § 9(3) (emphasis added).

The Court, in its discretion, assesses punitive "*double*" damages against Blue Sun and ITG such that KPM's ***total*** recovery against each of them shall be as follows:[10]

- Blue Sun: $3,000,000
- ITG: $3,600,000

The Court's reasoning for assessing such "double damages" is as follows. First, the Court finds that these total damages amounts will undoubtedly serve the twin goals of 93A: namely punishment and deterrence. See Kraft Power Corp., 981 N.E.2d at 684. These large sums will send a clear signal to the marketplace that egregious acts of trade secret

[9] As was true with respect to the jury's finding of unfair or deceptive practices, the Corporate Defendants dedicated hardly any space in their opposition brief to challenging validity of the jury's finding of willful or knowing 93A violations. See [ECF No. 264].

[10] These figures do not account for the imposition of any (to-be-determined) reasonable attorneys' fees and costs.

misappropriation on the one hand and tortious interference with contractual relationships on the other will result in significant, real-world consequences. Second, the Court is mindful that although Blue Sun and ITG's actions were certainly egregious in their own unique ways, "[e]gregiousness cannot be measured in a vacuum." Arthur D. Little Int'l, 979 F. Supp. at 928. In addition to ensuring that the total damages awards are sufficiently punitive, the Court must also make sure that the total damages awarded are proportional to the wrongdoing at issue. See Beninati, 2017 Mass. Super. LEXIS 107 at *9. When the Court considers that ITG's gross revenue over the last five years has been between $1,000,000 and $1,300,000 [ECF No. 240, p. 85:11-15] and that Blue Sun's five-year average gross revenue has been similar (i.e., $1,116,886) [ECF No. 264-2, p. 2], this Court finds that it will take an appropriately lengthy period of time for the Corporate Defendants to pay off these total damage awards. To have tripled the compensatory damage figures would not have been proportional. See Beninati, 2017 Mass. Super. LEXIS 107 at *9.

**iv. Corporate Defendants' Objections**

In their opposition brief, the Corporate Defendants raised a number of objections to KPM's motion for entry of judgment in their favor on the 93A claims. [ECF No. 264]. The Court did not find any of these objections to have merit, but it does wish to meaningfully engage with each of them. Since they will be the subject of further discussion at an upcoming motion hearing, the Court need not yet engage with the Corporate Defendants' objections relative to 93A-related attorneys' fees and costs and joint and several liability.

**1. Center of Gravity**

The Corporate Defendants argue that a judgment under 93A should not

enter against either of them since the unfair or deceptive acts occurred "primarily and substantially outside" the Commonwealth of Massachusetts. [ECF No. 264, pp. 4-7]. They point to various facts that they contend render a place other than Massachusetts as the "center of gravity" of the circumstances that gave rise to KPM's 93A claims -- which, if true, would mean that 93A liability could not attach to their actions. [ECF No. 264, p. 4]; Mass. Gen. Laws c. 93A, § 11 ("No action shall be brought or maintained under this section unless the actions and transactions constituting the alleged unfair method of competition or the unfair or deceptive act or practice occurred primarily and substantially within the commonwealth"). Defendants rightly point out that they bear the burden in making this argument. [ECF No. 264, p. 4].

Among the facts that the Corporate Defendants raise in support of their center of gravity argument include the fact that both ITG and Blue Sun are Maryland-based companies and that all of the Individual Defendants worked remotely from their homes during the relevant time period -- and that none of them live in Massachusetts nor traveled to Massachusetts in their employment capacity. [ECF No. 264, p. 5]. The Corporate Defendants further point out that none of the KPM customers named at trial reside in Massachusetts. [Id.] They also point out that Blue Sun has never conducted business in Massachusetts and that ITG's prior work in the Commonwealth was unconnected from the conduct alleged in this lawsuit. [Id.]

The applicable legal standard for resolving this issue derives from the Supreme Judicial Court's decision in Kuwaiti Danish Computer Co. v. Digital Equipment Corp. 781 N.E.2d 787, 799 (2003). There, the Court explained that the analysis:

> should not be based on a test identified by any particular factor or factors because of a tendency to shift the focus of inquiry away from the purpose and scope of c. 93A. Section 11 suggests an approach in which a judge should, after making findings of fact, and after considering those findings in the context of the entire §

11 claim, determine whether the center of gravity of the circumstances that give rise to the claim is primarily and substantially within the Commonwealth. Id.

Although the Kuwaiti Danish court was clear that no particular factor or factors should control the inquiry, it did acknowledge and did not disapprove of the First Circuit's three-pronged balancing test, which considers "(1) where the defendant commits the unfair or deceptive act or practice; (2) where the plaintiff receives or acts on the wrongful conduct; and (3) where the plaintiff sustained losses caused by the wrongful conduct." Id. at 798 n.13 (citing to, among others, Roche v. Royal Bank of Canada, 109 F.3d 820, 829 (1st Cir. 1997)). Thus, these three factors, while not an exhaustive list, can certainly guide this Court's inquiry. See Uncle Henry's Inc. v. Plaut Consulting Co., 399 F.3d 33, 45 (1st Cir. 2005) (observing that "the Kuwaiti Danish court certainly did not hold or imply that the factors identified by the district court (derived from our Roche decision) are irrelevant to the Chapter 93A calculus"). Here, factors (2) and (3) weigh very strongly in favor of a finding that Massachusetts was the center of gravity of the circumstances that gave rise to KPM's claims.

As to factor (2), it is clear from the record that KPM "received" the Corporate Defendants' various instances of wrongful conduct in Massachusetts. KPM is a Westborough, Massachusetts-based corporation that "maintains the core of its operations, including databases, email servers, and customer lists and data in Massachusetts." [ECF No. 272, p. 7]. Moreover, the KPM NIR analyzer machines that Gajewski and Eilert serviced while acting on Blue Sun's behalf had been manufactured in Westborough, Massachusetts. [ECF No. 235, p. 15:1-2]. Relatedly, the KPM sales operations that Blue Sun and ITG repeatedly targeted with wrongful conduct was based in Westborough, Massachusetts, too. [Id. at 15:3-5]. And each of KPM's customer relationships that were

negatively affected by Blue Sun and ITG's wrongful conduct was governed by Massachusetts law. [ECF No. 272, p. 6]. Accordingly, there is little doubt that KPM "received" the vast majority -- if not all -- of the Corporate Defendants' wrongful conduct in Massachusetts.

Consideration of factor (3) -- the situs of the loss -- weighs even more heavily in favor of a finding that Massachusetts was the center of gravity for purposes of KPM's 93A claims. Indeed, the trial record revealed that two individuals acting on behalf of Blue Sun initiated a meeting with a KPM employee designed to lure that employee over to Blue Sun in the first quarter of 2019. [ECF No. 234, pp. 28:16-29:12]. This meeting, which is just one example of Blue Sun/ITG's wrongful conduct, occurred in Milford, Massachusetts. [Id.]. Moreover, KPM's proprietary UCal software -- which Blue Sun misappropriated -- is available only from KPM, which is based in Massachusetts. [ECF No. 230, p. 2]; [ECF No. 272, p. 6]. Likewise, KPM's calibration datasets -- which Blue Sun also misappropriated -- reside within a Massachusetts-based "data library." [ECF No. 230, p. 2]; [ECF No. 235, p. 130:12-19]. As KPM noted, "[a]ll of the data that Rob Gajewski and Arnold Eilert used on behalf of Blue Sun necessarily came from [a] centralized database" containing calibration datasets that was located in Massachusetts. [ECF No. 272, p. 7]. The Court need not go on. The fact is that the Corporate Defendants have not met their burden here. The totality of the undisputed facts clearly show that Massachusetts was the "center of gravity of the circumstances that give rise" to KPM's 93A claims and therefore the Corporate Defendants cannot escape 93A liability under their location-based argument. See Kuwaiti Danish Comput. Co., 781 N.E.2d at 799.

### 2. Preemption

The Corporate Defendants argue that any award under 93A relative to Blue Sun's acts of trade secrets misappropriation is preempted by MUTSA, which they claim "provides the ***exclusive*** civil remedies for misappropriation of trade secret claims." [ECF No. 264, p. 6] (emphasis added). The Corporate Defendants do not cite any legal authority for this contention. Instead, they argue that since the MUTSA provides in part that it "supersede[s] ***any conflicting laws of the commonwealth*** providing civil remedies for the misappropriation of a trade secret," it necessarily follows that "MUTSA supersedes [93A] and tortious interference claims where the underlying conduct is theft of a trade secret but expressly does not affect other civil remedies to the extent that they are not based upon misappropriation of trade secret." Mass. Gen. Laws c. 93, § 42F(a) (emphasis added); [ECF No. 264, p. 6].

This Court has concluded that MUTSA does not preempt any of the other claims brought in this case -- including those under 93A -- for three reasons. First, it appears that the only other Court applying Massachusetts law to have addressed the possibility of a MUTSA claim preempting a 93A claim concluded after a careful and detailed analysis that preemption was not warranted. Neural Magic, Inc., 2020 U.S. Dist. LEXIS 266048 at *8. Second, and as the Neural Magic, Inc. court pointed out, 93A § 42F(a) contains a significant carveout -- and expressly does not affect, among other things, "other civil remedies to the extent that they are not based upon the misappropriation of trade secret." 2020 U.S. Dist. LEXIS 266048 at *7; Mass. Gen. Laws c. 93, §§ 42F(a), (b)(2). The presence of this statutory language signals that the focus of a preemption inquiry should be on the causes of action that give rise to those civil remedies, and "not the factual conduct that [gave] rise to the same." Neural Magic, Inc., 2020 U.S. Dist. LEXIS 266048 at *7 (citations omitted). In other words, since it is undisputed that 93A is not a

trade secrets-specific or tortious interference-specific statute, it is unwarranted to conclude that claims under 93A would be preempted by MUTSA. See id. Thirdly, the underlying conduct relative to KPM's 93A claims against both ITG and Blue Sun were not exclusively related to trade secret misappropriation. Indeed, the jury found ITG liable for tortious interference with KPM's contractual relationships, but not for trade secret misappropriation. Compare [ECF No. 230, p. 2] with [Id. at p. 6]. Accordingly, the Corporate Defendants' preemption argument relative to ITG fails on that ground alone. The underlying conduct for the 93A claim against Blue Sun was not limited to just trade secret misappropriation, either. Indeed, the jury found Blue Sun liable for tortious interference with contractual relationships, too. [Id. at p. 6]. Accordingly, this Court finds that KPM's MUTSA claims do not preempt any of KPM's other claims in this case. See Neural Magic, Inc., 2020 U.S. Dist. LEXIS 266048 at *8 (citations omitted).

**3. "Actual Damages"**

The Corporate Defendants contend that KPM's "actual damages" for purposes of 93A are not equal to the compensatory damages figures that were awarded against each of them, but that, instead, only KPM's lost profits qualify as "actual damages." [ECF No. 264, pp. 8-9]. The Corporate Defendants argue that since KPM's damages expert at trial testified that the profit lost by KPM due to the Corporate Defendants' wrongful conduct was $918,520, that figure is "the only suitable Actual Damage multiplier for use in calculating enhanced damages." [Id.].

The Court rejects this argument. The compensatory damages that the jury awarded against the each of the Corporate Defendants (i.e., $1,500,000 against Blue Sun and $1,800,000 against ITG) did constitute KPM's "actual damages" for purposes of 93A. See Mass. Gen. Laws ch. 93, § 11 (providing that the base level of recovery "shall be in the amount of actual damages .

