# EXHIBIT 5

# United States Court of Appeals
*for the*
# First Circuit

Case No. 25-1222

KPM ANALYTICS NORTH AMERICA CORPORATION,

*Plaintiff-Appellee,*

v.

BLUE SUN SCIENTIFIC, LLC; THE INNOVATIVE TECHNOLOGIES GROUP & CO., LTD.,

*Defendants-Appellants,*

ARNOLD EILERT; ROBERT GAJEWSKI; RACHAEL GLENISTER; GREGORY ISRAELSON; IRVIN LUCAS; PHILIP OSSOWSKII; MICHELLE GAJEWSKI,

*Defendants.*

ON APPEAL FROM THE DISTRICT COURT OF MA, WORCESTER, IN CASE NO. 4:21-cv-10572-MRG

## BRIEF FOR PLAINTIFF-APPELLEE

SCOTT R. MAGEE
PAIGE K. ZACHARAKIS
MORSE BARNES-BROWN & PENDLETON, PC
480 Totten Pond Road, 4th Floor
Waltham, Massachusetts 02451
(781) 622-5930
smagee@morse.law
pzacharakis@morse.law

*Counsel for Plaintiff-Appellee*

CP COUNSEL PRESS (800) 4-APPEAL • (390227)

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1(a), Plaintiff-Appellee KPM Analytics North America Corporation states that its parent company is KPM Analytics, Inc., which has a parent company named KPM Analytics Holding US 2, Inc., which in turn has a parent company named KPM Analytics Holding US, Inc., which in turn has a parent company named KPM Analytics Intermediate US Holding, Inc., which in turn has a parent company named KPM Analytics Holdings, LLC. No publicly held corporation owns more than 10% of Plaintiff's stock.

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT .......... i

TABLE OF AUTHORITIES .......... v

STATEMENT OF THE CASE .......... 1

I. Background Facts .......... 1

A. KPM's Business .......... 1

B. ITG Sets Up Blue Sun and Poaches KPM's Employees .......... 3

C. Blue Sun Diverts Customers and Business from KPM to Blue Sun for the Benefit of ITG Through, *Inter Alia*, the Use of KPM's Trade Secrets .......... 4

Diverting Customers .......... 4

Diverting Revenue .......... 6

Copying Files .......... 6

Using UCAL .......... 7

Lying to Customers .......... 8

D. ITG Adopts and Ratifies Blue Sun's Misconduct for ITG's Benefit .......... 9

E. The Trial Evidence Showed Blue Sun's and ITG's Conduct Occurred In and Connected to Massachusetts .......... 10

Massachusetts Employment .......... 11

Massachusetts Manufacturing .......... 11

Massachusetts Software .......... 12

Massachusetts Checklists .......... 12

Massachusetts Relationships .......... 13

Massachusetts Databases .......... 14

II. Proceedings Below .......... 15

SUMMARY OF THE ARGUMENT ....................17

STANDARD OF REVIEW ....................19

ARGUMENT ....................20

I. The Court Should Reject Blue Sun and ITG's Claim that the District Court Did Not Have Personal Jurisdiction Over Them ....................20

A. Blue Sun and ITG Failed to Preserve Their Personal Jurisdiction Argument for Appeal ....................21

B. The District Court Properly Concluded It Had Personal Jurisdiction Over the Corporate Defendants at the Beginning of the Case That Was Confirmed by the Trial Record ....................22

1. Blue Sun/ITG's Conduct Is Covered By the Massachusetts Long-Arm Statute ....................24

2. The District Court's Exercise of Specific Jurisdiction Over the Corporate Defendants Comported with Due Process ....................29

a) The Relatedness Prong Is Satisfied ....................30

b) The Purposeful Availment Prong Is Satisfied ....................34

II. The Court Should Affirm the Chapter 93A Award Because Blue Sun and ITG Cannot Show Their Unfair or Deceptive Acts Did Not Occur Primarily and Substantially in Massachusetts ....................36

III. Blue Sun and ITG's Argument that MUTSA Requires Vacating the Chapter 93A Judgment is Wrong as a Matter of Law and Fact ....................40

A. MUTSA Does Not Preempt G. L. c. 93A ....................40

B. Even if the MUTSA Preempts Chapter 93A for Trade Secret Misappropriation, There Is Sufficient Record Evidence to Support the Chapter 93A Finding Without Considering Trade Secret Misappropriation ....................42

C. Vacating the District Court's Award of Exemplary Damages Under Chapter 93A is Unwarranted ....................44

D. The District Court's Post-Trial Finding that Blue Sun's Misappropriation of Trade Secrets was "Willful and Malicious" was Proper, or in the Alternative, Harmless Error ....................45

IV. The "Head Start" Instruction Given by the District Court Was Proper ....47

V. The District Court Properly Instructed the Jury on Willful Blindness as it Relates to a Claim for Tortious Interference with Contractual Relationships....51

CONCLUSION ....53

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Acclaim System, Inc. v. Infosys, Ltd.*,
679 Fed. App'x 207 (3rd Cir. 2017) .......... 52, 53

*AcryliCon USA, LLC v. Silikal GmbH*,
985 F.3d 1350 (11th Cir. 2021) .......... 21, 22

*Adelson v. Hananel*,
652 F.3d 75 (1st Cir. 2011) .......... 18, 23, 33

*Angiodynamic, Inc. v. Bioletic AG*,
991 F.Supp.2d 299 (D. Mass. 2014) .......... 27

*Astro-Med, Inc. v. Nihon Kohden America, Inc.*,
591 F.3d 1 (1st Cir. 2009) .......... 32, 33, 35

*Azimi v. Jordan's Meats, Inc.*,
456 F.3d 228 (1st Cir. 2006) .......... 48

*BioPoint, Inc. v. Dickhaut*,
110 F.4th 337 (1st Cir. 2024) .......... 41, 49, 50

*Boit v. Gar-Tec Prods., Inc.*,
967 F.2d 671 (1st Cir. 1992) .......... *passim*

*Burger King Corp. v. Rudzewicz*,
471 U.S. 462 (1985) .......... 34

*C.W. Downer & Co. v. Bioriginal Food & Sci. Corp.*,
771 F.3d 59 (1st Cir. 2014) .......... 34

*Captivate, LLC v. Datalock Sys., Inc.*,
1984CV02429BLS2, 2019 WL 7707968 (Mass. Super. Dec. 10, 2019) .......... 26

*Carreras v. PMG Collins, LLC*,
660 F.3d 549 (1st Cir. 2011) .......... 34

*Cepeda v. Kass*,
819 N.E.2d 979 (Mass. App. 2004) .......... 24

*Custom Conveyor Corp. v. Hyde*,
237 F.Supp.3d 895 (D. Minn. 2017) .......... 32

*Davet v. Maccarone*,
973 F.2d 22 (1st Cir. 1992) .......... 46

*Daynard v. Ness, Motley, Loadholdt, Richardson & Poole, P.A.*,
290 F.3d 42 (1st Cir. 2002) .......... 27, 28

*Doane v. Python Leads, LLC*,
No. 1:24-CV-12947-JEK, 2025 WL 3485569 (D. Mass. Dec. 4, 2025) .......... 25

*Ealing Corp. v. Harrods Ltd.*,
790 F.2d 978 (1st Cir. 1986) .......... 24

*Fishman Transducers, Inc. v. Paul*,
684 F.3d 187 (1st Cir. 2012) .......... 40

*Ford Motor Co. v. Montana Eighth Judicial District Court, et al.*,
592 U.S. 351 (2021) .......... 30, 31

*Greer v. Miller*,
483 U.S. 756 (1987) .......... 48

*Harlow v. Children's Hosp.*,
432 F.3d 50 (1st Cir. 2005) .......... 30

*Hugel v. McNell*,
886 F.2d 1 (1st Cir. 1989) .......... 36

*In re Pharm. Indus. Average Wholesale Price Litig.*,
582 F.3d 156 (1st Cir. 2009) .......... 38

*International Floor Crafts, Inc. v. Dziemit*,
420 Fed. App'x 6 (1st Cir. 2011) .......... 51

*Jet Spray Cooler, Inc. v. Crampton*,
385 N.E.2d 1349 (Mass. 1979) .......... 50, 51

*Keane v. Expeditors Int'l of Washington, Inc.*,
138 F.4th 613 (1st Cir. 2025) .......... 28

*Kenda Corp., Inc. v. Pot O'Gold Money Leagues, Inc.*,
329 F.3d 216 (1st Cir. 2003) .......... 39

*Knox v. MetalForming, Inc.*,
914 F.3d 685 (1st Cir. 2019) .......... 29, 30

*KPM Analytics N. Am. Corp. v. Blue Sun Sci., LLC, et al.*,
729 F.Supp.3d 84 (D. Mass. 2024) .......... 41

*Kuwaiti Danish Computer Co. v. Digital Equip. Corp.*,
781 N.E.2d 787 (Mass. 2003) ....................37, 38, 39

*LaVallee v. Parrot-Ice Drink Prods. of Am., Inc.*,
193 F.Supp.2d 296 (D. Mass. 2002) ....................25

*M/A-COM Tech. Sols., Inc. v. Litrinium, Inc.*,
No. SACV 19-220 JVS (JDEX), 2019 WL 6655274 (C.D. Cal. Sept. 23, 2019) ....................32

*Massachusetts Sch. of Law at Andover, Inc. v. American Bar Assn.*,
142 F.3d 26 (1st Cir. 1998) ....................24

*N. Laminate Sales, Inc. v. Davis*,
403 F.3d 14 (1st Cir. 2005) ....................30, 35, 36

*Nandjou v. Marriott Int'l, Inc.*,
985 F.3d 135 (1st Cir. 2021) ....................23, 27, 28

*Neural Magic, Inc. v. Facebook, Inc.*,
1:20-CV-10444-DJC, 2020 WL 13538627 (D. Mass. Oct. 29, 2020) .........41, 42

*Orenstein v. U.S.*,
191 F.2d 184 (1st Cir. 1951) ....................47

*Phillips v. Prairie Eye Ctr.*,
530 F.3d 22 (1st Cir. 2008) ....................29

*Pritzker v. Yari*,
42 F.3d 53 (1st Cir. 1994) ....................30

*Proficio Mortgage Ventures, LLC v. Federal Savings Bank*,
15-CV-00510-RFB-MDC, 2024 WL 1345215 (D. Nev. Mar. 30, 2024) ..........46

*Prudential Real Estate Affiliates, Inc. v. Long & Foster Real Estate, Inc*.,
208 F.3rd 210 (Table), 2000 WL 248170 (4th Cir. 2000) ....................52, 53

*Roche v. Royal Bank of Canada*,
109 F.3d 820 (1st Cir. 1997) ....................39

*S & D Trading Acad., LLC v. AAFIS, Inc.*,
494 F.Supp.2d 558 (S.D. Tex. 2007) ....................31

*Sindi v. El-Moslimany*,
896 F.3d 1 (1st Cir. 2018) ....................44

Case 25-10998 Doc 118-5 Filed 03/19/26 Page 10 of 67

*Skyhook Wireless, Inc. v. Google, Inc.*,
19 N.E.3d 440 (Mass. App. 2014) ........ 40

*The Scuderi Grp., LLC v. LGD Tech., LLC*,
575 F.Supp.2d 312 (D. Mass. 2008) ........ 25