. ."). As the Supreme Judicial Court has said, "actual damages" in the 93A context "consist[s] ***of all damages*** foreseeably flowing from an unfair or deceptive act or practice." Haddad v. Gonzalez, 576 N.E.2d 658, 665 (1991) (emphasis added).

The Corporate Defendants' "actual damages" argument fails for three principal reasons. First, and as explained above, there was no "double counting" in terms of compensatory damages -- a premise that undergirds their "actual damages" argument. [ECF No. 264 at 7] (incorrectly concluding that the jury awarded "KPM $3M against Blue Sun ($1.5 million for trade secret misappropriation and $1.5 million for tortious interference with contract), and $1.8 million against ITG for tortious interference with contract only . . ."). Second, nothing in the nine-page verdict form asked the jury to indicate what category of damages the jury was awarding. [ECF No. 230]. This Court declines the invitation to speculate as to whether and how they may have employed KPM's damages expert's opinions. See Crabar/Gbf, Inc. v. Wright, No. 8:16-CV-537, 2023 U.S. Dist. LEXIS 166069, at *18-19 (D. Neb. Sep. 19, 2023) (rejecting the defendants' arguments about how the jury arrived at a damages figure in a trade secrets case and explaining that "the Court will not speculate as to how the jury arrived at its verdict") (citation omitted) (appeal pending, filed Oct. 20, 2023).

More fundamentally, though, the Corporate Defendants are incorrect that "courts have determined that the proper measure of damage is the plaintiff's lost profits, not the defendant's gain." [ECF No. 264, p. 8]. The Corporate Defendants have not pointed to any controlling precedent standing for this proposition. Moreover, case law from a number of federal and state courts provides otherwise. See, e.g., Kelley v. CVS Pharm., Inc, No. 98-0897-BLS2, 2007 Mass. Super. LEXIS 381, at *39-40 (Mass. Super. Ct. Aug. 24, 2007) (then-Justice of the Superior Court Gants explaining that, "[i]n cases involving so-called 'business torts,' ***such as the***

***misappropriation of trade secrets***, trademark infringement, and ***tortious interference with contractual relations***, the measure of [93A] damages 'entitles a plaintiff to recover full compensation for his lost profits ***and*** requires a defendant to surrender the profits which he realized from his tortious conduct'") (citations omitted and emphasis added); Tashkian v. CVS Pharm., Inc., No. 19-11164-TSH, 2020 U.S. Dist. LEXIS 71994, at *26-27 (D. Mass. Mar. 13, 2020), report and recommendation adopted, 19-cv-11164-TSH, ECF No. 30, (D. Mass. Mar. 30, 2020) (applying Kelley at the motion to dismiss stage and concluding that a 93A plaintiff "would be entitled to recover as damages any net profit Defendants obtained as a result of its unfair and deceptive act"). Indeed, as then-Justice Gants reasoned in Kelley, "once the conduct at issue is determined to be unfair or deceptive, it would make no sense to allow the defendants to keep the profits they reaped from such conduct and provide a financial incentive for such unfair and deceptive conduct to continue." 2007 Mass. Super. LEXIS 381 at *42. Accordingly, the Court declines the Corporate Defendants' invitation to adjust the applicable "actual damages" figures.

**4. Punitive Damages Against ITG**

A fourth objection that the Corporate Defendants raised to KPM's motion is essentially that punitive 93A damages should not enter against ITG because there was insufficient proof that Wilt and/or ITG committed a "willful or knowing" 93A violation. This argument is a non-starter. This Court will not disturb the jury's findings that ITG engaged in unfair or deceptive trade practices and that, further, these violations were willful or knowing. [ECF No. 230, p. 7]. Indeed, the Court has already adopted both of these jury findings. Since these two predicates were satisfied, the Court was statutorily mandated to award "***not less than two times*** [the amount of 'actual damages']." Mass. Gen. Laws ch. 93A, § 9(3) (emphasis added). Accordingly, the

Court will not entertain arguments about whether punitive damages were warranted vis-à-vis ITG.

**v. Prejudgment Interest**

KPM has requested that the Court award prejudgment interest as follows:

- At a rate of 12% from the date of the filing of the complaint on the single damages component of its 93A damages
- at a rate of 12% on the tortious interference and misappropriation of trade secret counts, and
- at a rate of 10% of its breach of contract claims. [ECF No. 253, p. 20].

The Court finds that KPM is entitled to prejudgment interest on any elements of the jury award(s) that can fairly be classified as "compensatory in nature." Governo Law Firm LLC v. Bergeron, 166 N.E.3d 416, 428 (Mass. 2021) ("[p]rejudgment interest applies to awards of compensatory damages because both prejudgment interest and compensatory damages seek to make a plaintiff whole"). However, the Court will not award prejudgment interest to KPM on any elements of the jury award(s) that are rightly classified as restitutionary in nature, since "restitutionary recoveries are not designed to make the plaintiff whole; as such, they are 'distinct from damages, which measures compensation for loss rather than disgorgement of the defendant's gain.'" Id. (citation omitted).

The Court cannot presently determine the exact amount(s), if any, that are due KPM in the form of prejudgment interest, in part, because the chart that KPM supplied in support of its prejudgment motion [ECF No. 252] seems to have erroneously presupposed certain double recoveries that, as explained above, are not consistent with the Court's interpretation of the verdict form. Relatedly, although the parties seem to agree that at least $918,520 of the total

damages awarded by the jury reflect lost profits (and therefore can be rightly categorized as "compensatory"), they have not each proposed for the Court the way in which this total sum ought to be divided against any, some or all of the Defendants. [ECF No. 264, p. 17 (Corporate Defendants stating that "$918,520 is the only suitable Actual Damage amount for use in calculating prejudgment interest" under 93A)]; [ECF No. 272, p. 18 ("there is no dispute that KPM had lost profits of at least [$918,520] and that KPM was deprived of that money, for which prejudgment interest is appropriate")]. Accordingly, the parties are to confer and to prepare and send to the Court a document setting forth each of their positions relative to the amount of prejudgment interest due KPM in light of the Court's rulings and guidance above. This document is to be filed on ECF no fewer than three (3) days prior to the next motion hearing.

**c. KPM's Motion for the Entry of a Permanent Injunction [ECF No. 257]**

With this motion, KPM asks the Court to effectively make permanent the as-revised preliminary injunction order that Judge Hillman issued in this case on December 17, 2021. [ECF No. 120]. For their part, the Individual Defendants and Blue Sun have no objection to a permanent injunction that would bar them from using KPM's UCal software and KPM's calibration datasets. [ECF No. 267, p. 1]. However, they do object to a permanent injunction that would bar them in perpetuity from soliciting or doing business with all KPM's customers. [Id.] ITG, for its part, argues that it should be immune from any permanent injunction that might issue, principally because ITG was only found liable under 93A and for tortious interference with contract, and that therefore, the supposedly trade secrets-focused permanent injunction should not apply to it. [ECF No. 265, p.2].

**i. Legal Standard**

The Court may, in its discretion, issue a permanent injunction if it concludes:

> "(1) that [a party] has suffered"—or . . . will suffer—"an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the [parties], a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction."

Glob. NAPs, Inc. v. Verizon New England, Inc., 706 F.3d 8, 13 (1st Cir. 2013) (alterations in original) (quoting eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006)). As the First Circuit has explained, "[t]he first two factors together require 'a substantial injury that is not accurately measurable or adequately compensable by money damages.'" Id. (citation omitted).

**ii. Application**

Here, KPM has established that it will suffer irreparable harm in the absence of a permanent injunction. The trial record revealed that KPM had expended significant effort, resources, and time into developing its trade secrets in UCal software, calibration datasets, and customer information. Moreover, the record showed that KPM had taken appropriate steps to protect those trade secrets, including requiring its employees to sign agreements containing confidentiality/non-disclosure provisions.

Despite being intimately aware of KPM's level of investment, its trade secrets, and these delicate market dynamics, Blue Sun and each of the Individual Defendants willfully and maliciously misappropriated various combinations of KPM's trade secrets in the context of a long-running scheme. ITG, for its part, was found to have tortiously interfered with KPM's contracts and to have, along with Blue Sun, committed willful or knowing 93A violations. The jury also found that each of the Individual Defendants breached their employment contracts as well as the covenants of good faith and fair dealing.

The Defendants' brazen actions over a substantial period of time has caused irreparable injury to KPM. In fact, given their history of attacks aimed at KPM, it is fair to anticipate that

some or all of the Defendants would commit future, similar misdeeds in the absence of a permanent injunction. See Benchmark Techs., Inc. v. Yugiang Tu, No. 22-10227-LTS, 2023 U.S. Dist. LEXIS 219369, at *9-10 (D. Mass. May 30, 2023) (concluding that a plaintiff had established irreparable harm in the absence of a permanent injunction in a trade secrets case and reasoning that "[g]iven Defendants' past knowing disregard for Benchmark's rights in its trade secrets and confidential information, irreparable harm from misuse of these two trade secrets by Defendants in the future may be fairly anticipated in the absence of an injunction").

A finding of irreparable harm is further supported by the fact that some courts have determined that misappropriation of trade secrets and tortious interference actually carry a presumption of irreparable harm. See e.g., TouchPoint Sols., Inc. v. Eastman Kodak Co., 345 F. Supp. 2d 23, 32 (D. Mass. 2004) ("[t]he loss of a trade secret is generally found to constitute irreparable harm. That is in recognition of the fact that, 'once the trade secret is lost, it is gone forever'") (citation omitted); Special Purpose Accts. Receivable Co-op Corp. v. Prime One Capital Co., 125 F. Supp. 2d 1093, 1105 (S.D. Fla. 2000) ("irreparable injury is presumed in cases involving tortious interference with business relationships. In such cases, irreparable injury need not be alleged or proven…") (citations omitted). Although it is not necessarily clear that these sort of presumptions automatically attach upon findings of trade secret misappropriation and tortious interference, this Court finds that, should it be proper for them to attach, they offer yet further support for this Court's conclusion that KPM has proven irreparable injury. See Benchmark Techs., Inc. v. Yugiang Tu, No. 22-10227-LTS, 2023 U.S. Dist. LEXIS 219369, at *10-11 (explaining that "[a]n open question exists in this circuit regarding whether a [trade secret misappropriation] presumption [] is proper (without a statutory basis) under the

Supreme Court's holding in eBay Inc. v. MercExchange, L.L.C., [547 U.S. 388, 392-93 (2006)])."

Turning to the second factor, KPM has also established that remedies available at law are inadequate to compensate for its above-described injury. In that connection, the Court notes that evidence at trial showed that the NIR analyzers sold in the parties' market have a lengthy life-span, often somewhere between fifteen and twenty years. [ECF No. 240, p. 100:11-13]. Relatedly, various pieces of trial testimony strongly suggested that in the parties' NIR analyzer market, customer relationships are "vital" in building a strong "service to sale" business model. [ECF No. 258, p. 7]. Accordingly, if the Defendants were allowed to restart their wrongful conduct, additional, immeasurable damage could befall KPM, especially because of the lengthy time intervals in between machine purchases. KPM argues that although the damages it was awarded in this case will address past harms suffered, the company may nevertheless "be rejected by customers months or years from now as a result of the confusion caused by defendants . . ." [ECF No. 258, p 8]. The Court agrees with this contention and finds that KPM has established that remedies available at law are inadequate to compensate for its injury. See Comet Techs. USA Inc. v. XP Power LLC, No. 20-cv-06408-NC, 2022 U.S. Dist. LEXIS 180127, at *6-7 (N.D. Cal. Sept. 30, 2022) ("Here, the damages awarded by the jury compensated for past harm, but they did not address ongoing or future harm from the future development of XP products based on the Comet trade secrets. . . . Therefore, the Court concludes that even the significant monetary award given by the jury does not adequately compensate and is not sufficient to prevent future harm against Comet.").