*United States v. Swiss Am. Bank, Ltd.*,
274 F.3d 610 (1st Cir. 2001) ........ 29

*United States v. Vazquez Rijos*,
119 F.4th 94 (1st Cir. 2024) ........ 47-48

*United States v. Zannino*,
895 F.2d 1 (1st Cir. 1990) ........ 46

*Vapotherm, Inc. v. Santiago*,
38 F.4th 252 (1st Cir. 2022) ........ 33, 34

*Wennik v. Polygram Grp. Distribution, Inc.*,
304 F.3d 123 (1st Cir. 2002) ........ 1, 20

*World-Wide Volkswagen Corp. v. Woodson*,
444 U.S. 286 (1980) ........ 23

*Zemvar Inc. d/b/a Grip Mobility Co., v. Uber Technologies, Inc.*,
No. 2484CV01525-BLS2, 2025 WL 354890 (Mass. Super. Jan. 2025) ........ 41

**Statutes & Other Authorities:**

U.S. Const. amend. VII ........ 46

U.S. Const. amend. XIV ........ 23

18 U.S.C. § 1836 ........ 15

18 U.S.C. § 1836(b)(3)(C) ........ 45

47 U.S.C. § 227(c) ........ 25

C.R.S.A. § 7-74-104 ........ 46

Fed. R. Civ. P. 12(d) ........ 20, 21

Fed. R. Civ. P. 61 ........ 46

M.G.L. c. 93 § 42 ........ 15

M.G.L. c. 93 § 42B(b) ........ 45

M.G.L. c. 93 § 42F ..... 42
M.G.L. c. 93 § 42F(a) ..... 40, 41
M.G.L. c. 93A ..... *passim*
M.G.L. c. 93A § 11 ..... 15, 37, 38
M.G.L. c. 159C ..... 25
M.G.L. c. 223A § 3(c) ..... 24, 26, 28, 34

# STATEMENT OF THE CASE

This appeal presents no basis for overturning the unanimous jury verdict, the District Court's rulings, or the Judgment entered in favor of Plaintiff KPM Analytics North America Corporation ("KPM") against Defendants Blue Sun Scientific, LLC ("Blue Sun") and The Innovative Technologies Group & Co., Ltd. ("ITG") (collectively referred to as the "Corporate Defendants").

## I. Background Facts.[1]

### A. KPM's Business.

KPM is in the business of manufacturing machines to perform spectrographic analyses of a variety of substances used in many industries, including human and pet food products. (RA430). This business line of KPM is run through a business unit originally called Unity Scientific. (RA430). Through this business unit, KPM provides near infrared ("NIR") spectroscopy analysis instrumentation. (RA430).

Spectroscopy is a scientific technique that measures the diffraction of light or other electromagnetic radiation propagated through a given substance to help determine the composition of that substance. (RA430-31). KPM manufactures, and

[1] The Court reviews the facts underlying a jury verdict "as the jury might have found them, consistent with the record, but in the light most favorable to the verdict." *Wennik v. Polygram Grp. Distribution, Inc.*, 304 F.3d 123, 126 (1st Cir. 2002).

has manufactured, a variety of NIR analyzers that are used in NIR spectroscopy, and has branded its NIR analyzers as the "SpectraStar." (RA430).

Over the years, KPM has developed an extensive calibration database of many of the substances frequently analyzed using a SpectraStar. (RA1050-51). KPM's current calibration database is robust, stable, and based on over 20 years of data collection. (RA1050-51). Decades of effort, significant investment, and partnering with hundreds of customers is required to replicate a comparable calibration library. (RA1289-90). Once the spectroscopy is performed on a SpectraStar, the results are compared to the appropriate calibration library dataset(s) (i.e., corn or flour), and the results are reported to the customer through KPM's proprietary software called UCAL. (RA1041). The UCAL software has been continuously developed, modified, and tested for over 12 years requiring the support of software developers, contractors, testers, and mathematicians and is currently in its fourth release. (RA1042).

This case is about the Corporate Defendants' poaching of KPM's now former employees, misappropriation of KPM's trade secrets and confidential data, including its UCAL software, calibration data sets, and customer data, and diversion of KPM's customers, leading to KPM's loss of revenue derived from the sale of SpectraStars, replacement parts, maintenance, servicing, and the replacement sales of new SpectraStars, driven by KPM's goodwill. The calibration data sets, UCAL software

Case 25-1079 Doc 118-5 Filed 08/19/26 Page 14 of 67

and customer information were all trade secrets the jury found Blue Sun misappropriated from KPM. (Add. 73).

### B. ITG Sets Up Blue Sun and Poaches KPM's Employees.

ITG manufactures a NIR analyzer now branded as the "Phoenix" Analyzer, which competes with KPM's SpectraStar. (RA435, 1308). ITG, through its sole owner and CEO Robert "Bob" Wilt, along with KPM employee Irvin Lucas, created an ITG subsidiary, Blue Sun Scientific, LLC, which was formally established in July 2018, to be the "sales arm" of ITG. (RA1323, 1355). Wilt is the sole Manager of Blue Sun, ITG is its sole Member, and Lucas is its President. (RA1865).

After establishing Blue Sun in July of 2018, Lucas began involving other existing KPM employees in Blue Sun ***while still employed at KPM***. (RA1430-31). Lucas formally became an employee of Blue Sun in May of 2019, despite maintaining a Blue Sun email address since mid-2018. (RA1322, 1430, 1537-38). In January 2019, Lucas recruited KPM's long time employee Robert Gajewski (RA1318),[2] who from 2019 until his termination in 2021, worked for Blue Sun and KPM ***simultaneously***, without telling KPM. (RA1777). Lucas also told Rachael Glenister about Blue Sun while they were both KPM employees. (RA1322, 3347-55). Glenister was hired by Blue Sun on July 20, 2020 (RA1533), after telling KPM

[2] Throughout this brief, Defendant Robert Gajewski will be referred to as "Gajewski" and his wife, Michelle Gajewski will be referred to by her full name.

she was resigning to "go back to school." (RA925). Arnold Eilert was then hired by Blue Sun on January 4, 2021, after resigning from KPM four days earlier to, as he told KPM, "involve [himself] in a family farming operation." (RA1797-98). Each of the four, now former, KPM employees hired by Blue Sun, had confidentiality obligations in their KPM contracts and through the KPM employee handbook. (RA3697-3703 (Glenister), 4040-45 (Eilert), 4056-63 (Lucas), 4087-93 (Gajewski), 4005 (handbook)).

### C. Blue Sun Diverts Customers and Business from KPM to Blue Sun for the Benefit of ITG Through, *Inter Alia*, the Use of KPM's Trade Secrets.

*Diverting Customers*

Unlawfully diverting customers from KPM to Blue Sun was a core pillar of Blue Sun's business model from the beginning. Between 2019 and April 5, 2021, when KPM customers sought to schedule maintenance of their SpectraStars, KPM employee Michelle Gajewski[3] redirected their inquiries to Blue Sun, and to her husband Robert Gajewski in particular. (RA1702-03, 3524-28, 3568-70, 3571, 3917-19). Gajewski and others would then perform the service and invoice the customer on behalf of Blue Sun, so Blue Sun would receive that revenue, not KPM. (RA3524-28, 3568-70, 3917-19). To further support this diversion of business, Blue Sun gave Michelle Gajewski control of an email address at Blue Sun

[3] Michelle Gajewski was the Sales Coordinator/Sales Support for KPM. (RA59).

Case 25-1222 Doc 118-5 Filed 08/19/26 Page 16 of 67

(info@bluesunscientific.com) while she was employed by KPM. (RA1311-12, 1704).

Blue Sun's unlawful diversion of business was successful. Blue Sun, through at least Lucas and Gajewski, used KPM's confidential pricing information to formulate lower quotes for Blue Sun to use in poaching KPM customers. (RA1645, 1672-73, 3568, 3572-96). For example, when KPM customer Jungbunzlauer needed maintenance on its Spectrastars, Gajewski emailed Jungbunzlauer from his Blue Sun email address, offered a "more attractive" quote than what KPM offered, and ultimately performed the maintenance on behalf of Blue Sun. (RA1632-33). Gajewski actively solicited KPM customer Lamb Weston's business by informing Lucas of the prices KPM offered in previous years (including discounts provided) and instructed Lucas to offer a similar discount to get Lamb Weston's business. (RA1644-46). Gajewski poached numerous other KPM customers on behalf of Blue Sun as he worked for both Blue Sun and KPM, without informing KPM, including KPM customers Omega Protein, (RA1668-73, 3569), and Post Consumer Brands, LLC. (RA1687-99, 3744-92). Blue Sun went so far as to copy KPM's SpectraStar preventative maintenance checklist, a document that is shared with customers after servicing, only changing the logo on the form to Blue Sun. (*See, e.g.*, RA3551-66). ITG and Blue Sun do not challenge these findings. (Add. 122).

*Diverting Revenue*

Blue Sun's conduct in pursuing maintenance opportunities for SpectraStar units wrongfully diverted service revenue from KPM to Blue Sun, which led to greater damage to KPM through the loss of subsequent analyzer sales. Witnesses from both sides agreed that developing relationships with customers for maintenance is done in part to obtain the lucrative analyzer sales that are made at the end of the so-called "service-to-sales" pipeline. (RA1073-74 (KPM's vice president Olson), 1380 (Lucas); 1562-63 (Glenister); 1697 (Gajewski)). For example, when KPM customer Post contacted Gajewski, who had performed multiple years of maintenance and calibration adjustments for Post on behalf of Blue Sun while simultaneously working for KPM, to purchase a new ***SpectraStar***, Gajewski as Blue Sun instead sold Post a Blue Sun Phoenix analyzer and went on to sell them at least 15 or 16 more analyzers for about $50,000 each. (RA1696-98, 3378-79).

*Copying Files*

Blue Sun also stole KPM's confidential electronic files. On behalf of Blue Sun, Gajewski copied KPM confidential files on three external hard drives, which he held onto even after his termination from KPM. (RA3504, 4284). KPM, in investigating the Defendants'[4] conduct, obtained screenshots showing Gajewski copying KPM customer data from his KPM issued hard drive, to a Lexar thumb

[4] "Defendants" refers to the defendants below, not all of whom are Appellants.

drive that also contained Blue Sun information. (RA1137-40, 3504). That Lexar thumb drive was never returned to KPM. (RA1145). At trial the jury saw the screenshot KPM took of Gajewski copying KPM customer data through KPM's monitoring of Gajewski's laptop activity. (RA3504). The other two hard drives on which Gajewski had copies of KPM material from his entire career at KPM, dating back to 2003, were not returned until demanded by KPM in this litigation. (RA1144, 4284). When Robert and Michelle Gajewski were terminated on April 5, 2021, Robert Gajewski immediately began to archive his entire email account from his KPM computer to preserve it, which included KPM customer communications, contact information, and related trade secrets and confidential information he maintained within his KPM email account. (RA1141-42).

Glenister also secreted away KPM's information for the benefit of Blue Sun while still working at KPM by funneling it through her non-KPM email accounts, including forwarding customer information to her personal Gmail account 22 minutes before the close of business on her last day at KPM. (RA1544-1548, 3715-18, 3721-24, 3725-27, 3728-29, 3920, 4127, 4128).