Turning to the third and fourth elements, for the reasons explained in KPM's memorandum in support of its motion [ECF No. 258, pp. 10-12], the Court finds that both

elements weigh in favor of the entrance of a permanent injunction. In particular, the Court notes that the Defendants will suffer virtually no harm from being barred from using KPM's trade secrets and are already legally barred from doing so. Moreover, the Court finds that even though the Defendants will be barred from approaching certain KPM customers for some reasonable length of time (e.g., to be determined, but likely no more than ten years), the record is clear that even despite the restrictions placed on the Defendants by the Court's preliminary injunction order [ECF No. 120], they have been not been prevented from meaningfully competing in the marketplace and with KPM. [Id.]. Accordingly, the Court concludes that a permanent injunction is warranted in this case.

As the Court has informed the parties, discussion of the scope of the preliminary injunction and its precise terms will be the subject of a Supplemental Memorandum and Order. However, for the avoidance of any doubt, the Permanent Injunction Order will apply with equal force to ITG. The Court rejects ITG's contentions that it should somehow be immune from coverage under the resulting order merely because the jury did not find that it misappropriated KPM's trade secrets. The fact remains that ITG was found liable for tortiously interfering with KPM's contracts and for willfully or knowingly engaging in unfair or deceptive trade practices. Moreover, since ITG has ownership and operational control over Blue Sun, the Court cannot and will not allow for a possibility in which a different entity under ITG's control could be allowed to engage in activities that Blue Sun is prevented from doing.

The Court expects to discuss the scope and precise terms of the resulting permanent injunction order at the next motion hearing in this case.

## VI. <u>REMAINING ISSUES & UPCOMING MOTIONS HEARING</u>

As discussed throughout, the Court will hear oral argument about at least the following issues at the next motion hearing in this case:

- KPM's Motion for Attorneys' Fees and Costs [ECF No. 259];
- Whether the Court should hold ITG and Blue Sun jointly and severally liable for the damages that have been awarded against them;
- The specific amount of prejudgment interest due KPM, and
- The exact terms/scope of the permanent injunction that will issue in due course.

The parties may file any additional briefing on these or other issues that they feel is necessary on ECF no fewer than three (3) days prior to the next motion hearing.

**SO ORDERED.**

**April 10, 2024**

/s/_Margaret R. Guzman________

Hon. Margaret R. Guzman

United States District Judge

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| KPM ANALYTICS NORTH AMERICA CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>BLUE SUN SCIENTIFIC, LLC, THE INNOVATIVE TECHNOLOGIES GROUP & CO., LTD., ARNOLD EILERT, ROBERT GAJEWSKI, RACHAEL GLENISTER, AND IRVIN LUCAS,<br><br>Defendants. | Civil Action No. 21-10572-MRG |

**GUZMAN, D.J.**

**MEMORANDUM & ORDER**

## I. Introduction

This Memorandum and Order addresses KPM's motion for attorneys' fees and costs. [ECF No. 259]. Familiarity is assumed with this Court's prior post-trial Memorandum and Order [ECF No. 297], particularly with respect to previously defined terms.

After careful consideration of the parties' filings and oral argument [e.g., ECF No. 279; ECF No. 303], the Court awards KPM reasonable attorneys' fees and reasonable costs as follows:

- **Total Reasonable Attorneys' Fees Due KPM:**
  - $1,519,800
- **Total Reasonable Costs Due KPM:**
  - $271,530

Each of the following Defendants shall owe the following amounts towards these totals:

| Defendant | Amount of Reasonable Attorneys' Fees Owed | Amount of Reasonable Costs Owed |
|---|---|---|
| Blue Sun | $682,301.20 | $121,446 |
| ITG | $833,923.80 | $148,434 |
| Gajewski | $1,125 | $500 |
| Eilert | $200 | $100 |
| Glenister | $750 | $300 |
| Lucas | $1,500 | $750 |
| Total Due KPM | **$1,519,800** | **$271,530** |

The Court's reasoning for these determinations follows.

## II. KPM's Request

With its motion (and supplemental briefing), [ECF No. 259; ECF No. 299 at 8-10] KPM has asked this Court to award **$3,799,531** in purportedly reasonable attorneys' fees. [ECF No. 299 at 8]. KPM has also asked this Court to award **$339,409.45** in purportedly reasonable costs. [Id.]

### a. KPM's Grounds for Requesting Attorneys' Fees & Costs

KPM argues that there are three independent grounds that entitle it to reasonable attorneys' fees and costs. Notably, neither the Individual Defendants nor the Corporate Defendants

have meaningfully[1] challenged these assertions; meaning that the real crux of the matter will be *exactly how much* of KPM's requested sums the undersigned determines to be reasonable. However, the Court will briefly explain why KPM is entitled to at least some amount of attorneys' fees and costs.

The first basis for KPM's claimed entitlement is the fact that Chapter 93A -- the state statute under which it prevailed against Blue Sun and ITG -- provides a mechanism by which plaintiffs automatically recoup reasonable attorneys' fees and costs in certain circumstances. See Mass. Gen. Laws ch. 93A, § 11 (providing in part that, "[i]f the court finds in any action commenced hereunder, that there has been a violation of section two, the petitioner ***shall***, in addition to other relief provided for by this section and irrespective of the amount in controversy, be awarded reasonable attorneys' fees and costs incurred in said action." (emphasis added)).

Second, each of the Individual Defendants signed employment agreements with KPM that had a provision relating to the award of reasonable attorneys' fees and costs. [See, e.g., ECF No. 299 at 9 (quoting the Individual Defendants' employment

[1] Although it is true that the Individual Defendants and the Corporate Defendants seek the Court's outright denial of KPM's request [ECF No. 266 at 5-6; ECF No. 268 at 20], neither have substantively rejected the notion that KPM is owed at least some amounts of reasonable attorneys' fees and costs under Chapter 93A and under the Individual Defendants' employment agreements.

agreements as containing the following provision: "[i]n any action successfully brought by [KPM] against you...[KPM] shall also be entitled to recover from you its reasonable attorneys' fees and costs of the action." (alteration in original))].

Third, KPM points out that because this Court has found that Blue Sun, and each of the Individual Defendants willfully and maliciously misappropriated certain KPM trade secrets, the undersigned now has the discretion under both the Massachusetts Trade Secrets Act and the federal Defend Trade Secrets Act to award reasonable attorneys' fees and/or costs to KPM as the "prevailing party." See 18 U.S.C. § 1836(b)(3)(D) ( "In a civil action brought under this subsection with respect to the misappropriation of a trade secret, a court ***may***...if...the trade secret was willfully and maliciously misappropriated, ***award reasonable attorney's fees*** to the prevailing party" (emphasis added)); M.G. L. c. 93 § 42C ("The court ***may*** award ***reasonable attorney's fees and costs*** to the prevailing party if: (i) a claim of misappropriation is made or defended in bad faith, (ii) a motion to enter or to terminate an injunction is made or resisted in bad faith, ***or (iii) willful and malicious misappropriation exists."*** (emphasis added)). To be sure, only the first and second of these three theories of recovery for attorneys' fees point towards a mandatory award, since neither the federal nor the state trade secret statute requires this

Court to impose any attorneys' fees or costs; it only empowers it to do so in its discretion.

## III. Corporate Defendants' and Individual Defendants' Responses

The Individual Defendants and the Corporate Defendants have lodged a host of objections to KPM's request. [See, e.g., ECF No. 266; ECF No. 268]. For example, they both take issue with the degree to which KPM redacted its submitted legal billing invoices as originally filed. [E.g., ECF No. 268 at 2-11]. Although KPM later submitted versions of its billing invoices that contained significantly fewer redactions,[2] it was clear from oral argument that the level of redactions remains a point of contention. Relatedly, the Individual Defendants and the Corporate Defendants also complain of purported "block billing"[3] by KPM's attorneys [ECF No. 268 at 10-13], and of the

[2] Apparently recognizing that the amount of redactions contained in its first submissions rendered them nearly undecipherable, KPM chose to attach a new, less redacted copy of its legal invoices in its reply brief. [ECF No. 275-1]. The Court opted to review this submission instead, although it notes and has taken into account that this was inefficient and did to some extent limit the Individual Defendants and the Corporate Defendants' ability to oppose the KPM's motion in their initial opposition briefs.

[3] This term refers to "the time-keeping method by which an attorney lumps together the total daily time spent working on a case, rather than itemizing the time expended on specific tasks." Conservation Law Found., Inc. v. Patrick, 767 F. Supp. 2d 244, 253 (D. Mass. 2011). It is a method that is "disfavor[ed]" by other sessions of this Court and it is disfavored in this one, as well. See id. (citation omitted).

purportedly "vague" nature of many of the submitted time entries. [ECF No. 268 at 12-14]. They also argue that many of the billing entries reveal that KPM's attorneys spent unreasonable amounts of time on certain tasks and/or duplicated efforts, etc. [ECF No. 268 at 14-18].

In terms of apportionment, the Individual Defendants essentially ask this Court to index any fees/costs amounts that they will be made to pay to the degree to which they were found liable and also ask that this Court consider their relative abilities to pay such an award. [Id. at 18-20]. Somewhat relatedly, the Corporate Defendants ask the Court to deny the fees/costs request in its entirety relative to ITG, principally because ITG was found not to have misappropriated KPM's trade secrets. [ECF No. 266 at 5-6].[4]

## IV. Attorneys' Fees Analysis

### a. Legal Framework

As a threshold matter, the Court must determine the appropriate method for evaluating the reasonableness of KPM's attorneys' fees request. The parties disagree as to the

[4] Although the Jury did not find ITG liable for trade secret misappropriation, it did render an advisory opinion that ITG committed a Chapter 93A violation [ECF No. 230 at 7] -- a finding that this Court later independently ratified. [ECF No. 297 at 37]. Thus, it is not the case that ITG is somehow immune from liability from an imposition of reasonable attorneys' fees and reasonable costs. See Mass. Gen. Laws ch. 93A, § 11.

controlling method -- with Individual Defendants[5] and the Corporate Defendants[6] arguing that the so-called lodestar approach controlled -- and KPM urging this Court to reject the lodestar method in favor of a more undefined, "holistic" approach.[7] After careful consideration of this issue, the Court will, as other sessions of this Court have done in arguably similar cases, apply the lodestar approach. See, e.g., BioPoint, Inc. v. Dickhaut, No. 20-10118-RGS, 2023 U.S. Dist. LEXIS 118565, at *1 (D. Mass. July 11, 2023) ("Courts in the First Circuit use the lodestar method to determine a reasonable attorney fee." (citation omitted)); Red Wolf Energy Trading, LLC v. BIA Capital Mgmt., LLC, No. 19-10119-MLW, 2022 U.S. Dist. LEXIS 194402, at *7 (D. Mass. Oct. 25, 2022). Moreover, the Court notes that the lodestar method is also permitted in Massachusetts state courts -- meaning that this approach is appropriate in light of the state law claims that were at issue in this case. See, e.g., Simmons v. Pilaster Digit. LLC, No.

[5] [ECF No. 268 (making repeated references to the lodestar approach)].

[6] [ECF No. 266 at 2-3].

[7] [ECF No. 283 at 81 (KPM's counsel stating that, "[i]n any event, the Supreme Court of Massachusetts has made it clear that the Court is to consider the request as a whole. It's not to parse out individual entries. That approach is more of what's known as the lodestar approach, and it's clear from case law that the lodestar approach is, quote, disfavored under the holistic approach that is favored in these instances."]