*Using UCAL*

Blue Sun's misappropriation also included use of KPM's proprietary and long-developed UCAL calibration software. Gajewski repeatedly used his KPM-issued UCAL license to service customers on Blue Sun's behalf. (RA1624-25, 1688,

1690, 1746-47). Eilert also kept a copy of UCAL software on his KPM-computer (RA1800-01) despite being instructed to return all KPM information and being instructed upon his departure from KPM that he could not use, and was contractually obligated not to use, such information. (RA4017-21, 4040-45). Eilert then proceeded to use KPM's proprietary software for Blue Sun's benefit once he was employed by Blue Sun. (RA1820, 1823-24, 3482, 3693-94).

The record is replete with Blue Sun using KPM's calibration data to assist customers on Blue Sun's behalf. (*See, e.g.*, RA 1627-28, 1641, 1815-17, 1820-21, 1823-24, 1826, 3482, 3693-94, 3740-43, 3744-50, 3771-76). Stealing and using KPM's calibration data, which KPM procured over two decades with its customers, provided Blue Sun a "head start" to compete immediately in the marketplace without having to invest the time, effort and expense of two decades worth of work. (RA923).

*Lying to Customers*

Separate from any use of KPM's trade secrets, Blue Sun also engaged in dishonest conduct to harm KPM by lying to customers about the relationship between KPM and Blue Sun. Gajewski, acting on behalf of Blue Sun, participated in many of these falsehoods. (RA1638, 3529 (misleading KPM-customer Kellogg); 3610-13 (misleading KPM-customer Lamb Weston); 3988-89 (misleading KPM-customer Disney); 3530, 3614-16, 3917-19). Wilt understood this to be the case. (RA1885).

Case 25-01998 Doc 118-5 Filed 03/19/26 Page 20 of 67

Blue Sun also set up pseudonymous email addresses to poach KPM employees and help them in their subterfuges with customers, calling Gajewski "Rob Roberts", Greg Israelson "Greg Gregory", and Arnold Eilert "Don Donaldson." RA1396.

Finally, Blue Sun posted on its website "Application Notes" for multiple constituent products created by Gajewski using UCAL and KPM's calibration libraries, passing them off as data produced from a ITG/Blue Sun Phoenix Analyzers. (RA1404-07 (Lucas), 1625-26 (Gajewski)). All above-described misconduct was done willfully.

### D. ITG Adopts and Ratifies Blue Sun's Misconduct for ITG's Benefit.

ITG adopted Blue Sun's unfair and deceptive conduct for its own benefit. Wilt, the owner and CEO of ITG and sole manager of Blue Sun, never asked whether Lucas or any other of the former KPM employees hired for Blue Sun had any contracts or nondisclosure obligations to KPM, affirmatively saying he did not want to know. (RA1475, RA1880-82). Wilt personally interviewed KPM employee Philip Ossowski before he was hired by Blue Sun, but Wilt never asked Ossowski if he had any confidentiality or non-disclosure obligations with KPM. (RA1879-80, 3501-02). Wilt did not take any steps to ensure Lucas was living up to his confidentiality obligations to KPM, and he never placed restrictions on Lucas as to who Lucas could hire (or contract with) to work for Blue Sun. (RA1881). ITG never

placed any restrictions on Blue Sun in selling ITG's analyzers, despite owning 100% of Blue Sun and taking 65% of the revenue from every analyzer sold by Blue Sun and despite Wilt being the Manager of Blue Sun. (RA1864-65, 1870, 1886).

When ITG indisputably learned of Blue Sun's conduct, including Blue Sun's use of KPM's trade secrets, it did not stop Blue Sun. Wilt had the ability to terminate Lucas after learning "new" facts about Blue Sun's nefarious conduct after being served with the Verified Complaint but did not. (RA1912-13). Wilt took no action to fire Lucas or any of Lucas's hires (all of which were former KPM employees), and he took no action to alter their conduct. *Id*. Wilt took no action when sued, when more facts were revealed during discovery, nor when the Defendants were preliminary enjoined by the District Court. *Id.*

### E. The Trial Evidence Showed Blue Sun's and ITG's Conduct Occurred In and Connected to Massachusetts.

The misconduct that Blue Sun, ITG, and their agents engaged in occurred in or through Massachusetts or would not have occurred but for their consistent and repeated interactions with Massachusetts.[5]

---

[5] From Blue Sun's launch, eventual Blue Sun employees took steps in Massachusetts to establish the competing company to poach KPM employees and customers. Doug Evans and Israelson, who eventually went to Blue Sun, approached KPM employee Bob Schumann about the new venture as early as 2019 in an in-person meeting in Milford, Massachusetts. (RA911-12).

*Massachusetts Employment*

At the outset of their misconduct, the Individual Defendants were employees of KPM, a Massachusetts entity headquartered in Massachusetts. (RA430). Their employment was directed from KPM's headquarters in Massachusetts. For instance, Gajewski's performance review identifies Ron Geis, who was physically based in Massachusetts, as his managing reviewer. (RA947, 4327-40). The Employee Handbook governing the obligations of each of the former KPM employees, including not only the individual defendants, was published at KPM headquarters in Milford, MA. (RA3990-4016).

*Massachusetts Manufacturing*

Corporate Defendants, through each of the four Individual Defendants and some non-defendants, including Michelle Gajewski, utilized KPM goods and information available only from Massachusetts and which required their interaction with Massachusetts. The SpectraStar analyzers that Gajewski and Eilert serviced, and which Lucas and Glenister sold, were manufactured in Massachusetts. (RA1038-39). ***Blue Sun*** repeatedly and publicly stated it was the original manufacturer of the ***SpectraStar***, deceptively placing itself squarely in Massachusetts. (RA3492, 3939-3980, 4177-78). KPM's sales operation to sell the SpectraStars is based in Massachusetts. (RA1039). The Corporate Defendants' efforts in selling Phoenix analyzers, through their misrepresentations and service-to-

sales scheme explained above,[6] were directed towards Massachusetts by diverting revenue from Massachusetts and interfering with KPM's Massachusetts sales and manufacturing. (RA1037, 1039, 1177-78, 1185-92).

*Massachusetts Software*

The UCAL software used improperly by Gajewski and Eilert on behalf of Blue Sun is only available from KPM headquarters in Massachusetts. (RA1046, 3611 and 3669-70 (UCAL based in Milford, Massachusetts), 4439 (UCAL maintained in Westborough, Massachusetts)). The Software License Agreement protecting the UCAL software is governed by and has a jurisdiction selection clause in Massachusetts. (RA4110-13). The Application Notes that Gajewski created for Blue Sun using the Massachusetts-based UCAL were generated using datasets maintained in Massachusetts, meaning they were stolen from Massachusetts. (RA1037, 1050, 1154). The datasets used by Gajewski to create the Application Notes were then returned to KPM and its Massachusetts-based repository. (RA1154).

*Massachusetts Checklists*

KPM's preventative maintenance checklists copied by Blue Sun are maintained by KPM in Massachusetts and certify that the "instrument meets factory

---

[6] RA1073-74 (Olson); RA1380 (Lucas); RA1562-63 (Glenister); RA1697 (Gajewski); *see also* RA3374-77.

Case 25-1071 Doc 118-5 Filed 08/19/25 Page 24 of 67

standards" – the factory being in Westborough, MA. (Compare RA3556-59 with 3560-62). Numerous other examples exist. (RA1121-24, 3551-66, 4218-65).

*Massachusetts Relationships*

The unfair or deceptive conduct presented at trial included significant efforts, often successful, by Blue Sun, ITG, and their agents to destroy relationships between KPM and its customers doing business in or through Massachusetts. The customer relationships that were the target of Defendants' unfair or deceptive conduct were relationships with Massachusetts governed by Massachusetts law. Substantial evidence demonstrated that the KPM sales Blue Sun and its employees interfered with were explicitly run out of "113 Cedar Street S-3, Milford, MA."

For example, when Gajewski diverted KPM customers on behalf of Blue Sun, those poached quotes he used were from Milford, MA. *See* RA3572-96 (quotes from Unity in Milford, MA to Lamb Weston). Lamb Weston, like every other KPM customer, was doing business directly with KPM/Unity in Massachusetts and agreed that any litigation under its quotes would be in Massachusetts pursuant to Massachusetts law. *E.g.*, (RA3576 ("This Agreement shall be construed in accordance with the laws of the State of Massachusetts, United States of America. Any litigation under this Agreement, if commenced by Buyer, shall be brought in a court of competent jurisdiction in the State of Massachusetts.")).

The same is true of Glenister and her actions to poach KPM customers from Massachusetts relationships. (RA4115-18 - Quote to R&R Machine Works from Milford, MA); (RA4423 - Demo system from Milford, MA to Mariani Packing Co.); RA3551-66 (Junbunzlauer's relationship with Milford, MA). Blue Sun also falsely told customers KPM no longer serviced SpectraStar instruments, deliberately targeting KPM in Massachusetts and its customer relationships existing or fostered from there. (RA1079, 3983-84, 4179-81). Each of the customer relationships which Blue Sun and ITG destroyed, resulting in lost service revenue and sales to KPM, was the destruction of a relationship explicitly and directly connected to Massachusetts.[7]

*Massachusetts Databases*

While engaging in all of the nefarious conduct detailed above, agents of the Corporate Defendants regularly communicated with or through KPM and its servers in Massachusetts. KPM maintains the core of its operations, including databases, email servers, and customer lists and data in Massachusetts. (RA1037). Indeed, there is no dispute that Gajewski's computer, which was provided by KPM from Massachusetts and improperly used by him for Blue Sun purposes during that employment with KPM was connected to the KPM network in Massachusetts from where Eric Olson was able to view Gajewski's nefarious activity. (RA1137, 3504).

[7] The same was true of the Defendants' efforts to explicitly "poach" the KPM/Unity employees, who, as noted, were all employed by a Massachusetts company. (RA3357-59, 3990-4016).

To update calibrations, which he did on behalf of Blue Sun, Gajewski used KPM's confidential databases, which are physically maintained in Massachusetts. (RA1288-89, 1037, 1050, 1154). All the data that Gajewski and Eilert used on behalf of Blue Sun necessarily came from this centralized database located in an accessed in Massachusetts. *Id*. Blue Sun and ITG's nefarious conduct resulted in ***multiple***, ***repeated*** contacts with Massachusetts, and spanned over approximately 3 years.

## II. Proceedings Below.

On April 5, 2021, KPM filed a Verified Complaint against Blue Sun and ITG, as well as former KPM employees Lucas, Gajewski, Glenister, Eilert, Israelson, Ossowski, and Michelle Gajewski. (RA46-258). KPM alleged that the Corporate Defendants had misappropriated KPM's trade secrets in violation of both the federal Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq*. ("DTSA") and the state cognate, Massachusetts Uniform Trade Secrets Act, Mass. Gen. L. c. 93, § 42 *et seq*., ("MUTSA") tortiously interfered with its contracts, and committed unfair or deceptive trade practices in violation of Mass. Gen. L. c. 93A, § 11 ("Chapter 93A"). (RA77-79, 82-84). The next day, KPM filed a motion for a preliminary injunction and an emergency motion for expedited discovery. (RA10). On May 19, 2021, the District Court granted the motion for expedited discovery to be completed by July 9, 2021. (RA12 (ECF No. 44)).