19-40072-DHH, 2021 U.S. Dist. LEXIS 267803, at *10 (D. Mass. Nov. 29, 2021) (observing that "[b]oth the First Circuit and Massachusetts courts generally follow the so-called 'lodestar' method for evaluating the reasonableness of fee application" (citation omitted)).

As the First Circuit has explained, the lodestar approach functions as follows:

> - [A] district court first calculate[s] the number of hours reasonably expended by the attorneys for the prevailing party, excluding those hours that are excessive, redundant, or otherwise unnecessary.
>
> - The court then determines a reasonable hourly rate or rates -- a determination that is often benchmarked to the prevailing rates in the community for lawyers of like qualifications, experience, and competence.
>
> - Multiplying the results of these two inquiries yields the lodestar amount.
>
> - The court may then adjust the potential award based on factors not captured in the lodestar calculation.

Matalon v. Hynnes, 806 F.3d 627, 638 (1st Cir. 2015) (internal citations and quotation marks omitted) (bullet points added).

Under the lodestar approach, KPM bears the burden of proving that both the number of hours billed and the hourly rates charged are reasonable. Creative Playthings Franchising Corp. v. Reiser, No. 09-11456-DLC, 2015 U.S. Dist. LEXIS 101063, at *7 (D. Mass. Aug. 3, 2015) (citations omitted). Very importantly, "the burden is on the fee applicant to establish his entitlement

to reasonable fees through submission of evidence" and this Court "is not in the business of estimating hours." Janney Montgomery Scott LLC v. Tobin, 692 F. Supp. 2d 192, 199 (D. Mass. 2010) (citation omitted). Although there is a "strong presumption" that the lodestar represents a "reasonable" fee, the parties opposing a fee application may present arguments and evidence that justify a downward adjustment of the lodestar amount. Creative Playthings Franchising Corp., 2015 U.S. Dist. LEXIS 101063, at *7 (citations omitted).

Another threshold issue is whether the Court should consider the attorneys' fees request on a claim-by-claim basis. The Court will *not* do so here since it finds that each of KPM's claims essentially involved the same operative set of facts and sought to remedy the same injury. See, e.g., Haddad Motor Grp., Inc. v. Karp, Ackerman, Skabowski & Hogan, P.C., 603 F.3d 1, 10 (1st Cir. 2010) ("Under Massachusetts precedent, fees and costs for non-Chapter 93A claims are recoverable provided that those claims and the Chapter 93A claims arise from a 'single chain of events'... (citations omitted)); Hanover Ins. Co. v. Sutton, 705 N.E.2d 279, 296 (Mass. App. Ct. 1999) (reasoning that since "a single chain of events gives rise to both a common law and a Chapter 93A claim, apportionment of legal effort between the two claims is not necessary..." (citation omitted)).

As the trial judge, the undersigned is deeply familiar with the facts of this case and has easily concluded that all of the claims that were put to the Jury arose from a single chain of events. Accordingly, this is not an instance where a claim-by-claim analysis of the legal fees would be appropriate.

**b. Application -- Reasonableness of Hours Spent**

As noted above, step one of the lodestar approach requires the Court to determine the number of hours reasonably spent less those hours it finds to be excessive, redundant, or otherwise unnecessary. See Matalon v. Hynnes, 806 F.3d at 638. The "usual starting place" for this inquiry is "the billing record supplied by the plaintiffs." Fryer v. A.S.A.P. Fire and Safety Corp., 750 F. Supp. 2d 331, 335 (D. Mass. 2010) (citation omitted). When determining the number of reasonable hours spent, the Court "scrutinizes 'the individual fees for the contemporaneousness and sufficient detail required to justify the charge.'" Janney, 692 F. Supp. 2d at 196 (citation omitted). Then, the court subtracts the "duplicative, unproductive, or excessive hours." Gay Officers Action League v. Commonwealth of Puerto Rico, 247 F.3d 288, 295 (1st Cir. 2001).

Before the Court delves into its analysis of the billing record that KPM has supplied [i.e., ECF No. 275-1], it will briefly describe the nature of this case, so that the legal

billings can be appreciated and evaluated in their proper context.

This complex action has run for over three years. Indeed, the first series of KPM's submitted legal billing entries is from April 2021. [ECF No. 275-1 at 2-9]. From the start, this case has been a complex and contentious affair marked by bitter disputes often requiring Court involvement. A few examples illustrate this point. KPM sought -- and obtained -- a preliminary injunction in the second half of 2021. [ECF No. 94; ECF No. 120]. The discovery process that followed was wide-ranging and time-consuming. For example, the parties took some twenty-one total depositions -- generating over one hundred deposition exhibits. [ECF No. 259 at 11]. In addition to navigating a vast ocean of fact discovery, KPM's lawyers also engaged in extensive expert discovery relative to both liability and damages. KPM notes that its attorneys reviewed "tens of thousands" of documents and responded to some seventy-five interrogatory and document requests. [Id.] An additional layer of discovery-phase complexity was driven by that fact that, as KPM points out, large swaths of relevant material involved the Individual Defendants' use of deliberately false email aliases. [Id.]

In addition to discovery, the parties also engaged in extensive motion practice -- including, just for example, the

defendants' motions to dissolve the preliminary injunction and motions for summary judgment. [ECF No. 148 (both the Individual Defendants and the Corporate Defendants' moving to dissolve the Preliminary Injunction); ECF No. 144 (Defendant ITG moving for summary judgment in its favor)]. The Court ruled in KPM's favor on both scores. [ECF No. 165]. The case culminated in a nine-day jury trial on seven, legally and factually complex counts. Nine live witnesses testified, and two witnesses testified by deposition. In the end, the Jury's verdict represented a near-total victory for KPM. [ECF No. 297 at 5-6 (the Court describing the outcome at trial)]. Indeed, the Court finds that KPM's attorneys provided their client with able representation prior to, during, and through trial.

However, careful review of the billing record submitted by KPM reveals some material deficiencies that weigh against a finding that the numbers of hours spent were reasonable. The Court has three specific areas of concern: first, the Court has been presented with a "data dump"[8] of sequential legal invoices

---

[8] See, e.g., Twin Fires Inv., LLC v. Morgan Stanley Dean Witter & Co., 837 N.E.2d 1121, 1137 (Mass. 2005) (finding that the trial court had been presented with what amounted to a "data dump" in connection with an attorneys' fees application where the plaintiffs had submitted "eight affidavits, three of attorneys who had worked on the case and five of attorneys familiar with the reputations of the principal attorneys who had worked on the case; sixty pages of invoices from two law firms and two expert witnesses; and 458 pages of detailed computerized daily time sheets and records of disbursements generated by thirty-seven

that are voluminous and written for a much different audience (i.e., a client, and not the Court) and which are presented without sufficient summaries and explanations. Second, a significant amount of the billing entries are overly vague and/or heavily redacted and were presented without a sanitized summary. Third, there was a considerable amount of block billing contained within the legal invoices. Each of these factors weigh against a finding that the number of total hours spent was reasonable and therefore warrant a globalized reduction to the requested attorneys' fees amount.

**i. Data Dump**

The Court understands that legal billing invoices are, of course, primary evidence of KPM's entitlement to an amount of attorneys' fees. However, merely presenting some 400 pages of invoices [ECF No. 275-1] without any meaningful summary charts or explanations onto the docket is not a particularly useful way to carry the burden of showing entitlement to the total amount of attorneys' fees requested. See Janney Montgomery Scott LLC v. Tobin, 692 F. Supp. 2d at 199. Indeed, as the Court noted in Fryer, the billing record is the "usual ***starting place***" for the Court's analysis of an attorneys' fees request. 750 F. Supp. 2d

---

individual 'timekeepers' at the plaintiffs' primary law firm. The hundreds of pages of routine, computerized time sheets were not summarized in any meaningful fashion.")

at 335 (emphasis added). It should not also be the ending place.

The Court considers KPM's sequential submissions of invoices to be a "data dump" -- a form of submission that is disfavored by other sessions of this Court and by Massachusetts state courts. See, e.g., Twin Fires, 837 N.E.2d at 1137; Full Spectrum Software, Inc. v. Forte Automation Sys., 125 F. Supp. 3d 301, 304 (D. Mass. 2015) ("Due to the extent of the redactions contained in the billing records, there is simply no way for this Court to competently determine whether the tasks and time billed by counsel were reasonable. Full Spectrum's offer to provide unredacted copies for *in camera* review is not sufficient, either. Even if the Court were to review unredacted invoices, the documentation still resembles the 'data dump' confronted by the Massachusetts Supreme Judicial Court in Twin Fires, where the court affirmed a 45% reduction in the requested award.")

The limited utility of this data dump had a material effect on the Court's ability to evaluate the reasonableness of KPM's requested award. Perhaps most significantly, the Court is not able to easily discern with any precision the exact number of purportedly reasonable hours at purportedly reasonable rates since such aggregate figures were seemingly not calculated and presented in KPM's filings. Whereas, for example, the Court in

BioPoint was able to state with precision how many hours had been billed to each major portion of the case -- this Court is left guessing as to exactly how many billed hours KPM believes were reasonable. See BioPoint, Inc. v. Dickhaut, No. 20-10118-RGS, 2023 U.S. Dist. LEXIS 118565, at *2 (D. Mass. July 11, 2023) ("BioPoint seeks fees for 3,690.60 hours of work, including 2,671.2 hours in pre-trial work and 1,019.4 hours in jury trial, bench trial, and post-trial work"). Indeed, this Court "is not in the business of estimating hours." Janney, 692 F. Supp. 2d at 199.

In addition to hindering the Court's ability to assess the exact number of purportedly reasonable hours, the lack of any charts and summaries also prevents the Court from having a real sense as to whether the amount of work being conducted was reasonable given the context of the various phases of the case's lifecycle. For example, it would have been helpful if KPM had provided some form of a graph showing trendlines of legal billings in relation to the different phases of the case (e.g., discovery, trial, etc.) This factor weighs against a finding that the number of hours was reasonable. See, e.g., Full Spectrum, 125 F. Supp. 3d at 304 ("Given its limited judicial resources, it is not for the Court 'to sort out the plaintiff's perplexing submission' in support of a fee request." (citation omitted)).

**ii. <u>Vague/Heavily Redacted Entries</u>**

Another problem that plagued KPM's submission was the presence of a non-negligible number of vague and/or heavily redacted billing entries. Vague, boilerplate billing entries are disfavored. <u>See, e.g.</u>, <u>Janney</u>, 692 F. Supp. 2d at 199 ("This Court discounts time billed that is vague and lacks sufficient detail in its description. [Attorney's] billing description fails for lack of detail and vagueness. A description reading 'Review arbitration issue' is hardly sufficient for the purpose of awarding fees." (citations omitted)).

In terms of redactions, the Court of course recognizes the need to make certain redactions on the basis of work-product and/or attorney-client privilege issues, but there is still an overarching obligation to provide the Court with sufficient detail about the requested attorneys' fees. <u>See, e.g.</u>, <u>Full Spectrum</u>, 125 F. Supp. at 304 ("The Court recognizes that it is the prerogative of the fee applicant to redact information contained in legal bills on the basis of work-product or attorney-client privilege. However, when it comes to a fee request, a plaintiff 'has an obligation to submit sufficient documentation to enable the judge to evaluate the hours spent on particular aspects of the case or the precise nature of the work.'" (citations omitted)).

Here, although some of the submitted billing entries were sufficiently detailed,[9] a non-negligible amount of KPM's entries were either too heavily redacted and/or too vague to pass muster. Several illustrative examples prove the point. For example, during the month of trial, a KPM attorney billed 12.8 hours for an entry that reads: "Exhibit list generation; multiple messages with team and client; assemble materials; emails to opposing counsel." [ECF No. 275-1 at 334]. An entry from April 2022 for 9.40 hours contains the following description: "Deposition planning and [scheduling]; multiple doc review and production issues." [Id. at 391]. A 10.40 hour billing entry from February 2023 reads simply, "Prepare for hearing." [Id. at 322]. Finally, a September 2022 entry for 8.80 hours just reads, "Work on Motions." [Id. at 405].