In the interim, each of the Defendants filed motions to dismiss, which the District Court heard on June 21, 2021. The Corporate Defendants jointly filed a motion to dismiss the claims against them, *inter alia*, on the basis that the District Court lacked personal jurisdiction over them as Maryland-based entities, which, they claimed, had insufficient contacts to Massachusetts. (RA261-62). KPM opposed, including proffering to amend the Verified Complaint with additional facts from expedited discovery if needed. (RA302 n. 4). The District Court denied the Corporate Defendants' motion to dismiss for lack of personal jurisdiction and on the merits as to each claim against them, save one (unjust enrichment). (Add. 69). The District Court dismissed three of the individual defendants and narrowed the claims against the remaining four: Lucas, Gajewski, Glenister and Eilert. (Add. 69-71).

At the conclusion of expedited discovery, the District Court took additional evidence and briefing on KPM's preliminary injunction motion, which it granted. (RA410-13). After full discovery, only ITG moved for summary judgment on the claims against it, which the District Court denied. (RA23, 26).

The case was tried for ten days to twelve jurors. Nine witnesses testified live, the deposition testimony of two other witnesses was presented to the jury, and over 230 exhibits were admitted into evidence. At the conclusion of trial, the jury found that Blue Sun misappropriated KPM's trade secrets and tortiously interfered with KPM's contractual relations, awarding KPM $1.5 million in damages from Blue

Sun. (Add. 72-74, 77). The jury also found that Blue Sun's parent company ITG tortiously interfered with KPM's contractual relations, awarding KPM $1.8 million in damages from ITG. (Add. 77).[8] The District Court also put the issue of liability under Chapter 93A to the jury, asking it to decide whether Blue Sun and/or ITG (i) engaged in unfair methods of competition or deceptive acts or practices in the conduct of trade or commerce, and (ii) whether they did so willfully or knowingly. (Add. 78). The jury answered those questions "yes" as to both Corporate Defendants. (Add. 78). After post-trial motions, the District Court adopted the jury's findings on the Chapter 93A count and doubled the damages against both Blue Sun and ITG for their willful or knowing violations of Chapter 93A, awarded attorneys' fees and costs to KPM, assessed the damages against Blue Sun jointly and severally against ITG, and assessed damages against ITG on a several, and not joint, basis.

## SUMMARY OF THE ARGUMENT

Each of the Corporate Defendants' challenges to the District Court's judgment fails.

They first fail to adequately preserve their right to appeal the District Court's denial of their motion to dismiss for lack of personal jurisdiction by not raising the issue post-trial, a logical requirement of this Court's decision in *Boit v. Gar-Tec*

[8] The other Defendants who went to trial did not appeal the verdicts against them, each of which included liability and damages for misappropriation of trade secrets, breach of contract, and violation of the covenant of good faith and fair dealing.

*Prods., Inc.*, 967 F.2d 671 (1st Cir. 1992). Unlike the grant of a motion to dismiss for lack of personal jurisdiction before trial, the denial allows for the Court to take evidence, which it should then consider, and which this Court considers on appeal. *Adelson v. Hananel*, 652 F.3d 75, 80 (1st Cir. 2011) ("*Adelson II*"). Even if this Court concludes that Blue Sun and ITG did not waive this issue for appeal, KPM easily established that there were sufficient contacts between Massachusetts and the Corporate Defendants to warrant the exercise of personal jurisdiction over them. The Verified Complaint alleged conduct that was purposefully directed at Massachusetts, resulted in the theft of trade secrets in Massachusetts and not elsewhere, and caused loss in Massachusetts. The trial evidence provided extensive additional evidence of how ITG, Blue Sun, and their agents engaged in repeated conduct in and directed at this Commonwealth, such that they availed themselves of Massachusetts courts.

Blue Sun and ITG's challenge to the District Court's Chapter 93A judgment ignores extensive evidence in the record showing that the center of gravity of the Defendants' nefarious conduct was Massachusetts. Accordingly, Blue Sun and ITG fail to meet their burden of showing that the center of gravity was not in Massachusetts.

The Massachusetts Uniform Trade Secret Act does not preempt Chapter 93A because it does not "conflict" with Chapter 93A. No court has held otherwise, and

those Court's that have addressed it, including this one, have concluded there is no preemption. The MUTSA instead expressly preserves other civil remedies not based on misappropriation of trade secrets. Preemption aside, the extensive trial record includes sufficient evidence in addition to any misappropriation of trade secrets to justify the Chapter 93A award and the double damages assessed by the District Court.

Blue Sun and ITG's challenge to the jury instructions also fails. The refusal to put to the jury the question of whether Blue Sun's misappropriation was "willful and malicious" is permitted by the statutory language, and in any event, because the District Court did not assess damages against Blue Sun on that basis, it is at most harmless error. The head start jury instruction was fully supported by extensive evidence that Blue Sun and ITG simply ignore. Finally, the willful blindness instruction was appropriate given the record of this case and case law analyzing conduct similar to ITG's intentional efforts to avoid knowledge of certain contracts.

## STANDARD OF REVIEW

KPM disputes Blue Sun and ITG's standard of review of the denial of the Court's denial of their motion to dismiss for lack of personal jurisdiction. The Corporate Defendants contend that the review is *de novo* review of the District Court's *prima facie* review of the Verified Complaint. However, review after trial is based on plain error, where Blue Sun and ITG did not re-raise their challenge in

light of the trial evidence. *Boit*, 967 F.2d 676 (If a district court "applies the *prima facie* standard and denies the motion to dismiss, it is implicitly, if not explicitly, ordering 'that hearing and determination [of the motion to dismiss] be deferred until the trial.'" quoting Fed. R Civ. P. 12(d) (alterations in original)). Like any other issue heard through trial, this Court looks to the full trial record, considering the facts in the record in the light most favorable to the verdict or findings (*Wennik*, 304 F.3d at 126) and not just the allegations in the Complaint.

## **ARGUMENT**

### I. The Court Should Reject Blue Sun and ITG's Claim that the District Court Did Not Have Personal Jurisdiction Over Them.

This Court should deny Blue Sun and ITG's appeal on the basis of personal jurisdiction for several, independently sufficient reasons. First, although the District Court only analyzed KPM's Verified Complaint on a *prima facie* basis at the motion to dismiss stage, the subsequent development of further germane facts at trial are now considered and, therefore, their personal jurisdiction challenge must be raised in a post-jury trial motion to be adequately preserved for appeal under the logic of this Court's precedent. Blue Sun and ITG's failure to revisit the issue after trial waived their right to challenge it on appeal. Second, even if not waived, the District Court properly denied the motion based on the allegations in the Verified Complaint and attached exhibits, and now, the extensive evidence adduced at trial fully supports the District Court's exercise of personal jurisdiction over Blue Sun and ITG.

### A. Blue Sun and ITG Failed to Preserve Their Personal Jurisdiction Argument for Appeal.

Blue Sun and ITG failed to preserve their challenge to the District Court's jurisdiction by not re-raising the issue after the factual record was developed, as contemplated in this Court's decision in *Boit*. If a District Court applies the *prima facie* standard to a motion to dismiss for lack of personal jurisdiction, as Judge Hillman did here, and denies the motion to dismiss, "it is implicitly, if not explicitly, ordering 'that hearing and determination [of the motion to dismiss] be deferred until the trial.'" *Boit*, 967 F.2d at 676, quoting Fed. R Civ. P. 12(d) (alterations in original). When deferred until after trial, the Court engages in factfinding, *id.* at 677, which, like any other issue taken to trial, must be preserved through a post-trial motion so the District Court can address it as the court in the best position to efficiently remedy any errors. Blue Sun and ITG did not do so.

Applying *Boit*, the Eleventh Circuit recently adopted a similar approach. After quoting this Court's decision in *Boit*, the Eleventh Circuit explained that "[a]fter trial, if the defendant still believes personal jurisdiction is lacking, it may invite the district court to revisit personal jurisdiction in light of the evidence produced at trial…." *AcryliCon USA, LLC v. Silikal GmbH*, 985 F.3d 1350, 1365 (11th Cir. 2021). The *AcryliCon* Court held that "when a district court denies a motion to dismiss for lack of personal jurisdiction, and then revisits personal jurisdiction post-trial in light of the record as it exists at that time, the defendant must

appeal the post-trial disposition in order to preserve the issue of personal jurisdiction on appeal." *Id.* at 1366. In that case, by failing to appeal the post-trial ruling applying the jurisdictional facts adduced at trial, the defendant waived its challenge to personal jurisdiction. *Id.* at 1365-66.

This Court should now make clear, as the logical conclusion from *Boit*, that a challenge to personal jurisdiction after a jury trial, as with any other issue tried to a jury, must be preserved through proper post-trial motion practice in order to be presented to this Court, and conclude that this argument has been waived since Blue Sun and ITG failed to do so.

### B. The District Court Properly Concluded It Had Personal Jurisdiction Over the Corporate Defendants at the Beginning of the Case That Was Confirmed by the Trial Record.

The District Court properly denied Blue Sun and ITG's motion to dismiss for lack of personal jurisdiction even under the *prima facie* standard that they urge this Court to review. The District Court relied solely on the Verified Complaint. KPM offered to amend the Verified Complaint after the close of the expedited discovery that was underway at the time (RA302 n. 4), which the District Court did not view as necessary, holding a hearing on June 21, 2021 (RA14-15) prior to the July 9, 2021 close of expedited discovery (RA14-15, ECF No. 44). It issued its decision denying

Case 25-1222 Doc 118-5 Filed 08/19/26 Page 34 of 67

the motion to dismiss on July 16, 2021. (RA15).[9] On appeal, this Court includes such evidence in its review. *See Adelson II,* 652 F.3d at 80 (considering the trial record and confirming it supported the denial of the pre-trial motion to dismiss for lack of personal jurisdiction).

To establish personal jurisdiction over Blue Sun and ITG, KPM must satisfy the requirements of both the Massachusetts long-arm statute and the Due Process Clause of the Fourteenth Amendment. *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 290 (1980); *Nandjou v. Marriott Int'l, Inc.*, 985 F.3d 135, 148 (1st Cir. 2021) (this Court "must evaluate whether the exercise of personal jurisdiction over the defendants complies with both the requirements of the Massachusetts long-arm statute and the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution."). KPM has shown both are satisfied.

[9] Given KPM's proffer to amend the Verified Complaint if needed at the close of expedited discovery within the first several months of the existence of this case, it would make little sense to not consider the evidence developed through discovery and all evidence ultimately presented at trial to show that KPM met its burden of establishing that the District Court had personal jurisdiction over Blue Sun and ITG. If the verdict were vacated as Blue Sun and ITG argue based on personal jurisdiction, another Verified Complaint could simply be refiled in Massachusetts with additional Massachusetts-based allegations supported by the copious evidence established at trial. This illustrates the waste of judicial resources for which Blue Sun and ITG are advocating.