---

[9] Just by way of example, one KPM attorney's 1.80 hour entry in March 2023 is described as follows:

> Develop trial and witness strategy; develop strategy for identifying and admitting exhibits at trial; correspondence concerning trial logistics, including hotel accommodations, working space, trial hot seat operators, and printing needs; develop strategy concerning trial brief and joint pre-trial memorandum; correspondence with opposing counsel concerning pre-trial schedule; correspondence with damages expert concerning supplementation of damages opinions[.]

[ECF No. 275-1 at 328].

Redacted entries provided without any sanitized summaries weaken KPM's submission somewhat, too. Three illustrative examples prove this point. On July 12, 2021, a 5.9 hour billing entry reads: "Prepare for and call with E. Olsen; checklist to team; attention to proof regarding [Redacted]." [Id. at 24]. A 4.30 hour entry from October 2021 reads, "Attention to discovery responses and docs RE: [Redacted]." [Id. at 46]. A July 2021 entry for 11.2 hours bears the following description: "Prepare for and attend [redacted]; prepare for Blue Sun deposition [redacted]" [Id. at 23]. Although the Court certainly understands the need for certain material to be redacted, it is unable to fully assess the reasonableness of the hours spent without any meaningful, accompanying sanitized explanations. See Full Spectrum, 125 F. Supp. 3d at 304 (finding that an attorneys' fees application was weakened by the fact that the plaintiff "has filed nearly 150 pages of heavily redacted, chronological invoices. No meaningful attempt has been made to summarize the content of the billing records, organize them by subject matter, or provide a total figure for the number of hours spent on the case by each attorney.")

**iii. Block Billing**

Another deficiency with KPM's submission was the too common use of block billing. Examples of this practice included:

- A 7.85 hour entry from May 2021 described as including, "Summarize research findings and email to S. Magee and J. Gutkoski; Review Motions to Dismiss and Opposition to Emergency Motion for Expedited Discovery; Call with S. Magee and J. Gutkoski regarding Motions to Dismiss and Opposition to Cross Motion to Stay Discovery; Legal research – [Redacted]; Client call with J. Gutkoski and S. Magee regarding Motions to Dismiss and Opposition to Cross Motion to Stay Discovery; Legal research - expedited discovery Legal research – [Redacted] discovery." [ECF No. 275-1 at 81].

- A 5.9 hour entry from July 2022 described as including, "Edit opposition to motion to compel; work on exhibits for motion to compel; contact clerk regarding motion to seal; review orders regarding sealing and redaction; emails with J. Gutkoski regarding opposition; redact brief; emails with clerk regarding same; finalize and serve redacted and unredacted versions of opposition to motion to compel." [Id. at 213].

- An 8.7 hour entry from April 2023 described as "Research and develop strategy for trial brief, jury instructions, verdict form, voir dire questions, and motions in limine; draft, finalize, and file same; review and analyze the defendants' trial brief, jury instructions, voir dire questions, and motions in limine; research, analyze, and develop strategy for oppositions to the defendants' motions in limine." [Id. at 338].

While not fatal to KPM's request, the use of block billing hinders the Court's ability to fully assess the reasonableness of the hours spent, yet another factor weighing against the requested award. See, e.g., Torres-Rivera v. O'Neill-Cancel, 524 F.3d 331, 340 (1st Cir. 2008) (finding no error in lower court's global reduction due to the presence of block billing).

c. **Application -- Reasonable Hourly Rates**

The next step in the lodestar analysis requires the Court to determine reasonable hourly rates based on "prevailing rates in the community (taking into account the qualifications, experience, and specialized competence of the attorneys involved)." See, e.g., Gay Officers Action League, 247 F.3d at 295 (citations omitted). The First Circuit has explained that reasonable hourly rates are calculated by considering "such factors as the type of work performed, who performed it, the expertise that it required, and when it was undertaken." Grendel's Den, Inc. v. Larkin, 749 F.2d 945, 950-51 (1st Cir. 1984).

Although the Court notes that neither the Individual Defendants nor the Corporate Defendants appear to have challenged the reasonableness of KPM's lawyers' hourly rates [see ECF No. 266; ECF No. 268], the Court still needs to assure itself that these rates are reasonable. See, e.g., Janney, 692 F. Supp. 2d 192, 200 (D. Mass. 2010) (noting that the Court had engaged in a "careful review" of submissions regarding the issue of reasonable rates in an instance where it "appear[ed] that [the opposing party] d[id] not contest[] the hourly rates.")

The Court will start by looking at who performed the work. KPM avers that it was primarily represented by four different attorneys during the lifecycle of this case: Mr. John Gutkowski,

Mr. Scott Magee, Ms. Paige Zacharakis, and Mr. Kevin Mosier. [ECF No. 259 at 15]. Unsurprisingly, other attorneys worked on the case on a much less frequent, as-needed basis. [Id.] As of the time of KPM's motion [ECF No. 259], the following attorneys had represented KPM in this case at the following hourly rates[10]:

| **Name and Title** | **Law Firm Name** | **Hourly Billing Rate** |
|---|---|---|
| John Gutkoski, Partner | Sunstein | $650-675 |
| Scott Magee, Partner | Morse | $495-555 |
| Paige Zacharakis, Associate | Morse | $330-370 |
| Kevin Mosier, Associate | Sunstein | $505 |
| Jacqueline Salwa, Associate | Sunstein | $435 |
| Katherine Soule, Associate | Sunstein | $505 |
| Bryan Harrison, Associate | Sunstein | $605 |
| Joseph Marrow, Partner | Morse | $620 |
| Matthew Mitchell, Partner | Morse | $545 |
| Omar Wadhwa, Partner | Cesari and McKenna, LLP | $500 |
| Matthew McCloskey, Partner | Cesari and McKenna, LLP | $495 |

After careful review of the primary attorneys' background and experience -- coupled with its assessment of their performance at trial -- the Court easily concludes that these lawyers had the appropriate level of expertise to handle this type of complex civil litigation. [See, e.g., ECF No. 260-1; ECF No. 261-1]. This finding weighs in favor of a finding that the requested number of hours was reasonable. Further, the

[10] [ECF No. 259 at 15-16].

Court credits KPM's analysis and argument that the hourly rates charged were appropriate and comparable to, if not lower than, those charged by similar commercial law firms in the community. [See, e.g., ECF No. 259 at 16-17; ECF No. 260 at 5-6]. Finally, the Court finds that the rates charged were commensurate with the skill of the attorneys, who like the attorneys in the BioPoint case, have "professional profiles [that] reflect extensive experience and credentials." See 2023 U.S. Dist. LEXIS 118565, at *4.

For all of these reasons, the Court finds that the hourly rates charged by KPM's attorneys in this case were reasonable and that no reductions are warranted on the basis of the rates charged.

**d. Total Amount of Attorneys' Fees Awarded**

Applying the lodestar approach, the Court has essentially concluded that, on the one hand, KPM's attorneys provided their client with effective, diligent and ultimately successful legal counsel. On the other hand, there were deficiencies in KPM's attorneys' fees submission that made it difficult for the Court to fully assess their request. Bearing in mind that KPM bore the burden of showing its entitlement to this attorneys' fees award, the Court has determined that an across-the-board deduction is appropriate. Accordingly, the Court will impose an approximately 60 percent global reduction of KPM's requested

attorneys' fees amount (i.e., $3,799,531) such that KPM is due a total of **$1,519,800** in attorneys' fees. This sort of global reduction based on submission deficiencies are not without precedent in this Court. See, e.g., Full Spectrum, 125 F. Supp. 3d at 306 ("In light of the foregoing, the Court concludes that an award of $166,162.08 in fees (50% of the fees request)...is reasonable"); Benchmark Techs., Inc. v. Yuqiang Tu, No. 22-10227-LTS, 2023 U.S. Dist. LEXIS 93512, at *9 (D. Mass. May 30, 2023) ("Accordingly, the Court will apply an across-the-board 50 percent reduction to the award of fees and costs..."). Who will pay what of this total is described below.

## V. Costs

With respect to costs, KPM argues that they are entitled to a purportedly reasonable sum of $339,409.45. [ECF No. 299 at 8]. In the affidavits submitted in conjunction with its initial motion [ECF No. 259], KPM sought a purportedly reasonable sum of $314,167 and provided a helpful summary chart showing how they arrived at that figure (reproduced here):

| **Cost Category** | **Sum of Cost** |
|---|---|
| E-Discovery Fees | $78,234 |
| Deposition and Transcript Fees | $29,577 |
| Printing and Copying Fees | $21,687 |
| Expert Fees – Mr. Neil Zoltowski | $127,620 |
| Trial Presentation Technician Fees | $36,683 |
| Shipping Fees | $1,026 |
| Travel and Lodging Fees | $19,340 |
| Total | **$314,167** |

[See e.g., ECF No. 260 at 7].

However, in their reply to the Defendants' opposition briefs, KPM increased the total amount of purportedly reasonable costs sought to $339,409.45. [ECF No. 275 at 12]. Rather than showing the Court how that number increased, KPM merely attached additional invoices and explained that the new total reflected purportedly reasonable costs that had been incurred in the interim period between the briefs. However, no such helpful cost breakdown chart was provided.

Upon review of both the cost breakdown chart contained in their initial filings [e.g., ECF No. 260 at 7] coupled with a review of the costs-related invoices themselves, the Court finds that these costs *categories* were each generally reasonable, especially given the length and complexity of this litigation. However, the Court is skeptical of, among other things, the high e-discovery fees. Indeed, some of the e-discovery-related invoices are vague and/or contain technical terminology that is difficult for the Court to fully understand.

Just by way of example, one e-discovery line item from March 2023 for $2,067.50 (among several other, similar ones) is described as "Host files in Insight repository for March 2023." [ECF No. 260-2 at 345]. Another entry from April 2022 for $144.00" is described as "TIFF conversion of 322 native electronic files with text and metadata extraction." [Id. at

334]. The lack of plain English summaries of these sorts of charges weighed against a finding that the requested amount was reasonable.

With respect to the expert-related fees, the Court certainly recognizes their value in this complicated case. However, the Court finds that certain of the expert-related invoices were too vague for the Court to fully assess. For example, one invoice from March 2023 for $3,282.50 was composed of seven separate expert billing entries where the only descriptors used were various combinations of the words, "[d]iscussions," "[d]ocument [r]eview," and "[a]nalysis." [Id. at 301].

For all of these reasons, the Court will apply an approximately 20 percent global reduction of KPM's requested costs; such that KPM shall be due a total of **$271,530**. Who will pay what of this total is described below.

## VI. Allocation

With respect to who will pay what of these reasonable attorneys' fees and costs, the Court will start with assigning the amounts that each of the Individual Defendants will be made to contribute. As a starting point, the Court finds that they each earn modest salaries. [ECF No. 268 at 21]. Moreover, the Court recognizes that each will already have to pay varying amounts of compensatory damages and that Lucas and Gajewski will

have to pay additional amounts of punitive damages. This Court may consider a party's ability to pay when assigning liability for reasonable attorneys' fees and costs. See e.g., Andrade v. Jamestown Hous. Auth., 82 F.3d 1179, 1193 (1st Cir. 1996) ("Once it has calculated the lodestar for a prevailing defendant, the district court may deny or reduce that amount after considering the plaintiff's financial condition" (citation omitted)).