### 1. Blue Sun/ITG's Conduct Is Covered By the Massachusetts Long-Arm Statute.

This Court has jurisdiction over Blue Sun and ITG based on the Massachusetts long arm statute, M. G. L. c. 223A § 3(c). "A court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action in law or equity arising from the person's…causing tortious injury by an act or omission in this commonwealth." *Id.* To establish that the allegations in a complaint satisfy the long arm statute, a reviewing Court must "take specific facts affirmatively alleged by the plaintiff as true (whether or not disputed) and construe them in the light most congenial to the plaintiff's jurisdictional claim." *Cepeda v. Kass*, 819 N.E.2d 979, 984 (Mass. App. 2004) (quoting *Massachusetts Sch. of Law at Andover, Inc. v. American Bar Assn.,* 142 F.3d 26, 34 (1st Cir. 1998)).

Blue Sun and ITG's primary contention is when personal jurisdiction based on Section 3(c) is premised on intentional conduct outside the commonwealth that is directed at Massachusetts, jurisdiction can only arise where fraudulent statements are directed at Massachusetts. *See* Opening Br. at 35 & n. 10 (citing *Ealing Corp. v. Harrods Ltd.,* 790 F.2d 978, 982 (1st Cir. 1986)). Section 3(c) is not so limited. Section 3(c) has been satisfied in numerous cases where intentional out-of-state conduct other than fraud allegedly caused injury in Massachusetts.

In the most recent case, a Court in this District denied a motion to dismiss for lack of personal jurisdiction under Section 3(c) where there was no fraud alleged,

and instead claimed a foreign defendant call center made unsolicited telemarketing calls to Massachusetts-resident plaintiff who had put his name on the do not call list, alleging violations of the TCPA, 47 U.S.C. § 227(c), the Massachusetts Telemarketing Solicitation Act, M.G.L. c. 159C, and Chapter 93A. *Doane v. Python Leads, LLC*, No. 1:24-CV-12947-JEK, 2025 WL 3485569, at *2, *4 (D. Mass. Dec. 4, 2025). The Court concluded that the defendant's CEO (Levine) who moved to dismiss "personally participated in, and benefited from, Python's call centers that targeted Massachusetts consumers like Doane. And the long-arm statute's causation standard is met here: Levine's conduct, including allegedly developing Python's call scripts, started a 'train of events' that led Python's callers to repeatedly contact Doane without his permission and cause him harm in Massachusetts." *Id.* at *4.

At least two other District Courts have concluded, as this Court has previously assumed, that stating a claim for a Chapter 93A violation also is sufficient to satisfy the tortious injury requirement. *LaVallee v. Parrot-Ice Drink Prods. of Am., Inc.,* 193 F. Supp. 2d 296, 300 (D. Mass. 2002) ("In addition, the plaintiffs state a cause of action under M.G.L. c. 93A, and the First Circuit Court of Appeals has "assume[d], without deciding, that a Chapter 93A violation would constitute a tortious injury under Chapter 223A."); *The Scuderi Grp., LLC v. LGD Tech., LLC,* 575 F.Supp.2d 312, 320-21 (D. Mass. 2008) (where the nonresident defendants were accused of misappropriation of trade secrets, fraud, and violating

Case 25-1198 Doc 118-5 Filed 08/19/26 Page 37 of 67

Chapter 93A); *Captivate, LLC v. Datalock Sys., Inc.*, 1984CV02429BLS2, 2019 WL 7707968 (Mass. Super. Dec. 10, 2019) (Section 3(c) of the long arm statute was satisfied where Florida defendant knew about and benefited from a scheme to steal money from a Massachusetts company).

The Verified Complaint alleged that both "Blue Sun and ITG were aware of [KPM's] contracts [with its employees] and the Individual Defendants' contractual obligations not to use or disclose Plaintiff's trade secrets, and/or work for a competitor such as Blue Sun, after leaving Plaintiff's employ" as part of their efforts to tortiously interfere with contracts with a Massachusetts based employer. (RA82). KPM further alleged that Blue Sun and ITG violated Chapter 93A by interfering intentionally with KPM's contracts with its employees, and "contractual relationships with its current and prospective customers," again knowing that KPM was a Massachusetts company. (RA48, 83-84); *see also* Add. 21 ("Given that KPM is a Massachusetts-based employer, that knowledge makes it foreseeable that the Corporate Defendants might be held accountable for their conduct in Massachusetts."). The Verified Complaint on its own alleged adequate culpable conduct by both Blue Sun and ITG individually, which subjected them to personal jurisdiction under Massachusetts' long arm statute.

The record at trial shows significant further contact and conduct that both Blue Sun and ITG engaged in directed at and in Massachusetts. *See,* pp. 10-15, *supra.*

(detailing conduct connected to Massachusetts). Notably, for this analysis, the conduct of those acting on behalf of and adopted by Blue Sun may be attributed to Blue Sun, and in turn, attributed to ITG who adopted them. *See,* pp. 9-10, *supra. Nandjou*, 985 F.3d at 150; *Daynard v. Ness, Motley, Loadholdt, Richardson & Poole, P.A.,* 290 F.3d 42, 55 (1st Cir. 2002) ("For purposes of personal jurisdiction, the actions of an agent may be attributed to the principal. Whether or not an agent is initially authorized to act on behalf of a principal, the agent's actions may be attributed to the principal, for purposes of personal jurisdiction, if the principal later ratifies the agent's conduct.").

ITG adopted Blue Sun's conduct. It set up Blue Sun (RA1355) and purposefully ignored the poached employees' nondisclosure obligations to KPM (RA1475, 1880-82, 3501-02), all while owning 100% of Blue Sun and taking 65% of the revenue of every analyzer sold by Blue Sun. (RA1864-65, 1886). This tortiously interfered with the contractual relationships that KPM had with each of its employees, including Lucas, by poaching them to start the new entity Blue Sun to compete with KPM using KPM's confidential information and also violated Chapter 93A. *Angiodynamic, Inc. v. Bioletic AG*, 991 F.Supp.2d 299, 304, 306 (D. Mass. 2014) (finding tortious interference and a violation of Chapter 93A by parent company where parent set up subsidiary to insulate parent from responsibility for breaches of contract with a third party). Once ITG and Wilt learned that Blue Sun

was using KPM's trade secrets, including KPM's proprietary UCAL software, confidential customer information, and calibration database, ITG had the ability to remedy Blue Sun's misconduct but took no action, reaping the benefits of the misconduct instead. (RA1912-13). ITG's repeated failure to terminate the unfair or deceptive conduct once it had learned about it is the exact sort of action that subjects ITG to jurisdiction in the forum state as adopting its agents acts. *Daynard,* 290 F.3d at 55.

*ITG's Independent Conduct*

Contrary to ITG's argument, veil piercing is not required. As set forth above, there is independent conduct by ITG sufficient to establish personal jurisdiction over it. *Nandjou*, 985 F.3d at 150; *Daynard,* 290 F.3d at 55; *see also* M. G. L. c. 223A § 3(c). The cases cited by Blue Sun and ITG do not hold otherwise. The *Keane v. Expeditors Int'l of Washington, Inc.*, decision is not on point as Blue Sun and ITG claim. Opening Br. at 38. In *Keane*, the plaintiff did not allege or show any independent conduct of the parent or base its jurisdiction on anything beyond "overlapping leadership of the companies." *Keane v. Expeditors Int'l of Washington, Inc.,* 138 F.4th 613, 615 (1st Cir. 2025). In contrast here, KPM alleged that ITG independently engaged in conduct that tortiously interfered with contracts with Massachusetts-based KPM and violated Chapter 93A. (RA82-84) (pleading improper interference with employee and customer contracts, through use of KPM's

Case 25-1222 ... Doc 118-5 Filed 03/19/26 Page 40 of 67

confidential information, among other things). These allegations were ultimately vindicated by the jury findings (Add. 78), which the District Court adopted (Add. 84), and which the District Court observed were never substantively challenged by Blue Sun or ITG. (Add. 122) ("the Court notes that neither of the Corporate Defendants has even substantively challenged the jury's determination that 93A violations occurred….").

Finally, Blue Sun and ITG also overstate the import of *United States v. Swiss Am. Bank, Ltd.*, 274 F.3d 610, 627 (1st Cir. 2001), claiming that it holds as a general rule that jurisdiction extends to a parent company *only* when there is alter ego liability. Opening Br. at 38. *Swiss Am. Bank* did not say that. Rather in that case, the government conceded that with respect to the parent of that subsidiary, alter ego liability was the only method to exercise jurisdiction over the parent. *Id.* That did not create a generally applicable rule.

### 2. The District Court's Exercise of Specific Jurisdiction Over the Corporate Defendants Comported with Due Process.

The District Court properly concluded that the exercise of jurisdiction over Blue Sun and ITG comports with Due Process based on the analysis adopted by the First Circuit requiring a showing of relatedness, purposeful availment, and reasonableness. *Knox v. MetalForming, Inc.*, 914 F.3d 685, 690 (1st Cir. 2019); *see also,* (Add. 18) (quoting *Phillips v. Prairie Eye Ctr.*, 530 F.3d 22, 27 (1st Cir. 2008)). The District Court found all three factors support jurisdiction here. Blue Sun and

ITG only challenge the relatedness and purposeful availment prongs[10] and are incorrect on both.

**a) The Relatedness Prong Is Satisfied.**

To show relatedness in the context of personal jurisdiction, a plaintiff "must demonstrate that their 'cause of action either arises directly out of, or is related to, the defendant's forum-based contacts.'" *Knox*, 914 F.3d at 690–91 (quoting *Harlow v. Children's Hosp.*, 432 F.3d 50, 61 (1st Cir. 2005)). "This 'flexible, relaxed standard,' *N. Laminate Sales, Inc. v. Davis*, 403 F.3d 14, 25 (1st Cir. 2005) (quoting *Pritzker v. Yari*, 42 F.3d 53, 61 (1st Cir. 1994)), requires only that the claim have a 'demonstrable nexus' to the defendant's forum contacts." *Knox*, 914 F.3d at 691. The U.S. Supreme Court has emphasized that a "strict causal relationship" between the injuries suffered by the plaintiff and the defendant's actions are not necessary to satisfy the relatedness requirement. *Ford Motor Co. v. Montana Eighth Judicial District Court, et al.*, 592 U.S. 351, 362 (2021). Instead, there should be equal focus on the language "or is related to" which is separate and apart from an analysis consisting of "arising out of" the defendant's actions. *Id.* (stating, "the first half of that standard asks about causation; but the back half, after the 'or,' contemplates that some relationships will support jurisdiction without a causal showing.").

[10] Blue Sun and ITG state that KPM failed on the reasonableness prong too, Opening Br. at 40, but fail to include any argument on that issue.

Blue Sun and ITG focus their argument almost exclusively on whether the tortious interference alleged in the Verified Complaint satisfied the relatedness prong, ignoring the trade secret claims and the Chapter 93A claims, among other things. Indeed, KPM alleged that "The trade secrets and confidential information forming the subject matter of this Verified Complaint is all stored on servers located in Massachusetts since at least 2016, including for all relevant times involving these Defendants." (RA49). It also alleged that both Blue Sun and ITG engaged in the theft of trade secrets and confidential information located in Massachusetts, which the District Court credited as an additional basis for finding the relatedness prong satisfied. (Add. 19-20).