That said, the fact remains that each of the Individual Defendants signed an employment agreement that explicitly provided for KPM's ability to recover from them reasonable attorneys' fees and costs in the event of a successful action being brought against them. [See, e.g., ECF No. 299 at 9]. Therefore, they must be made to contribute some meaningful amount towards the reasonable attorneys' fees and costs totals that have been determined. In keeping with the spirit of the Jury's assignment of different compensatory damages amounts based on each of their varying levels of liability in the case, the Court will likewise structure their required contributions towards the attorneys' fees and costs with Lucas paying the most, Gajewski paying second most, Glenister paying third most, and Eilert paying the least of the four.

With respect to the Corporate Defendants, the Court finds it reasonable to assign Blue Sun with approximately 45 percent of the remaining reasonable attorneys' fees and costs -- and to

assign ITG with 55 percent of those totals. This division is in approximately direct proportion with the Jury's assignment of compensatory damages against each of the Corporate Defendants at trial. [See ECF No. 296 (the Court interpreting the Verdict Form as finding that Blue Sun was liable for $1,500,000 in compensatory damages and ITG was liable for $1,800,000 in compensatory damages)].

Accordingly, the Individual Defendants and the Corporate Defendants shall be liable as follows:

| **Defendant** | **Amount of Reasonable Attorneys' Fees Owed** | **Amount of Reasonable Costs Owed** |
|---|---|---|
| Blue Sun | $682,301.20 | $121,446 |
| ITG | $833,923.80 | $148,434 |
| Gajewski | $1,125 | $500 |
| Eilert | $200 | $100 |
| Glenister | $750 | $300 |
| Lucas | $1,500 | $750 |
| Total Due KPM | **$1,519,800** | **$271,530** |

## VII. Conclusion

For the foregoing reasons, KPM's Motion for Attorney's Fees and Costs [ECF No. 259] is **granted in part** and **denied in part**.

**SO ORDERED.**
Dated: October 10, 2024

/s/ Margaret R. Guzman
MARGARET R. GUZMAN
United States District Judge

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| KPM ANALYTICS NORTH AMERICA CORPORATION,<br>Plaintiff,<br><br>v.<br><br>BLUE SUN SCIENTIFIC, LLC, THE INNOVATIVE TECHNOLOGIES GROUP & CO., LTD., ARNOLD EILERT, ROBERT GAJEWSKI, RACHAEL GLENISTER, and IRVIN LUCAS,<br><br>Defendants. | 21-CV-10572-MRG |

**FINAL JUDGMENT AND PERMANENT INJUNCTION**

This action came before the Court for a jury trial and the issues have been tried. The jury has rendered its verdict [ECF No. 230], and the Court has issued detailed post-trial opinions [ECF No. 297]; [ECF No. 315] regarding, among other things : (i) Plaintiff’s motion for a finding on its Chapter 93A claim, (ii) Plaintiff’s motion for a finding of willful and malicious conduct, (iii) Plaintiff’s motion for attorneys’ fees and costs, (iv) Plaintiff’s motion for a permanent injunction, and (v) Defendants’ motions to alter or amend the judgment, or in the alternative, for remittitur. It is hereby **ORDERED**, **ADJUDGED**, and **DECREED** that:

1. On Counts I and II of the Complaint, Defendants Blue Sun Scientific, LLC, Irvin Lucas, Robert Gajewski, Rachael Glenister, and Arnold Eilert misappropriated Plaintiff’s trade secrets

willfully and maliciously and judgment is hereby entered in favor of Plaintiff on Counts I and II of the Complaint against Defendants Blue Sun Scientific, LLC, Irvin Lucas, Robert Gajewski, Rachael Glenister, and Arnold Eilert by reason of the jury’s May 17, 2023 verdict, including exemplary damages assessed against Defendants, Irvin Lucas and Robert Gajewski, in an amount equal to 50% the compensatory damages awarded against each of them pursuant to 18 U.S.C., § 1836(b)(3)(C) and Mass. Gen. L. ch. 93, § 42B(b);

2. On Count III of the Complaint, Defendants Irvin Lucas, Robert Gajewski, Rachael Glenister, and Arnold Eilert breached their contracts with Plaintiff, and, in addition to damages, Plaintiff is entitled to an award of attorneys’ fees and costs (as described below) pursuant to the fee shifting provisions of the contracts. Judgment is hereby entered in favor of Plaintiff on Count III of the Complaint against Defendants Irvin Lucas, Robert Gajewski, Rachael Glenister, and Arnold Eilert by reason of the jury’s May 17, 2023 verdict;

3. On Count IV of the Complaint, Defendants Irvin Lucas, Robert Gajewski, Rachael Glenister, and Arnold Eilert violated the covenant of good faith and fair dealing implied in their contracts with Plaintiff and judgment is hereby entered in favor of Plaintiff on Count IV of the Complaint against Defendants Irvin Lucas, Robert Gajewski, Rachael Glenister, and Arnold Eilert by reason of the jury’s May 17, 2023 verdict;

4. On Count V of the Complaint, judgment is hereby entered on behalf of Defendants Irvin Lucas, Robert Gajewski, Rachael Glenister, and Arnold Eilert by reason of the jury's May 17, 2023, verdict;

5. Count VI of the Complaint against Defendants Rachael Glenister and Irvin Lucas was dismissed pursuant to Fed. R. Civ. P. 12(b)(6);

6. On Count VIII of the Complaint, Defendants Blue Sun Scientific, LLC, and the Innovative Technologies Group & Co., Ltd., tortiously interfered with Plaintiff's contractual relations and judgment is hereby entered in favor of Plaintiff on Count VIII against Defendants Blue Sun Scientific, LLC and The Innovative Technologies Group & Co., Ltd. by reason of the jury's May 17, 2023 verdict;

7. Count VIII of the Complaint against Defendant Arnold Eilert was dismissed pursuant to Fed. R. Civ. P. 12(b)(6) and dismissed against the Defendants, Blue Sun Scientific, LLC, The Innovative Technology Group & Co., Ltd., Robert Gajewski, Rachael Glenister, and Irvin Lucas, voluntarily, as stated on the record at Trial Transcript Day 9, 112:11-13;

8. Count IX of the Complaint against Defendants Blue Sun Scientific, LLC, The Innovative Technology Group & Co., Ltd., Robert Gajewski, Arnold Eilert, Rachael Glenister, and Irvin Lucas was dismissed pursuant to Fed. R. Civ. P. 12(b)(6);

9. On Count X, Defendants Blue Sun Scientific, LLC and The Innovative Technologies Group & Co., Ltd. engaged in knowing or willful violation of Mass. Gen. L. ch. 93A and judgment is hereby entered in favor of Plaintiff on Count X of the Complaint against Defendants Blue Sun Scientific, LLC and The Innovative Technologies Group & Co., Ltd., including an award of double damages and attorneys' fees;

10. Judgment is hereby entered in favor of Plaintiff on all counts of the Counterclaims by reason of the jury's May 17, 2023 verdict;

11. The Court awards **monetary damages** to Plaintiff in a total amount of $6,665,000.00, allocated against the following defendants in the following amounts:

**a.** $3,000,000.00 jointly and severally against Blue Sun Scientific, LLC and The Innovative Technologies Group & Co., Ltd.;

**b.** $3,600,000.00 severally against Defendant The Innovative Technologies Group & Co., Ltd.;

**c.** $30,000.00 severally against Defendant Irvin Lucas;

**d.** $22,500.00 severally against Defendant Robert Gajewski;

**e.** $10,000.00 severally against Defendant Rachael Glenister; and,

**f.** $2,500.00 severally against Defendant Arnold Eilert.

12. For the reasons explained in its detailed opinion [ECF No. 315] on KPM's motion for attorneys' fees and costs, the Court

awards **Reasonable Attorneys' Fees and Reasonable Costs** against the following Defendants in the following amounts:

| **Defendant** | **Amount of Reasonable Attorneys' Fees Owed** | **Amount of Reasonable Costs Owed** |
|---|---|---|
| Blue Sun | $682,301.20 | $121,446 |
| ITG | $833,923.80 | $148,434 |
| Gajewski | $1,125 | $500 |
| Eilert | $200 | $100 |
| Glenister | $750 | $300 |
| Lucas | $1,500 | $750 |
| Total Due KPM | **$1,519,800** | **$271,530** |

These amounts shall be assessed jointly and severally against Defendants Blue Sun Scientific, LLC, The Innovative Technologies Group & Co., Ltd., Irvin Lucas, Robert Gajewski, Rachael Glenister, and Arnold Eilert;

13. The Court awards **prejudgment interest** at the rate of 12% per annum[1] on the following *compensatory damages*[2] figures:

[1] Mass. Gen. Laws ch. 231, § 611 ("In any action in which damages are awarded, but in which interest on said damages is not otherwise provided by law, there shall be added by the clerk of court to the amount of damages interest thereon at the rate [of twelve percent per annum] to be determined from the date of commencement of the action even though such interest brings the amount of the verdict or finding beyond the maximum liability imposed by law.") Here, the action commenced on April 5, 2021. [ECF No. 1].

[2] This decision is in accordance with this Court's prior ruling that it would only award KPM prejudgment interest on "any elements of the jury award(s) that can fairly be classified as 'compensatory in nature'." [ECF 297 at 8 (citing Governo Law Firm LLC v. Bergeron, 166 N.E.3d 416, 428 (Mass. 2021) ("[p]rejudgment interest applies to awards of compensatory damages because both prejudgment interest and compensatory damages seek to make a plaintiff whole")].

| ***Defendant*** | ***Amount Liable (Compensatory Damages Only)*** |
|---|---|
| Blue Sun | $1,500,000 |
| ITG | $1,800,000 |
| Robert Gajewski | $15,000 |
| Arnold Eilert | $2,500 |
| Rachael Glenister | $10,000 |
| Irvin Lucas | $20,000 |

Accordingly, the Court awards KPM prejudgment interest, allocated against the following Defendants in the following amounts:

**a.** $692,383.56 jointly and severally against Blue Sun Scientific, LLC and The Innovative Technologies Group & Co., Ltd.;

**b.** $830,860.27 severally against Defendant The Innovative Technologies Group & Co., Ltd.;

**c.** $9,231.78 severally against Defendant Irvin Lucas;

**d.** $6,923.83 severally against Defendant Robert Gajewski;

**e.** $4,615.89 severally against Defendant Rachael Glenister; and,

**f.** $1,153.97 severally against Defendant Arnold Eilert.

14. The Court grants KPM's request for post-judgment interest at a rate of 3.91%, pursuant to 28 U.S.C. § 1961(a).

**Permanent Injunction**

15. For the reasons explained at length in the Court's written opinion [ECF No. 297 at 49-53] on KPM's motion for a

permanent injunction, the Court hereby ORDERS entry of a permanent injunction as follows:

**a.** Defendants and their agents, officers, employees and anyone acting on their behalf are prohibited from using, divulging, disclosing, furnishing, or making available for their own benefit or anyone else's benefit any of the Plaintiff's "Confidential Information" and trade secrets. Confidential Information shall include Plaintiff's confidential and non-public information; documents and data concerning research and development activities; data sets and calibration data; application notes; source code; all copies of UCAL, USCAN or other software; technical specifications; show-how and know-how; marketing plans and strategies; pricing and costing policies; customer lists and information, and accounts and nonpublic financial information.