The Supreme Court's "most common formulation of the rule demands that the suit arise out of *or relate to* the defendant's contacts with the forum." *Ford*, 592 U.S. at 362 (quotations omitted, emphasis in original). Any legitimate interpretation of the phrase that the "suit…relate to the defendant's contacts with the forum" must include allegations that the defendants stole trade secrets and confidential information from the forum state, i.e. Massachusetts. It is a conclusion so evident that it is rarely litigated, but when it is, it regularly supports the exercise of personal jurisdiction. *See, e.g., S & D Trading Acad., LLC v. AAFIS, Inc.,* 494 F.Supp.2d 558, 567 (S.D.Tex.2007) (ruling that, where defendant's employees had been given authorized access to plaintiff's trade secrets while visiting the forum, then left to

misappropriate it elsewhere, the trade secrets claim still arose out of the contacts with the forum); *see also Custom Conveyor Corp. v. Hyde*, 237 F. Supp. 3d 895, 901 (D. Minn. 2017) (finding sufficient minimum contacts to exercise jurisdiction over Georgia-based employee of Minnesota company who "had persistent contact with CCC in Minnesota, purportedly gained confidential information in the course of those contacts, and then allegedly disclosed the information to a competitor, causing harm to a Minnesota company."); *M/A-COM Tech. Sols., Inc. v. Litrinium, Inc.,* No. SACV 19-220 JVS (JDEX), 2019 WL 6655274, at *6 (C.D. Cal. Sept. 23, 2019) ("targeting Plaintiffs whose trade secrets are alleged to have been developed in part in design centers in California" was sufficient to satisfy relatedness prong of Due Process analysis).

As to the tortious interference claims, *Astro-Med, Inc. v. Nihon Kohden America, Inc.*, 591 F.3d 1 (1st Cir. 2009), decided after a jury trial, is on all fours with this case and supports a finding of relatedness. There, this Court held that where a party's out-of-state conduct constitutes tortious interference with a contract between a forum state plaintiff and other out-of-state defendants, that is a sufficient nexus with the forum state to confer jurisdiction. *Id.,* at 10. Indeed, the facts of *Astro-Med* are nearly identical to those in this case. In that case, a California corporation hired a Florida-based employee away from a Rhode Island based employer. *Id.,* at 6-7. The Rhode Island based employer sued the former employee

for misappropriation of trade secrets and breach of his employment agreement, which included non-competition and non-disclosure obligations. *Id.,* at 5. The employer also joined as a defendant the California corporation, alleging tortious interference with the employment agreement and misappropriation of trade secrets. *Id.* The Court held that the California corporation's "conduct in Florida and California was a cause of the breach of contract—the actual injury—that occurred in Rhode Island. That in-forum injury was clearly related to Astro–Med's tortious interference claim, satisfying the first prong of the minimum contacts analysis." *Id.* at 10. So too here. Even if Blue Sun's and ITG's conduct occurred outside of Massachusetts, as they claim, the conduct still was related to and constituted a tortious interference with contracts between KPM, a Massachusetts company, and its employees and customers, causing tortious harm in Massachusetts. Thus, Defendants here are identically situated to the California corporation in *Astro-Med*, and therefore Defendants' conduct satisfies the relatedness prong of the minimum contacts analysis.

Blue Sun and ITG's reliance on *Vapotherm, Inc. v. Santiago*, 38 F.4th 252 (1st Cir. 2022) is also unavailing. Opening Br. at 40. Like the other cases Blue Sun and ITG cite, that case was on appeal from a dismissal at the outset of the case and not after a trial record is developed. *Boit*, 967 F.2d at 676; *Adelson II*, 652 F.3d at 80. Further, *Vapotherm* focused solely on the issue of tortious interference by an

employee. 38 F.4th at 260-61. Here, there are additional specific allegations that Blue Sun and ITG misappropriated KPM's trade secrets and violated Chapter 93A through a variety of conduct that was not alleged in *Vapotherm*. (RA77-79); *see,* pp. 3-10, *supra.*

The same evidence from trial that supports the Massachusetts connections that satisfy Section 3(c) of Massachusetts' long arm statute again shows the relatedness of Blue Sun and ITG's conduct to Massachusetts. *See,* pp. 10-15, *supra* (detailing conduct connected to Massachusetts).

**b) The Purposeful Availment Prong Is Satisfied.**

"The purposeful availment prong 'represents a rough quid pro quo: when a defendant deliberately targets its behavior toward the society or economy of a particular forum, the forum should have the power to subject the defendant to judgment regarding that behavior.'" *C.W. Downer & Co. v. Bioriginal Food & Sci. Corp.*, 771 F.3d 59, 66 (1st Cir. 2014) (quoting *Carreras v. PMG Collins, LLC,* 660 F.3d 549, 555 (1st Cir. 2011)). "[T]he Supreme Court has 'consistently rejected' a physical contact test for personal jurisdiction." *C.W. Downer*, 771 F.3d at 68 (quoting *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 479 (1985)). As the District Court explained, "[g]iven that KPM is a Massachusetts-based employer, that knowledge makes it foreseeable that the Corporate Defendants might be held

Case 25-1798 Doc 118-5 Filed 03/19/26 Page 46 of 67

accountable for their conduct in Massachusetts." (Add. 21). That alone is sufficient to show purposeful availment.

The appellants' cited cases do not change this. In their effort to distinguish this case from *Astro-Med*, Blue Sun and ITG suggest that Lucas's initial Confidentiality and Non-competition Agreement with KPM's predecessor Unity Scientific only alerted Lucas that he could be haled into Court in Connecticut, because, in their words, the agreement "identified Connecticut – not Massachusetts – for … forum disputes.". Opening Br. at 45. Lucas's confidentiality agreement did not have any *exclusive* jurisdiction clause. (RA126). That agreement states only, "You consent to the jurisdiction of the courts of the State of Connecticut." (RA126). Merely consenting to jurisdiction in one state does not obviate the possibility that a party can be haled into court in another state, particularly where, as here, the KPM/Unity employees were well aware that Unity transitioned to KPM, based in Massachusetts - not Connecticut, and the trade secrets stolen by Lucas and others acting on behalf of Blue Sun were maintained in Massachusetts. (RA82); *See,* pp. 10-15, *supra.* The tortious interference with KPM's employee, customer and prospective customer contracts all included as one party the Massachusetts-based KPM. (RA83-84, 1037).

Blue Sun and ITG seek to distinguish *N. Laminate*, 403 F.3d at 26, relied on by the District Court, as irrelevant because it involved a fraudulent statement, though

Blue Sun and ITG offer no further explanation. Opening Br. at 46 n. 11. The crux of the purposeful availment analysis in that case was not dependent on the fraudulent nature of the conduct, it was the intentionality and the defendant's knowledge that the harm from his intentional conduct would be felt in the forum state. *N. Laminate*, 403 F.3d at 26 ("'The knowledge that the major impact of the injury would be felt in the forum State constitutes a purposeful contact or substantial connection whereby the intentional tortfeasor could reasonably expect to be haled into the forum State's courts to defend his actions.'" quoting *Hugel v. McNell*, 886 F.2d 1, 4 (1st Cir. 1989)). The trade secret and tortious interference claims are both intentional torts. Thus, the District Court properly relied on this Court's decision in *N. Laminate*, (Add. 21-22), as this Court should now.

Once again, the copious evidence presented at trial confirms that Blue Sun and ITG engaged in conduct that "caused tortious injury by an act or omission in this commonwealth," as required by the Massachusetts long arm statute and that satisfies the requirements of Due Process.

## II. The Court Should Affirm the Chapter 93A Award Because Blue Sun and ITG Cannot Show Their Unfair or Deceptive Acts Did Not Occur Primarily and Substantially in Massachusetts.

This Court should not vacate the Chapter 93A award based on ITG and Blue Sun's incorrect assertion that the unfair or deceptive acts for which they were held liable did not occur primarily and substantially in Massachusetts. For ITG and Blue

Sun to prevail on this argument, they bear the burden to show that the unfair or deceptive acts which the jury found they engaged in did not occur primarily and substantially in Massachusetts. Chapter 93A, § 11 para. 8 ("For the purposes of this paragraph, the burden of proof shall be upon the person claiming that such transactions and actions did not occur primarily and substantially within the commonwealth."). They fail to do so.

The Massachusetts Supreme Judicial Court has adopted the center of gravity test that is factually intensive and does not rely on any single fact as dispositive in determining whether a defendant has met its burden of showing, by the preponderance of the evidence, that the center of gravity of the conduct was not Massachusetts. *Kuwaiti Danish Computer Co. v. Digital Equip. Corp.*, 781 N.E.2d 787, 799 (Mass. 2003). Blue Sun and ITG (and the individuals acting for them) were directly engaged in destroying KPM's Massachusetts-oriented business, stealing trade secrets and other KPM property from Massachusetts, by using Massachusetts-based databases and means of communication, and tortiously interfering with Massachusetts contracts, all resulting in losses exclusively in Massachusetts.

The District Court below properly explained, quoting the Supreme Judicial Court, that the analysis:

> should not be based on a test identified by any particular factor or factors because of a tendency to shift the focus of inquiry away from the purpose and scope of c. 93A. Section 11 suggests an approach in which a judge should, after making findings of fact, and after

> considering those findings in the context of the entire §11 claim, determine whether the center of gravity of the circumstances that give rise to the claim is primarily and substantially within the Commonwealth.

(Add. 126-27) (quoting *Kuwaiti Danish*, 781 N.E.2d at 799). Blue Sun and ITG do not challenge the accuracy of any of the factfinding by the District Court in this case on this issue. They also ignore the extensive trial record not specifically referenced by the District Court in its post-trial opinion that this Court must view in the light most favorable to the verdict. Properly viewed, Blue Sun and ITG fail to meet their burden of showing that their unfair or deceptive conduct did not occur primarily and substantially in Massachusetts.

This Court has recognized that even out-of-state conduct that impacts the Commonwealth of Massachusetts supports the conclusion that the Chapter 93A violation occurred primarily and substantially within the Commonwealth. *See, e.g., In re Pharm. Indus. Average Wholesale Price Litig.*, 582 F.3d 156, 194 (1st Cir. 2009) (affirming that the Defendant's offending out of state conduct was still considered primarily and substantially in Massachusetts where the "conduct directly, and by design, affected physicians in Massachusetts and caused financial injury to payors in Massachusetts."). Here, the record reflects extensive conduct by Blue Sun and ITG specifically intended to affect KPM, which is exclusively based in Massachusetts. *See*, pp. 10-15, *supra* (detailing conduct connected to Massachusetts).

This Court has also long held that, among the factors that should be considered, which are consistent with *Kuwaiti Danish*, are "(1) where the defendant commits the unfair or deceptive act or practice; (2) where the plaintiff receives or acts on the wrongful conduct; and (3) where the plaintiff sustained losses caused by the wrongful conduct." (Add. 127) (quoting *Kuwaiti Danish*, 781 N.E.2d at 798 n. 13, in turn citing *Roche v. Royal Bank of Canada*, 109 F.3d 820, 829 (1st Cir. 1997)).

The District Court properly considered where plaintiff received the wrongful conduct. (Add. 127-28). The District Court concluded that "there is little doubt that KPM "received" the vast majority -- if not all -- of the Corporate Defendants' wrongful conduct in Massachusetts." (Add. 128). That is fully supported by the record. *See,* pp. 10-15, *supra.*

The District Court also properly concluded that the situs of the loss weighs "heavily" in favor of finding Massachusetts to be the center of gravity for purpose of the Chapter 93A claims. (Add. 128). There is no question here that the extensive losses to KPM occurred where it and its NIR business unit Unity Scientific are located in Westborough, Massachusetts. (RA430, 1037).