**b.** If they have not already done so, Defendants must account for and return any and all information and materials they are in possession of and which belong to the Plaintiff, including any and all Confidential Information and trade secrets. This includes, but is not limited to, any and all USB or other computer drives and any copies of the contents thereof containing KPM Confidential Information in the possession of Robert Gajewski, or any other Defendant, and any and all KPM/Unity Near Infra-Red instruments, materials, equipment, supplies, components, parts, calibrations, electronic files, or physical files in the possession of Arnold

Eilert;

**c.** Defendants Arnold Eilert, Robert Gajewski, Rachael Glenister, and Irvin Lucas are required to comply with all of the terms of their non-disclosure agreements with KPM and are prohibited from using, for their own and anyone else's benefit, or disclosing to anyone, any of KPM's trade secrets and Confidential Information.

**d.** **For a period of ten (10) years from the date of the issuance of this Permanent Injunction**, Defendants are prohibited from offering to provide or providing or offering to sell or selling to any party any services or products, including but not limited to any maintenance, hardware, software or data, related to any Near Infra-Red analyzer manufactured or sold by KPM or its predecessors in interest, including but not limited to analyzers manufactured or sold by Unity Scientific or Process Sensors Corporation.

**e.** **For a period of ten (10) years from the date of the issuance of this Permanent Injunction**, Defendants are prohibited from offering to sell or selling any Near-Infrared analyzer product to the customers listed on the attached Exhibit A, filed under seal herewith. Exhibit A to this Final Judgment and Permanent Injunction will remain under seal until such time as this Court lifts the seal. Nevertheless, Exhibit A will be made available to

the parties and to any person or entity bound by this Paragraph 16 of the Final Judgment and Permanent Injunction.

16. For purposes of this Permanent Injunction, if a customer-organization includes multiple individual divisions, sites, or locations that make independent buying decisions, each division, site, or location is deemed a separate party. A division, site, or location makes independent buying decisions if the division, site, or location has the authority to determine which near-infrared analyzer to purchase without input from other divisions, sites, or locations within the organization. A division, site, or location *does not make* independent buying decisions if the division, site, or location was referred to the Defendants by a person to whom the Defendants previously sold or offered to sell services or products related to any Near Infra-Red analyzer manufactured or sold by KPM or its predecessors in interest.

17. If any party believes that a violation of this Permanent Injunction has occurred, they must first meet and confer with other interested parties to see if the issue can be resolved without involvement of the Court. If not, the parties may jointly request that the Clerk schedule a Status Conference as soon as practicable.

18. The Permanent Injunction appearing at paragraph 15 of this Order is permanent and shall continue to be effective until

such time as this Court issues a subsequent order revising or ending the above ORDER.

19. The Court hereby ORDERS that the bond posted by Plaintiff in the amount of $70,000.00 shall be released by the Clerk of Courts.

**So ORDERED:** **Dated:**

/s/ Margaret R. Guzman
Hon. Margaret Guzman,
United States District Judge

February 7, 2025

United States Code Annotated
Title 18. Crimes and Criminal Procedure (Refs & Annos)
Part I. Crimes (Refs & Annos)
Chapter 90. Protection of Trade Secrets

18 U.S.C.A. § 1836

# § 1836. Civil proceedings

Currentness

**(a)** The Attorney General may, in a civil action, obtain appropriate injunctive relief against any violation of this chapter.

**(b) Private civil actions.**--

**(1) In general.**--An owner of a trade secret that is misappropriated may bring a civil action under this subsection if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce.

**(2) Civil seizure.**--

**(A) In general.**--

**(i) Application.**--Based on an affidavit or verified complaint satisfying the requirements of this paragraph, the court may, upon ex parte application but only in extraordinary circumstances, issue an order providing for the seizure of property necessary to prevent the propagation or dissemination of the trade secret that is the subject of the action.

**(ii) Requirements for issuing order.**--The court may not grant an application under clause (i) unless the court finds that it clearly appears from specific facts that--

**(I)** an order issued pursuant to Rule 65 of the Federal Rules of Civil Procedure or another form of equitable relief would be inadequate to achieve the purpose of this paragraph because the party to which the order would be issued would evade, avoid, or otherwise not comply with such an order;

**(II)** an immediate and irreparable injury will occur if such seizure is not ordered;

**(III)** the harm to the applicant of denying the application outweighs the harm to the legitimate interests of the person against whom seizure would be ordered of granting the application and substantially outweighs the harm to any third parties who may be harmed by such seizure;

**(IV)** the applicant is likely to succeed in showing that--


WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**(aa)** the information is a trade secret; and

**(bb)** the person against whom seizure would be ordered--

**(AA)** misappropriated the trade secret of the applicant by improper means; or

**(BB)** conspired to use improper means to misappropriate the trade secret of the applicant;

**(V)** the person against whom seizure would be ordered has actual possession of--

**(aa)** the trade secret; and

**(bb)** any property to be seized;

**(VI)** the application describes with reasonable particularity the matter to be seized and, to the extent reasonable under the circumstances, identifies the location where the matter is to be seized;

**(VII)** the person against whom seizure would be ordered, or persons acting in concert with such person, would destroy, move, hide, or otherwise make such matter inaccessible to the court, if the applicant were to proceed on notice to such person; and

**(VIII)** the applicant has not publicized the requested seizure.

**(B) Elements of order.**--If an order is issued under subparagraph (A), it shall--

**(i)** set forth findings of fact and conclusions of law required for the order;

**(ii)** provide for the narrowest seizure of property necessary to achieve the purpose of this paragraph and direct that the seizure be conducted in a manner that minimizes any interruption of the business operations of third parties and, to the extent possible, does not interrupt the legitimate business operations of the person accused of misappropriating the trade secret;

**(iii)(I)** be accompanied by an order protecting the seized property from disclosure by prohibiting access by the applicant or the person against whom the order is directed, and prohibiting any copies, in whole or in part, of the seized property, to prevent undue damage to the party against whom the order has issued or others, until such parties have an opportunity to be heard in court; and



WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

**(II)** provide that if access is granted by the court to the applicant or the person against whom the order is directed, the access shall be consistent with subparagraph (D);

**(iv)** provide guidance to the law enforcement officials executing the seizure that clearly delineates the scope of the authority of the officials, including--

**(I)** the hours during which the seizure may be executed; and

**(II)** whether force may be used to access locked areas;

**(v)** set a date for a hearing described in subparagraph (F) at the earliest possible time, and not later than 7 days after the order has issued, unless the party against whom the order is directed and others harmed by the order consent to another date for the hearing, except that a party against whom the order has issued or any person harmed by the order may move the court at any time to dissolve or modify the order after giving notice to the applicant who obtained the order; and

**(vi)** require the person obtaining the order to provide the security determined adequate by the court for the payment of the damages that any person may be entitled to recover as a result of a wrongful or excessive seizure or wrongful or excessive attempted seizure under this paragraph.

**(C) Protection from publicity.**--The court shall take appropriate action to protect the person against whom an order under this paragraph is directed from publicity, by or at the behest of the person obtaining the order, about such order and any seizure under such order.

**(D) Materials in custody of court.**--

**(i) In general.**--Any materials seized under this paragraph shall be taken into the custody of the court. The court shall secure the seized material from physical and electronic access during the seizure and while in the custody of the court.

**(ii) Storage medium.**--If the seized material includes a storage medium, or if the seized material is stored on a storage medium, the court shall prohibit the medium from being connected to a network or the Internet without the consent of both parties, until the hearing required under subparagraph (B)(v) and described in subparagraph (F).

**(iii) Protection of confidentiality.**--The court shall take appropriate measures to protect the confidentiality of seized materials that are unrelated to the trade secret information ordered seized pursuant to this paragraph unless the person against whom the order is entered consents to disclosure of the material.

**(iv) Appointment of special master.**--The court may appoint a special master to locate and isolate all misappropriated trade secret information and to facilitate the return of unrelated property and data to the person from whom the property was seized. The special master appointed by the court shall agree to be bound by a non-disclosure agreement approved by the court.



WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

**(E) Service of order.**--The court shall order that service of a copy of the order under this paragraph, and the submissions of the applicant to obtain the order, shall be made by a Federal law enforcement officer who, upon making service, shall carry out the seizure under the order. The court may allow State or local law enforcement officials to participate, but may not permit the applicant or any agent of the applicant to participate in the seizure. At the request of law enforcement officials, the court may allow a technical expert who is unaffiliated with the applicant and who is bound by a court-approved non-disclosure agreement to participate in the seizure if the court determines that the participation of the expert will aid the efficient execution of and minimize the burden of the seizure.

**(F) Seizure hearing.**--

**(i) Date.**--A court that issues a seizure order shall hold a hearing on the date set by the court under subparagraph (B)(v).

**(ii) Burden of proof.**--At a hearing held under this subparagraph, the party who obtained the order under subparagraph (A) shall have the burden to prove the facts supporting the findings of fact and conclusions of law necessary to support the order. If the party fails to meet that burden, the seizure order shall be dissolved or modified appropriately.

**(iii) Dissolution or modification of order.**--A party against whom the order has been issued or any person harmed by the order may move the court at any time to dissolve or modify the order after giving notice to the party who obtained the order.

**(iv) Discovery time limits.**--The court may make such orders modifying the time limits for discovery under the Federal Rules of Civil Procedure as may be necessary to prevent the frustration of the purposes of a hearing under this subparagraph.

**(G) Action for damage caused by wrongful seizure.**--A person who suffers damage by reason of a wrongful or excessive seizure under this paragraph has a cause of action against the applicant for the order under which such seizure was made, and shall be entitled to the same relief as is provided under section 34(d)(11) of the Trademark Act of 1946 (15 U.S.C. 1116(d)(11)). The security posted with the court under subparagraph (B)(vi) shall not limit the recovery of third parties for damages.

**(H) Motion for encryption.**--A party or a person who claims to have an interest in the subject matter seized may make a motion at any time, which may be heard ex parte, to encrypt any material seized or to be seized under this paragraph that is stored on a storage medium. The motion shall include, when possible, the desired encryption method.

**(3) Remedies.**--In a civil action brought under this subsection with respect to the misappropriation of a trade secret, a court may--

**(A)** grant an injunction--

**(i)** to prevent any actual or threatened misappropriation described in paragraph (1) on such terms as the court deems reasonable, provided the order does not--



WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

**(I)** prevent a person from entering into an employment relationship, and that conditions placed on such employment shall be based on evidence of threatened misappropriation and not merely on the information the person knows; or

**(II)** otherwise conflict with an applicable State law prohibiting restraints on the practice of a lawful profession, trade, or business;

**(ii)** if determined appropriate by the court, requiring affirmative actions to be taken to protect the trade secret; and

**(iii)** in exceptional circumstances that render an injunction inequitable, that conditions future use of the trade secret upon payment of a reasonable royalty for no longer than the period of time for which such use could have been prohibited;

**(B)** award--

**(i)(I)** damages for actual loss caused by the misappropriation of the trade secret; and

**(II)** damages for any unjust enrichment caused by the misappropriation of the trade secret that is not addressed in computing damages for actual loss; or

**(ii)** in lieu of damages measured by any other methods, the damages caused by the misappropriation measured by imposition of liability for a reasonable royalty for the misappropriator's unauthorized disclosure or use of the trade secret;

**(C)** if the trade secret is willfully and maliciously misappropriated, award exemplary damages in an amount not more than 2 times the amount of the damages awarded under subparagraph (B); and

**(D)** if a claim of the misappropriation is made in bad faith, which may be established by circumstantial evidence, a motion to terminate an injunction is made or opposed in bad faith, or the trade secret was willfully and maliciously misappropriated, award reasonable attorney's fees to the prevailing party.

**(c) Jurisdiction.**--The district courts of the United States shall have original jurisdiction of civil actions brought under this section.

**(d) Period of limitations.**--A civil action under subsection (b) may not be commenced later than 3 years after the date on which the misappropriation with respect to which the action would relate is discovered or by the exercise of reasonable diligence should have been discovered. For purposes of this subsection, a continuing misappropriation constitutes a single claim of misappropriation.