Blue Sun and ITG's reliance on numerous cases are easily distinguishable. In *Kenda Corp., Inc. v. Pot O'Gold Money Leagues, Inc.*, 329 F.3d 216, 235 (1st Cir. 2003), the actual fraudulent misrepresentation was both made and accepted in Michigan, unlike here, where KPM received the misconduct and the loss in

Massachusetts. In *Fishman Transducers, Inc. v. Paul*, 684 F.3d 187, 197 (1st Cir. 2012), cited by Appellants, Opening Br. at 48, unlike the facts of this case, the plaintiff there "concede[d] that the HSN advertising was not particularly targeted to Massachusetts customers and that no more than a 'small portion' of HSN's guitar sales occurred within Massachusetts." Unlike *Skyhook Wireless, Inc. v. Google, Inc*., 19 N.E.3d 440, 449 (Mass. App. 2014)), where "[a]ll … communications, both physical and electronic, occurred outside the Commonwealth," all of the electronic communications used by both Gajewskis and the other now former KPM employees when they were working on behalf of Blue Sun and KPM simultaneously using KPM's emails or data were housed in and occurred in Massachusetts. *See,* pp. 14-15, *supra.* Based on the reasons articulated above, Corporate Defendants have not satisfied their burden, and this Court should affirm the Chapter 93A judgment.

## III. Blue Sun and ITG's Argument that MUTSA Requires Vacating the Chapter 93A Judgment is Wrong as a Matter of Law and Fact.

### A. MUTSA Does Not Preempt G. L. c. 93A.

The MUTSA does not preempt Chapter 93A. Massachusetts General Law Chapter 93, § 42F(a) is limited, and states, "[e]xcept as provided in subsection (b), sections 42 to 42G, inclusive, shall supersede any conflicting laws of the commonwealth providing civil remedies for the misappropriation of a trade secret." (emphasis added).

The Corporate Defendants cite no case interpreting this language to render Chapter 93A inapplicable in trade secret cases. To the contrary, courts in the Commonwealth have found that where the cause of action questioned to be superseded by the MUTSA requires different elements to be met in order to satisfy it, then it is not superseded by the MUTSA, reasoning that "the focus should be on the causes of action that give rise to such civil remedies, not the factual conduct that give rise to same." *Neural Magic, Inc. v. Facebook, Inc.*, 1:20-CV-10444-DJC, 2020 WL 13538627, *3 (D. Mass. Oct. 29, 2020); s*ee also Zemvar Inc. d/b/a Grip Mobility Co., v. Uber Technologies, Inc.,* No. 2484CV01525-BLS2, 2025 WL 354890 (Mass. Super. Jan. 2025) (agreeing with both the District Court's reasoning in this case, *KPM Analytics N. Am. Corp. v. Blue Sun Sci., LLC*, *et al*, 729 F. Supp. 3d 84, 119-120 (D. Mass. 2024), and with the *Neural Magic, Inc*. decision); *see also BioPoint, Inc. v. Dickhaut*, 110 F.4th 337, 354 (1st Cir. 2024) (concluding under plain error review that there was no basis to find that MUTSA supersedes Chapter 93A).

This makes sense, given that the MUTSA only supersedes "***conflicting*** laws of the commonwealth." (emphasis added). A "conflict" is explicitly required for Section 42F(a) to apply, meaning that it must be impossible to comply with Chapter 93A and MUTSA simultaneously. There is nothing in the elements of the broad, remedial statute of Chapter 93A that ***conflicts*** with the MUTSA, nor have the

Appellants identified any. At most, Chapter 93A supplements the remedies in the MUTSA.

If the legislature had intended to effect a broader preemption that did not require an actual conflict, it could have, and presumably would have, said so explicitly. The MUTSA does not say that it is the "exclusive" remedy for circumstances where a defendant has engaged in conduct that involved misappropriation of trade secrets.

**B. Even if the MUTSA Preempts Chapter 93A for Trade Secret Misappropriation, There Is Sufficient Record Evidence to Support the Chapter 93A Finding Without Considering Trade Secret Misappropriation.**

Even if the MUTSA does preempt Chapter 93A conduct based on theft of trade secrets, there is sufficient record evidence in this case to support that the jury findings underpinning the Chapter 93A judgment, which the District Court adopted, based on non-trade secret conduct. The MUTSA expressly provides: "(b) Sections 42 to 42G, inclusive, do not affect: … (3) other civil remedies to the extent that they are not based upon misappropriation of a trade secret….". Even where some allegations of misappropriation of trade secrets are present, there is no preemption where the other civil remedies have different elements than the MUTSA; those other claims are not barred by Section 42F. *Neural Magic*, 2020 WL 13538627 at *3. In that case, the Court refused to dismiss Chapter 93A, tortious interference and unjust enrichment claims that were premised, in part, on theft of confidential or proprietary

Case 25-1222 Doc 118-5 Filed 08/19/26 Page 54 of 67

information that did not constitute a trade secret within the definition of the MUTSA, paralleling the claims here.

First, ITG's actions and the conduct for which the jury found ITG liable was not based on trade secret misappropriation. The jury found that ITG did *not* misappropriate any of KPM's trade secrets. (Add. 73). Instead, the jury found that ITG engaged in unfair or deceptive trade practices through other conduct. (Add. 78). The jury must have, and reasonably could have, identified the culpable conduct as ITG's tortious interference with contracts and other independent knowing or willful misconduct as the basis for this finding, including supporting Blue Sun's misconduct and acknowledging that Blue Sun was selling the Pheonix analyzer based on lies. (RA1885). *See*, pp. 9-10, *supra.*

Second, the conduct by Blue Sun underlying the Chapter 93A claim is also not solely premised on the misappropriation of trade secrets. The jury found that Blue Sun, like ITG, engaged in tortious interference with contractual relations, separate from misappropriating trade secrets. (Add. 77). Moreover, there is copious evidence of Blue Sun, ITG, and their employees lying and deceiving customers and KPM. *See,* pp. 3-10, *supra* (unlawfully diverting customers, copying KPM data for use by Blue Sun and ITG, copying preventative maintenance checklists, telling falsehoods to customers to interfere with their relationships with KPM, wrongfully diverting service revenue, using pseudonymous email addresses, and passing off

KPM's data libraries as Blue Sun's to attract customers). This independent conduct justifies the Chapter 93A award.

### C. Vacating the District Court's Award of Exemplary Damages Under Chapter 93A is Unwarranted.

Blue Sun and ITG's request that this Court vacate the District Court's award of double damages under Chapter 93A is entirely dependent upon their argument that there can be no Chapter 93A liability in the first place. For the reasons explained in the immediately preceding section, the District Court properly adopted the jury's Chapter 93A findings, which are supported by a wide variety of unfair conduct beyond simple theft of trade secrets or tortious interference, which Blue Sun and ITG never challenged. (Add. 122). The record belies Blue Sun and ITG's assertion that the Chapter 93A claims were only premised on the theft of trade secrets and tortious interference with the employment agreements.

There was plenty of evidence of interference with KPM's employment and customer contracts alike, and not merely theft of trade secrets to support the jury's findings as to Chapter 93A, along with their other nefarious conduct. *See*, pp. 3-10, *supra*. It is not the province of the District Court or this Court to second guess the jury unless reasonable persons could not have reached the conclusion the jury reached. *Sindi v. El-Moslimany*, 896 F.3d 1, 13 (1st Cir. 2018) (the Court "will reverse only if reasonable persons could not have reached the conclusion that the jury embraced," taking the evidence in the light most favorable to the jury verdict)

Case 25-1222 Document 118-5 Page 55 Filed 08/19/26 Page 56 of 67

(internal quotation and citation omitted). The District Court's award of double damages should not be disturbed.

### D. The District Court's Post-Trial Finding that Blue Sun's Misappropriation of Trade Secrets was "Willful and Malicious" was Proper, or in the Alternative, Harmless Error.

The District Court's finding that Blue Sun's misappropriation of trade secrets was willful and malicious should not be disturbed because (i) it is supported by the statutory language that the Court may enter such a finding and it need not be made by a jury, and (ii) in any event, it would be at most harmless error because the District Court did not award any exemplary damages based on it.

The statutes authorizing exemplary damages under the DTSA and the MUTSA both vest "the court" with the power to make such a finding and do not require it of the jury. The DTSA provides, "In a civil action brought under this subsection with respect to the misappropriation of a trade secret, ***a court*** may… if the trade secret is willfully and maliciously misappropriated, award exemplary damages in an amount not more than 2 times the amount of the damages awarded under subparagraph (B)." 18 U.S.C. § 1836(b)(3)(C) (emphasis added). Under the MUTSA, "[i]f willful and malicious misappropriation exists, ***the court*** may award exemplary damages in an amount not exceeding twice any award made under subsection (a)." M. G. L. c 93, § 42B(b) (emphasis added).

Where legislatures have adopted variations on the Uniform Trade Secret Act, they have consciously chosen whether to vest with the court or the jury the power to enter exemplary damages. *Compare, e.g.*, *Proficio Mortgage Ventures, LLC v. Federal Savings Bank*, 15-CV-00510-RFB-MDC, 2024 WL 1345215, at *5 (D. Nev. Mar. 30, 2024) (determining that the statutory language in Nevada's Uniform Trade Secret Act stating "if…willful and malicious misappropriation exists, ***the court*** may award reasonable attorney's fees to the prevailing party" to mean that "the statute indicates that it is within [the court's] authority to determine whether there was a willful and malicious trade secret misappropriation."); *with* Colorado Uniform Trade Secret Act, C.R.S.A. § 7-74-104, (providing for exemplary damages determined by "the court ***or the jury***."[11] The federal Congress and the Massachusetts legislature chose to vest that power with the court, and not the jury, as reflected in the plain language of the statutes.

In any event, the Court did not award any exemplary damages on that basis, causing no prejudice to Blue Sun, making it at most harmless error. Fed. R. Civ. P. 61; *Davet v. Maccarone*, 973 F.2d 22, 28 (1st Cir. 1992) ("even if we considered the

[11] Blue Sun's contention – asserted only in an argument heading with no supporting argument – that the Court's decision violated it Seventh Amendment right to a jury trial is false, and in any event does not rise to the level of argument this Court will entertain. *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990).

court's refusal to give a punitive damages instruction to be error, the error would be harmless, since it did 'not affect the substantial rights of the parties.'"); *Orenstein v. U.S.*, 191 F.2d 184, 193 (1st Cir. 1951) (finding denial of a jury trial is harmless error where the "eventual judgment awarded no damages to the plaintiff" on that cause of action.).

## IV. The "Head Start" Instruction Given by the District Court Was Proper.

The Corporate Defendants argue that the District Court improperly gave this head start instruction:

> Improperly obtaining a head start in the marketplace for misappropriating another's trade secrets is a form of unjust enrichment. To establish that a misappropriated trade secret gave a defendant a head start, plaintiff must proffer evidence: One, that the alleged misappropriation gave the defendant a head start in the marketplace; and two, that the head start helped to bring about certain earnings over the following months or years.

(RA2222). The Corporate Defendants objected to this instruction on only one ground: "And we also noted an objection to the head start instruction that appears on page 12. There was *no evidence* of a head start. Your Honor actually sustained my objections to that line of questioning." (RA2249) (emphasis added).