**CREDIT(S)**



WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

(Added Pub.L. 104-294, Title I, § 101(a), Oct. 11, 1996, 110 Stat. 3490; amended Pub.L. 107-273, Div. B, Title IV, § 4002(e)(9), Nov. 2, 2002, 116 Stat. 1810; Pub.L. 114-153, § 2(a), (d)(1), May 11, 2016, 130 Stat. 376, 381.)

Notes of Decisions (185)

18 U.S.C.A. § 1836, 18 USCA § 1836
Current through P.L. 119-36. Some statute sections may be more current, see credits for details.

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Massachusetts General Laws Annotated
Part I. Administration of the Government (Ch. 1-182)
Title XV. Regulation of Trade (Ch. 93-110h)
Chapter 93. Regulation of Trade and Certain Enterprises (Refs & Annos)

M.G.L.A. 93 § 42B

# § 42B. Trade secrets; damages

Currentness

<[ Text of section applicable as provided by 2018, 228, Sec. 70.]>

(a) Except to the extent that a material and prejudicial change of position prior to acquiring knowledge or reason to know of misappropriation renders a monetary recovery inequitable, a complainant is entitled to recover damages for misappropriation of information qualifying as a trade secret. Damages can include both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss. In lieu of damages measured by any other methods, the damages caused by misappropriation may be measured by the imposition of liability for a reasonable royalty for a misappropriator's unauthorized disclosure or use of a trade secret.

(b) If willful and malicious misappropriation exists, the court may award exemplary damages in an amount not exceeding twice any award made under subsection (a).

**Credits**
Added by St.2018, c. 228, § 19, eff. Oct. 1, 2018.

Notes of Decisions (3)

M.G.L.A. 93 § 42B, MA ST 93 § 42B
Current through Chapter 13 of the 2025 1st Annual Session. Some sections may be more current, see credits for details.

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Add. 183

Massachusetts General Laws Annotated
Part I. Administration of the Government (Ch. 1-182)
Title XV. Regulation of Trade (Ch. 93-110h)
Chapter 93. Regulation of Trade and Certain Enterprises (Refs & Annos)

M.G.L.A. 93 § 42C

# § 42C. Trade secrets; attorney's fees and costs

Currentness

<[ Text of section applicable as provided by 2018, 228, Sec. 70.]>

The court may award reasonable attorney's fees and costs to the prevailing party if: (i) a claim of misappropriation is made or defended in bad faith, (ii) a motion to enter or to terminate an injunction is made or resisted in bad faith, or (iii) willful and malicious misappropriation exists. In considering such an award, the court may take into account the claimant's specification of trade secrets and the proof that such alleged trade secrets were misappropriated.

**Credits**
Added by St.2018, c. 228, § 19, eff. Oct. 1, 2018.

Notes of Decisions (4)

M.G.L.A. 93 § 42C, MA ST 93 § 42C
Current through Chapter 13 of the 2025 1st Annual Session. Some sections may be more current, see credits for details.

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.



WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

Massachusetts General Laws Annotated
Part I. Administration of the Government (Ch. 1-182)
Title XV. Regulation of Trade (Ch. 93-110h)
Chapter 93. Regulation of Trade and Certain Enterprises (Refs & Annos)

M.G.L.A. 93 § 42F

# § 42F. Trade secrets; effect on other law

Currentness

<[ Text of section applicable as provided by 2018, 228, Sec. 70.]>

(a) Except as provided in subsection (b), sections 42 to 42G, inclusive, shall supersede any conflicting laws of the commonwealth providing civil remedies for the misappropriation of a trade secret.

(b) Sections 42 to 42G, inclusive, do not affect:

(1) contractual remedies, provided that, to the extent such remedies are based on an interest in the economic advantage of information claimed to be confidential, such confidentiality shall be determined according to the definition of trade secret in section 42, where the terms and circumstances of the underlying contract shall be considered in such determination;

(2) remedies based on submissions to governmental units;

(3) other civil remedies to the extent that they are not based upon misappropriation of a trade secret; or

(4) criminal remedies, whether or not based upon misappropriation of a trade secret.

**Credits**
Added by St.2018, c. 228, § 19, eff. Oct. 1, 2018.

M.G.L.A. 93 § 42F, MA ST 93 § 42F
Current through Chapter 13 of the 2025 1st Annual Session. Some sections may be more current, see credits for details.

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.



WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Massachusetts General Laws Annotated
Part I. Administration of the Government (Ch. 1-182)
Title XV. Regulation of Trade (Ch. 93-110h)
Chapter 93. Regulation of Trade and Certain Enterprises (Refs & Annos)

M.G.L.A. 93 § 42G

## § 42G. Trade secrets; uniformity of application and construction

Currentness

<[ Text of section applicable as provided by 2018, 228, Sec. 70.]>

Sections 42 to 42F, inclusive, shall be applied and construed to effectuate their general purpose to make uniform the law with respect trade secrets.

**Credits**
Added by St.2018, c. 228, § 19, eff. Oct. 1, 2018.

M.G.L.A. 93 § 42G, MA ST 93 § 42G
Current through Chapter 13 of the 2025 1st Annual Session. Some sections may be more current, see credits for details.

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.



WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Red Flag
Unconstitutional or PreemptedPreempted by Rev-Lyn Contracting Co. v. Patriot Marine, LLC, D.Mass., Feb. 08, 2011

KeyCite Yellow FlagProposed Legislation

Massachusetts General Laws Annotated
Part I. Administration of the Government (Ch. 1-182)
Title XV. Regulation of Trade (Ch. 93-110h)
Chapter 93A. Regulation of Business Practices for Consumers Protection (Refs & Annos)

M.G.L.A. 93A § 11

# § 11. Persons engaged in business; actions for unfair trade practices; class actions; damages; injunction; costs

Currentness

Any person who engages in the conduct of any trade or commerce and who suffers any loss of money or property, real or personal, as a result of the use or employment by another person who engages in any trade or commerce of an unfair method of competition or an unfair or deceptive act or practice declared unlawful by section two or by any rule or regulation issued under paragraph (c) of section two may, as hereinafter provided, bring an action in the superior court, or in the housing court as provided in section three of chapter one hundred and eighty-five C, whether by way of original complaint, counterclaim, cross-claim or third-party action for damages and such equitable relief, including an injunction, as the court deems to be necessary and proper.

Such person, if he has not suffered any loss of money or property, may obtain such an injunction if it can be shown that the aforementioned unfair method of competition, act or practice may have the effect of causing such loss of money or property.

Any persons entitled to bring such action may, if the use or employment of the unfair method of competition or the unfair or deceptive act or practice has caused similar injury to numerous other persons similarly situated and if the court finds in a preliminary hearing that he adequately and fairly represents such other persons, bring the action on behalf of himself and such other similarly injured and situated persons; the court shall require that notice of such action be given to unnamed petitioners in the most effective, practicable manner. Such action shall not be dismissed, settled or compromised without the approval of the court, and notice of any proposed dismissal, settlement or compromise shall be given to all members of the class of petitioners in such a manner as the court directs.

A person may assert a claim under this section in a district court, whether by way of original complaint, counterclaim, cross-claim or third-party action, for money damages only. Said damages may include double or treble damages, attorneys' fees and costs, as hereinafter provided, with provision for tendering by the person against whom the claim is asserted of a written offer of settlement for single damages, also as hereinafter provided. No rights to equitable relief shall be created under this paragraph, nor shall a person asserting such claim be able to assert any claim on behalf of other similarly injured and situated persons as provided in the preceding paragraph. The provisions of sections ninety-five to one hundred and ten, inclusive, of chapter two hundred and thirty-one, where applicable, shall apply to a claim under this section, except that the provisions for remand, removal and transfer shall be controlled by the amount of single damages claimed hereunder.

If the court finds for the petitioner, recovery shall be in the amount of actual damages; or up to three, but not less than two, times such amount if the court finds that the use or employment of the method of competition or the act or practice was a willful or knowing violation of said section two. For the purposes of this chapter, the amount of actual damages to be multiplied by



WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

the court shall be the amount of the judgment on all claims arising out of the same and underlying transaction or occurrence regardless of the existence or nonexistence of insurance coverage available in payment of the claim. In addition, the court shall award such other equitable relief, including an injunction, as it deems to be necessary and proper. The respondent may tender with his answer in any such action a written offer of settlement for single damages. If such tender or settlement is rejected by the petitioner, and if the court finds that the relief tendered was reasonable in relation to the injury actually suffered by the petitioner, then the court shall not award more than single damages.

If the court finds in any action commenced hereunder, that there has been a violation of section two, the petitioner shall, in addition to other relief provided for by this section and irrespective of the amount in controversy, be awarded reasonable attorneys' fees and costs incurred in said action.

In any action brought under this section, in addition to the provisions of paragraph (b) of section two, the court shall also be guided in its interpretation of unfair methods of competition by those provisions of chapter ninety-three known as the Massachusetts Antitrust Act.

No action shall be brought or maintained under this section unless the actions and transactions constituting the alleged unfair method of competition or the unfair or deceptive act or practice occurred primarily and substantially within the commonwealth. For the purposes of this paragraph, the burden of proof shall be upon the person claiming that such transactions and actions did not occur primarily and substantially within the commonwealth.

**Credits**

Added by St.1972, c. 614, § 2. Amended by St.1978, c. 459, § 3; St.1978, c. 478, §§ 47, 48; St.1979, c. 72, § 2; St.1985, c. 278, §§ 1 to 3; St.1986, c. 363, §§ 1 to 4; St.1989, c. 580, § 2.

Notes of Decisions (1457)

M.G.L.A. 93A § 11, MA ST 93A § 11
Current through Chapter 13 of the 2025 1st Annual Session. Some sections may be more current, see credits for details.

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Massachusetts General Laws Annotated
Part III. Courts, Judicial Officers and Proceedings in Civil Cases (Ch. 211-262)
Title II. Actions and Proceedings Therein (Ch. 223-236)
Chapter 223A. Jurisdiction of Courts of the Commonwealth over Persons in Other States and Countries (Refs & Annos)

M.G.L.A. 223A § 3

# § 3. Transactions or conduct for personal jurisdiction

Currentness

A court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action in law or equity arising from the person's

(a) transacting any business in this commonwealth;

(b) contracting to supply services or things in this commonwealth;

(c) causing tortious injury by an act or omission in this commonwealth;

(d) causing tortious injury in this commonwealth by an act or omission outside this commonwealth if he regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in this commonwealth;

(e) having an interest in, using or possessing real property in this commonwealth;

(f) contracting to insure any person, property or risk located within this commonwealth at the time of contracting;

(g) maintaining a domicile in this commonwealth while a party to a personal or marital relationship out of which arises a claim for divorce, alimony, property settlement, parentage of a child, child support or child custody; or the commission of any act giving rise to such a claim; or

(h) having been subject to the exercise of personal jurisdiction of a court of the commonwealth which has resulted in an order of alimony, custody, child support or property settlement, notwithstanding the subsequent departure of one of the original parties from the commonwealth, if the action involves modification of such order or orders and the moving party resides in the commonwealth, or if the action involves enforcement of such order notwithstanding the domicile of the moving party.

**Credits**
Added by St.1968, c. 760. Amended by St.1969, c. 623; St.1976, c. 435; St.1987, c. 100; St.1993, c. 460, § 86.



WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

Notes of Decisions (1018)

M.G.L.A. 223A § 3, MA ST 223A § 3
Current through Chapter 13 of the 2025 1st Annual Session. Some sections may be more current, see credits for details.

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.



WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works.