However, there was in fact significant evidence in the record from which the jury could properly conclude that Blue Sun did obtain a head start.[12] First, counsel's

---

[12] The District Court cabined this instruction to misappropriation of trade secret damages only. The Corporate Defendants improperly seek to apply this instruction to the tortious interference claim implicitly suggesting without evidence that the jury ignored the District Court's instructions, which this Court rejects. *United States v.*

claim in his objection that the Court sustained his objections to that line of questioning is only accurate as to KPM's expert witness, who was expressly asked whether damages based on a "head start" would be an appropriate consideration. (RA2026). Contrary to Blue Sun and ITG's insinuation, expert testimony is not necessary to establish damages, so this objection is immaterial if other evidence supports the verdict. *See Azimi v. Jordan's Meats, Inc.*, 456 F.3d 228, 236 (1st Cir. 2006), ("[T]ranslating legal damage into money damages…is a matter peculiarly within a jury's ken.").

Another witness testified, without objection, with respect to the calibration data that the jury found was a KPM trade secret misappropriated by Blue Sun:

> Q. "if a competitor were to obtain that data and use it, would that give that competitor a head start in the marketplace?
>
> A. Yes."

(RA923; Add. 73). Additionally, there was an abundance of evidence that Blue Sun's knowledge of KPM's trade secrets gave it a head start in the marketplace. Blue Sun used KPM's leads and known-customer pricing structures to target its sales

---

*Vazquez Rijos*, 119 F.4th 94, 111 (1st Cir. 2024) ("the jurors-follow-instructions presumption is overcome only if 'there is an overwhelming probability that [they] will be unable to follow [them] ... and a strong likelihood that the effect of the evidence would be devastating to the defendant[s].'") quoting *Greer v. Miller*, 483 U.S. 756, 766 n.8 (1987) (alterations in original)). Because the jury found that ITG did not misappropriate trade secrets (Add.73), the head start instruction cannot be a basis for vacating any damages award against ITG in any event.

efforts and formulate lower Blue Sun quotes to poach KPM customers. (RA1645, 3572-96) (Gajewski and Lucas using KPM/Unity quotes for Blue Sun); (RA1665-67) (KPM customer contacting Gajewski to buy a new KPM SpectraStar machine and in response Gajewski sent a quote for a Blue Sun Pheonix with ***a $16,000 discount***)); (RA1672-73, 3568) (Gajewski alerting Lucas that Michelle Gajewski quoted KPM customer a "high Unity price" so customer may be willing to "switch to Blue Sun" if he got "a better price"). Blue Sun also misappropriated KPM's customer information regarding the nature and timing of maintenance service for KPM's customers' SpectraStar machines, which Blue Sun used to advance its service-to-sales pipeline and to sell consumables to KPM's customers. (RA1696-97, 3378-79) (Gajewski, while employed by KPM in 2021, diverting long-time KPM customer Post to ultimately buy 15 or 16 Phoenix analyzers in lieu of requested SpectraStars based on the "service-to-sale" model).

As this Court recognized in *BioPoint*, Massachusetts law does not "limit the use of the head start doctrine against a defendant whose misappropriation gave it a head start in a relevant new business it would not otherwise have had." 110 F.4th at 348 n. 3. The jury had ample evidence from which to conclude that such sales by Blue Sun never would have occurred or would not have occurred as quickly but for Gajewski's simultaneous position at KPM and knowledge of KPM's customer information. *See*, Add. 73 (jury verdict concluding that Blue Sun and Gajewski

misappropriated KPM's customer data, UCAL software, and calibration datasets). Given that evidence, a head start instruction was warranted.

The Corporate Defendants' other arguments concerning the "head start" instruction, which they did not raise in the District Court, fare no better. The Corporate Defendants' argument assumes, wrongly, that the jury found that all of the damages awarded must have been based on the "head start" instruction. Nothing in the District Court's instruction required that the jury find all of the damages arose from a head start, even if the jury was warranted in concluding so.

If the Corporate Defendants wished to argue that only a portion of their profits were attributable to their use of KPM's trade secrets (as they do in their brief), then it was their burden to present that evidence to the jury. *Jet Spray Cooler, Inc. v. Crampton,* 385 N.E.2d 1349, 1358 at n. 14 (Mass. 1979) ("[o]nce the plaintiffs demonstrate that the defendants have made profits from sales of products incorporating the misappropriated trade secrets, the burden shifts to the defendants to demonstrate the portion of their profits which is not attributable to the trade secrets"). Where it is impossible to distinguish which of Blue Sun's profits were made because of misappropriation instead of other factors, the risk of imprecision falls on Blue Sun. *BioPoint*, 110 F.4th at 348 n. 3 ("'This award is made because it is impossible for the defendants to segregate the portion of their profits which is attributable to the misappropriated trade secrets from the portion of their profits

Case 25-1222 Doc 118-5 Filed 03/19/26 Page 62 of 67

which may be attributable to other factors.'") (quoting *Jet Spray Cooler*, 385 N.E.2d at 1349).

## V. The District Court Properly Instructed the Jury on Willful Blindness as it Relates to a Claim for Tortious Interference with Contractual Relationships.

The District Court's willful blindness instruction for KPM's tortious interference claim against ITG was proper given the facts of this case. The Corporate Defendants argue that the inclusion of a willful blindness instruction included within the tortious interference with contractual relations instruction altered the knowledge requirement of the tort down to a "mere negligence" standard. (Opening Br. at 60). Not so.

A willful blindness instruction to establish knowledge in torts is appropriate under Massachusetts law. In *International Floor Crafts, Inc. v. Dziemit*, this Court recognized that it was proper for the trial court to instruct the jury on willful blindness for the knowledge element in connection with common law fraud. 420 Fed.App'x 6, 15 (1st Cir. 2011) (stating "the jury needed to find only actual knowledge ***or willful blindness*** to deem Dziemit liable for fraud.") (emphasis added).

The lower court specifically examined and explained the justification for the instruction:

> a corporate defendant cannot say the absence of evidence therefore should release him from liability when there is evidence of connection

> to Blue Sun… the jurors are entitled to know that just because someone successfully puts themselves in a bubble [i.e. ITG/Wilt], it doesn't necessarily mean, especially when there is testimony that he [Wilt] was not just a shareholder, [Wilt] was the founder of [Blue Sun], or he was – knew the person who founded the company, and he was also the manager of [Blue Sun – an LLC]. A manager [of an LLC] should be held to some level of something.

RA2112-13. A jury could reasonably find as a factual matter that the connection between ITG and Blue Sun (the party that affirmatively knew about KPM's ex-employees' confidentiality and non-disclosure agreements) is so strong that it is simply illogical for ITG to deny knowledge of the contracts. ITG is the sole member of Blue Sun (RA1474), Wilt is the sole manager of Blue Sun (RA1865), Wilt is the president and CEO of ITG (RA1865), Wilt is also the sole shareholder of ITG (RA1864), ITG and Blue Sun prepare consolidated financial reports and file joint tax returns (RA1867-68).

Corporate Defendants' reliance on the Third Circuit decision is wrong. Opening Br. at 62-63 (citing *Acclaim System, Inc. v. Infosys, Ltd*., 679 Fed. App'x 207, 209 (3rd Cir. 2017)). In *Acclaim System*, the defendant ***specifically asked*** the individual ex-employees of plaintiff if they were subject to non-competes, and each ex-employee stated "no." *Id*. A willful blindness instruction would have been inappropriate because "Infosys did not shut its eyes but made numerous inquiries" regarding possible non-competes. *Id*., at 212. The reasoning articulated by the Fourth Circuit in the *Prudential Real Estate Affiliates, Inc. v. Long & Foster Real*

Case 25-01198 Doc 118-5 Filed 03/06/26 Page 64 of 67

*Estate, Inc*., decision is more on point. 208 F.3rd 210 (Table), 2000 WL 248170 at *4-5 (4th Cir. 2000). In *Prudential Real Estate*, the Court acknowledged that when a defendant purposefully does not ask for a copy of the contract in question, and has "ample opportunity to educate itself as to [the] terms" of the contract, the defendant cannot "insulate itself from [plaintiff's] tortious interference claim by asserting that it did not know about the specific terms of the [contract]." *Id*.

Like *Prudential Real Estate*, and unlike the *Acclaim Systems* defendants, ITG and Wilt actively avoided asking Lucas or Blue Sun about possible contractual obligations KPM's ex-employees may be bound by. (RA1882-86). Despite having "ample opportunity to educate itself", ITG (through Wilt) ***purposefully avoided*** the topic of KPM's ex-employee contractual obligations and therefore should not be able to insulate itself from a tortious interference with contractual relations claim through its purposeful actions to not educate itself on the KPM ex-employee contractual obligations. *Prudential Real Estate*, 2000 WL 248170 at *4-5. The willful blindness instruction was not erroneous.

## CONCLUSION

For all of the foregoing reasons, KPM respectfully requests that the Court affirm all of the District Court's rulings challenged by Appellants in their appeal, affirm the Verdict and Judgment, dismiss this appeal, and award KPM its reasonable attorneys' fees and costs under Chapter 93A.

Dated: February 6, 2026

Respectfully submitted,

MORSE, BARNES-BROWN &
PENDLETON, PC

By: */s/ Scott R. Magee*

MORSE, BARNES-BROWN &
PENDLETON, PC
Scott R. Magee (Bar No. 111746)
Paige K. Zacharakis (Bar No. 1216028)
480 Totten Pond Road, 4th Floor
Waltham, Massachusetts 02451
Tel: (781) 622-5930
Fax: (781) 622-5933
smagee@morse.law
pzacharakis@morse.law

*Attorneys for KPM Analytics North America Corporation*

**CERTIFICATE OF COMPLIANCE**

I, Scott R. Magee, attorney of record for KPM, hereby certify that the foregoing brief complies with the typeface and type styles requirements in FRAP 32(a)(5) and FRAP 32(a)(6) and the type-volume limitation set forth in FRAP 32(a)(7)(B)(i). The total number of words in the brief is 12,529.

*/s/ Scott R. Magee*
Scott R. Magee

## CERTIFICATE OF SERVICE & CM/ECF FILING

I hereby certify that I caused the foregoing brief to be served on counsel for Defendants -Appellants Blue Sun Scientific LLC and The Innovative Technologies Group, Ltd. via Electronic Mail generated by the Court's electronic filing system (CM/ECF) with a Notice of Docket Activity pursuant to Local Appellate Rule 25.1:

Christopher Duggan
Dana A. Zakarian
Patricia A. Hartnett
Christopher J. Hurst
SMITH DUGGAN CORNELL & GOLLUB LLP
55 Old Bedford Road, Suite 300
Lincoln, MA 01773
chris.duggan@smithduggan.com
dana.zakarian@smithduggan.com
phartnett@smithduggan.com
churst@smithduggan.com

I certify that an electronic copy was uploaded to the Court's electronic filing system. Nine hard copies of the foregoing brief will be sent to the Clerk's Office by Federal Express Next Business Day delivery upon the court's request to:

Clerk of Court
United States Court of Appeals, First Circuit
1 Courthouse Way, Suite 2500
Boston, Massachusetts 02210
(617) 748-9057

On this 6th day of February 2026.

*/s/ Scott R. Magee*
Scott R. Magee